**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE #1 <u>et al.</u> | * |
| | * |
| | * |
| Plaintiffs, | * |
| | *     Civil Action No. 06-2131 (EGS) |
| vs. | * |
| | * |
| ANDREW C. VON ESCHENBACH | * |
| COMMISSIONR | * |
| FOOD AND DRUG ADMINISTRATION | * |
| <u>et al.</u> | * |
| Defendants. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**RESPONSE TO DEFENDANTS' OBJECTION TO**
**PLAINTIFFS' RELATED CASE DESIGNATION**

    This instant matter (hereinafter referred to as "Anthrax II") was filed on December 13, 2006, by four members of the U.S. Armed Forces and two federally employed civilians to challenge the renewed implementation of the Department of Defense's old Anthrax Vaccination Immunization Program based on the approval of the defendant Food & Drug Administration ("FDA"). At the time of filing the plaintiffs, through their undersigned counsel, notified the Clerk of the Court that this case was related to <u>John Doe#1 et al. v. Rumsfeld et al.</u>, Civil Action No. 03-707 (EGS)(hereinafter referred to as "Anthrax I").

    The defendants object to this related case designation. This objection, however, should be denied as the designation is appropriate, consistent with the intent of the Local Rules of this Court and will conserve judicial resources.

**<u>INTRODUCTION</u>**

    As it is this Court that has been initially assigned Anthrax II, the Local Rules dictate that this Court makes the determination regarding the defendants' objection to the related case designation. LCvR 40.5 (c)(3). There appears to be no binding precedent that dictates this

Court's actions in determining the appropriateness of a related case designation. The D.C. Circuit Court of Appeals has apparently never addressed the issue on a substantive level.[1]

Additionally, although the Local Rules previously permitted a party to appeal an individual judge's decision regarding this type of dispute, see e.g., Tripp v. Executive Office of the President et al., 196 F.R.D. 201 (D.D.C. 2000), the revisions adopted by this District on October 12, 2006, eliminated this ability and determined that the individual judge's decision is "final". See Comment to LCvR 40.5(c)(3) at http://www.dcd.uscourts.gov/LocalRulesEdited-101206.pdf.

Therefore, this Court is essentially left to its own discretion to determine what is in the best interests of the judicial process.[2] Based on a rational application of the law and facts this Court should deny the defendants' objection and retain jurisdiction over this case.

## ARGUMENT

As this District's Calendar Committee once noted (a panel that included this Court):

> The fundamental rationale for the general rule requiring random assignment of cases is to ensure greater public confidence in the integrity of the judicial process. The rule guarantees fair and equal distribution of cases to all judges, avoids public perception or appearance of favoritism in assignments, and reduces opportunities for judge-shopping. The exception to the general rule, contained in LCvR 40.5, rests primarily on considerations of judicial economy. It will often prove wasteful

---

[1] An appeal of such a decision appears unlikely. Tripp v. Executive Office of the President et al., 2001 U.S. App. LEXIS 4013 (D.C.Cir. 2001)("Assuming the order of the Calendar Committee filed August 14, 2000 is an appealable order, it is not a final decision of the district court appealable under 28 U.S.C. § 1291 and it does not meet the requirements for reviewability under the collateral order doctrine.").

[2] Contrary to the defendants' assertion that there are "strict positions" governing determining what constitutes a "related case", Defendants' Objection to Plaintiffs' Related Case Designation at 4 (filed January 5, 2007), there are no known binding precedents that govern how this Court must rule. Admittedly, the language relied upon by the defendants is directly cited from a prior district court decision, but a review of that case and the original decision from which the quote was obtained reveals the language is simply persuasive authority as the opinion of one fellow co-equal colleague.

of time and resources for two judges to be handling cases that are so related that they involve common factual issues or grow out of the same event or transaction.

<u>Tripp</u>, 196 F.R.D. at 202.

Moreover, this very Court noted in <u>Lucas et al. v. Barretto</u>, 2005 U.S. Dist. LEXIS 4248, *6 (D.D.C. March 16, 2005)(EGS):

> Local Rule 40.5 stands as an exception to the general rule of random assignment of cases in the District Court. <u>See</u> <u>Tripp. v. Executive Office of the President</u>, 194 F.R.D. 340, 342 (D.D.C. 2000). The rule allows "related cases" to be assigned to the same judge when they "(i) relate to common property, or (ii) involve common issues of fact, or (iii) grow out of the same event or transaction, or (iv) involve the validity or infringement of the same patent." LCvR 40.5(a)(3). When a party notifies the Clerk of a related case at the time of filing, the Clerk assigns the case to the judge to whom the older related case is assigned. LCvR 40.5(c)(1).

Regardless of the general rules it is clear that in some cases the interests of judicial economy served by the related case rule outweigh the fundamental interests served by the random assignment rule. This is just such a case.

## I.    ANTHRAX I SHOULD BE CONSIDERED TO BE PENDING ON THE MERITS FOR PURPOSE OF THE RELATED CASE DESIGNATION TO ANTHRAX II GIVEN THE NUANCES OF THE ATTORNEYS' FEE APPLICATON

In <u>Collins v. Pension Ben. Guaranty Corp.</u>, 126 F.R.D. 3, 6 (D.D.C. 1989), the Court noted that "there is very little case law on what the drafters of the Local Rule intended by the term 'pending on the merits.'" In <u>Collins</u> the Honorable Aubrey E. Robinson, Jr., opined that "even the main legal issue decided by the settlement agreement can be considered as still pending until an order of dismissal is entered." <u>Id</u>. at 7 fn.3.

Not much has changed in the eighteen years since <u>Collins</u> was decided, although there are now a few cases interpreting that clause of Rule 40.5 (a)(3). To be sure, some judges within this District have ruled that a case which has settled is no longer pending on the merits. <u>See</u> <u>Stewart v. O'Neill</u>, 225 F. Supp. 2d 16, 19-20 (D.D.C. 2002); <u>Burt Lake Band of Ottawa v. Norton</u>, 2001 WL 1701669 (D.D.C. June 15, 2001). <u>See also</u> <u>Keepseagle v. Glickman</u>, 194 F.R.D. 1, 2 (D.D.C. 2000)("Except in unusual circumstances, once a lawsuit is settled and a consent decree is entered, it is no longer 'pending on the merits.'"). What actually constitutes "unusual

circumstances" has never been unequivocally defined. In <u>Collins</u> the "unusual circumstance" turned on the fact that the possibility remained that the parties would be required to litigate the merits of the case at some point even though a settlement had been reached. <u>Id.</u>, 126 F.R.D. at 7 fn. 3.

Admittedly, the plaintiffs' counsels, who are the same in both actions, do not believe there is any future litigation on the horizon in Anthrax I other than resolving the dispute involving the awarding of attorneys' fees. However, resolution of this issue very much turns on the merits of the underlying dispute that existed in Anthrax I. The entire thrust of the defendant's arguments in challenging that counsel are not entitled to any fees from their work in Anthrax I is that their positions were "substantially justified". In their objection to the fee application in Anthrax I, the defendants have essentially relitigated – on the merits – the very substantive issues that were determined by this Court on two separate occasions. <u>See</u> Exhibit "1" (defendants' opposition to plaintiffs' fee application). Indeed, the defendants continue to challenge the appropriateness of this Court's earlier rulings as part of its argument that the undersigned counsels are not entitled to fees. <u>See e.g.</u> at 9 ("But nevertheless, the Court imported the rulemaking-based logical outgrowth doctrine into its analysis of the FDA's final order. It is far from settled that this was appropriate").

Under the circumstances, given that the merits of Anthrax I are actually still being debated, and litigated, the plaintiffs' would submit that these facts constitute an "unusual circumstances" and that they meet the spirit, if not the letter, of the reasoning behind the related case designation. Therefore, the defendants' objection should be denied.

## II. ANTHRAX II INVOLVES THE SAME PARTIES AND SUBJECT MATTER AS ANTHRAX I TO SUCH A SIGNIFICANT EXTENT TO MERIT RELATED CASE DESIGNATION

A case may still be related to one that is no longer pending on the merits. In order for those cases to be related, however, plaintiff must show that the second case involves the same parties and relates to the same subject matter. Local Rule 40.5(a)(4) provides "cases whether criminal or

civil, including miscellaneous, shall be deemed related where a case is dismissed, with prejudice or without, and a second case is filed involving the same parties and relating to the same subject matter." <u>Stanford v. Potomac Elec. Power Co.</u>, 394 F. Supp. 2d 81, 84 (D.D.C. 2005)

There does not appear to exist any true substantive analysis issued by a court concerning this provision that provides any guidance as to interpretation of some of the generic terms utilized. The plaintiffs believe that, under the present factual circumstances and relationship between Anthrax I and II, the intent of Local Rule 40.5(a)(4) is met and justifies denial of the defendants' objections.

### A.  The Factual Matters In Anthrax I And Anthrax II Are Substantively Identical And This Court Spent Considerable Time Educating Itself As To These Matters

Nearly all, if not all of, the factual and legal issues that will be litigated in Anthrax II were at issue and actually briefed in Anthrax I.[3] Even a cursory review of the two operative Complaints from Anthrax I, <u>see</u> Exhibit "2", and Anthrax II, <u>see</u> Exhibit "3", reveal how obviously related the two cases are. Indeed, many of the factual paragraphs in Anthrax II were lifted verbatim, except for perhaps some grammatical or aesthetic tightening, from the Anthrax I Complaint.

Most importantly, this Court spent considerable time from March 2003 to October 2004 adjudicating the very same substantive issues (and of course retains jurisdiction over the remaining attorney's fees dispute which revisits some of these issues) and reviewing thousands of pages of documents.[4] Every page of the FDA Administrative Record in Anthrax I is part of the FDA Administrative Record in Anthrax II. Indeed, many of the documents that will now be part of the Anthrax II FDA Administrative Record, but were not part of the initial Anthrax I FDA Administrative Record, were submitted by the plaintiffs to the Court for review as part of the Anthrax I litigation. In fact, some of the litigation filings, to include this Court's rulings, from

---

[3] In issuing a permanent injunction this Court noted that "since the Court's holding is based on procedural grounds, the Court does not reach plaintiffs' numerous substantive challenges to FDA's Final Rule and Order." <u>Doe</u>, 341 F.Supp.2d at 16 fn.10.

[4] The FDA's Administrative Record alone was over 4,000 pages.  <u>Id</u>. at 14. Thousands of additional pages were submitted by the plaintiffs.

Anthrax I are <u>part of</u> the Anthrax II FDA Administrative Record and will be subject to further review.

Of course, the Anthrax I case compelled the FDA to issue its December 19, 2005, Order that is now directly the subject of this lawsuit. Anthrax II is a logical outgrowth of Anthrax I. Had the plaintiffs wished to do so, they likely could have simply filed a Second Amended Complaint in Anthrax I and proceeded with this same challenge.

The bottom line is that these two cases are so replete with common issues of fact that it would be "a needless exercise in pedantry to discuss all" of them. <u>Assiniboine and Sioux Tribe of the Fort Pect Indian Reservation v. Norton et al.</u>, 211 F.Supp.2d 157, 158 (D.D.C. 2002). "It would waste judicial resources and be nonsensical to have another court address these same factual issues". <u>Id</u>. at 159.

### B. Given The Nature Of The Cases The Parties Are Virtually The Same And Meet The Spirit Of The Local Rule's Intent

Both Anthrax I and II were filed against the same federal defendant agencies, although of course there has been a change in the individual leadership at each. Additionally, for all intents and purposes, the plaintiffs are the same as well.

Anthrax I was modified as a proposed class action by the filing of a First Amended Complaint on January 6, 2004. However, it was never necessary to certify the action as a class given the Court's ultimate ruling that it was appropriate for its ruling to embrace "government-wide injunctive relief." Doe, 341 F. Supp. 2d at 17-18 (D.D.C. 2004). Thus, in determining that the injunction applied "to all persons subject to DoD's involuntary anthrax inoculation program and not just the six Doe plaintiffs" this Court, as a practical matter, effectively accorded class action status to the litigation. <u>Id</u>. at 19.

Anthrax II has likewise been filed as a class action lawsuit. Whether class action status will be necessary in light of precedent for government-wide injunctive relief that produces the same result will be determined at a later date. However, as a matter of fact, the approximately three million people who are potentially subject to inoculation with the anthrax vaccine participated in

Anthrax I and are conceivably now part of Anthrax II. Certainly, there is the potential for overlap of tens of thousands, if not hundreds of thousands of the same "plaintiffs".

Other than for standing purposes, the identities of the individual plaintiffs are virtually irrelevant. None of their conduct is at issue. Their ranks do not matter. Their responsibilities do not matter. Their testimony will likely never matter. For the purposes of this litigation, as was the case in Anthrax I, the plaintiffs are nameless and faceless. All that matters is that they are potentially facing inoculation with the anthrax vaccine.

It is the defendants' past and present conduct and decisions that will be substantively debated and litigated. And for the second time now.

## <u>CONCLUSION</u>

In light of the clear connections between Anthrax I and II, this Court should respectfully deny the defendants' objections.

Date:   February 16, 2007

Respectfully submitted,

/s/

_____
Mark S. Zaid, Esq.
D.C. Bar #440532
Mark S. Zaid, P.C.
1920 N Street, N.W.
Suite 300
Washington, D.C. 20036
(202) 454-2809
ZaidMS@aol.com

John J. Michels, Jr., Esq.
D.C. Bar #457575
McGuireWoods LLP
77 W. Wacker, Suite 4400
Chicago, Illinois 60601
(312) 849-8150
jmichels@mcguirewoods.com

Attorneys for the Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1, et al., <br>     Plaintiffs, <br> <br>       v. <br> <br> DONALD H. RUMSFELD, <br> SECRETARY OF DEFENSE, et al., <br>     Defendants. | ) <br> ) <br> ) <br> )   1:03-cv-00707 (EGS) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## INTRODUCTION

Plaintiffs have filed an application for $479,710.50 in attorneys fees and an additional $6,699.94 in costs and expenses under the Equal Access to Justice Act (EAJA), 28 U.S.C. 2412(d). Plaintiffs' fee application should be denied in its entirety because defendants' position was substantially justified.

But even if plaintiffs were entitled to fees under EAJA, they have not met their burden of proof on the rates that they seek or many of the hours and expenses that they claim. Simply put, plaintiffs have ignored the statute's plain language and the rich body of precedent that makes much of what they seek not compensable. Moreover, plaintiffs are not entitled to recover anything for the appeal in this matter as they were not the prevailing party. Accordingly, even if plaintiffs are entitled to any recovery, it must be substantially reduced. As set out herein, plaintiffs may not recover more that $137,645.34 in attorneys' fees, $1,160.26 in costs, and $6,900 in expert witness fees.

## BACKGROUND

This case concerned a challenge to the license of the biologic vaccine Anthrax Vaccine Adsorbed (AVA) and to the Department of Defense's mandatory Anthrax Vaccine

Immunization Program (AVIP), which used this vaccine.  Plaintiffs are allegedly members of the military or civilian employees or contractors working for the Department of Defense.

Anthrax is an acute bacterial disease caused by infection with spores of *bacillus anthracis*.  <u>See</u> Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review, 50 Fed. Reg. 51,002, 51,058 (Dec. 13. 1985).  Anthrax spores may enter the body in three ways:  by skin contact (cutaneous), ingestion (gastrointestinal), or by breathing (inhalation).  <u>See</u> Institute of Medicine, The Anthrax Vaccine: Is It Safe, Does It Work? (2002) at AR 3363-64.[1]  AVA is the only vaccine licensed for active immunization against anthrax in the United States.

 Prior to 1972, the National Institutes of Health granted licenses for biologics, and in November of 1970, the NIH granted a license for AVA.  <u>See</u> AR 1377.  The NIH-approved label (or "package insert") recommended immunization with AVA for certain identified classes of persons with a risk of exposure to anthrax spores.  AR 3291.  It did not recommend that immunization be limited to only those individuals who were at risk from a particular route of exposure.  AR 3291-92.

In 1972, the division within NIH responsible for licensing biologics was transferred to the FDA.  <u>See</u> Redelegation of Authority to Administer Certain Provisions of the Federal Food, Drug, and Cosmetic Act, 37 Fed. Reg. 4,004, 4,005 (Feb. 25, 1972).  That same year, FDA proposed regulations establishing procedures to review the safety, effectiveness, and labeling of all biological products previously licensed by NIH.  <u>See</u> Procedures for Review of Safety, Effectiveness and Labeling, 37 Fed. Reg. 16,679, 16,679-80 (Aug. 18, 1972).  Pursuant to those regulations, an advisory panel was convened to review AVA and several other similar drugs.  The panel submitted its report in 1980, AR 1-600, and the Commissioner published

---

[1]  Where appropriate, defendants will cite to the 15-volume Administrative Record (AR) submitted in this matter.

the report and a proposed order concerning AVA and the other drugs in 1985. 50 Fed. Reg. 51,059. The panel rated AVA safe, effective, and not misbranded and "that the appropriate license(s) be continued because there is substantial evidence of safety and effectiveness for this product." The Commissioner concurred in the Panel's recommendation, and the proposed order recommended adopting the Panel's conclusion. Id. at 51,104. A final order was not published, however, until after this suit began.

In 1998, DoD initiated the AVIP, inoculating certain members of the armed forces and civilian employees with AVA. Individuals were designated to participate in the AVIP based on whether or not their assignments were likely to place them in certain geographic areas where the Department considered the threat of a biological attack using anthrax to be possible.

Five years later, plaintiffs filed this suit in March 2003. Complaint at 1. In their original complaint, plaintiffs sought to establish that AVA was not properly licensed to vaccinate against anthrax contracted through inhalation exposure. They alleged that, as to inhalation exposure, AVA was either an investigational new drug or an approved drug being used for an unapproved use. Id. at 2. Accordingly, plaintiffs contended that it could not be used on members of the military without either their informed consent or a Presidential waiver of the informed consent requirement under 10 U.S.C. § 1107. Complaint ¶¶ 51-60. They brought three causes of action, all alleging violations of the Administrative Procedures Act (APA). Id. ¶¶ 61-71. For relief, they sought a declaration that AVA was either an investigational new drug (IND) – and thus subject to clinical testing protocols, including a requirement that every recipient provide informed consent before receiving it – or a drug unapproved for its intended use, and additionally sought preliminary and permanent injunctions against

3

inoculating the plaintiffs and those similarly situated unless DoD complied with the informed consent provisions of 10 U.S.C. 1107. Id. at 14-15.

On December 22, 2003, the Court granted plaintiffs a preliminary injunction. Doe #1 v. Rumsfeld, 297 F.Supp.2d 119, 135-36 (D.D.C. 2003). The Court found that because neither the license nor the FDA-approved label specified that AVA was approved to prevent anthrax from inhalation exposure, the vaccine had not been approved for that purpose. Id. at 133. In short, the Court was concerned that the FDA had never definitively decided the status of AVA for vaccinating against contracting anthrax via inhalation exposure. Having found that plaintiffs were likely to succeed on the merits, and having found that the other requirements for preliminary relief had been met, the Court enjoined the defendants from inoculating service members without their consent. Id. at 135-136.

Eight days later, the FDA published the final order regarding the status of the products addressed in the 1980 panel report. See Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review, 69 Fed. Reg. 255, 257-59 (Jan. 5, 2004). As to AVA, the FDA adopted the panel's recommendation that it be considered safe, effective, and not misbranded. Id. at 257. It disagreed, however, with the panel's suggestion that a field study by Dr. Brachman – the only field study upon which the license was based – did not establish that AVA was effective against contracting anthrax via inhalation exposure. Id. at 259-260. Dr. Brachman's study consisted of observing 1,249 textile mill workers who were processing raw goat hair. AR 3732-33. Because anthrax spores are often found in the hides of animals, these workers had historically been at risk of contracting the disease. The workers were broken up into three groups consisting of workers who were inoculated with AVA, those who received a placebo, and those who were not inoculated with anything but

were merely observed for the occurrence of the disease. AR 3736-37, During the course of the study, 26 cases of anthrax occurred: 21 via cutaneous exposure and 5 via inhalation exposure. AR 3733. Of the cutaneous cases, fifteen were in the placebo group, three were in the observational group, and three were in the vaccine group (two of whom were determined not to have been fully vaccinated). AR 3733-36. Of the five cases contracted via inhalation exposure, two were in the placebo group and three in the observational group; none were in the vaccination group. Id.

Based on this data, the panel had expressed a concern that, because the study involved only 5 cases of inhalation exposure, there was no statistical basis for assessing the efficacy of AVA against this route of exposure. 50 Fed. Reg. 51,058. The FDA, however, disagreed. 69 Fed. Reg. 259. The final order noted that the panel had erred by improperly attributing Dr. Brachman's 92.5% efficacy calculation solely to cases of cutaneous exposure when, in fact, he had included the inhalation exposure cases in the analysis. Id. 259-260. The FDA also noted that the Centers for Disease Control had conducted a twelve-year surveillance study of anthrax in at-risk industrial settings from 1962 through 1974. Id. 260. That study reported 27 cases of anthrax, 24 of which were in unvaccinated workers and the remaining 3 in workers who had not completed the initial vaccination schedule. Id. No cases were reported in fully vaccinated workers. Id. And additionally, the FDA noted that the Institute of Medicine (IOM) had been chartered by Congress to independently review AVA. Id. Noting that the IOM's published report concluded that AVA "as licensed," is an effective vaccine to protect humans against anthrax including inhalation exposure, the FDA stated it

> agrees with the report's finding that studies in humans and animal models support the conclusion that AVA is effective against B. anthracis strains that are dependent upon the anthrax toxin as a mechanism of virulence, regardless of the route of exposure.

Id.  As a result, the FDA therefore explicitly approved the fact that the label did not limit AVA to any route of exposure.

As the FDA had now spoken on the efficacy of AVA, the Court vacated its preliminary injunction except, with the acquiescence of defendants, as it pertained to the six plaintiffs.  Order dated Jan. 7, 2004.  Plaintiffs also amended their complaint adding a count to challenge the FDA's final order as arbitrary and capricious.  As an APA challenge to agency actions, the Court set all issues in the case down for briefing on cross-motions for summary judgment.

On October 23, 2004, the Court granted plaintiffs' motion for summary judgment and denied defendants' motion.  Doe #1 v. Rumsfeld, 341 F.Supp.2d 1, 19 (D.D.C. 2004).  In making this ruling, the Court did not challenge any of the FDA's substantive, technical findings regarding the efficacy or safety of AVA.  Rather, it confined its ruling to the narrow procedural ground that the FDA had expanded the final order beyond the issues contemplated by the proposed order.  Id. at 15.  Specifically, the Court held that the FDA's pronouncement on the efficacy of AVA against contracting anthrax from inhalation exposure could not have been contemplated during the 1985 notice-and-comment period.  Id.  The Court concluded that neither the panel report nor the proposed order, which closely mirrored the report, properly indicated that this issue was being considered.  Id.  Consequently, the Court held that the factual status of this case reverted back to where it was when the preliminary injunction issued, with the FDA having failed to definitively approve AVA against inhalation exposure to anthrax.  Id. at 16.  Accordingly, the Court vacated the FDA's final order, remanded it for further reconsideration, and permanently enjoined the inoculation of military personnel absent their informed consent or a Presidential waiver of the informed consent requirement pursuant to 10 U.S.C. 1107.  Id. at 19.

Defendants appealed the Court's ruling.  During the appeal, the FDA republished a

proposed final order for AVA, including in that order notice that it was considering explicitly

approving the drug for use against inhalation exposure.  See Biological Products; Bacterial

Vaccines and Toxoids; Implementation of Efficacy Review, 69 Fed. Reg. 78,281 (Dec. 29,

2004).  Almost one year later, after a notice-and-comment period, and while the Court of

Appeals still had the matter under review, the FDA issued a new final order, explicitly finding

AVA efficacious against inhalation exposure to anthrax spores.  See Biological Products;

Bacterial Vaccines and Toxoids; Implementation of Efficacy Review, 70 Fed. Reg. 75,180 (Dec.

19, 2005).  As a result, the appellate court held that this Court's injunction had dissolved

automatically, dismissed the appeal as moot, and remanded the case to this Court for

consideration of defendants' suggestion that the Court's decision should be vacated.  Order dated

Feb. 9, 2006 (D.C. Cir.).  On remand, defendants chose not to pursue vacatur, so the only issue

remaining is the plaintiffs' pending application for attorneys' fees and costs under EAJA.

## ARGUMENT

## I    PLAINTIFFS SHOULD RECOVER NOTHING BECAUSE DEFENDANTS' POSITION WAS SUBSTANTIALLY JUSTIFIED

An award of fees under EAJA is not authorized where the government's position in the

case was "substantially justified." 28 U.S.C. § 2412(d)(1)(A).  Under this standard, plaintiffs

may not recover any fees where defendants' position was "justified to a degree that could satisfy

a reasonable person." Pierce v. Underwood, 487 U.S. 552, 560 (1988).  "[I]f a reasonable person

could think it correct," defendant's position must be deemed substantially justified and no award

of fees is proper.  Id. at 566, n. 2; see also Public Citizen Health Research Group v. Young, 909

F.2d 546, 552 (D.C. Cir. 1990).  Indeed, any reasonable position is sufficient to preclude an

award of fees, "even though it is not correct." Pierce, 487 U.S. at 566, n.2.  Thus, the

government can lose on the merits and nevertheless be found to have taken a substantially justified position. Taucher v. Brown-Hruska, 396 F.3d 1168, 1173 (D.C. Cir. 2005). Defendants' position in this case easily meets this standard. The fact that the Court ultimately disagreed with defendants' position does not mean it was not substantially justified.

The Court's basis for rejecting the FDA's 2004 final order was that it was not a logical outgrowth of the 1985 proposed order. 341 F.Supp.2d at 15. Simply put, the Court felt that the final order differed significantly from the proposed order by stating "'the vaccine is indicated for active immunization against [anthrax], independent of the route of exposure,' and that the vaccine will 'protect humans against . . . inhalation anthrax.'" Id. But the government's position that the final order and the proposed order were fully consistent was, if not successful, certainly reasonable. For properly viewed, the Court and government had two separate starting point for this analysis. And while the Court may not agree with the government's starting point, defendants respectfully submit that it was at least reasonable.

As an initial matter, it is questionable whether the logical outgrowth doctrine should have been applied. In general, the FDA's process for licensing biological products is not subject to rulemaking requirements. See, e.g., 42 U.S.C. 262(a)(2)(A)("[t]he Secretary shall establish, by regulation, requirements for the approval, suspension, and revocation of biologics licenses"); 21 C.F.R. 601.2-601.9 (procedures for applying for, issuing, denying, suspending, and revoking biological licenses); see also United States v. Florida East Coast R.R. Co., 410 U.S. 224, 245-246 (1973)(in discussing the difference between rulemaking and orders, noting the "recognized distinction . . .between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.). This Court ultimately agreed with defendants that this matter concerned an

order, not a rule. 341 F.Supp.2d at 12. But nevertheless, the Court imported the rulemaking-based logical outgrowth doctrine into its analysis of the FDA's final order. It is far from settled that this was appropriate.

But even assuming that the logical outgrowth doctrine applied, the critical issue – and hence the critical position that needed to be substantially justified – was whether or not AVA was originally licensed, and remained licensed thereafter, as a vaccine against anthrax contracted through inhalation exposure. The defendants continue to contend that it is. The Public Health Service Act, 42 U.S.C § 262(a)(2), authorized the FDA to establish a licensing scheme, and that scheme provides that once a drug is licensed, it remains so until the FDA takes affirmative steps to suspend or revoke the license, 21 C.F.R. § 601.4(2). Here, AVA was properly licensed by the NIH in 1970 to prevent anthrax, and at no time has that license ever been revoked. The essential dispute between the parties was whether this initial license included an indication for use against exposure via inhalation. Neither the license nor the product label have ever specified a route of exposure. In practice, the FDA usually licenses vaccines against a specific disease unrelated to the route of exposure, and such licenses included all routes of exposure. Such was the case here. Accordingly, from the FDA's starting point, the final order did not make any change in the licensing of AVA, for the general indication that the vaccine was licensed to prevent anthrax already included an indication against inhalation exposure.

Disagreeing, the Court found that silence as to route of exposure meant that only cutaneous exposure was covered because the Court had doubts as to the adequacy of testing for the other routes of exposure. This was true, apparently, even though neither the license nor the label explicitly limited AVA to use against cutaneous exposure (nor, for that matter, explicitly approved AVA for cutaneous exposure). From the Court's starting point, therefore, the FDA

needed to propound a clearer statement of its interest in approving AVA for inhalation exposure before the final order could have properly included that approval.

Despite the Court's disagreement, the FDA's position was reasonable. The government's starting point was fully supported by the actions of the panel and its report. Despite expressing doubts about Dr. Brachman's study as it related to inhalation exposure, the panel did not recommend altering the labeling to exclude that route of exposure or otherwise limit the indications for AVA to cutaneous exposure alone. Properly read, the panel recommended no change in the license or labeling for AVA, rather recommending that the FDA classify it safe, effective, and not misbranded. Thus, from the government's starting point, the final order was identical to the proposed order: it adopted the panel's decision and, from the government's viewpoint, made no change in the license. Put another way, because the proposed order made no change in the license or labeling of AVA and because the government interpreted the silence of the license and labeling as to route of exposure to mean that AVA was indicated against inhalation exposure, the government considered the final order to be a logical outgrowth of the proposed order. Thus, as the first of these premises is clearly true, to the extent that the second of the premises – the government's starting point – was correct (or at least reasonable), the government's position was substantially justified.

And that starting point is certainly correct – or at least reasonable – as to AVA. While in some cases the route of exposure to a disease may be critical to what drug treatment or vaccine is necessary to counteract it, the independent Institutes of Medicine concluded that anthrax is not such a disease. The IOM report establishes that once inside the body the virulence of anthrax derives from three proteins – protective antigen (PA), edema factor (EF), and lethal factor (LF) – and a protective capsule. IOM Rep. at 47. The proteins are not toxic by themselves. Id. Rather

PA must bind to cellular receptors and then bind with either EF or LF before cell damage may occur. Id. This progression of the disease is the same no matter how the spores enter the body, the only difference being what surrounding tissue is attacked. Id. at 46. AVA creates antibodies to PA, thus attacking it and preventing it in combination with the other two proteins from harming the body. Id. at 48. Because AVA's protective mechanism is independent of the path by which anthrax enters the body, AVA should be effective against all forms of anthrax, including inhalation anthrax. Id. at 77. In other words, the biological mechanism by which the vaccine works is independent of route of exposure.

In its second final order, the FDA independently reached the same conclusion as the IOM. In responding to a public comment that route of exposure could be a critical factor influencing vaccine effectiveness, the FDA stated:

> We agree that the route of exposure to an infectious agent may potentially have an impact on the effectiveness of a vaccine. The impact likely depends on the nature of the infectious agent in terms of its mechanism of virulence and the pathophysiology of infection and disease, and the mechanism of protection afforded by the vaccine. The Brachman study showed the anthrax vaccine to be effective in preventing anthrax disease regardless of the route of exposure (Ref. 1[Brachman Study]). This finding is consistent with our current knowledge of the critical role played by anthrax toxins in the pathophysiology of cutaneous and inhalation anthrax and how antibodies generated in response to vaccination with AVA disrupt cytotoxic activities of those toxins. Furthermore, aerosolized anthrax spore challenge studies in both rabbits and nonhuman primates do demonstrate the ability of AVA to protect the test animals against inhalation anthrax (Refs. 3, 4, 5 [published reports of animal challenge studies]).

In responding to another comment that it was inappropriate for the Brachman study to include both cutaneous and inhalation cases in the efficacy analysis, the FDA similarly stated:

> The inclusion of both cutaneous and inhalation cases of anthrax in the analysis of the Brachman study was appropriate because it was not possible to predict the route of exposure (cutaneous versus inhalation) that would occur within the environmental setting of the woolen mills. With regard to the known pathophysiology of anthrax, the signs and symptoms of disease arise due to the

production of toxins by anthrax bacteria growing within the infected individual. The toxins produced by anthrax bacteria do not vary based on the route of exposure. The antibodies produced in response to vaccination contribute to the protection of the vaccinated individual by neutralizing the activities of those toxins. Thus, AVA elicits an antibody response to disrupt the cytotoxic effects of toxins produced by anthrax bacteria, regardless of the route of exposure.

Thus, both the IOM and the FDA concluded that the biological mechanism by which anthrax attacks the body is the same no matter how it is introduced. Because that mechanism requires the PA protein to bind to a cell's receptors as a prelude to infection of the cell, and because AVA prevents PA from binding to the cell, it is reasonable to assume that AVA provides protection against all routes of exposure to anthrax.

The reasonableness of the government's view that AVA was originally licensed for all routes of exposure is further supported by the consistent confirmation of the independent conclusions of the FDA and the IOM by all the testing done to date, including the Brachman study. In both its Initial Order and Second Order, the FDA noted that the 1980 advisory panel stated that the Brachman study results demonstrate "a 93 percent (lower 95 percent confidence limit = 65 percent) protection against cutaneous anthrax" and that "inhalation anthrax occurred too infrequently to assess the protective effect of vaccine against this form of the disease." 50 Fed. Reg. at 51058. On the latter point, however, the Panel erred. Because the Brachman comparison of anthrax cases between the placebo and vaccine groups included both inhalation and cutaneous cases, FDA has determined that the calculated efficacy of the vaccine to prevent all types of anthrax disease combined was, in fact, 92.5 percent (lower 95 percent confidence interval = 65 percent). The efficacy analysis in the Brachman study, therefore, included all cases of anthrax disease regardless of the route of exposure or manifestation of disease. While the FDA agrees that the five cases of inhalation anthrax reported in the course of the Brachman study are too few to support an independent statistical analysis, the groups that these five cases

12

occurred in were noteworthy. Of these cases, two occurred in the placebo group, three occurred in the observational group, and no cases occurred in the vaccine group. Consequently, the Brachman study at least indicated that the vaccine was efficacious against inhalation exposure.

The IOM's review of the studies of AVA's effectiveness confirms this conclusion. This review included the Brachman study and a CDC study which tracked the occurrence of anthrax in mills for over a decade. IOM Rep. 57-59. In both those studies, only one person who had adhered to the vaccination schedule became infected, and that was via cutaneous exposure. Id. While the IOM concluded that the occurrence of inhalation anthrax was too infrequent in either of these studies to statistically establish efficacy, the IOM also concluded that animal challenge studies – including those in species whose immune systems will respond very closely to humans – corroborated FDA's conclusion that AVA is effective against inhalation anthrax regardless of the route of exposure. Id. at 69, 77. In one study, inoculated monkeys were exposed to an aerosol dose of anthrax over 900 times larger than that expected to kill at least one-half of the animals, but all the monkeys survived. Id. at 77. Based on its review of these and other studies, the IOM concluded that "the available evidence from studies with humans and animals, coupled with reasonable assumptions of analogy, shows that AVA as licensed is an effective vaccine for the protection of humans against anthrax, including inhalational anthrax." Id.

In short, the scientific understanding of how anthrax causes harm and how AVA seeks to prevent that harm, as well as the studies done to date, show that AVA has consistently provided protection against inhalation exposure. Thus, in the absence of any indication that AVA was not efficacious against inhalation exposure, the government's position was, at least, reasonable.

Finally, the reasonableness of the government's position is strongly supported by the unanimous decision of the Court of Appeals of the Armed Forces in United States v. Kinsala, 64

M.J. 50 (2006).  There, the appellate court rejected the very arguments that this Court relied on in reaching its conclusion that AVA was not licensed for inhalation anthrax.  Kinsala involved an appeal by a soldier against charges that he disobeyed a lawful order to receive the anthrax vaccine.  Citing to the two decisions of this Court, and noting that Kinsala had raised the argument that AVA was an IND as to prevention of anthrax from inhalation exposure, the court of appeals nevertheless held that Kinsala had not shown that the license was erroneously granted.  Id. at 54.  The court held: "[t]he licensing history reflects that the vaccine has been licensed as approved for anthrax inoculation since 1970 without interruption, revocation, or suspension.  Id. at 54-55.  The court further noted that the FDA had recently reaffirmed this position in the final order of December 19, 2005 and, so, concluded that "the vaccine is not an investigational drug that would implicate 10 U.S.C. 1107 or Exec. Order 13,139." Id. at 55. [2]

The unanimous decision of the court of appeals in Kinsala validates the reasonableness of defendants' position.  Defendants are aware of no precedent in this Circuit in which a position clearly endorsed by a United States Court of Appeals and not contradicted by a coordinate court has been rejected as not substantially justified.  At a minimum, Kinsala and O'Neil show that other courts have reached the opposite conclusion than this Court on the core issue of this case, namely that the failure of AVA's license or label to specifically mention that it is efficacious against inhalation exposure renders it experimental for that use.  Notably, neither the license nor label specify that it is efficacious against cutaneous exposure, but plaintiffs do not argue, nor has the Court contended, that this silence renders AVA an IND for cutaneous exposure.  Simply put, the Court decided that silence as to route of exposure meant that AVA was not approved for inhalation exposure; the government contended that silence meant it was proper for any route of

---

[2] The court of appeals in Kinsala is not the only court to find that AVA is not an investigational new drug or a drug unapproved for its intended use.  In O'Neil v. Secretary of the Navy, 76 F.Supp.2d 641 (W.D.Pa. 1999), the court held, without elaboration, that AVA "is not an experimental drug." Id. at 645.

14

exposure.  The agreement with that position by the unanimous court of appeals in <u>Kinsala</u>

indicates, that, at a minimum, the government's position was reasonable and, hence, substantially

justified.

## II.   PLAINTIFFS ARE NOT ENTITLED TO RECOVER FEES FOR THE APPEAL BECAUSE THEY ARE NOT PREVAILING PARTIES

Plaintiffs seek attorneys' fees and costs under the Equal Access to Justice Act (EAJA), 28

U.S.C. § 2412.  As pertinent here, that statute provides that the Court may award attorneys' fees

to a "prevailing party" for claims brought against the United States:

> Except as otherwise specifically provided by statute, a court shall award to a **prevailing party** other than the United States fees and other expenses, in addition to costs awarded pursuant to subsection (a). . ..

<u>Id</u>. § 2412(d)(1)(A) (emphasis added).  The term "prevailing party" as used in the statute is a

term of art whose definition is dispositive of plaintiffs' request for attorneys' fees for the appeal

of this matter.  <u>Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health &

Human Resources</u>, 532 U.S. 598, 603 (2001).  <u>Buckhannon</u> instructs that a party must obtain a

judicially ordered "'material alteration of the legal relationship of the parties'" before it may be

considered a prevailing party under the many statutes that permit an award of attorneys' fees.  <u>Id</u>.

at 604 (quoting <u>Texas State Teachers Ass'n v. Garland Indep. School Distr.</u>, 489 U.S. 782, 792-

93 (1989)).[3]

After <u>Buckhannon</u>, parties such as plaintiffs may not rely on a voluntary change in

conduct by a defendant to argue that they are a prevailing party because they were the "catalyst"

of a defendant's outside-of-court actions.  "A defendant's voluntary change in conduct, although

---

[3] The two attorneys' fee statutes at issue in <u>Buckhannon</u> were 42 U.S.C. § 3613(c)(2) (FHAA) and 42 U.S.C. § 12205 (ADA).  Though <u>Buckhannon</u> involved different fee-shifting statutes, the District of Columbia Circuit has held that <u>Buckhannon</u> applies to attorneys' fees under EAJA.  <u>Thomas v. National Science Found.</u>, 330 F.3d 486, 492 n.1 (D.C. Cir. 2003).

perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." 532 U.S. at 605. The Court held that a prevailing party is one "who has been awarded some relief by the court," such as through a judgment or a consent decree. Id. at 603-604. Thus, post-Buckhannon, absent some judicially ordered relief on the merits, a party cannot be awarded attorneys' fees as a prevailing party.

Here, to the extent that the plaintiffs could be considered prevailing parties, that status would be limited solely to the result in this Court. The only judicially ordered relief in this matter were the two injunctions, with the permanent injunction barring a mandatory AVIP until such time as the FDA reopened the notice-and-comment period and then approved AVA for use against inhalation exposure to anthrax spores. See Environmental Defense Fund, Inc. v. Reilly, 1 F.3d 1254, 1257 (D.C.Cir. 1993) (noting a remand that offered plaintiffs a chance to participate in a notice-and-comment period was real relief under the APA). On the appeal, however, plaintiffs received no relief; rather, because the FDA reopened the notice-and-comment period, readjudicated the status of AVA, and explicitly approved it for use against inhalation exposure, the appeal was dismissed as moot. The appellate court also expressly noted that this Court's injunction had dissolved automatically upon issuance of the FDA's Final Order. Thus, under Buckhannon, plaintiffs cannot seek attorneys' fees for the appeal as no judicial result was reached, whether or not the underlying lawsuit was in fact the catalyst for the mooting of the appeal.

This result is fully consistent with Buckhannon. There, as here, the plaintiffs asserted that an action by a government agency violated federal law. Before a court could rule on the merits of that dispute (there the district court, here the appellate court), the government took some action which mooted the underlying claim. On those facts, the Supreme Court held that the

government's action meant that the plaintiff could not be considered a prevailing party. It matters not that the filing of the suit there, or the injunction here, were the motivating factors in the ultimate mooting of the cases. Under <u>Buckhannon</u>, plaintiffs are not entitled to fees just because their lawsuit may have been the catalyst for government action. Accordingly, just as the plaintiffs in Buckhannon were not compensated for the fees that they incurred in bringing their action, so the plaintiffs here may not be compensated for the fees that they incurred in defending the appeal. Absent judicial relief at the appellate level, attorneys' fees will not lie here.[4]

Even if the Court were to find that plaintiffs were a prevailing party under <u>Buckhannon</u> for the case overall because of the final injunction, they would still not be entitled to any attorneys' fees for the appeal. In <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983), the Supreme Court made clear that just because a party prevailed in part of its case, it still might not be entitled to fees for the remainder of case. As applicable here, the Court instructed the lower courts to question whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." <u>Id</u>. at 434. Following this instruction, courts have refused to award fees for those stages of litigation where a party did not succeed. <u>Jean v. Nelson</u>, 863 F.2d 759, 770 (11th Cir. 1988) (no fees for briefs or argument before the Supreme Court); <u>Bonner v. Coughlin</u>, 657 F.2d 931, 935 (7th Cir. 1981) (no fees for appeal). Here, because plaintiffs cannot be said to have succeeded on the appeal, they are entitled to no fees for that stage.

---

[4] As set forth in Section III, defendants contend that plaintiffs should be awarded no more than $137,683.38 in attorneys' fees. <u>See</u> Ex. 1 (calculation of this amount). This assumes that the plaintiffs were not prevailing parties on the appeal. Were the Court to determine that plaintiffs are entitled to attorneys' fees for the appeal, then, based on the minimum deductions and reductions set forth <u>infra</u>, plaintiffs' counsel would be entitled to, at most, $192,210.95 for the time spent both in this Court and on the appeal.

## III.   ASSUMING ANY AWARD WERE APPROPRIATE, IT SHOULD BE SUBSTANTIALLY REDUCED

Assuming, *arguendo*, that defendants' position was not substantially justified, plaintiffs would still only be entitled to receive a fraction of the $486,410.44 they claim in fees, costs and expenses.  Plaintiffs bear the burden of establishing entitlement to the fees sought.  Hensley v. Eckerhart, 461 U.S. at 437.  This burden is a heavy one which must be satisfied by the production of clear and convincing evidence.  Id. at 433.  In support of their fee petition, plaintiffs are required to provide "contemporaneous time records of hours worked and rates claimed, plus a detailed description of the subject matter of the work with supporting documents, if any."  In re Donovan, 877 F.2d 982, 206 (D.C. Cir. 1989).  Here, plaintiffs have not only not met their burden, they have ignored the very requirements of the law under which they seek to recover.  As just two examples, they seek attorneys' fees at the rates of either $300 (for three of them) or $225 (for 12 more), without even mentioning that rates for fees are limited under EAJA to $125 per hour.  28 U.S.C. 2412(d)(2)(A).  Similarly, they have submitted their bills in per day increments, rather than per task, even though such "block" billing makes it impossible for the Court to assess the reasonableness of their performance.  In re North, 59 F.3d 184, 190 (D.C. Cir. 1995).  As a result, plaintiffs may be awarded only a small portion of their requested fees.

### A.   PLAINTIFFS' HOURLY RATES EXCEED THE MAXIMUM PERMITTED UNDER EAJA

In seeking attorneys' fees, plaintiffs have ignored the statutory requirements for calculating the permissible rates that they may charge.  Plaintiffs claim hourly rates ranging from $125 to $300.[5]  EAJA specifically provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor,

---

[5] "Attorney Rates" sought by plaintiffs:  Adrounie - $225, Beattie - $225, Bonini - $225, Bubar -  $225, Gardner - $225, Getchell - $300, Hochhausen - $225, Martin - $125, Michels - $300, Miller - $225, Peterson - $225, Pinedo - $225, Riley - $225, Sewell - $225, Stallbaumer - $225, Zaid - $300.

such as the limited availability of qualified attorneys for the proceedings involved, justifies a

higher fee." 28 U.S.C. § 2412(d)(2)(A).  If an award is made, the hourly rates should be limited

to no more than the EAJA maximum of $125 plus a cost of living adjustment (calculated using

the Consumer Price Index for all Urban consumers).[6]  See Chen v. Slattery, 842 F. Supp. 597

(D.D.C. 1994).  Because under EAJA the government is liable only for historic rates, this

calculation must be computed for each calendar year for which fees were incurred and then

applied to the fees for that year.  Masonry Masters, Inc. v. Nelson, 105 F.3d 708, 712-13 (D.C.

Cir. 1997).  Accordingly, the baseline rates defendants are required to pay under EAJA are

capped at $138.25 for 2000, $142.18 for 2001, $144.43 for 2002, $147.72 for 2003, $151.65 for

2004, $156.79 for 2005, and $161.05 for 2006 (based on the first six months average only as the

annual average is not yet available).  See n.3.

### B.   PLAINTIFFS ARE NOT ENTITLED TO A HIGHER FEE BASED ON UNIQUE QUALIFICATIONS

Attorneys Michels and Zaid cannot justify their requested $300 rates on unique

qualifications.  EAJA provides that

> attorney fees shall not be awarded in excess of $125 per hour unless the court
> determines that . . .a special factor, such as the limited availability of qualified
> attorneys for the proceedings involved, justifies a higher fee.

28 U.S.C. 2412(d)(2)(A).  The Supreme Court has narrowly construed the term "special factor"

in this provision.  It noted that such factors "must be such as are not of broad and general

application," specifically rejecting as possible examples the novelty and difficulty of the issues,

---

[6]  Hourly Rate Computations (using Consumer Price Index All Urban Consumers):
2000: (172.2/155.7) x $125 = $138.25
2001: (177.1/155.7) x $125 = $142.18
2002: (179.9/155.7) x $125 = $144.43
2003: (184.0/155.7) x $125 = $147.72
2004: (188.9/155.7) x $125 = $151.65
2005: (195.3/155.7) x $125 = $156.79
2006: (200.6(avg. Jan-June)/155.7 x $125 = $161.05

the undesirability of the case, the work and ability of counsel, and the results obtained, customary fees and awards in other cases, and the contingent nature of the case.  Pierce v. Underwood, 487 U.S. 552, 572 (1988).  In particular, the Court has interpreted the "limited availability" provision as referring to attorneys "'qualified for the proceedings' in some specialized sense, rather than just their general legal competence."  Id. (internal quotes in the original).  The Court held that this exception to the EAJA rate cap requires attorneys to possess "some distinctive knowledge or specialized skill needful for the litigation in question — as opposed to an extraordinary level of general lawyerly knowledge and ability useful in all litigation."  Id.  The three examples of "distinctive" or "specialized" attributes that the Court stated might justify an exception were patent law, knowledge of foreign law, or knowledge of a foreign language.  Id.

Adhering to the Supreme Court's admonition to interpret this exception to the EAJA rate cap strictly, the D.C. Circuit has held that a higher fee would be appropriate for specialties "requiring technical or other education outside the field of American law."  Waterman Steam Ship Corp. v. Maritime Subsidy Bd., 901 F.2d 1119, 1124 (D.C. Cir 1990).  The court has specifically noted that administrative law cases such as this one will rarely, if ever, qualify for a fee enhancement.  In rejecting a claim that firearms law represented a qualifying specialty, the court stated "[t]o be sure, lawyers practicing administrative law typically develop expertise in a particular regulated industry, . . .[b]ut they usually gain this expertise from experience, not from the specialized training justifying fee enhancement."  F.J. Volmer Co. v. Magaw, 102 F.3d 591, 598 (D.C.Cir. 1996).  The Court was especially concerned that "[i]f expertise acquired through practice justified higher reimbursement rates, then all lawyers practicing administrative law in technical fields would be entitled to fee enhancements."  Id.  Rejecting a similar claim that

expertise federal election law justified a fee enhancement, the court held "[a]lthough federal election law 'involves a complex statutory and regulatory framework, the field is not beyond the grasp of a competent practicing attorney with access to a law library and the other accoutrements of modern legal practice.'" In re Sealed Case 00-5116, 254 F.3d 233, 236 (D.C.Cir. 2001) (quoting Chynoweth v. Sullivan, 920 F.2d 648, 650 (10th Cir. 1990).

Applying this test here, it is clear that none of the three bases proffered by Messrs. Michels and Zaid qualify them for a fee enhancement. One of the bases –federal administrative law – is precisely the area of expertise already rejected by the D.C. Circuit. See, e.g., F.J. Volmer Co., 102 F.3d at 598. So too for the two remaining bases, military justice and civil-military federal court litigation, which are nothing more than common branches of law with their own statutes and regulations, such as the federal elections law rejected in In re Sealed Case, the firearms law rejected in F.J. Volmer Co, or the maritime law in Waterman Steamship Corp. To be sure, the plaintiffs are alleged to have been members of the military or to have worked for the military, but, in the end, this case was a straight-forward challenge to an FDA license under the APA. The plaintiffs' military status, though perhaps the motivation behind the bringing of this case, was not material to these issues.

This Court has previously rejected the assertion of military law as a basis for a fee enhancement. In Lynom v. Widnall, 222 F.Supp.2d 1 (D.D.C. 2002) (Sullivan, J.), an Air National Guard officer successfully challenged an Air Force Board of Correction of Military Records decision not to retroactively promote her. She then sought an enhanced fee for her attorney, claiming that he had an expertise in military law. Citing approvingly to F.J. Volmer and In re Sealed Case 00-5116, the Court rejected her arguments, stating that attorneys are not entitled to an enhancement "simply because they develop an expertise in a particular area

21

through their experience in the field." Id. at 6.  The Court further noted that the plaintiff had failed to identify anything that would suggest military law is a specialty field warranting an enhancement.  Id.  And the Court concluded by noting that plaintiff had failed to explain why the legal issues of her case presented questions of law that required an attorney with special knowledge or expertise.

So too here.  Plaintiffs have provided no justification to establish military law as a field requiring specialized training beyond that achievable by most attorneys with a little study and experience.  Nor have they explained why military law was more than tangentially related to the issues in this case.  And notably, they have provided no evidence to support the enhancement other than there own barebones statements as to their having this expertise.  They have provided no declarations from other members of the bar attesting to their qualifications, nor have they even specified the types and numbers of, let alone the identities of, the cases or other sources of their alleged expertise.  Given the state of this record and the lack of a needful basis for any type of expertise in this case, plaintiffs' request for an enhancement must be denied.

## C.   PLAINTIFFS' REQUESTED RATES FOR REIMBURSEMENT OF LEGAL ASSISTANT SERVICES MUST BE REDUCED

Unlike the rates requested for attorneys, the rate that Mr. Michels's firm seeks to recover for paralegal services is below the EAJA cap.  Nevertheless, these requested rates should be reduced.  EAJA permits a plaintiff to recover market rates for legal services, up to the specified rate cap of $125 dollars for attorneys.  28 U.S.C. 2412(d(2)(A).  The party seeking fees bears the burden of justifying those rates.  Role Models America, Inc. v. Brownlee, 353 F.3d 962, 969 (D.C. Cir. 2004).  But here, as in Role Models America, plaintiffs have made no showing as to what the market rate is for legal assistants.  See id. at 970.  Nor have they taken even "the basic step of submitting an affidavit detailing the non-attorneys' experience and education."  Id.  The

D.C. Circuit assessed a 25% penalty in <u>Role Models America</u> for plaintiffs' failure to properly

justify their legal assistant rates.  <u>Id</u>.  Accordingly, here plaintiffs' suggested rate for the eight

legal assistants of $100 should be reduced by a minimum of 25% to $75 per hour.

### D.   AS WITH THE LEGAL ASSISTANTS, PLAINTIFFS HAVE FAILED TO JUSTIFY THE FEE OF ONE ATTORNEY

Without explanation, plaintiffs seek only $125 per hour for Attorney James H. Martin.

To the extent that this is a typographical error and they meant to request $225 per hour for his

services, then his rate is capped by at the cola-adjusted rates noted in section III, A above.  If this

was not a typographical error, however, then the request for Mr. Martin's suffers from the same

deficiencies as the rate requested for the legal assistants.  Plaintiffs have made no attempt to

establish Mr. Martin's experience or education, nor have they provided any evidence of what the

market rate for lawyers with similar levels or experience would charge.  Accordingly, his $125

per hour rate should also be reduced by a minimum of 25% to $93.75.

### E.   PLAINTIFFS' CLAIMED HOURS MUST BE GREATLY REDUCED UNDER EAJA

A fee applicant has the burden of establishing the reasonableness of its fee request.

<u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433-34 (1983); <u>American Petroleum Inst. v. EPA</u>, 72 F.3d

907, 915 (D.C. Cir. 1996).  In assessing reasonableness, prevailing counsel "must make a good

faith effort to exclude from a fee request hours that are excessive, redundant or otherwise

unnecessary."  <u>Hensley</u>, 461 U.S. 434.  As a starting point, the applicant must keep in mind that

fees or costs that would not be billed properly to a paying client are also not properly billed to

the government under statutory authority.  <u>Id</u>.  But what may be billed to a paying client is a

necessary but not sufficient condition for seeking to charge those hours to the government, for as

the D.C. Circuit has held "items of expense or fees that may not be 'unreasonable' between a

first class law firm and a solvent client, are not [always] supported by indicia of reasonableness sufficient to allow us justly to tax the same against the United States." In re North, 59 F.3d 184, 189 (D.C.Cir. 1995) (quoting In re North, 8 F.3d 847, 852 (D.C.Cir. 1993)).

It is thus plain that not all hours expended by an applicant are properly chargeable to an opponent under a fee-shifting statute. As an initial matter, the plaintiff is required to exercise "billing judgment" before submitting its fee application, Action on Smoking & Health v. CAB, 724 F.2d 211, 220 (D.C.Cir. 1984), "to make a good faith effort to excise excessive, redundant, or otherwise unnecessary time from their bills." Hensley, 461 U.S. at 434. After having done so, the applicant is obliged to disclose this fact to the Court by tendering a list of those hours and the nature of the work excluded for the Court's review. National Ass'n of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1327-28 (D.C.Cir. 1982).

To further assist the Court's assessment of reasonableness, "[a]ttorneys who anticipate making a fee application must maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." National Ass'n of Concerned Veterans, 675 F.2d at 1327. One discredited practice is to lump together all the tasks performed in a single day under one time allocation. When records kept in this fashion are submitted, the "court is left to approximate the amount of time which should be allocated to each task." Role Models America, Inc. v. Brownlee, 353 F.3d 962, 971 (D.C.Cir. 2004). Such "inadequate descriptions" bar the Court from "determining with a high degree of certainty, as it must, that the billings are reasonable." Id. In such instances, the Court is left with no option but to reduce any billings that it finds unreasonable by a rough percentage, as it cannot merely excise the offending portion of the entry with any precision. See Action on Smoking & Health, 724 F.2d at 220.

Here, as detailed below, plaintiffs' application suffers from many deficiencies. For example, they used lumped billing throughout their applications. And just as they have ignored the statutory limit on the rates that they may charge, similarly, they have ignored the rich case law that details what is and what is not permitted to be sought in a fee petition. For example, they seek to recover for conversations with the press, for having paralegals deliver documents, and for having professionals perform purely clerical tasks, all clearly barred by precedent in this Circuit. They also seek to recover here fees attributable to other actions, both related and unrelated. And they have even attempted to bill for time associated with scheduling attendance at a concert. Finally, they have failed to inform the Court whether they exercised any billing judgment at all, or to provide the Court with a list of the excised billings if they did so. As a result, this Court cannot be sure whether they have have exercised any billing judgment at all.

## 1. Plaintiffs are not entitled to recover for contacts with the media

It is well-settled that fee applicants may not charge the government for time spent in discussions with the press or in drafting press releases. Role Models America, Inc., 353 F.3d at 973; American Petro. Inst., 72 F.3d at 913; In re Donovan, 877 F.2d 982, 993-94 (D.C.Cir. 1989). Simply put, media relations has no bearing on the conduct of a case. Donovan, 877 F.2d at 994. Consequently, the following entries should be deducted in their entirety or, at a minimum modified by the suggested percentages to account for plaintiffs attempt to bill for press relations.

## McGuire Woods Time

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction[7] | Hours Deducted |
|------|-----------|---------------|-------------|---------------------|----------------|
| 3/18/03 | Michels | 4.3 | Complete filing; prepare documents for exhibits and email; review and approve press release | 25% | 1.1 |
| 1/15/04 | Michels | 3.2 | Review proposed order for court; telephone calls to/from R. Wiltsie regarding several provisions; review outline for next brief; telephone call from reporter regarding status | 25% | 0.8 |
| 2/17/04 | Michels | 1.8 | Interview with Washington Post reporter regarding case and holdings | 100% | 1.8 |
| 10/05/04 | Michels | 1.0 | Conference with M. Zaid and E. Grossman regarding story on vaccine scheduling | 100% | 1.0 |
| 10/31/04 | Michels | 1.4 | Draft press releases for clients | 100% | 1.4 |
| 5/19/05 | Burbar | 0.3 | Email to ABA reporter, read government appellate brief | 25% | 0.1 |

## Mark Zaid Time

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction | Hours Deducted |
|------|-----------|---------------|-------------|-------------------|----------------|
| 1/10/03 | Zaid | 0.8 | E-mails; Review Congressional hearing transcripts; Tel. conv. w/media | 25% | 0.2 |
| 3/16/03 | Zaid | 0.2 | Draft press release; E-mails | 50% | 0.1 |
| 3/17/03 | Zaid | 5.9 | Draft Complaint; TRO Motions, memos, press release, Preparation for filing; Tel. conv. w/LM, fact expert, DOJ attnys, media; Disseminate press release | 25% | 1.5 |
| 3/18/03 | Zaid | 3.5 | File pleadings; Tel.conv. w/media, fact expert, LM, Ron Wiltsie, DOJ attnys; Media interviews; E-mails; Review files | 25% | 0.9 |
| 5/22/03 | Zaid | 0.4 | Tel. conv. w/media; E-mails | 50% | 0.2 |
| 12/22/03 | Zaid | 7.8 | Review Court decision; Draft/issue press release; Tel. conv. w/ media, fact expert; E-mails | 25% | 1.9 |
| 12/23/03 | Zaid | 11.2 | Media Interviews; Review court decision; Draft press release; E-mails; Tel. conv. w/media, DOJ, Steve Robinson, fact expert; Review DoD press conferences; E-mails; Online research | 25% | 2.8 |
| 12/24/03 | Zaid | 4.0 | Review DOJ motion; E-mails; Tel. conv. w/media, Online research | 10% | 1.0 |
| 12/26/03 | Zaid | 1.4 | Draft/issue press release | 100% | 1.4 |
| 12/30/03 | Zaid | 6.3 | Tel conv w/LM, media, Wiltsie, Goldberg; Review FDA statement, Govt motions; Draft/issue press release | 25% | 1.6 |

---

[7] Because plaintiffs have used lumped billing, defendants and the Court are left to approximate the percentage of time that may be deducted to account for the impermissible request. The D.C. Circuit has found that, plaintiffs having the burden to justify their request, deductions greater than 50% for an entire bill are not an abuse of discretion. Role Models America, Inc., 353 F.3d at 962.

| Date | Attorney | Hours | Description | Percentage | Adjusted |
|---|---|---|---|---|---|
| 1/6/04 | Zaid | 10.0 | Tel. conv. w/LM, Wiltsie, Fact expert, media; Review cases; documents; E-mails; Prepare for oral arguments; Online research; Draft First Amended complaint, Notice of Filing | 10% | 1.0 |
| 1/8/04 | Zaid | 3.3 | Tel. conv. w/media, LM; E-mails; Mtg. w/media; Review documents, files; Online research | 25% | 0.8 |
| 1/9/04 | Zaid | 0.8 | E-mails; Tel. conv. w/media, LM | 50% | 0.4 |
| 1/14/04 | Zaid | 4.2 | Preparation for Court; Court Appearance; Tel. conv. w/LM, media; E-mails; Review files | 10% | 0.4 |
| 1/16/04 | Zaid | 0.7 | Tel conv w/ media, LM; E-mails; Review court orders | 25% | 0.2 |
| 1/21/04 | Zaid | 1.7 | E-mails; Tel. conv. w/LM, media; Review draft motion | 25% | 0.4 |
| 2/9/04 | Zaid | 1.5 | Meeting w/ Fact Expert; Tel. conv. w/ Wiltsie, media; Review files, Govt. Opp, Michels outline; E-mails | 10% | 0.2 |
| 2/17/04 | Zaid | 6.2 | Tel conv w/LM, Fact expert; Mtg. w/ media; Draft APA Reply; Prepare to file; File; E-mails | 10% | 0.6 |
| 3/15/04 | Zaid | 4.2 | Preparation for Court; Court Appearance; Tel. conv. w/ LM, media; Mtg w/ fact expert, Law Clerk | 10% | 0.4 |
| 5/24/04 | Zaid | 3.9 | Draft press notification; Prepare for oral arguments; E-mails; Tel. conv. w/ LM, JR, media | 25% | 1.0 |
| 7/1/04 | Zaid | 0.5 | Tel. conv. w/LM, media; E-mails | 50% | 0.2 |
| 10/14/04 | Zaid | 0.2 | Tel. conv. w/ media; E-mails | 50% | 0.1 |
| 10/27/04 | Zaid | 8.0 | Review decision; E-mails; Tel. conv. w/media, LM | 15% | 1.2 |
| 12/17/04 | Zaid | 1.4 | Tel. conv. w/media; E-mails | 75% | 1.0 |
| 12/22/04 | Zaid | 2.7 | Tel. conv. w/media; E-mails; Draft/prepare FOIA request, letter to FDA; Review DoD documents | 10% | 0.3 |
| 1/7/05 | Zaid | 0.5 | E-mails; Tel. conv. w/media | 60% | 0.3 |
| 2/14/05 | Zaid | 3.1 | Court appearance; Tel. conv. w/LM, Fact Expert, media; E-mails; Review Court Orders | 10% | 0.3 |
| 2/15/05 | Zaid | 0.9 | Tel. conv. w/media; E-mails | 75% | 0.7 |
| 4/7/05 | Zaid | 0.2 | E-mails; Review articles; Respond to press inquiries | 50% | 0.1 |
| 4/26/05 | Zaid | 0.2 | E-mails; Tel. conv. w/media | 50% | 0.1 |
| 4/29/05 | Zaid | 0.3 | E-mails; Tel. conv. w/media | 50% | 0.1 |
| 5/16/05 | Zaid | 1.4 | Tel. conv. w/media; E-mails; Review Govt DC Cir brief | 10% | 0.1 |
| 12/1/05 | Zaid | 8.0 | Prepare for oral arguments; Mtg. w/LM, media; Oral arguments; Tel.conv. w/ media | 10% | 0.8 |
| 12/2/05 | Zaid | 1.0 | E-mails; Tel. conv. w/media; Review FDA documents | 25% | 0.3 |
| 12/16/05 | Zaid | 0.7 | E-mails; Tel. conv. w/media | 50% | 0.4 |
| 6/12/06 | Zaid | 0.3 | Tel. conv. w/ media; Review documents | 30% | 0.1 |
| 9/7/06 | Zaid | 1.8 | Court Appearance; E-mails; Tel. conv. w/LM; Meeting with media | 10% | 0.2 |

## 2. Plaintiffs may not recover fully for travel time

In this Circuit, plaintiffs may recover for travel time at only 50% of the permitted rate. Cooper v. United States RR Retirement Bd., 24 F.3d 1414, 1417 (D.C. Cir. 1994).  Mr. Michels seeks to recover for four trips from/to Chicago to argue parts of this case.  Because this time is lumped with his other case activities on those days, it is impossible to know with certainty just how much time was devoted to travel.  Nevertheless, as a direct flight between Washington and Chicago averages between 1.5 and 2.0 hours flying time, defendants suggest that the Court estimate that Mr. Michels devoted a minimum of four hours for travel each day.  This includes time reaching the airport, clearing security, boarding his plane, and then traveling from the destination airport.  As mathematically it is irrelevant to the fee calculation whether the 50% deduction is taken against the statutory maximum rate or the hours, defendants present their challenge to plaintiffs' request here as a request for a 50% deduction to the four hours that it is estimated Mr. Michels spent traveling each day.[8]

| Date | Timekeeper | Hours Claimed | Description | Hours Deducted |
|---|---|---|---|---|
| 5/19/03 | Michels | 10.4 | Travel to DC; prepare for oral argument | 2 |
| 5/20/03 | Michels | 12.2 | Prepare for and argue temporary restraining order motion; travel return to Chicago | 2 |
| 5/24/04 | Michels | 8.5 | Preparation for oral argument | 2 |
| 5/25/04 | Michels | 12.1 | Preparation for, attendance at, and do post mortem on motion for summary judgment; return travel to Chicago | 2 |
| 3/20/05 | Michels | 9.9 | Travel to DC and prepare for hearing | 2 |
| 3/21/05 | Michels | 9.5 | Prepare and attend hearing; return to Chicago | 2 |
| 11/30/05 | Michels | 4.1 | Prepare for oral argument and travel to DC | 2 |
| 12/1/05 | Michels | 8.0 | Prepare for and present argument at DC court of appeals, return travel | 2 |

---

[8] Defendants note that Mr. Michels has billed for return travel on May 25, 2004, but that his bills neglect to note his travel time to Washington for that argument.  As he has consistently flown in the day before each argument, defendants have deducted two hours from his billings for May 24, 2004.

### 3.    Plaintiffs cannot charge for time spent seeking admission to a Court

Plaintiffs seek to recover for time spent by paralegals to apply for an unidentified lawyer's or lawyers' admission to the bar of the D.C. Circuit.  Recovery for bar admissions is not permitted: "the cost of joining the bar of this court [is] an expense of doing business not chargeable to clients – much less to the federal government." Role Models America, Inc., 353 F.3d at 973; see also Miller v. Alamo, 983 F.2d 856, 862 (8th Cir. 1993) (agreeing that fee shifting statutes "should not be used to require the government to fund the enhancement of an attorney's versatility or capability.").  Accordingly, the following deductions must be made:[9]

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction | Hours Deducted |
|------|------------|---------------|-------------|-------------------|----------------|
| 2/9/05 | Loy | 5.4 | Download important case-related documents into e-room document files; download and update electronic pleading file; obtain rules and forms regarding admission to D.C. Court of Appeals | 25% | 1.3 |
| 2/10/05 | Loy | 5.9 | Download important case-related documents into e-room document files; prepare admission forms for D.C. Court of Appeals | 50% | 2.9 |
| 2/25/05 | Loy | 1.5 | Complete application to DC Court of Appeals | 100% | 1.5 |
| 3/14/05 | Loy | 0.4 | Prepare electronic filing registration for District of D.C. and download electronic filing rules and procedures | 100% | 0.4 |
| 3/16/05 | Loy | 0.3 | Draft letter to M. Zaid enclosing completed application for admission to D.C. Court of Appeals and supporting materials | 100% | 0.3 |
| 8/9/05 | Veizaga | 0.6 | Telephone call to U.S. Court of Appeals, DC District, regarding applications for admission for attorney; look for correspondence in DM regarding same; research admission process to U.S. Court of Appeals; print out application | 100% | 0.6 |
| 8/10/05 | Veizaga | 1.0 | Telephone conference with US Court of Appeals – DC regarding procedure for application for admission to practice; telephone conference with U.S. District Court – DC regarding procedure to obtain certificate of good standing; request funds from J. Sylvie; prepare correspondence and request form for certificate of good standing from US District Court -- DC | 100% | 1.0 |

---

[9]  Requests for having paralegals file such documents would also be non-compensable under the prohibition against charging professional time for clerical matters.  See, infra, section 6.

| 9/6/05 | Veizaga | 0.7 | Prepare application for admission to DC Court of Appeals; prepare correspondence to Mr. Zaid enclosing application, check for filing fees and certificate of good standing from U.S. District for District of Columbia; send out same | 100% | 0.7 |

### 4. Plaintiffs cannot recover for matters outside this litigation

Plaintiffs are not entitled to recover for any fees incurred outside this litigation. Under EAJA, a claim for attorneys' fees, costs, and expenses is limited to those fees, costs, and expenses in the "civil action." 28 U.S.C. 2412(a)(1) and (d)(1)(a). Plaintiffs' application, however, seeks recovery for matters outside this case. For example, one entry seeks recovery for an appeal in the Seventh Circuit. Another series of entries seeks recovery for actions related to a Freedom of Information Act request/case. Even if related to the issues in this case, recovery is not permitted here as (1) there were no FOIA issues or claims in this action and (2) these entries occurred long after this Court had issued its final judgment. See Role Models America, 353 F.3d at 971 (court concerned that fee application contained entries for a separate bankruptcy action). And yet another series of entries seems to concern the review of military records for possible corrective action in pending courts martial or before military records correction boards. One entry appears to involve a "follow-up complaint" for a potential new case challenging the reissued FDA final order. Perhaps most egregiously of all, two entries seek to recover time related to a "concert" or "music conference." None of these entries are compensable in this action.

**McGuire Woods Time**

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction | Hours Deducted |
|------|-----------|---------------|-------------|-------------------|----------------|
| 1/14/02 | Michels | 2.8 | Meet with DoD Undersecretary for Health Affairs, and fact expert John Richardson | 100% | 2.8 |
| 4/16/04 | Schwartz | 2.5 | Prepare filing for seventh circuit reply | 100% | 2.5 |
| 4/20/04 | Michels | 1.0 | Pro bono conference with Anthrax attorneys regarding assignment of work and upcoming music conference | 25% | 0.3 |

| 12/3/04 | Michels | 2.0 | Review materials regarding pending courts martials to determine intervention; continue to assess participants in correction of records cases | 100% | 2.0 |
| 4/21/04 | Bubar | 0.4 | E-mail to remind L. Michels about concert; review of order from D.C. court | 50% | 0.2 |
| 9/13/05 | Michels | 1.0 | Respond to inquiries regarding record upgrades | 100% | 1.0 |
| 1/18/06 | Michels | 0.7 | Review messages regarding declaration by DOD on injunction; telephone call to M. Zaid regarding follow-up complaint | 50% | 0.4 |
| 6/4/06 | Michels | 0.5 | Review and assess FOIA release from FDA; plan response at status conference | 50% | 0.3 |
| 6/9/06 | Michels | 1.2 | Conference with M. Zaid regarding hearing on June 27; review latest documents from FOIA request response; plan argument to court | 50% | 0.6 |

**Mark Zaid Time**

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction | Hours Deducted |
|------|------------|---------------|-------------|-------------------|----------------|
| 12/22/04 | Zaid | 2.7 | Tel. conv. w/media; E-mails; Draft/prepare FOIA request, letter to FDA; Review DoD documents | 50%[10] | 1.3 |
| 1/5/05 | Zaid | 4.2 | Review DoD, HHS FOIA letters, caselaw; Tel conv. w/ DoD; Message for HHS; E-mails; Online research; Draft letter to agencies, Complaint, TRO/PI Motion | 100% | 4.2 |
| 1/6/05 | Zaid | 2.0 | File FOIA lawsuit; Draft letter to govt; E-mails; Tel. conv. w/DO | 100% | 2.0 |
| 1/10/05 | Zaid | 2.8 | E-mails; Conference call; Online research; Draft TRO/PI Motion; Tel. conv. w/ Army FOIA | 100% | 2.8 |
| 1/12/05 | Zaid | 0.3 | E-mails, Review Army letter | 100% | 0.3 |

Similarly, plaintiffs cannot recover fees for submitting comments or otherwise participating in the reopened FDA notice-and-comment period. As a general matter, time spent on administrative proceedings is not compensable. See NAACP v. Donovan, 554 F.Supp. 715, 720 (D.D.C. 1982). But here, an even more simple reason establishes that plaintiffs may not recover fees, for the reopened notice-and-comment period was not part of this case. Though the Court in its final order did remand this matter to the FDA, it then closed the case, retaining jurisdiction only to enforce its order, not to supervise the FDA's subsequent actions or the reissued final order. Similarly, the reopened comment period was not an issue on the appeal,

---

[10] This item has already been reduced 10% for including time for contact with the media.

even if the eventual issuance of the FDA's final order did moot the appeal.  The irrelevance of

the reopened notice-and-comment period to this "civil action" is perhaps best demonstrated by

the fact that plaintiffs' counsel recently filed a completely separate action to challenge the FDA's

new order.  See Doe v. Von Eschenbach, Case No. 1:06-cv-2131-EGS.  As a result, the

following entries are not compensable:

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction | Hours Deducted |
|------|-----------|---------------|-------------|-------------------|----------------|
| 12/29/04 | Michels | 4.2 | Review FDA announcement and analyze for appellate issues; review notice of appeal; telephone call to J. Richardson regarding assistance | 10% | 0.4 |
| 12/30/04 | Michels | 3.0 | Review FDA comment materials | 100% | 3.0 |
| 1/4/05 | Michels | 0.9 | Draft memorandum regarding FDA submissions | 100% | 0.9 |
| 1/20/05 | Michels | 1.1 | Telephone calls to/from M. Zaid regarding FDA submissions | 100% | 1.1 |
| 1/25/05 | Michels | 2.0 | Review FDA requirements for filing comments; outline potential comments and format for injury reports | 100% | 2.0 |
| 2/1/05 | Burbar | 2.1 | Reading numerous documents including transcripts of a meeting for military physicians; the FDA proposed final rule, etc. | 100% | 2.1 |
| 2/4/05 | Loy | 2.7 | Search electronic files for final letter to FDA to assist attorney complete organization of hard copy of pleadings file | 100% | 2.7[11] |
| 2/28/05 | Burbar | 0.8 | Read email from L. Loy on link to FDA site; read FDA comment submissions by servicemen and groups | 100% | 0.8 |
| 3/28/05 | Michels | 1.0 | Review and forward materials to FDA for inclusion in comment period file | 100% | 1.0 |
| 4/13/05 | Michels | 1.1 | Review documents regarding FDA submissions by P. Rachman and A. Friedlander | 100% | 1.1 |

## 5.   Plaintiffs cannot recover for work done on a motion that they never filed

Plaintiffs cannot recover for a contempt motion that they never filed.  To the extent that it

might be proper to charge a paying client for motions drafted but not filed, Hensley, 461 U.S. at

434, that appropriateness usually would stem from the prior permission of the client to do the

work.  Plaintiffs, as adversaries, cannot create a charge against the government's fisc by

---

[11]  This entry is also objectionable because it charges professional time for a clerical task.  See, infra, section 6.

performing work to which the government never had the opportunity to respond.  Such unfiled

motions fall squarely in the ambit of those matters that might be compensable by a "solvent

client" but that are not supported "by indicia of reasonableness sufficient to allow us justly to tax

the same against the United States."  In re North, 59 F.3d at 189.

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction | Hours Deducted |
|------|-----------|---------------|-------------|-------------------|----------------|
| 2/3/05 | Bubar | 6.7 | Reading new articles/documents posted in eroom; reviewing emails; research whether plaintiff can file motion for contempt citation and/or sanctions against defendant for violation of permanent injunction; research whether Deputy Secretary of Defense acting on behalf of Secretary of Defense invalidates authority based on statute | 30% | 2.0 |
| 2/4/05 | Beattie | 8.0 | Research law in support of motion for contempt, appointment of plaintiffs' attorneys as special prosecutors in criminal contempt against Department of Defense; draft motion for contempt | 100% | 8.0 |
| 2/4/05 | Bubar | 2.6 | E-mails; read latest E-Room posts; research whether plaintiff can bring motion for contempt for defendant's violation of injunction and conversation with B. Beattie on same; research issues of whether Deputy Secretary determination (not Secretary of Defense) violated HHS statute | 40% | 1.0 |
| 2/5/05 | Beattie | 3.5 | Research law in support of motion for contempt; draft motion for contempt | 100% | 3.5 |
| 2/8/05 | Beattie | 7.4 | Draft, review and revise motion for contempt | 100% | 7.4 |
| 2/9/05 | Beattie | 8.0 | Draft, review and revise motion for contempt | 100% | 8.0 |
| 2/10/05 | Beattie | 1.4 | Draft, review and revise motion for contempt | 100% | 1.4 |

### 6.    Plaintiffs Cannot Recover For Professional Time Spent On Clerical or Administrative Matters

Attorneys may not seek to recover fees for tasks normally performed by paralegals,

clerical personnel, or other non-attorneys.  Role Models America, Inc., 353 F.3d at 973; In re

North, 59 F.3d at 194.  Similarly, paralegals may not seek fees for clerical tasks normally

performed by non-billing employees of law firms.  59 F.3d at 194.  Thus, neither lawyers nor

paralegals may recover for filing or delivering documents.  Here, plaintiffs application is full of

requests seeking compensation for lawyers and paralegals performing clerical tasks. For examples, attorneys seek to recover for organizing their own files. Even if the attorney had a good reason for organizing his own files, it is not proper to bill a client and hence the government for it. Hensley, 461 U.S. at 434. Similarly, most of the items that follow concern having a paralegal update some sort of computer based site for monitoring documents (called the e-room or extranet in the entries below). There does not appear to be any reason that a secretary or non-billable information technician could not have done the same. And lastly, plaintiffs seek to recover for having one paralegal in Chicago coordinate another paralegal in Washington pick-up and return some documents from the FDA. Billing paralegal time for "deliveries" has long been barred in this Circuit. In re North, 59 F.3d at 194.

**McGuire Woods Time**

| Date | Timekeeper | Hours Claimed | Description | Percent Reduction | Hours Deducted |
|------|------------|---------------|-------------|-------------------|----------------|
| 3/18/03 | Michels | 4.3 | Complete filing; prepare documents for exhibits and email; review and approve press release | 50% | 2.1 |
| 3/19/03 | Michels | 2.4 | Update pleadings[12]; plan pleading date with M. Zaid; respond t inquiries regarding complaint | 50% | 1.2 |
| 4/25/03 | Michels | 1.6 | Update e-mail listings for clients, plan oral argument | 25% | 0.4 |
| 6/11/03 | Michels | 1.4 | Update files | 100% | 1.4 |
| 6/16/03 | Michels | 2.0 | Update document files; telephone call to R. Wiltsie regarding production of IND documents | 50% | 1.0 |
| 6/18/03 | Michels | 1.8 | Review documents related to IND application; update filing materials for case; discuss protective order parameters with Department of Justice attorney and M. Zaid | 25% | 0.4 |
| 6/10/04 | Michels | 0.4 | Update document files and pleading | 100% | 0.4 |
| 10/13/04 | Michels | 0.6 | Forward case materials to E. Urello for filing and organization | 100% | 0.6 |
| 1/19/05 | Michels | 1.3 | Update files; review materials in preparation for appeal | 25% | 0.3 |
| 1/24/05 | Michels | 1.0 | Update materials on e-room | 100% | 1.0 |
| 2/1/05 | Loy | 4.4 | Prepare index of all pleadings in e-room and download various pleadings from court docket to complete | 100% | 4.4 |

---

[12] Plaintiffs filed this action on March 18, 2003. Thus it was not possible to update the "pleading," but it was possible to update the pleading file on March 19th.

| Date | Name | Hours | Description | % | Total |
|------|------|-------|-------------|---|-------|
| 2/2/05 | Loy | 6.7 | Complete index of pleadings in e-room and download various pleadings from court docket to compete (sic); create document database in e-room and download various documents into same | 100% | 6.7 |
| 2/7/05 | Loy | 1.0 | Download important case-related documents into e-room document files | 100% | 1.0 |
| 2/9/05 | Loy | 5.4 | Download important case-related documents into e-room document files; download and update electronic pleading file; obtain rules and forms regarding admission to D.C. Court of Appeals | 75%[13] | 4.1 |
| 2/10/05 | Loy | 5.9 | Download important case-related documents into e-room document files; prepare admission forms for D.C. Court of Appeals | 50%[14] | 3.0 |
| 2/14/05 | Loy | 3.5 | Update e-room pleadings; download additional important case-related documents into e-room document file | 100% | 3.5 |
| 2/22/05 | Loy | 0.3 | Update e-room with transcripts | 100% | 0.3 |
| 3/1/05 | Loy | 1.5 | Download documents and pleadings into e-room; update pleadings index | 100% | 1.5 |
| 3/10/05 | Loy | 0.5 | Update pleadings binder in e-room and download additional documents to document file | 100% | 0.5 |
| 3/11/05 | Loy | 1.5 | Update pleadings binder in e-room and download additional documents into e-room document file | 100% | 1.5 |
| 3/15/05 | Loy | 0.5 | Update documents file in e-room; update pleadings file in e-room | 100% | 0.5 |
| 3/23/05 | Loy | 0.5 | Update pleadings binder in e-room | 100% | 0.5 |
| 3/24/05 | Loy | 2.0 | Download additional documents into e-room; work on creating a CD of all Anthrax documents and pleadings filed by plaintiff | 100% | 2.0 |
| 4/4/05 | Loy | 2.0 | Work on filing notice of appearance; update pleadings index in e-room; file response to defendant's notice | 75% | 1.5 |
| 4/14/05 | Loy | 0.5 | Update pleadings in e-room | 100% | 0.5 |
| 4/18/05 | Loy | 0.2 | Update memo file in e-room | 100% | 0.2 |
| 4/22/05 | Michels | 2.4 | Update files regarding status of documents and pleadings relating to the emergency use authorization; telephone call from M. Zaid regarding additional research to determine liability for injuries | 50% | 1.2 |
| 4/26/05 | Loy | 0.8 | Update pleadings binder in e-room | 100% | 0.8 |
| 5/3/05 | Loy | 0.5 | Update document database and pleadings in e-room | 100% | 0.5 |
| 5/6/05 | Loy | 3.7 | Update pleadings and documents in e-room; complete list of pleadings and exhibits filed by plaintiff to be submitted to government for the joint appendix | 25% | 0.6 |

---

[13] 25% was already deducted for this entry for the time allotted to applying for admission to the D.C. Circuit.
[14] 50% was already deducted for this entry for the time allotted to applying for admission to the D.C. Circuit.

| Date | Name | Hours | Description | % | Total |
|---|---|---|---|---|---|
| 5/17/05 | Loy | 1.5 | Update pleadings in e-room and review Appellate brief received from Department of Justice; download DC Court of Appeals Rules and Procedures | 30% | 0.5 |
| 8/11/05 | Veizaga | 1.0 | Prepare letter to FDA with CD of all downloaded pleadings from March 2003 through December 2004; create second CD with revised pleadings and pleadings list to send to FDA; review pleading list; send out package to FDA | 100% | 1.0 |
| 8/11/05 | Veizage | 3.5 | Brief conversation with L. Michels regarding compiling pleadings and CD to ship to FDA; request CD from IKON; review pleadings from March 2003 through December 2004; scan pleadings list; download all pleadings from March 2003 through December 2004; create subfolders for each pleading and burn CD with all pleadings and pleadings list for Anthrax | 100% | 3.5 |
| 9/6/05 | Veizaga | 0.1 | Upload notice of weekly report to e-room pleadings | 100% | 0.1 |
| 9/26/05 | Veizaga | 0.4 | Update pleadings binder in case-print and enter new pleadings in binder | 100% | 0.4 |
| 9/28/05 | Veizaga | 0.4 | Prepare documents folder and update with judge's opinion in another case; prepare new folder and organize | 100% | 0.4 |
| 9/29/05 | Veizaga | 0.4 | Numerous attempts to e-mail joint appendix to B. Mizer; e-mail B. Mizer regarding large attachment will not go through via e-mail | 100% | 0.4 |
| 9/29/05 | Veizaga | 0.5 | E-mails between B. Mizer and myself regarding joint appendix and letter from A. Johnson Winegar from 10/5/95; e-mail L. Michels regarding same | 100% | 0.5 |
| 9/29/05 | Veizaga | 0.4 | Download and e-mail joint appendix to B. Mizer for review, cc L. Michels | 100% | 0.4 |
| 9/30/05 | Veizaga | 0.8 | E-mails from B. Mizer regarding creating disk with joint appendix and sending to him; e-mail L. Michels regarding same; prepare disk of joint appendix vol. I and II and prepare letter to B. Mizer with disk and sent out | 100% | 0.8 |
| 10/11/05 | Veizaga | 0.7 | Brief meeting with L. Michels regarding Anthrax pleadings to pick up from FDA; telephone conference with Washington, D.C. paralegal regarding boxes of pleadings to pick up and review from FDA in Maryland; e-mail with instructions and pleadings list to Washington, DC paralegal; prepare list of pleadings we need to omit from pleading documents to FDA | 100% | 0.7 |
| 10/11/05 | Veizaga | 0.1 | E-mail Washington, D.C. paralegal the FDA contact person and her phone number | 100% | 0.1 |

| 10/12/05 | Annand | 1.1 | Retrieve pleadings from FDA | 100% | 1.1 |
|----------|--------|-----|-----------------------------|------|-----|
| 10/12/05 | Veizaga | 0.4 | Telephone conference with DC office regarding courier pick up of Anthrax pleadings from the FDA; brief meeting with L. Michels regarding documents in route to the DC office | 100% | 0.4 |
| 10/13/05 | Annand | 0.7 | Remove documents from Anthrax docket and send back to FDA | 100% | 0.7 |
| 10/13/05 | Veizaga | 0.8 | E-mail and telephone conferences with our Washington DC paralegal regarding pleadings to omit from box of documents to FDA, correspondence to K. Cook at General Counsel and procedure for returning documents to FDA and omitted pleadings to us; review case pleadings list to ensure all pleadings file under seal have been requested to be omitted | 100% | 0.8 |
| 10/14/05 | Veizaga | 0.2 | E-mail to our Washington DC paralegal to check on status of pleadings package to K. Cook and FDA | 100% | 0.2 |
| 10/18/05 | Veizaga | 0.3 | Prepare document folder for pleadings excluded from FDA filings on 10/13/05 | 100% | 0.3 |
| 10/31/05 | Veizaga | 0.2 | Save documents on extranet for case in document folder | 100% | 0.2 |
| 11/17/05 | Veizaga | 0.3 | Update pleadings binder with new pleadings filed | 100% | 0.3 |
| 12/6/05 | Veizaga | 0.3 | Download new pleadings from Pacer and update extranet pleadings for file | 100% | 0.3 |
| 12/7/05 | Veizaga | 0.4 | Upload pleadings to extranet; update pleading binder | 100% | 0.4 |
| 12/19/05 | Veizaga | 1.0 | Update documents and pleadings folder on Extranet | 100% | 1.0 |
| 1/5/06 | Veizaga | 0.2 | Update pleadings on extranet | 100% | 0.2 |
| 1/18/06 | Veizaga | 0.8 | Review Pacer for all pleadings filed recently; download new pleadings and print report | 100% | 0.8 |
| 1/22/06 | Michels | 0.8 | Organize mail and pleadings file | 100% | 0.8 |
| **Mark Zaid Time** | | | | | |
| 3/18/03 | Zaid | 3.5 | File pleadings; Tel.conv. w/media, fact expert, LM, Ron Wiltsie, DOJ attnys; Media interviews; E-mails; Review files | 25%[15] | 0.9 |
| 5/2/03 | Zaid | 0.2 | Deliver copies to Court | 100% | 0.2 |

### 7.   Mr. Zaid's Time Must Be Reduced Because His Entries Are Inexcusably Vague

Mr. Zaid's descriptions of work are so vague as to require a significant reduction in the number of hours for which fees could be awarded.  To receive compensation in this Circuit,

---

[15]  25% was already deducted for this entry for the time allotted to noncompensable contacts with the press.

plaintiffs are required to provide "a detailed description of the subject matter of the work.  In re

Donovan, 877 F.2d at 994.  Descriptions of services rendered such as "legal issues" or

conference re all aspects" or "call re status" or conferences and teleconferences with individuals

whose relationship to the case is not identified are vague and non-compensable.  Id. at 995.

Without more specific descriptions neither the Court, nor defendants, can determine the merits of

the application.  National Ass'n of Concerned Veterans, 675 F.2d 1319, 1327 (D.C. Cir. 1982).

Here, a sampling of Mr. Zaid's descriptions of work show that they are the type that have

been found to be too vague to permit the Court and the government to evaluate the necessity of

the work performed:

| Date | Hours Claimed | Description |
|------|---------------|-------------|
| 4/9/01 | 1.2 | E-mails; Review documents; Draft Complaint |
| 12/18/01 | 1.1 | Tel. conv. w/LM; E-mails |
| 5/18/02 | 0.1 | E-mails |
| 8/5/02 | 0.2 | E-mails; Review DoD AVIP policy, articles |
| 8/6/02 | 0.1 | E-mails |
| 10/10/02 | 0.3 | E-mails; Tel. conv. w/fact expert |
| 2/21/03 | 0.3 | E-mails; Review draft edits |
| 3/1/03 | 1.1 | E-mails; Review pleading drafts |
| 3/2/03 | 2.7 | E-mails; Review cases, drafts, Online research |
| 3/6/03 | 0.2 | Review DoD articles, FDA meeting minutes; E-mails |
| 3/13/03 | 0.5 | Tel. conv. w/ LM; Review pleadings; E-mails |
| 3/21/03 | 0.1 | E-mails; Review LM letter |
| 4/1/03 | 0.4 | Tel. conv. w/LM; Emails |
| 4/18/03 | 2.9 | E-mails; Tel. conv. w/ LM; Draft Opp. |
| 7/22/03 | 0.1 | E-mails |
| 7/23/03 | 0.1 | E-mails |
| 8/6/03 | 0.1 | E-mails |
| 10/29/03 | 0.1 | E-mails |
| 12/27/03 | 2.0 | Tel conv w/LM; Online research |
| 12/28/03 | 3.7 | Tel. conv. w/LM, Fact expert; Review decision, file, articles |
| 1/4/04 | 4.3 | Mtg. w/ FDA expert; Tel. conf. w/WP, LM; Review court filings, FDA documents; E-mails, Draft Emergency Opp, First Amended Complaint; File Emergency Opp. |
| 1/5/04 | 10.0 | Tel. conv. w/LM, Fact expert, FDA expert, media; E-mails, Online research, Review cases, FDA documents, briefs; Prepare briefs and for oral argument |

| 4/19/04 | 1.7 | Tel. conv. w/ LM; Review and revise Reply, Review filings |
| 7/12/04 | 0.5 | Review file |
| 7/13/04 | 0.6 | Tel. conv. w/ Congressional staffer; E-mails |
| 10/4/04 | 0.2 | E-mails; Review info |
| 10/20/04 | 0.4 | Tel conv. w/JR; E-mails; Review articles |
| 12/16/04 | 1.3 | Tel. conv. w/ Cong source, LM; E-mails; Review letters, articles |
| 2/26/05 | 0.2 | E-mails |
| 2/27/05 | 2.1 | E-mails; Review file; Revise Inj Opp |
| 4/7/05 | 0.2 | E-mails; Review articles; Respond to press inquiries |
| 12/5/05 | 0.9 | Tel. conv. w/LM; E-mails |
| 1/31/06 | 0.2 | Tel. conv. w/LM; E-mails |
| 2/2/06 | 0.6 | Tel. conv. w/Cong source, Fact expert; E-mails |
| 3/27/06 | 0.2 | Review documents; E-mails |
| 6/13/06 | 0.2 | E-mails |
| 6/15/06 | 0.1 | E-mails |

As can be seen, Mr. Zaid routinely reviews documents but fails to disclose their subject, referring to them as e-mails or articles. By failing to disclose the subject of the documents, he is preventing the court and the government from assessing the reasonableness of the time allotted. Similarly, while Mr. Zaid seeks to recover for time spent in telephone conversations, he never discloses how those conversations relate to this case. While occasionally an entry may show an evident connection to this case (i.e. draft reply), even then it is virtually impossible to determine if the time spent was reasonable as the scope of work is missing. Accordingly, the hours claimed in Mr. Zaid's fee application should be reduced by a minimum percentage of 50%. See Role Models America, Inc., 353 F.3d at 973 (approving 50% reduction for use of lumped billing and vague entries, just as Mr. Zaid has done here); see also Action on Smoking & Health, 724 F.2d at 223 (approving percentage reductions of 10 to 33% for various attorney's submissions).

### 8. The time that plaintiffs devoted to the appeal is excessive

Even if plaintiffs are entitled to fees for the appeal, their request must be greatly reduced. No compensation is appropriate for "duplicative or unrelated hours," for "nonproductive time," or for time resulting from attorney overstaffing. Hensley, 461 U.S. at 433. And notably, for

purposes of assessing plaintiffs' request for fees for the appeal, "[a] lawyer exercising 'billing judgment' would not bill a client for a second lawyer's learning time, particularly when that period is lengthened by the lawyer's inexperience." Action on Health & Smoking, 724 F.2d at 223.

Here, Mr. Michels and Mr. Zaid did virtually all the work in this case until this Court issued its final judgment. Then, in anticipation of the appeal, they brought in 12 additional attorneys. Plaintiffs' application provides no information on the experience of these 12 lawyers except for Duncan Getschell – a "federal court appellate specialist," Application, Ex. E – but it appears that they must be associates. And while two of these attorneys (Messrs. Bubar and Beattie) worked on a few matters outside of the appeal, most of their time – and all of the time for the remaining ten – appears to be devoted to the appeal.

This time is objectionable for several reasons. First, in bringing these attorneys in, they all had to devote time to reading the record from this Court. The 32 hours that are documented, plus others that were charged but not documented, make this time excessive:

| Attorney | Date | Hours Claimed | Description |
|---|---|---|---|
| Sewell | 1/20/05 | 0.6 | Discuss background, procedural history of case with J. Michel |
| Burbar | 1/21/05 | 2.2 | Read District Court's opinion and order; meet with L. Michels on same |
| Riley | 1/21/05 | 0.9 | Review pleading; meet with J. Michels |
| Sewell | 1/21/05 | 1.0 | Attend introductory meeting with J. Michels |
| Burbar | 1/23/05 | 1.3 | Review opinion and order from District Court and take notes from it |
| Sewell | 1/25/05 | 0.8 | Review pleadings |
| Riley | 1/26/05 | 1.2 | Read over background materials |
| Burbar | 1/30/05 | 1.6 | Read through pleadings in case |

| Beattie | 1/31/05 | 0.6 | Review opinion |
| Riley | 1/31/05 | 1.1 | Read over background materials |
| Sewell | 2/3/05 | 0.2 | Review pleadings binder, e-room postings |
| Sewell | 2/4/05 | 0.6 | Review opinion memorandum; discuss background/facts with J. Michels, B. Beattie |
| Sewell | 2/7/05 | 3.0 | Research advisory panels; draft postings for e-room; **review pleadings, documents** |
| Burbar | 2/26/05 | 1.3 | Read original TRO complaint; memorandum in support of same; motion and memorandum for plaintiff to show cause; memo from K. Sewell and other documents |
| Peterson | 5/3/05 | 2.0 | Review pleadings in preparation for response |
| Peterson | 5/6/05 | 2.0 | Review pleadings and other materials in preparation for filing response brief |
| Peterson | 5/10/05 | 2.1 | Review pleadings and other materials relevant to response to government brief |
| Sewell | 5/26/05 | 5.0 | Review and analyze pleadings, reports, research in preparation for appellate brief |
| Beattie | 6/1/05 | 5.0 | Research cases for response to appeal; **review materials from case below** |
| Stallbaumer | 6/22/05 | 3.6 | **Review documents regarding complaint** and handover of biologics regulation from NIH to FDA |

Second, it appears for the most part that the claimed work done by ten of the twelve was either duplicative of time claimed for work already done in this Court or was completely unnecessary. For example:

Zach Miller billed two hours for reviewing the case file, but did no substantive work on this matter.(entry for 1/6/06, after appeal argued)

Karen Sewell billed 14.8 hours (of 23.3 hours total, the rest being for background research on this case) researching the functions of the FDA's advisory panels, a major issue before this Court

Brett Beattie billed 47.8 hours researching and writing unspecified portions of the appellate brief

John Bonini billed 28.5 hours researching the availability of military-wide injunctions, an issue that received extensive briefing in this Court, and another 37.8

hours doing "miscellaneous research"

Clayton Stallbaumer   billed 6.1 hours researching a footnote on the regulation that transferred regulation of biologics from NIH to the FDA.

Daniel Burbar billed 14 hours drafting unspecified portions of the brief, while devoting an additional 34.1 hours to reviewing the e-room or administrative matters such as arranging meetings.

Nancy Riley   billed 7.4 hours researching whether subsequent versions of a vaccine has to go through drug trials, another 7.6 hours researching issues of deference to be paid to the FDA, again core issues that had been previously raised by plaintiffs in this Court

Anne Peterson  spent 9.6 hours researching informed consent issues, and another 2.5 hours researching a court's ability to ignore an FDA licensing decision

Jaime Hochhausen  spent 6 hours researching unspecified FDA regulations, 5 researching the anthrax vaccine, 8 researching inhalation versus cutaneous anthrax, and another 7 for claims against the FDA

Luis Pinedo    spent 24.5 hours researching a court's ability to intervene in military affairs, a core issue in this Court

Thus, 204 hours were devoted to additional research on topics that had all arisen and been argued in the first instance in this Court.  This violates the Court of Appeals warning against charging a fee to the government just because the applicant chose to do the work twice.  Action on Health & Smoking, 724 F.2d at 223.

By defendants' calculation, plaintiffs devoted 578 hours to the appeal. [16]  This is clearly excessive. Thus, to the extent that this Court determines that plaintiffs are entitled to recover anything for the appeal, plaintiffs suggest that the time for work on the appeal by all attorneys – with the exception of Mr. Michels and Mr. Zaid (though Mr. Zaid's time would still be subject to the requested 50% reduction for excessively vague entries) – be reduced by a minimum

---

[16] This includes all the time by Messrs. Michel, Zaid, Burbar, and Beattie between April 25, 2005 and January 31, 2006.  A review of their time records indicates that nearly all of their billings for this period were associated with the appeal.  The total calculation of 578 hours also includes all the time for the following lawyers: Adrounie, Bonini, Getchell, Hochausen, Miller, Peterson, Pinedo, Riley, Sewell, and Stallbaumer.  It also includes all time by legal assistants Loy, Veizaga, and Annand in 2005.

42

percentage of an additional 50% to account for the unnecessary review of background documents by 12 additional lawyers and their duplication of work already performed in this Court. Even applying the suggested 50% reduction, plaintiffs would still be compensated for over 350 hours for the appeal, assuming any compensation is appropriate at all.

### F.   Plaintiffs Are Not Entitled To All Their Expenses For Assistance

EAJA permits "fees and other expenses includ[ing] the reasonable expenses of expert witnesses, the reasonable cost of any study analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees . . ." 28 U.S.C. 2412(d)(2)(A). Here, plaintiffs seek $6,900.00 for the expert services of Dr. Walther R. Schumm for his statistical analysis and expert declaration in this matter, and have submitted a declaration by Dr. Schumm attesting to his activities and billing rate if compensation is otherwise appropriate. Defendants do not object to this request.

But plaintiffs also seek $15,000 for "its team of investigators and factual researchers who assisted counsel in securing documents, analyzing the administrative record, preparing a chronology of administrative action regarding AVA and document management services." Plaintiffs identify these individuals as John Richardson, Russell Dingle, Thomas Rempfer, and Kenneth Levine. Plaintiffs have not supported this request with any details as to these individual's activities other than to reference the times that they appear in the attorneys' billing records. Thus, this Court has no basis for assessing the amount of time that these individuals devoted to this case, what they did, how much they were paid, let alone that the sought for reimbursement was reasonable. As a result, this request must be denied.

43

### G.    Plaintiffs Are Not Entitled To Most Of Their Costs

Under EAJA and the case law of this Circuit, plaintiffs' claimed costs and expenses must be drastically reduced.  Under EAJA, costs are limited to those "enumerated in section 1920 of this title."  28 U.S.C. 2412(a)(1).  As pertinent here, section 1920 limits recovery for costs to (1) fees of the clerk or marshal, (2) fees for transcripts, (3) fees for printing and witnesses, and (4) fees for copying.  28 U.S.C. 1920 §§ (1)-(4).  Thus, the costs for overhead, secretarial services, taxi fares, messenger costs, telephone bills, postage, meals, travel, etc. are not compensable in this circuit.  E.g., Action on Smoking and Health, 724 F.2d at 224 (taxi fares, postage are not compensable under EAJA); Hirschey v. FERC, 777 F.2d 1, 6 (D.C. Cir. 1985) (taxi, overhead, secretarial services cannot be reimbursed); Massachusetts Fair Share v. Law Enforcement, 776 F.2d 1066, 1069 (D.C.Cir. 1985) (travel expenses, telephone bills and postage are not compensable under EAJA); Photo Data v. Sawyer, 533 F.Supp. 348, 353 (D.D.C. 1982) (overtime meals, car, local transportation, and miscellaneous costs).

In light of this precedent, the vast majority of plaintiffs' requested costs or expenses are not allowed under EAJA.  Their claims for taxies, online research, facsimiles, Federal Express or other overnight delivery charges, messengers, dinner, long distance phone charges, and postage must be denied.  Accordingly, if an award is otherwise appropriate, plaintiffs may recover only the following costs:

|  | McGuire Woods | Mark Zaid |
|---|---|---|
| Copy Charges | $33.70 | $281.16 |
| Hearing Transcript | $359.70 | $485.70 |
|  | $393.40 | $766.86 |

# CONCLUSION

As a result of the forgoing, defendants oppose plaintiffs' petition for $479,710.50 in attorneys' fees and an additional $6,699.94 in costs. Because defendants were substantially justified in their position, plaintiffs are entitled to no recovery here. But even if the Court were to find that some recovery is permitted, plaintiffs' petition must be substantially reduced. Pursuant to the calculations in exhibit 1, which applies the minimum deductions and reductions justified in this opposition, plaintiffs should be allowed no more than $137,645.34 in fees, $6,900 in expert witness fees, and $1,160.26 in costs.

Respectfully submitted

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

 /s/ Ronald J. Wiltsie
RONALD J. WILTSIE (D.C.Bar 431562)
ANDREW TANNENBAUM
Civil Division
Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
(202) 307-1401

5 February 2007

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN DOE #1, JOHN DOE #2, | * | |
| JOHN DOE #3, JOHN DOE #4, | * | |
| JANE DOE #1, JANE DOE #2 | * | |
| c/o Mark S. Zaid, Esq. | * | |
| Krieger & Zaid, PLLC | * | |
| 1747 Pennsylvania Avenue, N.W. | * | |
| Suite 300 | * | |
| Washington, D.C. 20006 | * | |
| | * | |
| and | * | |
| | * | |
| OTHER SIMILARLY SITUATED | * | |
| INDIVIDUALS | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Action No. 1:03-cv-00707-EGS |
| vs. | * | CLASS ACTION COMPLAINT |
| | * | |
| DONALD  H. RUMSFELD, | * | |
| SECRETARY OF DEFENSE | * | |
| DEPARTMENT OF DEFENSE | * | |
| 1000 Defense Pentagon | * | |
| Washington, D.C. 20301 | * | |
| | * | |
| and | * | |
| | * | |
| TOMMY THOMPSON | * | |
| SECRETARY OF HEALTH AND | * | |
| HUMAN SERVICES | * | |
| 200 Independence Avenue, S.W. | * | |
| Washington, D.C. 20201, | * | |
| | * | |
| and | * | |
| | * | |
| MARK B. McCLELLAN, | * | |
| COMMISSIONER | * | |
| FOOD AND DRUG ADMINISTRATION | * | |
| 5600 Fishers Lane | * | |
| Rockville, Maryland   20857-0001, | * | |
| | * | |
| Defendants. | * | |

*    *    *    *    *    *    *        *    *    *    *    *    *

**FIRST AMENDED COMPLAINT**

Plaintiffs John Doe #1, John Doe #2, John Doe #3, John Doe #4, Jane Doe #1 and Jane Doe #2, on behalf of themselves and all other similarly situated individuals, file this action against defendants Donald Rumsfeld, Secretary of Defense, Department of Defense ("DoD"), Tommy Thompson, Secretary of Health and Human Services, Department of Health and Human Services, and Mark B. McClellan, Commissioner, Food and Drug Administration ("FDA"), seeking temporary and permanent injunctive relief from the DoD's anthrax vaccination program, as well as a declaratory judgment that Anthrax Vaccine Adsorbed ("AVA"), currently being involuntarily administered to active and Reserve U.S. Armed Forces members and DoD civilian employees, is an investigational new drug ("IND"), as defined by 21 U.S.C. § 355, or a drug unapproved for its intended use, pursuant to 10 U.S.C. § 1107, Executive Order 13139, DoD Directive 6200.2, and 21 C.F.R. § 201.5, and is being administered to United States service members, federal employees and civilian defense contractors in violation of federal law. Plaintiffs seek this relief pursuant to the Administrative Procedures Act, 5 U.S.C. § 551, et seq., the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and the All Writs Act, 28 U.S.C. § 1651.

**PARTIES**

1.   Plaintiffs are active duty service members, reservists, national guardsmen and civilian employees and DoD contractors who have been ordered, or will imminently be ordered, to take AVA as part of their military duties or employment obligations, or have been administered AVA in violation of the FDA's mandated sequence protocol. Similarly situated individuals include current members of the active duty, reserve members of the Armed Forces, national guardsmen and current civilian DoD employees and contractors who have been ordered, or will imminently be ordered, to take the vaccination series, or who have been administered the vaccine in violation of the FDA's mandated sequence protocol.

2.   Defendant Department of Defense, represented by the Secretary of Defense, is the principal user of AVA.  By order of the Secretary of Defense, the DoD has, since 1998, engaged

2

in the practice of mass inoculations of active duty and reserve members of the Armed Forces, and civilian employees, without seeking the informed consent of those individuals prior to giving the vaccination.  The Secretary of Defense is personally responsible for compliance with his own directives.

3.    The DoD was and is heavily involved in the manufacturing and licensing process for the AVA and is considered the de facto manufacturer of AVA by the FDA.

4.    Defendant Department of Health and Human Services ("HHS"), through its agent FDA, is the federal agency responsible for licensing and quality control of drugs and biologic products, such as vaccines like the AVA.  The FDA is responsible for promulgating federal regulations that describe what makes a drug or vaccine an "IND" and how a drug is placed in IND status.

## JURISDICTION AND VENUE

5.    There is a legitimate matter in controversy between the named parties because Plaintiffs claim that AVA is a) an IND, b) an unlicensed or improperly licensed vaccine, and c) being used "off label", requiring the Secretary of Defense and DoD to secure Plaintiffs' informed consent before DoD may administer AVA to them. The AVA manufacturer has submitted an IND application for the AVA to amend the license, rendering AVA an IND in circumstances germane to this action.

6.    Plaintiffs will suffer substantial and irreparable injury if they are forced to take the vaccine because of Defendants' failure to follow presidential orders and/or federal law requiring informed consent prior to the administration of an IND to members of the Armed Forces.

7.    Jurisdiction is proper in this Court under the Administrative Procedures Act, 5 U.S.C. § 702, and under 28 U.S.C. § 2201, which states that actions involving controversies with federal agencies may be pursued in any United States District Court, and under 28 U.S.C. §§ 1331 and 1346.

## CLASS ACTION ALLEGATIONS

8.   This action is brought by the plaintiffs, on their own behalf and on behalf of the class of all others similarly situated, under the provisions of Fed. R. Civ. P. 23(a) and (b).

9.   The class so represented by the plaintiffs in this action, and of which they are members, consists of active duty, reservists and national guardsmen of the United States Armed Forces, as well as any civilian federal employees or DoD contractors who have taken, been ordered to take, or will be ordered to take, the anthrax vaccine.

10. The exact number of members of the class, as hereinabove identified and described, is not known, but it is estimated that there are in excess of 2.5 million members.  The class is so numerous that joinder of individual members is impractical.

11. The relief sought is common to the entire class, and there are common questions of law and fact that relate to and affect the rights of each member of the class.  These common questions include and involve whether the AVA is an IND, as defined by 21 U.S.C. § 355, or a drug unapproved for its intended use, pursuant to 10 U.S.C. § 1107, Executive Order 13139, DoD Directive 6200.2, and 21 C.F.R. § 201.5, or is being administered to United States military service members, federal employees and civilian defense contractors in violation of federal law. Certain defenses raised by the defendants would apply equally to all members of the class.

12. The claims of the plaintiffs are typical of the claims of the class in that the claims of all members of the class depend on a showing of the acts and omissions of defendants as giving rise to rights to the relief sought herein.  There is no conflict as between the plaintiffs and other members of the class with respect to this action, or with respect to the claims for relief contained herein.

13. The plaintiffs are representative parties for the class, and are able to and will fairly and adequately protect the interests of the class. The attorneys for the plaintiffs are experienced and capable in litigating the claims at issue and have successfully represented claimants in other litigation matters of this nature. Attorneys John J. Michels, Jr. of McGuire Woods, LLP, and Mark S. Zaid of Krieger & Zaid, PLLC, will actively conduct and be responsible for the conduct of the action on behalf of the plaintiff class.

14. This action is properly maintained as a class action in that the prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of others not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

15. This action is properly maintained as a class action inasmuch as the questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FACTUAL BACKGROUND

### A. Anthrax Vaccine Adsorbed

16. AVA was originally licensed as a vaccine against anthrax on November 2, 1970 by the United States Public Health Service.

17. The vaccine was licensed as a preventive for anthrax for "individuals who may come in contact with imported animal hides, furs, bone meal, wool, hair (especially goat hair), and bristles; for all personnel and factories handling these materials and for individuals contemplating investigational studies involving *Bacillus anthracis*." See Attachment A, Anthrax Vaccine Adsorbed product insert, December 1979.

18. A 2002 product insert revision (the AVA is referred to as "BioThrax") stated that:

> BioThrax is indicated for the active immunization against *Bacillus anthracis* of individuals between 18 and 65 years of age who come in contact with animal products such as hides, hair or bones that come from anthrax-indemic areas, and that may be contaminated with *Bacillus anthracis* spores. BioThrax is also indicated for individuals at high risk of exposure to *Bacillus anthracis* spores such as veterinarians, laboratory workers, and others whose occupations may involve handling potentially infected animals or other contaminated materials. Since the risk of anthrax infection in the general population is low, routine immunization is not recommended.

See Attachment B, 2002 Anthrax Vaccine Adsorbed Product Insert.

19. The license for AVA states that "primary immunization consists of three subcutaneous injections, 0.5mL each, given two weeks apart followed by three additional subcutaneous injections, 0.5mL each given at 6, 12 and 18 months." Id.

20. In 1985, the DoD (through the Department of the Army) issued a Request for Proposals ("RFP") No. DAMD17-85-R-0078 soliciting the development of a new anthrax vaccine. The Request for Proposals stated that there was no vaccine in current use which would safely and effectively protect military personnel against exposure to anthrax. The Request for Proposals noted that AVA was highly reactogenic, required multiple boosters to maintain immunity, and might not protect against all strains of anthrax. See Attachment C, RFP DAMD17-85-R-0078.

**B.  FDA Failure to Finalize AVA Licensing**

21. In 1985, as part of an FDA biologic and drug licensing review, the Biologics Review Panel, an independent advisory panel to the FDA, recommended that the FDA classify the AVA as "not misbranded". The FDA issued a Proposed Rule to adopt the Panel's recommendations and finalize FDA approval of the AVA license. A 2001 Citizen Petition challenge to the FDA's unreasonable delay to finalize the Rule was rejected. See Attachment D, August 28, 2002 letter to Russell Dingle in response to Citizen Petition Docket No. 01P-0471/CP1 ("Response to Citizen Petition"). However, in direct response to this litigation, after 18 years, on December 30, 2003, the FDA announced it was issuing its Final Rule and Final Order Regarding Safety and

6

Efficacy of Certain Licensed Biological Products Including Anthrax Vaccine. The alleged Final Rule was published in the Federal Register on January 5, 2004, at *http://www.fda.gov/cber/rules/ bvactox.pdf*.

22. The FDA's delayed issuance of its Final Rule and Order was undertaken in violation of its own internal procedures and requirements, and was so arbitrary and capricious as to amount to bad faith. The circumstances that led to its issuance, and the contents of the actual Final Rule Order, are nothing less than extraordinary and are completely inconsistent with the prior history of FDA Final Rules. Upon information and belief, the FDA would never permit a private drug manufacturer to rely upon the type of information cited in the FDA's Final Rule and Order for purposes of vaccine licensing or efficacy studies. Additionally, the Final Rule and Order relies upon flawed and inconsistent data so as to nullify its application. Upon further information and belief, the FDA's Final Rule and Order was issued as a result of policy pressures by DoD and other sources.

**C. AVA is Not Licensed for Use Against Inhalation Anthrax**

23. In addition, on December 13, 1985, as part of its license review process, the FDA published a specific product review of the AVA, stating that the vaccine's "efficacy against inhalation anthrax is not well documented . . . no meaningful assessment of its value against inhalation anthrax is possible due to its low incidence." See Attachment E, Federal Register, December 13, 1985.

24. In early 1990, the AVA manufacturer, then the Michigan Department of Public Health ("MDPH"), modified its production process for AVA to accommodate DoD needs. U.S. Army medical research personnel from Fort Detrick, Maryland, determined in October 1990, that these changes in the AVA manufacturing process resulted in a 100-fold increase in AVA protective antigen levels. See Attachment F, Testimony of Nancy Kingsbury, United States General Accounting Office, before the Sub-Committee on National Security, Veterans' Affairs and International Relations, Committee on Government Reform, House of Representatives, October 23, 2001, Page 5-6.

25. In March 1990, Army doctors Colonel Ernest T. Takafuji and Colonel Phillip K. Russell described AVA as a "limited use vaccine" and an "unlicensed experimental vaccine" in an article, "Military Immunizations: Past, Present and Future Prospects", published in *Infectious Disease Clinics of North America*.

26. In 1995 the Army contracted with the Science Applications International Corporation ("SAIC") to develop a plan to obtain FDA approval for a license amendment for AVA.  The purpose of the license amendment was to add aerosolized anthrax exposure to the product license and to enable the manufacturer of AVA to list on the product license that AVA was effective against inhalation anthrax.

27. The SAIC license amendment plan, ultimately adopted by the Army, states that AVA is not licensed as protection for aerosol anthrax exposure as expected in a biological warfare environment.  See Attachment G, October 5, 1995 License Amendment Plan.

**D.  The AVA Becomes an Investigational New Drug**

28. On October 20, 1995, the Army Joint Program Office for Biological Defense met to begin the process of obtaining the FDA license modification to include an indication that AVA was effective against inhalation anthrax.  At the meeting, the participants noted that studies of AVA effectiveness in people working in tanneries showed protection against skin contact anthrax, but that there was insufficient data to demonstrate protection against inhalation anthrax. See Attachment H, Minutes of October 20, 1995 Meeting.

29. On August 26, 1996, as a precursor to changing the AVA license by filing an investigational new drug application, the Army's Medical Research Institute of Infectious Diseases ("USAMRIID") discussed the purpose of the IND application by saying, "We wish to obtain an indication for protection against inhalation anthrax and to reduce the number of doses to two primary doses with a booster due at one year.  These two goals will be studied and discussed as separate issues."  See Attachment I (Col. Arthur O. Anderson, Chairman, USAMRIID Human Use Committee), "Comparative Study of the Safety and Immunogenicity of Two-Dose Priming Schedule of Human Anthrax Vaccine," August 26, 1996.

30. On September 20, 1996, as part of the Army/SAIC plan, the AVA manufacturer, Michigan Biologic Products Institute ("MBPI", the successor to MDPH) submitted to the FDA an investigational new drug application for AVA. The application was prepared, in whole or in part, by a U.S. Army agency located at Fort Detrick, Maryland.

31. The manufacturer's stated purpose for filing the IND application was to "conduct clinical investigations designed to investigate changes in the approved labeling for the licensed product. The potential labeling changes would affect the specific clinical indication, route and vaccination schedule for AVA." See Attachment J, September 20, 1996, MBPI Letter to Dr. Kathryn C. Zoon.

32. The Introductory Statement from the IND application states that "[t]he ultimate purpose of this IND is to obtain a specific indication for inhalation anthrax and a reduced vaccination schedule." See Attachment K, IND Introductory Statement.

33. The submission of the IND application was accompanied by a testing protocol designed to demonstrate effectiveness against inhalation anthrax in animals and correlate that effectiveness with comparable effectiveness in human subjects.

34. FDA regulations found at 21 C.F.R § 312 address the requirements for IND status for biologic products such as AVA.

35. Under FDA regulations, a drug may be placed in investigational new drug status, even when the drug is properly licensed for use, if the drug is used for a different purpose or in a different manner than that specified in the license.

36. Under FDA regulations, a drug is placed in investigational new drug status when a manufacturer files an investigational new drug application seeking a product license change reflecting a different use for the product.

37. Under FDA regulations, a manufacturer which files an IND application seeking to change the license for a vaccine to show the vaccine as effective against a different method of infection uses the vaccine in IND status if the vaccine is used for the purpose for which the license amendment is sought.

38. The investigational new drug application filed by MBPI sought a license amendment for AVA stating that AVA is effective against inhalation anthrax.

39. On December 13, 1996, the FDA sent a letter to the Department of the Army, following the Army's publishing of an advertisement in the Washington Post on October 15, 1996, seeking experimental test subjects for the investigation proposed in the AVA IND application. The December 13 letter advised the Army agency that it could not represent the vaccine as fully licensed when the Army was conducting tests pursuant to an IND application. Specifically, the letter advised the Army that the vaccine was not licensed for the indication for which the IND application was filed. See Attachment L, FDA letter of December 13, 1996.

40. The only indication for which the AVA IND application was filed was for inhalation anthrax.

**E. DoD Uses AVA as an IND**

41. In December 1997, DoD announced a multi-service vaccination program for all active duty, Reserve and National Guard service members using the AVA as a preventative for inhalation anthrax.

42. As part of this program, Plaintiffs and those similarly situated to them were ordered to submit to involuntary anthrax vaccinations.

43. If they refuse to comply with orders to take the AVA inoculations, the military Plaintiffs, and those similarly situated to them, will be subject to military disciplinary actions, including courts-martial convictions, forfeitures of pay and allowances, incarceration, bad conduct discharges, and administrative separation from the Armed Forces. Civilian Plaintiffs will be fired from their positions as DoD employees or defense contractors. Those individuals who take the anthrax vaccine will be subject to significant adverse health effects, including the possibility of death or permanent disability, and will not even receive full protection given the DoD's continuing violation of the FDA required vaccination sequence schedule of six shots in 18 months followed by an annual booster.

44. In December 1997, the Joint Program Office for Biological Defense, an agency of Defendant Department of Defense, noted that "Anthrax and Smallpox are the only licensed vaccines that are useful for the biological defense program, but they are not licensed for a biological defense indication." See Attachment M, Appendix G, "Industrial Capabilities Assessment Summary Report for the Production of the Anthrax Vaccine, Preliminary Report," December 1997, Joint Program Office for Biological Defense, Falls Church, Virginia.

45. The AVA IND application submitted by MBPI (now BioPort) has been supplemented and remains current and pending. See Attachment N, IND Application Supplements.

46. BioPort's subsequent submissions as part of the IND application process indicate that the license modification being sought is currently only for inhalation anthrax. Id.

47. The DoD inoculation program currently underway is specifically designed to inoculate members of the Armed Forces against inhalation anthrax, which has a high mortality rate and is identified by DoD as a military threat.

48. The use of AVA for a purpose which is the subject of a currently pending IND application, i.e. as a preventative against inhalation anthrax, means that DoD is using AVA as an IND.

49. By Memorandum of Decision dated April 1998, Army Secretary Togo West, Jr. took steps to approve a request to indemnify the anthrax vaccine manufacturer, Michigan Biologic Products Institute (the predecessor to the current manufacturer, BioPort) against all liability arising from "the unusually hazardous risks associated with potentially severe adverse reactions and the potential lack of efficacy of the AVA." The indemnification concerns, according to Secretary West, were a result of the limited use of the vaccine on too small a scale to permit accurate assessments of types and severities of adverse reactions and, insufficient experience in mass immunization programs to evaluate the efficacy of the vaccine. See Attachment O, Indemnification Agreement.

50. By Memorandum of Decision dated September 3, 1998, Army Secretary Louis Caldera again authorized indemnification of the AVA manufacturer because:

> the obligation assumed by MBPI under this contract involves
> unusually hazardous risks associated with the potential for adverse
> reactions in some recipients and the possibility that the desired
> immunological effect will not be obtained by all recipients.
> …[T]he size of the proposed vaccination program may reveal
> unforewarned idiosyncratic adverse reactions. Moreover, there is
> no way to be certain that the pathogen used in tests measuring
> vaccine efficacy will be sufficiently similar to the pathogen that
> U.S. forces might encounter to confer immunity.

**F. DoD Deviates From the AVA License Requirements**

51. On September 29, 1999, Dr. Kathryn Zoon, Director, FDA Center for Biologic

Evaluation and Research, wrote to Dr. Sue Bailey, Assistant Secretary of Defense Health Affairs

and stated:

> We reiterate our previous statement made to DoD on December
> 16, 1997, that FDA approval of the anthrax vaccine is based on the
> six-dose regimen found in the approved labeling. Because we are
> unaware of any data demonstrating that any deviation from the
> approved intervals of doses found in the approved labeling will
> provide protection from anthrax infection, we strongly recommend
> that the Anthrax Vaccine Immunization Program follow FDA
> approved schedule.

See Attachment P, September 29, 1999 Letter to Bailey.

52. In July 2000, DoD announced the first of several reductions in the scope of the AVIP

because of a failure by Bioport Corporation to meet federal manufacturing standards. DoD

stated that it was suspending AVA vaccinations for all but a limited number of personnel

because of a shortage of the vaccine.

53. As part of this suspension, DoD announced that members of the Armed Forces who had

received at least one of the sequence of six vaccinations required by the AVA product license

would be subject to a modified vaccination schedule that is inconsistent with the vaccination

schedule required by the AVA license. Specifically, DoD announced that members who had

received one or more vaccinations, but who had not completed the six shot sequence of

vaccinations, would not be required to restart the inoculation sequence as long as they received a subsequent shot within two years of their last vaccination.

54. DoD formally resumed the AVIP in June 2002. On August 6, 2002, DoD published policy guidance to component services. In part, the guidance stated that, "Those individuals that have had their doses deferred shall resume the series when directed …." See Attachment Q, August 6, 2002, Memorandum on Policy on Administrative Issues Related to the Anthrax Vaccine Immunization Program (AVIP).

55. On October 11, 2002, the Chief of Staff, United States Air Force, promulgated an AVIP policy and guidance for all active duty and reserve units. The policy states, in Annex B, Paragraph 4b:

> The Anthrax vaccine is a six-dose schedule [sic] followed by an annual booster. The vaccine doses are given at 0, 2 and 4 weeks, followed by doses at 6, 12, and 18 months, and an annual booster thereafter. The vaccine must be given in accordance with the above dosing schedule, as approved by the Food and Drug Administration (emphasis in original).

56. Notwithstanding the guidance to follow the licensed vaccination schedule, Paragraph 4c of Annex B states:

> Personnel whose vaccination series was interrupted during the previous AVIP slowdown will not need to repeat any doses already received in the vaccine series or receive extra doses. Once these individuals are identified as requiring the vaccine, they will just continue with the next dose in the series.

Upon information and belief, similar policies have been adopted by all other military services.

57. The deviation from the licensed application schedule for AVA and the use of AVA in a mass inoculation effort represent new uses of the AVA by DoD. Indeed, DoD is currently seeking test subjects to validate its practice of altering the shot sequence.

58. Such new uses of a product that are not in accordance with product labeling render the AVA "investigational" under FDA regulations and makes the AVA a drug "unapproved for its

intended use" under 21 C.F.R. § 201.5, and subject to the requirements of 10 U.S.C. § 1107 (2000), Executive order 13139 and DoD Directive 6200.2.

### G. Federal Law and Regulations Prohibit the Use of INDs Without Informed Consent of Recipients

59. 10 U.S.C. § 1107 (2000) provides that investigational new drugs or drugs unapproved for their intended uses may not be given to members of the Armed Forces without their prior consent except in the case of a waiver by the President of the United States.

60. Similarly, Executive Order 13139 states that before administering an investigational drug or a drug unapproved for its intended use to members of the Armed Forces, the DoD must obtain informed consent from each individual unless a waiver of this requirement is signed by the President of the United States.

61. A judicial declaration that AVA is an IND does not preclude the use of AVA by DoD, as long as the appropriate consent or waiver is obtained.

62. DoD has adopted the requirements of 10 U.S.C. § 1107 and Executive Order 13139 and set up procedures to follow these requirements in DoD Directive 6200.2 dated August 1, 2000.

63. Peer-reviewed statistical analysis of adverse reactions associated with AVA vaccinations published by research physicians indicates substantial increases in joint-related medical conditions such as arthralgia, arthritis, myalgia, and others following AVA vaccination.

64. A similar analysis of adverse events for AVA shows a substantial increase in gastrointestinal adverse reactions as well.

65. Moreover, informed consent documents provided by the Center for Disease Control to civilian postal workers and congressional staff in the Fall of 2001 indicated adverse reactions including death, birth defects and a wide range of autoimmune disorders that were not included in the then-current March 1999 FDA-approved package insert.  These adverse reactions were never disclosed to service members subject to mandatory vaccinations with AVA.  The Center for Disease Control is a subordinate entity of Defendant Department of Health and Human Services.

66. In January 2002, the FDA-approved product insert for AVA was modified to include the above adverse reactions such as death, birth defects and autoimmune disorders, consistent with the informed consent provided to civilians in the Fall of 2001. The new FDA-approved package insert also changed the "use in pregnancy" rating from Category C ("risk cannot be ruled out") to Category D ("positive evidence of risk"). This information has not been provided to service members, and service members are not provided with a copy of the FDA-approved package insert prior to mandatory vaccination.

## FIRST CAUSE OF ACTION
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)

67. Plaintiffs reallege the facts in Paragraphs 1 through 66 as if fully set forth in this Count.

68. Defendant DoD will inoculate Plaintiffs with the AVA within the immediate future. Defendant DoD notified Plaintiffs that they will be ordered to submit to AVA inoculation shortly, in some cases within 30 days.

69. The submission of an Investigational New Drug application by DoD and BioPort for AVA for inhalation anthrax renders the drug an investigational new drug if used as a preventative against inhalation anthrax.

70. The DoD's actions in ordering Plaintiff's to submit to vaccination with an investigational new drug, without seeking the Plaintiff's informed consent, violate a federal statute, namely 10 U.S.C. § 1107, as well as Executive Order 13139 and DoD Directive 6200.2.

71. The Defendant's failure to follow federal law, a presidential executive order and DoD regulations in its AVIP creates a legal wrong against the Plaintiffs. Plaintiffs are entitled to seek review of Defendant's actions under the Administrative Procedure Act, 5 U.S.C. § 702.

## SECOND CAUSE OF ACTION
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)

72. Plaintiffs reallege the facts in Paragraphs 1 through 66 as if fully set forth in this Count.

73. Defendant's use of an unlicensed or improperly licensed vaccine is a violation of Food and Drug Administration regulations found at 21 C.F.R. § 312, and a violation of the Food and

Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., and also means that DoD is using a drug unapproved for its intended use.  DoD's actions violate 10 U.S.C. § 1107, Executive Order 13139, and DoD Directive 6200.2.

74. Defendant's intent to inoculate Plaintiffs with an unlicensed drug, unapproved for its intended use, is a legal wrong against Plaintiffs, entitling them to judicial review under the Administrative Procedure Act, 5 U.S.C. § 702.

## THIRD CAUSE OF ACTION
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)

75. Plaintiffs reallege the facts in Paragraphs 1 through 66 as if fully set forth in this Count.

76. The DoD's intentional alteration of the licensed and FDA-approved schedule of vaccinations and use of AVA in a mass inoculation program renders the AVA a drug unapproved for its intended or applied use within the meaning of 21 U.S.C. § 355; 10 U.S.C. § 1107, 21 C.F.R. § 201.5, Executive Order 13139 and DOD Directive 6200.2. Upon information and belief, the DoD routinely only administers two or three vaccination shots based on its belief that additional shots are unnecessary to afford adequate protection. Oftentimes, individuals receive only one or two vaccinations.

77. The DoD's intent to inoculate, and in fact the inoculation of, Plaintiffs with the AVA according to an unlicensed and unapproved vaccination schedule, is a legal wrong against Plaintiffs, entitling them to judicial review under the Administrative Procedure Act, 5 U.S.C. § 702.

78. In fact, at least one plaintiff, John Doe#3, who spent more than 30 days assigned to a military base in the Middle East and was ordered to take the vaccine, received only one shot. No follow-up by the DoD ever occurred to ensure he received his second through sixth shots, in violation of the FDA's licensing requirement for AVA.

79. The FDA has recognized the DoD as a manufacturer of the AVA. The deviation from the FDA licensing requirements governing shot sequence constitutes an off-label use prohibited by federal statute and regulation.

16

80. The DoD's intentional alteration of the AVA shot sequence schedule creates a legal wrong against the Plaintiffs. Plaintiffs are entitled to seek review of DoD's actions under the Administrative Procedure Act, 5 U.S.C. § 702.

## FOURTH CAUSE OF ACTION
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)

81. Plaintiffs reallege the facts in Paragraphs 1 through 66 as if fully set forth in this Count.

82. In 1985, as part of an FDA biologic and drug licensing review, the Biologics Review Panel, an independent advisory panel to the FDA, recommended that the FDA classify the AVA as "not misbranded". On December 13, 1985, the FDA published in the Federal Register a Proposed Rule to adopt the Panel's recommendations and finalize FDA approval of the AVA license.

83. On October 12, 2001, a Citizen Petition was filed with the FDA challenging the FDA's unreasonable delay to finalize the Rule. The specific relief requested in the Petition was rejected by the FDA on August 28, 2002.

84. On January 5, 2004, the FDA published in the Federal Register a Final rule and final order concerning the AVA. The Final rule and final order purports to respond to matters covered in the proposed rule published in the Federal Register on December 13, 1985. The issuance of this Final rule and final order constitutes final agency action under the Administrative Procedure Act. 5 U.S.C. § 704.

85. The FDA published the Final rule and final order in direct response to this litigation and due to pressure imposed on it by DoD and other sources.

86. The FDA's 1985 Proposed Rule did not propose that the anthrax vaccine was effective against exposure to aerosolized anthrax. The review panel concluded that the vaccine's "efficacy against inhalation anthrax is not well documented…no meaningful assessment of its value against inhalation anthrax is possible due to its low incidence." As the question of efficacy against aerosolized exposure was not at issue, the FDA did not respond to the panel's conclusion or seek public comment on this specific matter either in 1985 or 2003.

17

87. In issuing its Final rule and final order, the FDA acted in bad faith and excluded evidence adverse to its determination which was known to it at the time of the decisionmaking. Additionally, it has distorted or exaggerated the scientific conclusions upon which it relied for its decision, and failed to note significant limitations asserted by the authors of anthrax-related studies. The FDA's stated rationale is but a pretext masking the true basis of its decision. It has no rational connection and is unsupported by substantial evidence. Therefore, the Final rule and final order, to the extent it applies to AVA, is arbitrary and capricious.

88. The FDA's reliance on studies involving animal data to support its conclusion that the AVA is effective against inhalation anthrax is inappropriate and violates its own regulations. No scientific correlation has been demonstrated between animal studies and human reaction with respect to AVA, thereby negating its value. FDA's reliance on faulty data to justify the issuance of its Final rule and final order constitutes an abuse of discretion.

89. The FDA's judgment and analysis in issuing the Final rule and final order does not merit deference under the circumstances and is so unwarranted by the facts that it is subject to trial de novo.

90. The FDA's Final rule and final order was issued in violation of its own internal procedures and requirements, and was so arbitrary and capricious as to amount to bad faith. The issuance and contents of the Final rule and final order are nothing less than extraordinary and demonstrate a departure from the FDA's consistent and longstanding precedents and policies. The FDA has failed to explain the reasons for its departure from precedent. The FDA's Final rule and final order was issued without observance of procedure as required by law.

WHEREFORE, Plaintiffs, and those similarly situated to them, respectfully ask this Court to:

A.  Certify this action as a class action, including creating any subclasses which the Court deems appropriate;

B.  Designate the law firms of McGuire Woods, LLP and Krieger & Zaid, PLLC, as class counsel;

C.  Find and declare that AVA, as it is being used by Defendants, is an investigational new drug within the meaning of 10 U.S.C. § 1107, Executive Order 13139 and DoD Directive 6200.2;

D.  Find and declare that AVA has been in investigational new drug status since the original investigational new drug application was filed on September 20, 1996;

E.  Find and declare that as a result of the unilateral change in vaccination schedule by Defendant DoD, the AVA is a drug unapproved for its intended use within the meaning of 10 U.S.C. § 1107, Executive Order 13139, and DoD Directive 6200.2, as of June, 2000;

F.  Find and declare that AVA is an unlicensed or improperly licensed biologic product under FDA regulations and, therefore, is a drug unapproved for its intended use within the meaning of 10 U.S.C. § 1107, Executive Order 13139 and DoD Directive 6200.2;

G.  Find and declare that the FDA's Final rule and final order was issued in violation of the Administrative Procedure Act, thereby voiding its application, and remand the matter to the FDA for further evaluation;

H.  Enjoin Defendant from inoculating Plaintiffs, and those similarly situated to them, without informed consent, or in accordance with the provisions of 10 U.S.C. § 1107, Executive Order 13139 and DoD Directive 6200.2; and

I.  Award Plaintiffs their costs and attorneys' fees and any other relief this Court may find appropriate.

Date:  January 6, 2004

Respectfully submitted,


/s/

_____

Mark S. Zaid, Esq.
D.C. Bar #440532
Krieger & Zaid, PLLC
1747 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20006
(202) 454-2809


/s/

_____

John J. Michels, Jr., Esq.
D.C. Bar #457575
McGUIREWOODS LLP
77 W. Wacker, Suite 4400
Chicago, Illinois 60601
(312) 849-8150

Attorney For The Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE #1, JOHN DOE #2,       *
JOHN DOE #3, JOHN DOE #4,       *
JOHN DOE #5, JANE DOE #1       *
c/o Mark S. Zaid, Esq.       *
Mark S. Zaid, P.C.       *
1920 N Street, N.W.       *
Suite 300       *
Washington, D.C. 20036       *
     *
     and       *
     *
OTHER SIMILARLY SITUATED       *
INDIVIDUALS       *
     *
       Plaintiffs,       *
     *     Civil Action No. 06-_____
     vs.       *
     *
ANDREW C. VON ESCHENBACH       *
COMMISSIONER       *
FOOD AND DRUG ADMINISTRATION       *
5600 Fishers Lane       *
Rockville, Maryland   20857-0001,       *
     *
     and       *
     *
ROBERT GATES       *
SECRETARY OF DEFENSE       *
DEPARTMENT OF DEFENSE       *
1000 Defense Pentagon       *
Washington, D.C. 20301       *
     *

```
       and                          *
                                    *
MIKE LEAVITT                        *
SECRETARY OF HEALTH AND             *
HUMAN SERVICES                      *
DEPARTMENT OF HEALTH AND            *
HUMAN SERVICES                      *
200 Independence Avenue, S.W.       *
Washington, D.C. 20201,             *
                                    *
       Defendants.                  *
*     *     *     *     *     *     *     *     *     *     *     *     *
```

## COMPLAINT

Plaintiffs John Doe #1, John Doe #2, John Doe #3, John Doe #4, John Doe #5 and Jane Doe #1, on behalf of themselves and all other similarly situated individuals, file this action against defendants Andrew C. Von Eschenbach, Commissioner, Food and Drug Administration ("FDA"), Robert Gates, Secretary of Defense, Department of Defense ("DoD"), and Mike Leavitt, Secretary of Health and Human Services, Department of Health and Human Services.

Plaintiffs seek temporary and permanent injunctive relief from the DoD's anthrax vaccination program, as well as a declaratory judgment that Anthrax Vaccine Adsorbed ("AVA" or "BioThrax"), which will imminently or is currently being involuntarily administered to active and Reserve U.S. Armed Forces members and DoD civilian employees, is a drug unapproved for its applied/intended use, pursuant to 10 U.S.C. § 1107, Executive Order 13139, DoD Directive 6200.2, and 21 C.F.R. § 201.5, and is being administered to United States service members, federal employees and civilian defense contractors in violation of federal law.  Plaintiffs seek this relief pursuant to the Administrative Procedures Act, 5 U.S.C. § 551, et seq., the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and the All Writs Act, 28 U.S.C. § 1651.

## PARTIES

1.   Plaintiffs are active duty service members, Reservists, National Guardsmen and civilian employees and/or DoD contractors who have been ordered, or will be ordered, perhaps imminently, to take AVA as part of their military duties or employment obligations. If administered the vaccine it is likely, as has been the case in the past, that they will be administered the AVA in violation of the FDA's mandated shot sequence protocol. Similarly situated individuals include current members of the active duty and Reserve forces of the Armed Forces, National Guardsmen and current civilian DoD employees and contractors who have been ordered, or will imminently be ordered, to take the vaccination series, or who have been administered the vaccine in violation of the FDA's mandated sequence protocol.

2.   Defendant Department of Defense is the principal user of AVA. By order of the Secretary of Defense, the DoD is engaged in the practice of mass inoculations of active duty and reserve members of the Armed Forces, and civilian employees, without seeking the informed consent of those individuals prior to giving the vaccination.

3.   Defendant Department of Health and Human Services ("HHS"), through its agent the FDA, is the federal agency responsible for licensing and quality control of drugs and biologic products, such as vaccines like the AVA.  The FDA is responsible for promulgating federal regulations that describe whether a drug or vaccine is safe, effective, and not misbranded, or a drug unapproved for its applied use.

## CLASS ACTION ALLEGATIONS

4.   This action is brought by the plaintiffs, on their own behalf and on behalf of the class of all others similarly situated, under the provisions of Fed. R. Civ. P. 23(a) and (b).

5.   The class so represented by the plaintiffs in this action, and of which they are members, consists of active duty, reservists and national guardsmen of the United States Armed Forces, as well as any civilian federal employees or DoD contractors who have taken, been ordered to take, or will be ordered to take, the anthrax vaccine.

6.   The exact number of members of the class, as hereinabove identified and described, is not known, but it is estimated that there are in excess of 2.5 million members. The class is so numerous that joinder of individual members is impractical.

7.   The relief sought is common to the entire class, and there are common questions of law and fact that relate to and affect the rights of each member of the class. These common questions include and involve whether the AVA is an IND, as defined by 21 U.S.C. § 355, or a drug unapproved for its intended use, pursuant to 10 U.S.C. § 1107, Executive Order 13139, DoD Directive 6200.2, and 21 C.F.R. § 201.5, or is being administered to United States military service members, federal employees and civilian defense contractors in violation of federal law. Certain defenses raised by the defendants would apply equally to all members of the class.

8.   The claims of the plaintiffs are typical of the claims of the class in that the claims of all members of the class depend on a showing of the acts and omissions of defendants as giving rise to rights to the relief sought herein. There is no conflict as between the plaintiffs and other members of the class with respect to this action, or with respect to the claims for relief contained herein.

9.   The plaintiffs are representative parties for the class, and are able to and will fairly and adequately protect the interests of the class. The attorneys for the plaintiffs are experienced and capable in litigating the claims at issue and have successfully represented claimants in other litigation matters of this nature. Attorneys John J. Michels, Jr. of McGuire Woods, LLP, and

Mark S. Zaid of Mark S. Zaid, P.C. will actively conduct and be responsible for the conduct of the action on behalf of the plaintiff class.

10. This action is properly maintained as a class action in that the prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of others not parties to the adjudications, or would substantially impair or impede their ability to protect their interests.

11. This action is properly maintained as a class action inasmuch as the questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## JURISDICTION AND VENUE

12. There is a legitimate matter in controversy between the named parties because plaintiffs' claim that AVA is a drug unapproved for its applied use in the DoD vaccination program, requiring the Secretary of Defense and DoD to secure informed consent before DoD may administer AVA to them.

13. Plaintiffs will suffer substantial and irreparable injury if they are forced to take the vaccine because of defendants' failure to follow presidential orders and/or federal law requiring informed consent prior to the administration of a drug unapproved for its applied use to members of the Armed Forces.

14. Jurisdiction is proper in this Court under the Administrative Procedures Act, 5 U.S.C. § 702, and under 28 U.S.C. § 2201, which states that actions involving controversies with federal

agencies may be pursued in any United States District Court, and under 28 U.S.C. §§ 1331 and 1346.

## **FACTUAL BACKGROUND**

### **A. Licensing History of Anthrax Vaccine Adsorbed**

15. Anthrax Vaccine Absorbed ("AVA") is the only vaccine in the United States licensed as a prophylactic against any version of anthrax.

16. The vaccine was originally licensed as a preventive for cutaneous anthrax for "individuals who may come in contact with imported animal hides, furs, bone meal, wool, hair (especially goat hair), and bristles; for all personnel and factories handling these materials and for individuals contemplating investigational studies involving *Bacillus anthracis*."

17. The vaccine is licensed to be given in the following intervals: three 0.5 mL subcutaneous inoculations given two weeks apart followed by three 0.5 mL subcutaneous inoculations given at six, twelve and eighteen months.

18. A 2002 product insert revision (wherein AVA is referred to as "BioThrax") lists the categories of people who would benefit from immunization that is nearly identical to categories listed in the 1979 insert:

> BioThrax is indicated for the active immunization against Bacillus anthracis of individuals between 18 and 65 years of age who come in contact with animal products such as hides, hair or bones that come from anthrax-indemic areas, and that may be contaminated with Bacillus anthracis spores. BioThrax is also indicated for individuals at high risk of exposure to Bacillus anthracis spores such as veterinarians, laboratory workers, and others whose occupations may involve handling potentially infected animals or other contaminated materials. Since the risk of anthrax infection in the general population is low, routine immunization is not recommended.

19. The only human field trial of an anthrax vaccine ("the Brachman Study") was conducted in the 1950s at four mills where goat hair was processed.

20. The Brachman study involved approximately 1,200 mill employees of whom about 40 percent received the vaccine and the remainder received a placebo or nothing. The average yearly incidence of clinical anthrax in this population was 1 percent. During the evaluation period, 26 cases of anthrax occurred. Twenty-one of the affected individuals received no vaccine, four had incomplete immunizations and one completed the immunization process.

21. Based on analysis of attack rates per 1,000 person-months, the Brachman study indicated that the vaccine gave 93 percent (lower 95 percent confidence limit = 65 percent) protection against cutaneous anthrax based on comparison with the control group.

22. However, recent studies have concluded that Brachman's analysis is flawed and that the vaccine's effectiveness was not statistically significant in 75% of the mills studied.

23. Prior to licensing, the National Institute of Health ("NIH"), the federal licensing authority for biological products such as AVA, made clear that no existing studies (including the Brachman study) established the efficacy of AVA.

24. Notwithstanding the lack of proper evidence reflecting efficacy, NIH licensed AVA on November 2, 1970.

25. In 1972, the authority to regulate and license biologics (including vaccines like AVA) was transferred to FDA. In order to determine exactly what NIH-licensed products were actually effective, FDA promulgated regulations to evaluate the safety, effectiveness, and labeling of all NIH licensed biologics. Specifically, the regulations require the Commissioner to appoint an advisory panel, which must include qualified experts capable of reaching responsible medical

and scientific findings, to review the labeling of the products, and to advise the Commissioner

"on which of the biological products under review are safe, effective, and not misbranded."

26. In accordance with the newly promulgated regulations, an advisory panel (the "Expert

Panel"), independent of FDA, evaluated the entire AVA record and submitted its report in 1980.

27. The Expert Panel indicated in its report that although the vaccine appeared to offer

protection against cutaneous anthrax under the limited circumstances for which it was employed,

there was insufficient evidence to support an indication of its effectiveness against inhalation

anthrax. However, it recommended that the FDA classify the AVA as safe and effective for its

limited role in protecting commercial animal hide processing operations.

28. On December 13, 1985, the FDA issued a Proposed Final Rule and Order to adopt the

Expert Panel's report verbatim and finalize FDA approval of the AVA license. However, after

the closure of the 90-day comment period on March 13, 1986, the FDA took no further action on

the panel's report until December 30, 2003.

29. Averring that there was no vaccine in current use which would safely and effectively

protect military personnel against exposure to anthrax, the DoD (through the Department of the

Army) issued a Request for Proposals ("RFP") No. DAMD17-85-R-0078, in 1985, soliciting the

development of a new anthrax vaccine.  Additionally, the Request for Proposals noted that AVA

was highly reactogenic, required multiple boosters to maintain immunity, and might not protect

against all strains of anthrax.

30. On October 20, 1995, the Army Joint Program Office for Biological Defense met to

begin the process of obtaining FDA approval to modify its license to include an indication that

AVA was effective against inhalation anthrax. At the meeting, the participants noted that studies

of AVA effectiveness in people working in tanneries showed protection against skin contact

anthrax, but that there was insufficient data to demonstrate protection against inhalation anthrax.

31. On September 20, 1996, as part of the Army/SAIC plan, the AVA manufacturer,

Michigan Biologic Products Institute ("MBPI", the successor to MDPH) submitted to the FDA

an IND for AVA.  The application was prepared, in whole or in part, by a U.S. Army agency

located at Fort Detrick, Maryland.

32. The submission of the IND application was accompanied by a testing protocol designed

to demonstrate effectiveness against inhalation anthrax in animals and correlate that

effectiveness with comparable effectiveness in human subjects.

33. In December 1997, DoD announced a multi-service vaccination program for all active

duty, Reserve and National Guard service members using AVA as a preventative for inhalation

anthrax (the Anthrax Vaccine Immunization Program or "AVIP"). As part of this program,

Plaintiffs and those similarly situated to them were ordered to submit to involuntary anthrax

vaccinations.

34. In 2002, a Citizen Petition challenge to the safety and efficacy of AVA, noting FDA's

unreasonable delay to finalize the 1985 Rule, was rejected. In the rejection letter, the FDA

erroneously combined statistical categories to reach a combined number to validate the

effectiveness of the vaccine against inhalation anthrax.

35. In March 2003, affected members of the U.S. military and several DoD employees filed

suit, John Doe#1 et al. v. Rumsfeld et al., Civil Action No. 03-707, in the U.S. District Court for

the District of Columbia asking the Court to enjoin the Anthrax Vaccine Immunization Program

(AVIP) of the DoD, and to declare AVA an investigational drug when used for inhalation

anthrax.

36. On December 22, 2003, the Court first granted the plaintiffs' Motion for Preliminary Injunction and enjoined the defendants from inoculating service members under AVIP in the absence of informed consent or a Presidential waiver of informed consent. Later, on October 27, 2004, the Court permanently enjoined the defendants from inoculating service members under AVIP because the vaccine was not properly licensed on procedural grounds, specifically that FDA failed to allow public comment, despite a substantial change in the basis for FDA's action. However, the Court explicitly declined to decide the substantive issues at that time.

37. In response, the FDA reopened the comment period for 90 days on the Bacterial Vaccines and Toxoids efficacy review document. As a result of the Court's decision, the DoD initiated a "voluntary" vaccination program.

38. On December 19, 2005, the FDA announced it was issuing its Final Rule and Order on characterization of AVA.  FDA declared AVA to be safe, effective, and not misbranded, as protection against <u>all</u> forms of anthrax, and placed it in Category I.

39. The FDA based these findings in substantial part on the 1950s Brachman study and a CDC open label study performed in the 1960s. However, the FDA's Final Rule and Order failed to address the substantive licensing issues raised by plaintiffs in the first *Doe* litigation.

40. On October 16, 2006, DoD announced the resumption of the mandatory Anthrax Vaccine Immunization Program for military personnel and emergency-essential DoD civilians and contractors serving in the Iraq, Afghanistan and South Korea theatres (which would include individuals who could be deployed to such areas).

**B.  The FDA's reasoning for placing AVA in Category I is analytically flawed.**

41. In its 2005 Final Rule and Order, the FDA asserts that the Brachman Study shows that AVA is effective against anthrax regardless of exposure. The FDA came to this conclusion by improperly combining the outcome of cutaneous anthrax cases with the small number of

inhalation anthrax cases. While admitting that there "are too few [inhalation anthrax cases] to support a meaningful statistical conclusion," the FDA still claimed that "the calculated effectiveness level against all reported cases of anthrax combined in those subjects was 92.5%."

42. Contrary to the FDA's averments, modern statistical analysis of Brachman data reveals that there is no statistical correlation between vaccination with AVA and inhalation anthrax protection. Indeed, Brachman himself admitted that "no assessment of effectiveness of the vaccine against inhalation anthrax could be made [from his study] because there were too few cases." The FDA's analysis of combining two difference outcomes (cutaneous and inhalation anthrax infection) to obtain a statistically favorable result for inhalation anthrax is statistically flawed, incompatible with normal FDA procedure, and represents an arbitrary and capricious decision-making process that violates the APA.

**C. The current version of AVA is significantly different than the originally licensed version.**

43. The original vaccine, manufactured by Defendant DoD at Fort Detrick, Maryland, went through significant manufacturing and formulaic changes to arrive at its current formulation. In fact, there are four different variations of the vaccine, produced by three different manufacturers. Subsequent to the completion of Brachman's study, the vaccine has undergone the following substantial alterations:

> (1)    The strain of bacteria used to produce the vaccine was changed from R1-NP, a nonencapsulated, nonproteolytic mutant form of *B. anthracis* to V770-NP1-R.
>
> (2)    The active and component ingredients were altered. The production process was changed "to increase the concentration of the active ingredient, known as 'protective antigen' (increasing the vaccine's potency), and to decrease the amount of other bacterial components in the vaccine thus increasing purity");
>
> (3)    The AVA manufacturing method changed from using an aerobic method to using an anaerobic method.

(4)    The AVA manufacturers changed from DoD personnel at Fort Detrick, to Merck Sharp & Dohme from 1960 to 1961, and finally to the Michigan Department of Public Health ("MDPH") in the mid-1960s.

(5)    Further changes were made to the manufacturing process in order to scale up production.  For example, in the 1960s, after the completion of the Brachman Study, the DoD changed the mutant B. anthracis strain used to produce the vaccine and use of an anaerobic culture method.

44. U.S. Army medical research personnel from Fort Detrick, Maryland determined in October 1990 that changes in the AVA manufacturing process (specifically to the fermenters and filters) resulted in a 100-fold increase in AVA protective antigen levels from previous versions of the vaccine.

45. The vaccine which FDA found to be safe, effective, and not misbranded based on the Brachman study is not the same vaccine as is currently being administered to the members of the military.

46. The FDA regulations mandate that changes in manufacturer, changes in manufacturing, and other alterations like those associated with AVA, require new clinical trials.  However, the only human field trial conducted on AVA was performed with the earliest version of the vaccine and is now more than 40 years old.

47. FDA's failure to require new trials or re-licensing of the AVA is an abuse of discretion and an arbitrary and capricious failure to follow its own regulations.

**D.  The Anthrax Vaccine Immunization Program.**

48. The MDPH, in its 1996 IND, expressed interest in pursuing certain labeling changes which would "affect the specific clinical indication, route and vaccination schedule for AVA." The FDA has not determined that any changes in the vaccination schedule are proper or consistent with the current license. On September 29, 1999, Dr. Kathryn Zoon, Director, FDA

Center for Biologic Evaluation and Research, wrote to Dr. Sue Bailey, Assistant Secretary of

Defense Health Affairs and stated:

> We reiterate our previous statement made to DoD on December 16, 1997, that FDA approval of the anthrax vaccine is based on the six-dose regimen found in the approved labeling. Because we are unaware of any data demonstrating that any deviation from the approved intervals of doses found in the approved labeling will provide protection from anthrax infection, we strongly recommend that Anthrax Vaccine Immunization Program follow FDA approved schedule.

49. Beginning in July of 2000, the first of several reductions in the scope of the AVIP took

place because of a failure by Bioport Corporation to meet federal manufacturing standards. DoD

stated that it was suspending AVA vaccinations for all but a limited number of personnel

because of a shortage of the vaccine.

50. As part of this suspension, DoD announced that members of the Armed Forces who had

received at least one of the sequences of six vaccinations required by the AVA product license

would be subject to a modified vaccination schedule that is inconsistent with the vaccination

schedule required by the AVA license. Specifically, DoD announced that members who had

received one or more vaccinations, but who had not completed the six shot sequence of

vaccinations, would not be required to restart the inoculation sequence as long as they received a

subsequent shot within two years of their last vaccination.

51. This modified schedule was never approved by the FDA. DoD's current vaccination

program also intends to implement a schedule that is unapproved by the FDA.

52. Following an initial suspension in 2001 because of insufficient stock of AVA, DoD

formally resumed the AVIP in June 2002. On August 6, 2002, DoD published policy guidance to

component services. In part, the guidance stated that, "Those individuals that have had their

doses deferred shall resume the series when directed …."

53. On October 11, 2002, the Chief of Staff, United States Air Force, promulgated an AVIP policy and guidance for all active duty and reserve units. The policy states, in Annex B, Paragraphs 4b:

> The Anthrax vaccine is a six-dose schedule [sic] followed by an annual booster. The vaccine doses are given at 0, 2 and 4 weeks, followed by doses at 6, 12, and 18 months, and an annual booster thereafter. The vaccine must be given in accordance with the above dosing schedule, as approved by the Food and Drug Administration (emphasis in original).

54. Notwithstanding the guidance to follow the licensed vaccination schedule, Paragraph 4c of Annex B states:

> Personnel whose vaccination series was interrupted during the pervious AVIP slowdown will not need to repeat any doses already received in the vaccine series or received extra doses. Once these individuals are identified as requiring the vaccine, they will just continue with the next dose in the series.

55. Upon information and belief, similar policies have been adopted by all other military services.

56. Following the FDA's Final Rule and Order of December 19, 2005, DoD issued a memorandum on October 12, 2006, to the Secretaries of the Military Departments, the Chairman of the Joint Chiefs of Staff, the Under Secretaries of Defense, the Assistant Secretaries of Defense, General Counsel for the DoD, the Inspector General of the DoD, the Directors of Defense Agencies, and the Commandant of the U.S. Coast Guard, regarding the resumption of the mandatory Anthrax Vaccine Immunization Program. In part, this memorandum stated: "Individuals whose vaccine series was interrupted are not required to restart the vaccine series, but will proceed in accordance with appropriate medical practice." Upon information and belief, the sentence means that service members who already had inoculations, no matter how long ago, will not take the shots in the FDA approved sequence.

14

57. The deviation from the licensed application schedule for AVA and the use of AVA in a mass inoculation effort represent an "off-label" use of the AVA by DoD.  Indeed, DoD is currently seeking test subjects to validate its practice of altering the shot sequence.

58. The use of the AVA outside the licensed application schedule makes the AVA a drug unapproved for its applied use under 10 U.S.C. § 1107.

### FIRST CAUSE OF ACTION
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)

59. Plaintiffs reallege the facts in Paragraphs 1 through 58 as if fully set forth in this Count.

60. To support its categorization of AVA as safe, effective, and not misbranded, FDA's 2005 Final Rule relies upon the Brachman Study, a field trial conducted in the 1950's, and a CDC observational safety study conducted from 1966 to 1971.

61. However, these studies are not scientifically sound and therefore cannot be used to prove that AVA is effective.

62. In its 2005 Final Rule and Order, FDA avers that the Brachman Study shows that AVA is effective against anthrax regardless of the route of exposure. In so finding, the FDA expressly rejects the Expert Panel's Report, which concluded "that the protection was limited to cutaneous anthrax cases," yet the FDA never conducted any new scientifically sound study.  Rather, the FDA improperly combines the outcome of cutaneous anthrax cases with the small number of inhalation anthrax cases – which the FDA admits "are too few to support a meaningful statistical conclusion" if analyzed separately – and claims that "the calculated effectiveness level against all reported cases of anthrax combined in those subjects was 92.5%."

63. Contrary to the FDA's assertion, modern statistical analysis of Brachman data reveals that there is no statistical correlation between vaccination with AVA and inhalation anthrax protection.

64. In fact, Brachman himself admitted that "no assessment of the effectiveness of the vaccine against inhalational anthrax could be made [from his study] because there were too few cases." The Brachman "data simply do not provide statistically significant evidence of protection against inhalation anthrax…. [e]ven taking both cutaneous and inhalation anthrax into account, we found that the vaccine's protective effects were not significant in 75% of the mills tested."

65. FDA's analysis—combining two different outcomes (cutaneous and inhalation anthrax infection) to obtain a statistically favorable result—is incompatible with normal FDA procedure, and represents an arbitrary and capricious decision-making process that violated the APA.

66. Additionally, the CDC surveillance data from the observational safety study was much less well controlled than the Brachman field study. Its use was incompatible with normal FDA procedure and represents an arbitrary and capricious decision-making process that violated the APA.

67. FDA's 2005 Final Rule and Order also relies on animal studies to prove efficacy, which is an improper analysis under the requirements of 21 CFR § 601.25(d)(2). No correlate of immunity has ever been found between any of the animals tested and human beings, a requirement for the use of or reliance upon animal studies.

68. The FDA issued its Final Rule and Order in violation of its own internal procedures and requirements, and was so arbitrary and capricious as to amount to a violation of the APA.

69. The process that led to its issuance, and the factual support for the contents of the actual Final Rule Order, are completely inconsistent with FDA procedure and requirements.

70. The FDA has deviated from the procedures it uses for vaccines used in a civilian capacity. Additionally, the Final Rule and Order relies upon flawed and inconsistent data so as to nullify its validity.

71. Upon further information and belief, the FDA's Final Rule and Order was issued as a result of pressure by DoD and other sources to approve AVA.

72. Defendant's reliance on flawed scientific studies in licensing AVA is a violation of the Administrative Procedure Act.

## SECOND CAUSE OF ACTION
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)

73. Plaintiffs reallege the facts in Paragraphs 1 through 58 as if fully set forth in this Count.

74. Statutory requirements at the time of AVA's initial licensing did not require that it be tested for efficacy.

75. When AVA was licensed in 1970 under the Public Health and Safety Act ("PHSA"), a manufacturer needed only to demonstrate safety, purity, and potency in support of a licensing decision.  However, after 1972, under the Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer must demonstrate that its vaccine is safe, effective, and not misbranded.

76. The standards articulated under the PHSA and the FDCA are different. Potency and efficacy are not synonymous. In order for a biological product to be licensed, it must be tested to ensure that it is "safe, pure, potent, and effective"

77. Thus, under its original 1970 license, AVA was never tested for efficacy.

78. In an attempt to rectify this oversight, FDA avers in its 2005 Final Rule and Order that the tests conducted prior to AVA's licensing, namely the Brachman Study and the CDC observational safety study show that AVA is effective to protect against anthrax infection regardless of the route of exposure.

79. However, these studies provide no scientific evidence of the AVA's efficacy.

80. Prior to licensing, NIH made clear that no existing studies (including the Brachman study) provided sufficient proof that AVA was effective.

17

81. FDA noted in its 1985 review of AVA that the vaccine's "efficacy against inhalation anthrax is not well documented ... no meaningful assessment of its value against inhalation anthrax is possible due to its low incidence."

82.  Similarly, in 1999, Dr. Friedlander, an Army expert, observed that "[n]o assessment of the effectiveness of the vaccine against inhalation anthrax could be made because there were too few cases" in the original Brachman study.

83. Likewise, a 2002 Institute of Medicine ("IOM") Report stated that "the small number of inhalation anthrax cases in those studies provides insufficient information to allow a conclusion about the vaccine's efficacy against inhalation infection to be made."

84. Thus, no study utilized by FDA has shown that AVA is effective against inhalation anthrax, which means the vaccine is a drug unapproved for its applied used under 10 U.S.C § 1107.

85. Defendant's failure to prove that AVA is effective is a violation of the Administrative Procedure Act.

### THIRD CAUSE OF ACTION
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT)

86. Plaintiffs reallege the facts in Paragraphs 1 through 58 as if fully set forth in this Count.

87. Although the original version of the anthrax vaccine underwent a human field trial (the "Brachman study"), the current version of the vaccine (AVA) has never been employed in a controlled field trial.

88. Since the Brachman study, the anthrax vaccine has undergone significant manufacturing and formulaic changes.

89. However, FDA has approved AVA without requiring additional trials to ensure that the vaccine in its current state is safe and effective.

18

90. No single manufacturer of AVA created a successor product, and so the FDA's "comparability policy" does not apply. The FDA's "comparability policy" simply allows a single manufacturer to make minor manufacturing changes to a product without performing additional clinical studies to demonstrate the safety and efficacy of the successor product. Rather, four different variations of AVA were manufactured by three different manufacturers. Since the vaccine's inception, DoD, Merck, Sharp & Donne, and the Michigan Department of Public Health each have manufactured different variations of AVA.

91. Defendants approved the altered vaccine without subjecting it to further clinical trials.

92. The FDA's actions violated its own rules and regulations and are therefore a violation of the Administrative Procedure Act.

### FOURTH CAUSE OF ACTION
### (VIOLATION OF 10 U.S.C. § 1107)

93. Plaintiffs reallege the facts in Paragraphs 1 through 58 as if fully set forth in this Count.

94. 10 U.S.C. § 1107 (2000) provides that investigational new drugs or drugs unapproved for their applied uses may not be given to members of the Armed Forced without their informed consent except in the case of a waiver by the President of the United States.

95. Similarly, Executive Order 13139 states that before administering an investigational drug or a drug unapproved for its intended use to members of the Armed Forces, the DoD must obtain informed consent from each individual unless a waiver of this requirement is signed by the President of the United States.

96. DoD has adopted the requirements of 10 U.S.C. § 1107 and Executive Order 13139 and set up procedures to follow these requirements in DoD Directive 6200.2 dated August 1, 2000.

97. AVA's license sets forth a specific vaccination schedule.

98. Since 2000, DoD has been following a vaccination schedule inconsistent with the schedule required by the AVA license.

99. Therefore, DoD is or will be inoculating the plaintiffs and all similarly situated individuals "off-label." This deviation from the required vaccination schedule is a new and unapproved use of AVA by DoD.

100. Such new uses of a product that are not in accordance with product labeling render AVA a drug "unapproved for its intended use" under 21 C.F.R. § 201.5, and subject to the requirements of 10 U.S.C. § 1107 (2000), Executive Order 13139 and DoD Directive 6200.2.

101. Under 10 U.S.C. § 1107, a drug unapproved for its intended use may not be given to members of the Armed Forces without their prior consent.

102. Plaintiffs are part of an inoculation program first instituted by DoD in 1997, and reconstituted in October 2006, and have not been given nor will be given the opportunity for informed consent before being inoculated. In fact, DoD is not providing informed consent to any of its service members prior to inoculating them.

103. Therefore, the Defendant's failure to comply with the vaccination schedule coupled with its mandatory inoculation program is a violation of 10 U.S.C. § 1107.

**WHEREFORE**, Plaintiffs, and those similarly situated to them, respectfully ask this Court to:

A.  Find and declare that as a result of the unilateral change in vaccination schedule by defendant DoD, AVA is a drug unapproved for its applied use within the meaning of 10 U.S.C. § 1107, Executive Order 13139, and DoD Directive 6200.2;

20

B.  Find and declare that AVA is an improperly licensed biologic product under FDA regulations and, therefore, is a drug unapproved for its applied use within the meaning of 10 U.S.C. § 1107, Executive Order 13139 and DoD Directive 6200.2;

C.  Find and declare that AVA is an improperly licensed biologic product under FDA regulations as there is no valid evidence of human efficacy;

D.  Find and declare that AVA is an improperly licensed biologic product under FDA regulations as it is being used in a manner that is inconsistent with the license and product labeling;

E.  Vacate the FDA's Final Rule and Order of December 19, 2005, as being arbitrary and/or capricious and not based on the facts under the Administrative Procedure Act;

F.  Enjoin defendant DoD from inoculating the plaintiffs, and those similarly situated to them, without informed consent, or in accordance with the provisions of 10 U.S.C. § 1107, Executive Order 13139 and DoD Directive 6200.2; and

G.  Award plaintiffs their costs and attorneys' fees and any other relief this Court may find appropriate.

Date:   December 13, 2006

Respectfully submitted,


/s/
_____
Mark S. Zaid, Esq.
D.C. Bar #440532
Mark S. Zaid, P.C.
1920 N Street, N.W.
Suite 300
Washington, D.C. 20036
(202) 454-2809
ZaidMS@aol.com

21

John J. Michels, Jr., Esq.
D.C. Bar #457575
McGuireWoods LLP
77 W. Wacker, Suite 4400
Chicago, Illinois 60601
(312) 849-8150
jmichels@mcguirewoods.com

Attorney for the Plaintiffs