**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN DOE #1 <u>et al.</u> | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Action No. 06-2131 (EGS) |
| vs. | * | |
| | * | |
| ANDREW C. VON ESCHENBACH | * | |
| COMMISSIONR | * | |
| FOOD AND DRUG ADMINISTRATION | * | |
| <u>et al.</u> | * | |
| Defendants. | * | |

* * * * * * * * * * * *

**REPLY TO DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' EX-PARTE MOTION FOR LEAVE TO**
<u>**FILE COMPLAINT USING "JOHN DOES" AND "JANE DOES"**</u>

This is a follow-up, and related, lawsuit to <u>John Doe#1 et al. v. Rumseld et al,</u>, Civil Action No. 03-707 (D.D.C.)(EGS), both of which were filed to challenge the legality of the defendant Department of Defense's Anthrax Vaccination Immunization Program. In the original action the plaintiffs were also permitted to utilize "John Doe" and "Jane Doe" pseudonyms. The plaintiffs in this case, John Does Numbers 2 through 5 and Jane Doe Number 1 ("Plaintiffs"), seek the identical relief. [1] This time, however, the defendants are formally challenging Plaintiffs' request to remain anonymous.

As with the previous case, the plaintiffs should be permitted to proceed anonymously. If the plaintiffs are forced to reveal their identities they will be irrevocably harmed. Indeed, as set forth more fully below, if plaintiffs' identities are revealed, they likely will be subjected to retaliation

---

[1] The plaintiff previously identified as "John Doe #1" will no longer participate in the litigation in large part due to his reasonable good faith concerns that he will be retaliated against if his employer learns of this litigation. <u>See</u> Declaration of Mark S. Zaid, Esq., at ¶12 (dated February 20, 2007)("Zaid Decl."), attached at Exhibit "1".

and punishment that will ultimately undermine their ability to bring this action.  Moreover, the

defendants face a minimal risk of prejudice if plaintiffs proceed anonymously.

I.  **<u>PLAINTIFFS SHOULD BE ENTITLED TO PROCEED ANONYMOUSLY</u>**

There is no local rule governing whether this Court should permit a party to proceed

anonymously in the instant litigation.  <u>Qualls v. Rumsfeld</u>, 228 F.R.D. 8, 10 (D.D.C. 2005).

Rather, the decision of whether to permit parties to proceed under a pseudonym is committed to

the sound discretion of the Court.  <u>See</u> <u>James v. Jacobson</u>, 6 F.3d 233, 238 (4th Cir. 1993).

Several circuit courts condone pseudonymous litigation, because of the recognition that

"confidentiality concerns are sometimes sufficiently critical that parties should be allowed"

anonymity.  <u>Id</u>.  Indeed, "there is a judicial duty to inquire into the circumstances of a particular

case to determine whether [anonymity] is warranted."  <u>Id</u>.

Both the Supreme Court and the D.C. Circuit Court of Appeals, although not directly

addressing the issue, have permitted pseudonymous litigation to proceed.  <u>See</u> <u>Qualls</u>, 228

F.R.D. at 10 (citing <u>Roe v. Wade</u>, 410 U.S. 113 (1973); <u>Doe v. Sullivan</u>, 938 F.2d 1370 (D.C.

Cir. 1991)).  However, the determination of whether to permit a party to proceed anonymously is

guided by weighing several factors.  None of the factors alone is dispositive, and the Court

should consider all relevant factors.

One significant factor in determining whether to permit a party to proceed as a "Doe"

plaintiff is whether "the . . . party would be compelled to admit criminal behavior or be subject to

punishment by the state."  <u>Qualls</u>, 228 F.R.D. at 11 (citations omitted).  Where this situation

exists, it weighs heavily in favor of granting permission to proceed anonymously.  Id. at 10-11.

Other factors to consider include: whether anonymity is sought to preserve privacy in sensitive or

highly personal matters; whether identification would pose a risk of retaliatory harm; whether the

parties seeking anonymity are minors; whether the action is against a governmental or a private

party, and; whether there is a risk of unfairness to the opposing party.  See James, 6 F.3d at 238

(citations omitted).  Here, only four of the six factors are relevant.

 A. *Plaintiffs Should Remain Anonymous So They Are Not Forced to Admit an Intention to Engage in Conduct Punishable By the Military*

Courts recognize that permitting a plaintiff to remain anonymous in prosecuting a lawsuit is

warranted if the plaintiff, by proceeding, will be forced to admit to potential criminal violations

or conduct punishable by the state.  See Qualls, 228 F.R.D. at 11; see also S. Methodist Univ.

Ass'n of Women Law Students v. Wynn & Jaffe, 599 F.2d 707, 713 (5th Cir. 1979)(recognizing

that plaintiffs have been permitted to proceed under pseudonyms in cases in which they "had to

admit that they . . . wished to engage in prohibited conduct"), citing Doe v. Commonwealth's

Attorney for Richmond, 403 F. Supp. 1199 (E.D.Va. 1975)(class representative challenging state

sodomy statute); Roe, 410 U.S. 113 (challenging state statutes criminalizing abortion).

Here, plaintiffs include active duty military service members, National Guard members who

are facing deployment, and a civilian employee already in a vaccination target area.  If military

officials (or civilian federal employer) are able to identify them, these officials will be able to

retaliate against them for specifically prosecuting this lawsuit or more broadly challenging the

vaccination program. That retaliation could take the form of an order directing mandatory

administration of the anthrax vaccine. Refusal to take the vaccine will then lead to the institution

of court-martial charges or, in the case of the civilian, termination proceedings. This risk of

retaliation is real, and not based on speculation, given DoD's position that it is entitled to

administer involuntary vaccinations to military personnel.  See e.g., Approval of U.S. Army

Anthrax Vaccine Immunization Program (AVIP) Implementation Plan, February 13, 2007,

available at *http://www.vaccines.mil/documents/1007ALARACT_AVAcontinue.pdf*.  Additionally,

military officials and defense contractors have a history of retaliatory actions when it comes to implementing its anthrax vaccination program. See Zaid Decl. at *passim*; Declaration of John J. Michels, Esq. at *passim* (dated February 19, 2007), attached at Exhibit "2"

If the military plaintiffs refuse to comply with the mandatory order, they will then be subjected to discipline under the military justice system. See Uniform Code of Military Justice, 10 U.S.C. § 892 Art. 92 (2006)(providing that any person who fails to obey a lawful order or regulation shall be punished as a court-martial may direct). As a result, if plaintiffs' identities are revealed, they will be put in the untenable position of having to publicly engage in conduct that is tantamount to military criminal conduct, or conduct otherwise punishable by the state. Thus, this factor weighs heavily in favor of permitting Plaintiffs to proceed anonymously.

II.  *If Plaintiff' Identities are Revealed The Defendant Department of Defense May Take Actions To Strip Them of Standing*

Revealing plaintiffs' identities will not only compel them to confess that they intend to disobey a lawful order, but the plaintiffs may potentially lose their standing to bring this action by the actions of the defendant Department of Defense to create a court-martial scenario. See generally Doe #1 v. Rumsfeld, 297 F. Supp. 2d 119, 128 (D.D.C. 2003)(Sullivan, J.)(recognizing that an issue in federal court can be rendered non-justiciable if the federal matter was "instigated in an attempt to thwart a pending court martial"). This is the type of serious retaliatory harm that justifies permitting a party to proceed anonymously. See, James, 6 F.3d at 238; see also Yacovelli v. Moeser, Case No. 1:02CV596, 2004 U.S. Dist. LEXIS 9152, at *21 (M.D.N.C. May 20, 2004)(a copy of the decision is attached at Exhibit "3"). Once the plaintiffs are within the jurisdiction of the military justice system for disobeying an order, this Court essentially loses jurisdiction. In other words, the issues before the Court will no longer be justiciable because one or more of the plaintiffs will be unable to maintain their standing and will be unable to take any

- 5 -

action to prevent this from occurring.  Schlesinger v. Councilman, 420 U.S. 738, 758

(1975)(holding that federal courts must refrain from intervention "when a serviceman charged

with crimes by military authorities can show no harm other than that attendant to resolution of

his case in the military justice system"). In sum, if plaintiffs' identities are disclosed it may

create circumstances that will be rob them of their right to seek relief in the federal courts.

Unlike the situation in Qualls, the threat of retaliation in this case is real.  In Qualls, the

plaintiff soldiers sought to challenge the involuntary extension of their tours of duty under

pseudonyms.  Qualls, 228 F.R.D. at 9.  The soldiers asserted that if their identities were revealed,

there was "a *potential* for increased tension" within their units and "retaliatory conduct" that

could ultimately result in their deaths while on duty in Iraq.  Id. at 11 (emphasis added).  The

court held that a vague concern about potential retaliation, unsupported by affidavits from the

individual soldiers, was insufficient to warrant permission to proceed with the lawsuit using

pseudonyms.  Id. at 12.

In stark contrast, here, the risk of retaliation is not a speculative risk of physical harm.[2]  The

plaintiffs have included declarations filed by counsel who possess personal knowledge of past

retaliation relating to the anthrax vaccine. Within one of the declarations are statements made by

---

[2]Plaintiffs, however, also assert that they may be subject to potentially grave physical harm as a result of being compelled to take an experimental vaccine treatment as yet untested and unapproved for the military's proffered purposes, and administered without regard to existing regulations governing use of experimental drugs and informed consent. As this Court noted in granting a preliminary injunction: "The women and men of our armed forces put their lives on the line every day to preserve and safeguard the freedoms that all Americans cherish and enjoy. Absent an informed consent or presidential waiver, the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs." Doe #1, 297 F.Supp.2d at 135.

four of the plaintiffs as well attesting to their experiences and/or concerns.[3]. See Zaid Decl. at ¶11. Thus, the plaintiffs reasonably believe that disclosure of their identities will set in motion retaliation within the military and civilian personnel system. Indeed, plaintiffs will be subject to what is tantamount to an involuntary dismissal of their action with prejudice by actions outside of their control. Given the severity of this result, this factor weighs in favor of permitting plaintiffs to proceed anonymously.

### III. Defendants are Government Agencies, and They Face a Minimal Risk of Prejudice if Plaintiffs Proceed Anonymously

Courts appear more willing to allow plaintiffs to proceed anonymously when they are challenging government activity as opposed to private wrongdoing. See Yacovelli, 2004 U.S. Dist. LEXIS, at *1 (pseudonymous college-student plaintiffs permitted to proceed anonymously when challenging the constitutionality of a public university's policy). The plaintiffs are challenging government activity, not private wrongdoing. Importantly, the plaintiffs' anonymity creates a minimal risk of prejudice to defendants because this case involves legal issues surrounding the validity of government conduct. None of the plaintiffs' credibility is at issue. Both of these factors weigh in favor of permitting plaintiffs to proceed anonymously.

More specifically, the plaintiffs are challenging the scientific determinations underlying defendant Food & Drug Administration's ("FDA") December 19, 2005 Order that held that anthrax vaccine adsorbed is safe, effective, and not misbranded for use against inhalation anthrax, as well as the defendant DoD's decision to reinstitute involuntary inoculations of the vaccine for military personnel and DoD employees. See Complaint at 1 (filed December 13,

---

[3] In order to file these statements on the public record, rather than under seal, it was decided to incorporate the plaintiffs' views into counsel's declaration. This, of course, required that identifying information be eliminated. If the Court desires more specific details the plaintiffs are more than willing to provide individual sworn declarations under seal.

2006). Each of the individual defendants is named only in his official capacity as an agency representative. Id. at ¶¶ 2-3. Therefore, the defendants' need to know plaintiffs' identities is significantly reduced.

Additionally, where a case does not hinge on credibility, the risk of unfairness and prejudice by permitting a plaintiff to proceed anonymously is significantly reduced. See Yacovelli, 2004 U.S. Dist. LEXIS 9152, at *25; James, 6 F.3d at 238-39. The plaintiffs' anonymity poses little risk of unfairness and prejudice to defendants because legal questions, not credibility, are the focus of this matter. In other words, none of the defendants can validly claim that they are prejudiced in defending this case because they do not know the plaintiffs' identities.[4] See, generally, Doe v. Stegall, 653 F.2d 180, 185 (5th Cir. 1981)(where party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them, parties may proceed anonymously).

## CONCLUSION

For the foregoing reasons, the favorable adjudication of Plaintiffs' Ex-Parte Motion for Leave to File Complaint Using "John Does" and "Jane Does" should remain in place, and the

---

[4] Defendants' argument that they need plaintiffs' identities revealed in order to make standing and/or class representation arguments is a red herring. This certainly did not result in a problem with the initial Doe lawsuit and there is no reason to believe it will be the case here. There is no real dispute that each of the individual plaintiffs has standing (by virtue of their status as active-duty military servicemembers or emergency essential civilians) to maintain the instant lawsuit. Each of them potentially faces in the future or faces now inoculation with the vaccine. The plaintiffs are more than willing to continually update this Court with any changes in a plaintiffs' military/civilian status Additionally, the plaintiffs will soon move for class certification thereby likely bringing into this case tens of thousands of servicemembers who are also facing inoculation. Finally, the crux of this case is actually against the defendant FDA in challenging its determination. The defendant DoD is simply utilizing that FDA decision as the basis for the vaccination program. If the FDA Order is declared void, the DoD program cannot legally be sustained. It is the plaintiffs' contention that, in light of their circumstances, each would have independent standing against the FDA.

plaintiffs should be permitted to proceed under these pseudonyms for the duration of this case (or

until the parties or Court orders otherwise).[5]

Date:  February 20, 2007

                                        Respectfully submitted,

                                            /s/
                                        _____

                                        Mark S. Zaid, Esq.
                                        D.C. Bar #440532
                                        MARK S. ZAID, P.C.
                                        1920 N Street, N.W.
                                        Suite 300
                                        Washington, D.C. 20036
                                        (202) 454-2809
                                        ZaidMS@aol.com

                                        John J. Michels, Jr., Esq.
                                        D.C. Bar #457575
                                        McGUIRE WOODS LLP
                                        77 W. Wacker Drive, Suite 4100
                                        Chicago, IL 60601
                                        (312) 849-8150

                                        *Counsel for Plaintiffs*

---

[5] Should the Court decide that the plaintiffs cannot proceed anonymously, the plaintiffs respectfully request thirty days to consider whether to reveal their identities, drop out of the case, seek certification for appeal and/or file an Amended Complaint.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN DOE #1 <u>et al.</u>                    *
                                            *
                                            *
              Plaintiffs,                   *
                                            *          Civil Action No. 06-2131 (EGS)
        vs.                                 *
                                            *
ANDREW C. VON ESCHENBACH                    *
COMMISSIONR                                 *
FOOD AND DRUG ADMINISTRATION                *
<u>et al.</u>                               *
              Defendants.                   *
*       *      *     *     *     *     *    *    *    *    *    *    *

## <u>DECLARATION OF MARK S. ZAID, ESQ.</u>

The undersigned hereby declares as follows:

1.   I am a person over eighteen (18) years of age and competent to testify. I make this declaration on personal knowledge. This declaration is submitted in support of the Reply to Defendants' Opposition to Plaintiffs' Ex-Parte Motion for Leave to File Complaint Using "John Does" and "Jane Does".

2.   I am admitted to practice law in the States of New York, Connecticut and the District of Columbia, as well as before the D.C. Circuit, Second Circuit and Fourth Circuit Court of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York and the Southern District of New York. I have been litigating cases involving the federal government for nearly a decade; essentially my entire professional legal career. I routinely represent individuals associated with or within the intelligence, law enforcement or military communities. Since 1998, I have also served as the Executive Director of The James Madison Project (*www.jamesmadisonproject.org*), which seeks to educate the public on secrecy and national security issues. Along with John J. Michels, Jr., Esq., I am co-counsel for the plaintiffs.

3. On December 14, 2006, I filed this action along with the Motion now in dispute. This lawsuit pertains to a legal challenge to the defendant Department of Defense's Anthrax Vaccination Immunization Program ("AVIP") as authorized by the defendant Food & Drug Administration. I set forth our reasoning in a declaration, currently under seal, dated December 12, 2006, as to why the plaintiffs believe it is both proper and necessary to initially prosecute this litigation through use of pseudonyms until such time as the parties stipulate or the Court orders otherwise. Each of the plaintiffs' true names, positions and employers were identified in my declaration. As has been publicly revealed the plaintiffs are either members of the Armed Forces (Active Duty, Reserve or National Guard) or Defense Department civilian employees.

4. In the predecessor action of Doe v. Rumsfeld, Civil Action No. 03-707 (D.D.C.)(EGS), which also pertained to a legal challenge to AVIP, we requested and were granted identical relief. Although the defendants did not formally file an opposition to our motion in that case, they did verbally oppose the request during the initial open proceedings which was denied by the Court. The identities of the plaintiffs were never revealed until recently, which was accomplished under the guise of the execution of a court-approved Protective Order, in order to permit the defendants to ascertain standing of the plaintiffs for purposes of our application for attorneys' fees. As I understand it, standing was confirmed for one or more of the plaintiffs thereby demonstrating their participation was legitimate.

5. At no time during the initial litigation was the identity or position of the plaintiffs ever at issue or even relevant to any dispute other than a challenge to standing. There will be no difference in this current lawsuit either. None of their conduct is at issue. Their ranks do not matter. Their responsibilities do not matter. Their testimony will likely never matter. For the purposes of this litigation, as was the case in the original litigation, the plaintiffs are nameless and faceless. All that matters is that they are potentially facing inoculation with the anthrax vaccine.

2

6.  It is the beliefs of the plaintiffs and their counsel that they face severe retaliation and repercussions, both personally and professionally, from the defendants were it to be known they have publicly challenged implementation of the AVIP. Actions could include, but not be limited to, administrative discipline, loss of employment and even criminal prosecution.

7.  I base my conclusions upon extensive personal experiences with the defendants. I have been intimately involved with the AVIP since it was first implemented service-wide in March 1998. This has included my testifying before Congress in 1999, handling two Freedom of Information Act lawsuits, two prior civil lawsuits challenging the AVIP and through service as lead defense counsel in more than one dozen courts-martials of military service members who refused the anthrax vaccine during 1998-2000, and representation of dozens of National Guardsmen, Reservists and civilians who also challenged the AVIP. Many of my clients suffered immediate retaliation that harmed their careers by their military commanders or civilian leadership, as well as significantly and unfavorably affected their personal lives.

8.  For example, I have personally witnessed clients being transferred to unfavorable and/or career-ending positions because they challenged, or at least were perceived to have challenged, their chain-of-command in publicly opposing the AVIP. I can also attest that my personal observations echo what John Doe #5, in particular, states with respect to the impact a public refusal has on the senior leadership. They are perceived by higher leadership as having failed in their responsibilities to have persuaded the men/women under their command to have taken the vaccination. This further exacerbates an already tense situation and creates additional conflicts and potential for retaliation.

9.  One personal experience I witnessed involved the first group of Marines I represented at 29 Palms in June 1999. They were significantly retaliated against by their leadership. Four of the Marines were completely isolated from their squad and assigned trivial and embarrassing tasks such as raking rocks back and forth in a square, or

3

spending day after day in the defense counsel's office doing nothing other than watching videos. Although their courts-martial proceedings did not interfere with their ability to perform their normal administrative responsibilities they were shunned and ostracized – essentially being found guilty of misconduct – before their trial even commenced. Moreover, it was made perfectly clear to my clients that once the court-martial was over, and they had served any sentence that had been meted out, they would be ordered to take the vaccine again, and prosecuted again. And that process would continue and continue and continue – until they submitted to the vaccination. This was a local command decision that did not emanate from the Pentagon, which likely had no knowledge this was occurring. This retaliation was so bad that each of my clients willingly requested bad conduct discharges in order to leave the service even though they had the opportunity to remain.

10. Can I unequivocally state that repercussions or retaliation will be experienced by each of the plaintiffs were their identities to be known? No, I cannot. But I have spent nearly fifteen years representing federal employees, including whistleblowers (which is certainly a comparable status to these plaintiffs) and history quite clearly demonstrates what often happens to those in the military or civilian federal employees when they challenge the system. In fact, in the past year, I have twice testified before the U.S. House of Representatives on efforts to strengthen federal whistleblower laws. The reason why such oversight is necessary is because of the acknowledgement that individuals, such as those who refuse or challenge the AVIP, are likely to suffer retaliation and lack sufficient protection.

11. I personally requested each of the plaintiffs to articulate why they believe they will be retaliated against, or the possible negative consequences that would arise, were they to be publicly identified in this lawsuit. I heard back from four of the plaintiffs (more than likely the other plaintiff, who is overseas, was unavailable due to his government

4

responsibilities). The plaintiffs were each informed these statements would be submitted under penalty of perjury. They expressed the following sentiments:

    a. ***John Doe #2 (Air National Guard, Major)***

        *I have been involved in protestations concerning the anthrax vaccine for more than five years. It has been my personal experience that individuals who oppose this vaccination program are singled out, have their character attacked, are discredited, are denied advancement/promotion, and are labeled as "non-patriotic", non-team players, etc., etc. I feel if my identity is revealed my ability to deploy and serve my country will be in jeopardy. I view the Government's attempt to force me to reveal my identity is nothing less than a pure, blatant, attempt to intimidate me (and it is succeeding). I have witnessed how our senior leadership (Wing/CC, Vice and O-6s at State Staff) did not want to hear ANYTHING negative against the shot. Once when a DoD AVIP Team came to "educate my squadron", I was ordered to "not be disruptive," which I took to clearly mean "do NOT ask questions."*

        *But the main thing I remember is the feeling of being a second class citizen due to my objections to the shot. All my Squadron mates were glad I was opposing the shot, but the leadership looked at me as a problem.*

        *Luckily, we ended up not having to take the shot and my career has progressed nicely. But with the ongoing war and the likelihood I will be deployed to the region, I am extremely concerned that if my identity is revealed my career is OVER.*

    b. ***John Doe #3 (Army, Private First Class)***

        *I am writing to request to remain anonymous as it would be detrimental to my status as a soldier to be revealed as I would be found by fellow soldiers and command to be against military cohesion and fear that as such I would be the target of retribution.*

    c. ***John Doe #5 (Air National Guard, LtCol)***

        *Witnessing the anthrax vaccine program implementation over the past eight years, any servicemember can cite multiple cases where anyone who voiced concern, refused the vaccine, or questioned the program were unequivocally retaliated against and shunned within their unit.  The program became a loyalty test, and those who questioned the vaccinations in my former unit were actually accused of being "traitors."  This was caught on video tape.  When I first took steps to protest the vaccination*

*when the program was first initiated I was grounded from my military flying position, and ordered to resign from my unit. It's taken me seven years to find a new military unit that was willing to hire me again, but only because they believed the anthrax vaccine program was not an issue anymore. Since the Department of Defense has announced starting the program again, I request that my continued concern be shielded, and my anonymity protected, so that I don't get removed again from my flying duties, and so that my current position and retirement are not threatened. More importantly, I do not want my new leaders, who have faith and confidence in my service, and are fully aware of my past experiences with the anthrax vaccine program, to be retaliated against or questioned by senior leaders in the military for their uncommon courage in hiring me.*

### d. Jane Doe#1 (Army, Captain)

*I am a very specialized officer within the Army, and as far as I know the only one of my position who has taken a stand against the vaccination policy. This is likely so because of the sensitive nature of my position. If my name is released, I will face the consequences and reprisal for this cause of action; my career as an Army Officer will be finished. I am not a sergeant in a platoon who is far removed from the headquarters and thus only his name would be mentioned by the brigade commander if his name is released. I advise a brigade commander on course of conduct. The commander's faith in me and the community I represent will be drastically diminished if he discovers his trusted advisor is party to this action.*

*My branch is small enough that everyone will know that I am a plaintiff in this action. The Division who I answer to will figure out who I am after a few facts are released. I am afraid if my name will be released I may have to pull out of this action like the "Try One" litigants (the enlistment contract litigation) in fear of reprisal.*

*In a former position of responsibility that I held there were several Soldiers in my jurisdiction that refused the anthrax vaccine and faced non-judicial punishment and administrative separation, resulting in an Other Than Honorable discharge. I saw how their concerns were ignored. When it was my turn, my concerns were ignored and actually I was laughed at. I have severe reservations about this "vaccine" and the only way to bring those legitimate concerns to light is this cause of action.*

*I like my profession and I like serving my country. I have almost eight years in service. I have been selected for promotion to Major and to attend a graduate course. This will all go away if my identity (and these*

*facts) is released.  I am a real Soldier and an officer.  Please protect my identity, as I am not ready for my Army career to be over.*

12. John Doe#1 will be withdrawing from the litigation altogether. The sole reason was due to his serious concern that his employer would discover his participation in this lawsuit. The defendants' mere filing of their Motion to challenge the Doe status was sufficient enough to intimidate him.

13. It would seem to us that the issue is more one of balance than anything else. What is the possibility of retaliation were the plaintiffs' identities revealed balanced against the need of the defendants to know the plaintiffs' identities? The possibility is real. The need is minimal to none.

I do solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge.

Date: February 20, 2007

/s/
_____
Mark S. Zaid, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN DOE #1 <u>et al.</u>                      *
                                              *
                                              *
                    Plaintiffs,               *
                                              *          Civil Action No. 06-2131 (EGS)
          vs.                                 *
                                              *
ANDREW C. VON ESCHENBACH               *
COMMISSIONR                                   *
FOOD AND DRUG ADMINISTRATION           *
<u>et al.</u>                                 *
                    Defendants.               *
*      *      *      *      *      *      *      *      *      *      *      *

<u>**DECLARATION OF JOHN J. MICHELS, JR., ESQ.**</u>

The undersigned hereby declares as follows:

1.      I am a person over eighteen (18) years of age and competent to testify.  I

make this declaration on personal knowledge.  This declaration is submitted in support of

the Reply to Defendants' Opposition to Plaintiffs' Ex-Parte Motion for Leave to File

Complaint Using "John Does" and "Jane Does".

2.      I am admitted to practice law in the states of Tennessee, Virginia and

Illinois and the District of Columbia.  I am also admitted to practice before the federal

Courts of Appeal for the DC Circuit, Second Circuit, Fourth Circuit, Sixth Circuit and

Tenth Circuit.  Among other courts, I am admitted to practice before the United States

District Courts for the District of Columbia, the Eastern District of Virginia, the Eastern

District of Tennessee, and the Northern District of Illinois.  I began my legal career trying

cases as a Judge Advocate for the United States Air Force in 1985, and continued

working in military law as both a prosecutor and defense counsel over the course of my

active duty and Reserve career.  I retired as a Lieutenant Colonel from the Air Force

Reserve in 2003.  Along with Mark S. Zaid, Esq., I am co-counsel for the Plaintiffs in this case.

3.      Mr. Zaid's Declaration truthfully sets out the nature of the claims and procedural history with regard to our filing of the case using John and Jane Doe pseudonyms.  See Declaration of Mark S. Zaid, Esq., at §§ 3-5.

4.      Both plaintiffs and their counsel in this case feel they will face severe and significant retaliation and repercussions, personally and professionally, from defendant Department of Defense if it became known that they were engaged in a public challenge to the implementation of the AVIP.  Potential retaliation could take many forms, but typically would include poor performance evaluations, unfavorable job reassignments, denial of selective or career-enhancing duty assignments, administrative discipline, and loss of employment.

5.      I base my conclusions upon extensive personal experience with the Department of Defense as both a prosecutor and a defense attorney over a period of approximately 20 years.  I have participated personally in the courts martial of two Air Force officers who opposed the anthrax vaccination program, as well as reviewing the cases of dozens of Reserve, National Guard, and active-duty service members who challenged the AVIP.  Virtually all of these people suffered immediate retaliation that harmed their careers and unfavorably affected their personal lives.

6.      I represented one client who was threatened with loss of his professional certification pay -- a contractually guaranteed amount – if he did not agree to publicly state that he would take the shot.  I represented another client who was removed from flying status because he was suddenly deemed "unreliable" after he announced his

opposition to the anthrax vaccine program.  I am aware of wing commanders who were removed from their positions following their questioning of the vaccine program using their chain of command.  I know of Guard and Reserve pilots who were removed from their units, or had their unit affiliations threatened as a result of their simply opposing the vaccine program.  There is no doubt in my mind that active-duty service members who take the step of suing the government to stop the vaccination program would be downgraded on their performance evaluations and face a myriad of unreviewable administrative actions designed to either force them out of the service or unequivocally end their careers.

7.      Given the fact that none of these Doe plaintiffs will be required to testify, and that their service status is the only thing that matters, it seems that the government's efforts to force their disclosure is nothing short of intimidation.  Plaintiffs' counsel has already demonstrated their ability to ensure that the plaintiffs in a virtually identical case maintained sufficient standing for the case to continue.  There is absolutely no reason, at this stage of the litigation, to force disclosure of these plaintiffs' names.

I solemnly affirm under the penalties of perjury that the contents of the foregoing are true to the best of my knowledge.

Date: February 19, 2007

/s/
_____
John J. Michels, Jr.

2004 U.S. Dist. LEXIS 9152, *

**JAMES YACOVELLI, TERRY MOFFITT, JOHN DOE NO. 1, JOHN DOE NO. 2,
a minor, by and through his parents, JOHN and JANE DOE, SR., as next friends,
and JANE ROE, Plaintiffs, v. JAMES MOESER, individually and in his official ca-
pacity as Chancellor of the University of North Carolina at Chapel Hill, and
CYNTHIA WOLF JOHNSON, in her official capacity as Associate Vice Chancellor
for Student Learning for the University of North Carolina at Chapel Hill, Defen-
dants.**

**Case No. 1:02CV596**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
NORTH CAROLINA**

***2004 U.S. Dist. LEXIS 9152***

**May 20, 2004, Decided
May 20, 2004, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Dis-
missed by *Yacovelli v. Moeser, 324 F. Supp. 2d 760,
2004 U.S. Dist. LEXIS 12815 (M.D.N.C., July 7, 2004)*

**DISPOSITION:** [*1] Defendants' Motion to Dismiss
the Taxpayer Plaintiffs was granted. Defendants' Motion
to Dismiss the Pseudonymous Plaintiffs was denied.
Plaintiffs' Motion to Proceed Anonymously was granted.
Defendants' Motion to Dismiss the Amended Complaint
was granted. Plaintiffs' Motion for Leave to File a Sec-
ond Amended Complaint was granted as to Free Exercise
claims and denied as to *Establishment Clause* claims and
claims for injunctive relief, Defendants' Motion to Stay
Discovery was granted. Plaintiffs' motion to strike was
denied.

**COUNSEL:** For JAMES YACOVELLI, TERRY
MOFFITT, JOHN DOE NO. 1, JOHN DOE NO. 2,
JANE ROE, plaintiffs: JAMES FLYNN WALKER,
DANIEL S. BULLARD, WALKER & BULLARD,
GIBSONVILLE, NC.

For JAMES YACOVELLI, TERRY MOFFITT, JOHN
DOE NO. 1, JOHN DOE NO. 2, JANE ROE, plaintiffs:
STEPHEN M. CRAMPTON, MICHAEL J. DEPRIMO,
BRIAN FAHLING, BRYAN J. BROWN, AMERICAN
FAMILY ASSOC. CENTER FOR LAW & POLICY,
TUPELO, MS.

For JAMES MOESER, CYNTHIA WOLF JOHNSON,
defendants: JOYCE S. RUTLEDGE, N. C.
DEPARTMENT OF JUSTICE, RALEIGH, NC.

**JUDGES:** N. Carlton Tilley, Jr., United States District
Judge.

**OPINION BY:** N. Carlton Tilley, Jr.

**OPINION:**

MEMORANDUM OPINION

TILLEY, Chief Judge.

This matter is before the Court on several pending
motions. Defendants [*2] filed Motions to Dismiss both
the Taxpayer Plaintiffs [Doc. # 10] and the Pseudony-
mous Plaintiffs [Doc. # 8]. The Plaintiffs filed a Motion
for Permission to Proceed Anonymously [Doc. # 14] and
a Motion for Leave to File a Second Amended Com-
plaint [Doc. # 42]. The Plaintiffs have also filed a Mo-
tion to Strike Portions of Affidavits [Doc. # 25]. Finally,
the Defendants have filed a Motion to Dismiss the
Amended Complaint [Doc. # 36] and a Motion to Stay
Discovery [Doc. # 34].

For the reasons set forth below, Defendants' Motion
to Dismiss the Taxpayer Plaintiffs will be GRANTED.
Defendants' Motion to Dismiss the Pseudonymous Plain-
tiffs will be DENIED. Plaintiffs' Motion to Proceed
Anonymously will be GRANTED. Defendants' Motion
to Dismiss the Amended Complaint will be GRANTED
as to the *Establishment Clause* Claims and the claims for
injunctive relief. Plaintiffs' Motion for Leave to File a
Second Amended Complaint will be GRANTED as to
the Free Exercise claims and DENIED as to the *Estab-
lishment Clause* claims and claims for injunctive relief.
Defendants' Motion to Stay Discovery will be
GRANTED. Plaintiffs' Motion to Strike will be
DENIED.

I.

The facts as set forth in [*3] the Amended Com-
plaint n1 are as follows: The University of North Caro-

2004 U.S. Dist. LEXIS 9152, *

lina at Chapel Hill ("UNC") has an orientation program prior to the beginning of classes for all incoming freshman. The stated goals of the orientation program are to: (1) stimulate discussion and critical thinking around a current topic, (2) introduce the student to academic life at UNC, (3) enhance a sense of community between students, faculty and staff, and (4) provide a common experience for incoming students. n2

> n1 Plaintiffs have filed a Motion for Leave to File a Second Amended Complaint but, because this Motion will be denied in part and because Defendants have moved to dismiss the Amended Complaint, the facts of the Amended Complaint will be used.

> n2 These goals were listed on UNC's website along with details about the assignment. Plaintiffs attached a hard copy of UNC's web page to their Amended Complaint and specifically referenced it in the Amended Complaint. These are considered because documents that are "integral to and explicitly relied on in the complaint" may be considered in a 12(b)(6) motion if their authenticity is not in question, *Phillips v. LCI Intern., Inc.,* 190 F.3d 609, 618 (4th Cir. 1999).

[*4]

UNC seeks to accomplish these goals by assigning a selected book, requesting that the students consider study questions and prepare a written response to the book, and holding a two-hour small-group discussion meeting led by volunteers. According to UNC's website, the purpose of the written requirement was to help students prepare for the discussion and to provide a sample of their analytical and writing skills for the First Year writing course.

For the 2002 orientation program, UNC selected portions of Michael Sells' Approaching the Qur'an: The Early Revelations (White Cloud Press 1999). Sells is "a ranking Islamicist" n3 and professor of religion at Haverford College. UNC stated in the assignment that it chose the book because Westerners have long been puzzled about the traditions of Islam and because it thought that a book exploring Islam was highly relevant in light of the terrorist attacks of September 11, 2001. UNC eventually changed the writing assignment for the 2002 orientation in order to allow those with religious objections to the book to write a short paper explaining their objections to reading the book instead of analyzing the book itself. n4

> n3 Plaintiffs contend that this description of Sells in a book review means that Sells "sympa-

thizes with (if not subscribes to) the religion of Islam." (Compl. P 20.)

[*5]

> n4 It appears that this alternative was provided in the wake of the lawsuit.

The assigned portions of the book were in two parts: pages 1-31 and 41-141. n5 Pages 1-31 contain a discussion of the historical, cultural, and literary content of the earliest Islamic writings - Muhammad's earliest revelations contained in the first written Suras. n6 These pages identify recurrent themes and discuss the organization of the individual Suras as compared with pre-Islamic, Arabian poetry. The unique compositional structure of the Qur'an is also discussed. Finally, sound recordings of the Suras being recited are included because the rhythmic patterns of the Arabic language are "central to the Qur'an." Sells, supra, at 22.

> n5 Because the book is integral to and relied on in the Complaint, and neither party disputes its authenticity, the Court will consider it without converting the motion into one for summary judgment. *Phillips, 190 F.3d at 618 (4th Cir. 1999).*

> n6 Suras are "hymnic chapters." Sells, supra, at 3.

[*6]

Sells states that "the purpose of the introduction is to clarify the cultural and historical matrix in which the Qur'an came to exist, the central themes and qualities of hymnic Suras, and the manner in which the Qur'an is experienced and taken to heart within Islamic societies." Id. at 4. Sells goes on to note that "the purpose of this book is neither to refute nor to promote the Qur'anic message. Rather, the goal is to allow those who do not have access to the Qur'an in its recited, Arabic form to encounter one of the most influential texts in human history in a manner that is accessible." Id. at 5. Sells explains his approach as follows:

> My approach to the Qur'an presumes to make no judgment on the ultimate truth of these texts, which are among the more influential in human history. It engages them with the respect for literary and theological depth that a translator gains through repeated efforts to recreate some

sense of the original. In that spirit, this volume is meant for a varied audience: for those who have wished to know something about Islam and who have little background in its history; for those who wish to study or teach the Qur'an in a classroom setting; [*7] and for Muslims who may find this version to capture some aspects of the text in a relevant way or who wish to share an approach to the Qur'an that is accessible with non-Muslim friends. My goal is to present in English some of the texture, tone, power, and subtlety of the Arabic text that is the Qur'an."

Id. at 26.

The second part of the assignment, pages 41-141, includes a translation of several Suras and accompanying commentary. The commentary includes observations about themes in the Suras, relating them to the culture of the time and sometimes comparing them to similar or different themes in other religions. See, e.g., id. at 57-59 (comparing Sura 83 to "the gospel parables of Jesus" and the "day of reckoning"). This portion of the book is dedicated to "issues of interpretation, historical context, and key themes" of Islam as expressed in the early Suras. Id. at 21.

Plaintiffs filed the instant lawsuit alleging that UNC's orientation program violated both the *Establishment Clause* and the *Free Exercise Clause of the First Amendment to the United States Constitution*. The Plaintiffs in this case include three pseudonymous UNC students n7 ("Pseudonymous Plaintiffs") [*8] and two non-student citizens ("Taxpayer Plaintiffs"). One of the Taxpayer Plaintiffs, James Yacovelli, is also an alumnus of UNC. n8

> n7 All three were prospective freshmen at the time this suit was instituted. One of the three was 17-years old at the time the Complaint was filed, and therefore brought suit through his parents.

> n8 Nothing about this fact, standing alone, makes the analysis of this particular Taxpayer Plaintiff's standing different from that of the other Taxpayer Plaintiff.

Plaintiffs contend that Approaching the Qur'an presents a biased view of Islam as a peaceful religion and that it leaves out less flattering stories about Muhammad. Plaintiffs conclude that this positive portrayal of both Muhammad and Islam constitutes an endorsement of Islam. Furthermore, Plaintiffs contend that the inclusion of Suras and a compact disk ("CD") containing a reading of these Suras in Arabic is impermissible. While Sells explains that listening to a reading of the text in Arabic creates a different experience [*9] than simply reading a translation, Plaintiffs argue that listening to the CD exposes students to "the spell cast by a holy man of Islam." (Compl. P 26.)

Plaintiffs also contend that, even if the students do not have to read the book, forcing students to write about and share personal religious beliefs intrudes on the *Free Exercise Clause of the United States Constitution*. In the Amended Complaint, Plaintiffs point to various study questions as evidence of UNC's impermissible purpose. For example, one set of study questions asks the students, "What did you really know about the Qur'an before reading this book?" and "What ideas or impressions did you have about Muslim cultures more generally? Has reading these parts of the Qur'an affected or changed those ideas or impressions about Islam? How?" Another set of questions asks, "What are the main human and personal virtues and vices or flaws that these readings emphasize? ... From your perspective, how comprehensive are these lists of virtues and vices? Is there anything you would add? Or de-emphasize? Why?"

Plaintiffs sought a preliminary injunction to keep UNC from conducting its summer program. Defendants responded by moving to dismiss [*10] both sets of plaintiffs, the Taxpayer Plaintiffs and the Pseudonymous Plaintiffs. Injunctive relief was denied both by this Court and by the Fourth Circuit. Thereafter, the Defendants filed a Motion to Dismiss the Amended Complaint in its entirety. Although the program has now been completed, Plaintiffs urge this Court to enjoin UNC from organizing such a program in the future. Plaintiffs also seek nominal damages and attorneys' fees.

II.

To date, Defendants have filed three motions to dismiss. Two of these motions are for the dismissal of particular Plaintiffs. Defendants moved to dismiss the Taxpayer Plaintiffs, James Yacovelli and Terry Moffitt, because of their alleged lack of standing to challenge the reading assignment. Defendants have also moved to dismiss the Pseudonymous Plaintiffs for failure to name themselves in the Complaint. For the reasons set forth below, Defendants' Motion to Dismiss the Taxpayer Plaintiffs will be GRANTED. However, Defendants' Motion to Dismiss the Pseudonymous Plaintiffs will be DENIED.

A.

Defendants first assert that The Taxpayer Plaintiffs lack standing as citizens or taxpayers to challenge the constitutionality of the reading assignment. Article III of the United States Constitution [*11] requires that only "cases" or "controversies" may be adjudicated. *Allen v. Wright, 468 U.S. 737, 750-51, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984)*. As part of this requirement, a plaintiff must demonstrate that he has standing to pursue the case or controversy. Id.

In order to demonstrate standing, plaintiffs need to satisfy the following three constitutional elements set forth by the Supreme Court: (1) injury in fact, (2) a causal connection between the injury and the challenged action, and (3) a likelihood that the court could redress the injury. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)*. In addition to the constitutional concerns, courts should also look to various "prudential" considerations when determining whether a plaintiff has standing. *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 474-75, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982)*. However, the Plaintiffs have not met the constitutional requirements, so prudential concerns need not be addressed.

1.

The Taxpayer Plaintiffs are unable to show the first constitutional standing element, [*12] injury in fact. The Fourth Circuit has recognized that "the concept of injury for standing purposes is particularly elusive in *Establishment Clause* cases." *Suhre v. Haywood County, 131 F.3d 1083, 1085 (4th Cir. 1997)* (citations omitted). However, there is no "hierarchy of constitutional values" or "'sliding scale' of standing." *Valley Forge, 454 U.S. at 484*. Therefore, a plaintiff suing for a violation of the *Establishment Clause* must still demonstrate some direct injury, whether it be economic or otherwise. Id.; *Suhre, 131 F.3d at 1086*. Specifically, to establish standing in an *Establishment Clause* case, the plaintiff must present more than a "mere abstract objection to unconstitutional conduct." *Suhre, 131 F.3d at 1086*.

There are only two allegations in the Amended Complaint which relate to the Taxpayer Plaintiffs. First, the Complaint alleges that the State of North Carolina spends taxpayer dollars in operating UNC. (Am. Compl. PP 5, 6.) Second, the Complaint alleges that UNC, through its freshman orientation program, used taxpayer dollars to violate the *First Amendment*. (Am. Compl. PP 12, 49.) No further allegation [*13] of injury to the Taxpayer Plaintiffs by, or personal contact with, UNC is included in the Amended Complaint. n9

n9 The Plaintiffs' proposed Second Amended Complaint also fails to allege any direct injury beyond the alleged constitutional violation.

Plaintiffs correctly point out that there is no requirement of economic injury in *Establishment Clause* cases. See *Suhre, 131 F.3d at 1086*. However, the Taxpayer Plaintiffs' claims fail not because of a lack of economic injury, but from a lack of any demonstrable injury. Plaintiffs argue that the intangible injury they have suffered is like that of plaintiffs in the "religious display" line of cases. Courts have found standing for citizens who suffer a personal injury from unwelcome state-sponsored religious displays, such as where a plaintiff objects to the placement of a creche in front of a municipal building or to the display of the Ten Commandments in a courthouse. Id. However, plaintiffs in those cases had to show something more than a [*14] negative reaction to the "observation of conduct with which one disagrees" in order to establish citizen standing. Id.

The Taxpayer Plaintiffs claim, in their response to the Defendants' Motion to Dismiss, that UNC's display of the assignment and study questions on the university's website is, in effect, an offensive state sponsored religious display. They further contend that placement of the freshman orientation information on the website subjects them to direct contact with an unwelcome religious exercise to which they strenuously object based on deeply held religious beliefs. Neither of these allegations were present in the Amended Complaint.

Even if the Amended Complaint had included allegations that the Taxpayer Plaintiffs suffered from their exposure to the website, these allegations would have been insufficient to establish injury. The Taxpayer Plaintiffs here lack the direct personal contact with the state sponsored offensive conduct that is required in the line of cases they cite. Indeed, Plaintiffs acknowledge this requirement by including in their Response Brief a quote from a constitutional law treatise explaining the requirement. L. Tribe, American Constitutional [*15] Law §§ 3-16 at 118-119 (2d ed. 1988) (stating that taxpayer plaintiffs must show "a direct and concrete impact upon themselves"). Any exposure the Taxpayer Plaintiffs may have had to the University website could be classified as little more than "observation of conduct with which one disagrees," which the Fourth Circuit has found insufficient for standing. *Suhre, 131 F.3d at 1086*.

It is also noteworthy that the website in question could not properly be deemed a religious display. The website provided a brief synopsis of Approaching the Qur'an without including any portions of either the book or the Qur'an. At most, it provided information about an orientation session that may or may not be constitutional.

In summary, even if Taxpayer Plaintiffs Yacovelli and Moffitt had alleged direct injury from exposure to UNC's website in the pleadings, they would not prevail because they cannot present a direct injury sufficient to confer standing.

2.

In addition to the Taxpayer Plaintiffs' argument that they have personally suffered a direct injury, they also claim that they have been injured as taxpayers. This second alleged basis for standing relies on the Supreme [*16] Court's decision in *Flast v. Cohen, 392 U.S. 83, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968)*. In Flast, the Supreme Court held that taxpayers may have standing to challenge congressional action taken under the taxing and spending clause. n10 Taxpayer standing is only appropriate when the congressional action in question violates constitutional provisions restricting the spending power, such as the *First Amendment's Establishment Clause. Id. at 102-103*.

n10 *U.S. Constitution, Art. 1, § 8, cl. 1*.

The exception enumerated in Flast was a narrow exception to the general rule that taxpayers do not have standing solely because of their taxpayer status. *392 U.S. at 102-103*; see also *Doremus v. Bd. of Educ. of Borough of Hawthorne, 342 U.S. 429, 433, 96 L. Ed. 475, 72 S. Ct. 394 (1952)* (finding no taxpayer standing where plaintiffs objecting to school Bible readings neither pointed to a particular appropriation, showed that the readings added to the school's operating costs, or demonstrated [*17] any direct financial injury). Plaintiffs asserting taxpayer status must allege more than a violation of the *Establishment Clause*. They must contend that, by use of the taxing and spending power, the government has exceeded its constitutional authority under the *Establishment Clause. Flast, 392 U.S. at 102-103*.

The cases the Taxpayer Plaintiffs cite are distinguishable from the instant case because those cases involve challenges to legislation governing the appropriation of tax moneys. n11 In the instant case, there is no congressional or state legislative exercise of the power to tax and spend. Plaintiffs do not allege any specific appropriations measure. Instead, Plaintiffs have filed suit to challenge the use of UNC's operating funds for the purpose of conducting the freshman orientation seminars, assuming more money was spent to conduct the seminars than would have been spent in the ordinary course of running UNC. Taxpayer standing does not exist in this factual scenario.

n11 *Jamestown Sch. Comm. v. Schmidt, 699 F.2d 1 n.1 (1st Cir. 1983)* (noting that plaintiffs had standing under Flast to challenge a statute requiring local school committees to provide bus transportation for private school students); *DiCenso v. Robinson, 316 F. Supp. 112 (D.R.I. 1970)* (challenging the validity of the *Salary Supplement Act* which provided state funds to teachers of non-religious subjects in private schools).

[*18]

Because Taxpayer Plaintiffs Yacovelli and Moffitt have not alleged any injury in fact, nor shown injury under *Flast*, they have no standing to assert claims for violation of the *Establishment Clause*. Accordingly, the Defendants' Motion to Dismiss the Taxpayer Plaintiffs will be GRANTED.

B.

Defendants also have moved to dismiss the Pseudonymous Plaintiffs, claiming that allowing the student plaintiffs to proceed anonymously would infringe on the public's interest in open court proceedings and would have a prejudicial effect on Defendants. Defendants further contend that the Pseudonymous Plaintiffs have offered no persuasive reason to support their desire to proceed pseudonymously. Plaintiffs both responded to the Defendants' Motion and filed their own Motion for Permission to Proceed Anonymously.

*Federal Rule of Civil Procedure 10(a)* requires that a complaint "include the names of all parties." *Rule 10(a)*, however, does not act as an absolute bar to pseudonymous filings. In certain exceptional circumstances, courts have determined that plaintiffs may file suit under a pseudonym. See, e.g., *James v. Jacobson, 6 F.3d 233, 238-39 (4th Cir. 1993)* [*19] (explaining the circumstances giving rise to a party's ability to proceed pseudonymously); *Doe v. Stegall, 653 F.2d 180 (5th Cir. 1981)* (allowing minor plaintiffs to use pseudonyms in action challenging the constitutionality of school Bible readings where townspeople had stated that they needed to "beat the evil out of these people").

When determining whether a plaintiff should be permitted to proceed under a pseudonym, courts must afford appropriate weight to the presumption of openness in judicial proceedings. The public has a legitimate interest in having access to court proceedings. See *Cox Broad. Corp. v. Cohn, 420 U.S. 469, 490-92, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975)*; *James, 6 F.3d at 238*. Courts must balance the presumption of openness with a plaintiff's privacy rights. In James, the Fourth Circuit enumerated several factors to consider when balancing the public's interest in open judicial proceedings with the plaintiff's privacy interest. The Fourth Circuit held that

district courts should consider the following when determining if a plaintiff will be granted the "rare dispensation" of proceeding anonymously:

> [1] whether [*20] the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personally nature; [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; [3] the ages of the persons whose privacy interests are sought to be protected; [4] whether the action is against a governmental or private party; and, relatedly, [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* at 238.

The first factor requires the plaintiff to identify a specific sensitive and personal privacy interest. The Pseudonymous Plaintiffs contend that their deeply held religious beliefs are sufficiently personal and sensitive to satisfy this factor. Religious beliefs are "quintessentially private." *Stegall, 653 F.2d at 186.* In fact, the Supreme Court has said that the purpose behind the *Establishment Clause* is that "religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion'" by [*21] government. *Engel v. Vitale, 370 U.S. 421, 431-32, 8 L. Ed. 2d 601, 82 S. Ct. 1261 (1962),* cited in *Mellen v. Bunting, 327 F.3d 355 (4th Cir. 2003).* Defendants' allegations to the contrary are unpersuasive. The first factor thus weighs in the Plaintiffs' favor.

The second factor addresses the threatened consequences of the identification of plaintiffs. Here, the Pseudonymous Plaintiffs first contend that they will be harassed and socially ostracized because of their involvement in the lawsuit. Plaintiffs point to e-mails received by the Family Policy Network that refer to supporters of Plaintiffs' cause as such things as "pathetic hate mongers," "close minded and ignorant," "idiot[s]," "silly ninnies," and "outrageously out of touch." However, embarrassment and harassment are generally insufficient to demonstrate retaliatory harm. *Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992); Stegall, 653 F.2d at 186* (stating that "the threat of hostile public reaction, standing alone, will only with great rarity warrant public anonymity").

The Pseudonymous Plaintiffs also contend that they will be subject to physical harm in retaliation for [*22] their views if their identities are publicly revealed. In support of this argument, Plaintiffs have identified portions of the Qur'an which state that "those who reject Islam must be killed." Plaintiffs also point to the terrorist activities of extreme fundamentalist Islamic groups, such as the bombings of the World Trade Centers and the death threats received by author Salmon Rushdie.

Finally, Plaintiffs identify several allegedly threatening e-mails. The e-mails, however, do not specifically threaten physical harm to the Plaintiffs. One of the more outrageous e-mails states that "you people suck a**. Why don't you all pack yourselves into a boat, go out into the middle of the ocean, and then set it on fire." Another states, "may evolution make quick work of you and pople [degree] [sic] who think like you (and I use 'think' in the most liberal sense [sic] possible)." While unpleasant and disturbing to the persons receiving them, these e-mails do not threaten physical harm.

Unlike the situation in *Stegall,* in which community members stated their desire to "beat the evil" out of those who objected to religious exercises, Plaintiffs here have not pointed to any likelihood [*23] of physical harm. See *Doe v. Beaumont Indep. Sch. Dist., 172 F.R.D. 215, 217 (E.D. Tex. 1997)* (noting that the "it has happened before, therefore it might happen here" argument was insufficient). At most, the students here face social ostracism and harassment which may upset them and disrupt their college community life and, thereby perhaps, their education. The second factor thus tips slightly in favor of Defendants.

The third factor considers the ages of the plaintiffs who seek to protect their privacy interests. John Doe No. 1 and Jane Roe were eighteen-years old and John Doe No. 2 was seventeen-years old at the time the Complaint was filed. Because one of the Plaintiffs was a minor at the time of filing, Plaintiffs are correct in noting the importance of this factor. In cases permitting plaintiffs to proceed with pseudonyms, minors are often among the plaintiffs. See e.g., *Stegall, 653 F.2d at 180.* Courts have allowed minor children anonymity while simultaneously denying adults the same protection in cases involving *First Amendment* challenges to religious displays at school. See, e.g., *Doe v. Santa Fe Indep. Sch. Dist., 933 F. Supp. 647, 651-52 (S.D. Tex. 1996)* [*24] (refusing to protect the identities of adult plaintiffs "who are simply not as vulnerable as schoolchildren to social and physical intimidation or violence centered around events at public schools").

Although "adolescents are often susceptible to pressure from their peers toward conformity, and that influence is the strongest in matters of social convention," *Lee*

*v. Weisman, 505 U.S. 577, 593, 120 L. Ed. 2d 467, 112 S. Ct. 2649 (1992)*, the Pseudonymous Plaintiffs in the instant case are not primary or secondary school students. Instead, they had graduated from high school at the time of the filing of this action, and are now finishing their second year in an undergraduate academic setting in which critical thought is essential to academic pursuits. Although all of the Plaintiffs are now of the age of majority, college students may still possess the immaturity of adolescence. The third factor therefore does not strongly favor either party.

The fourth factor explores the identity of the defendant in a given case and whether the plaintiff is pursuing legal action against a governmental or private party. When a plaintiff challenges the government or government activity, courts are more [*25] like to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing. See *Doe v. Harlan County Indep. Sch. Dist., 96 F. Supp. 2d 667, 671 (E.D. Ky. 2000)*; *Doe v. N.C. Central Univ., 1999 U.S. Dist. LEXIS 9804, 1999 WL 1939248 at *4 (M.D.N.C. April 15, 1999)*. Here, Plaintiffs are challenging the constitutionality of UNC's orientation requirements and not attacking the Chancellor per se. This factor therefore favors Plaintiffs.

The fifth factor looks at the risk of unfairness and prejudice to the other party. Defendants contend that Plaintiffs are directly attacking the Chancellor's reputation and that their identities should be disclosed in the interest of fairness. Courts have refused to grant anonymity to plaintiffs when credibility is at issue, such as in employment discrimination cases and cases involving deliberate wrongdoing. See, e.g., *James v. Jacobson, 6 F.3d 233, 238-39*; *Doe v. Frank, 951 F.2d 320, 323 (11th Cir. 1992)*. However, as noted above, Plaintiffs are targeting the constitutionality of a school policy and are not specifically targeting the Chancellor's personal reputation. [*26]

Further, none of the three Pseudonymous Plaintiffs has alleged that the Defendants caused them any specific or particular harm, such that the Defendants would be harmed by a failure to depose or identify the students. What is at issue is a legal question - whether or not there has been a violation of the *Establishment Clause*. The credibility and factual knowledge of the anonymous students are not at issue in deciding the matter. Therefore, the fifth factor tips in favor of Plaintiffs.

The five factors enumerated in James are not exclusive. *6 F.3d 233, 238.* Therefore, although not a factor enumerated in James, this Court may also consider the fact that the case has received intense media coverage. The threat of harassment and public hostility is therefore potentially more severe and harmful than that in a less publicized case.

The balance of the *James* factors weighs in Plaintiffs' favor. The Plaintiffs' personal religious beliefs at stake combined with the Defendants' weak showing of prejudice lean in favor of allowing pseudonyms in this case. Therefore, the Plaintiffs' Motion for Permission to Proceed Anonymously will be GRANTED and Defendants' Motion to [*27] Dismiss the Pseudonymous Plaintiffs will be DENIED.

III.

After simultaneously filing the Motion to Dismiss the Pseudonymous Plaintiffs and the Motion to Dismiss the Taxpayer Plaintiffs, but before filing their Answer, Defendants filed a Motion to Dismiss the Amended Complaint. The Motion to Dismiss the Amended Complaint contains two basic arguments: (1) that the Plaintiffs' equitable claims are moot, and (2) that the Plaintiffs' claim for nominal damages should be dismissed because of qualified immunity.

Plaintiffs contend that Defendants waived their right to file this 12(b)(6) Motion and to raise the defense of qualified immunity by filing an earlier 12(b) motion to dismiss. n12 *Federal Rule 12(g)* provides that a party raising any 12(b) defenses by pre-answer motion waives any 12(b) defenses that are not raised in that motion. However, a defense under *12(b)(6)* for failure to state a claim is not waived if not included in the pre-answer motion. *Rule 12(h)(2)* provides that a 12(b)(6) motion still may be raised in any pleading, by motion for judgment on the pleadings, or at trial. Defendants have not brought their 12(b)(6) motion in a pleading or motion for judgment on the pleadings. [*28] Instead, they have filed a separate pre-answer motion.

> n12 The Motion to Dismiss Pseudonymous Plaintiffs was brought pursuant to *Federal Rules 12(b)(1)* and *(b)(2)*. The Motion to Dismiss Taxpayer Plaintiffs alleged that the Plaintiffs lacked standing.

While technically a violation of the *12(g)* consolidation requirement, courts have allowed untimely 12(b)(6) motions where not imposed for the purpose of delay or harassment and where the motion would expedite disposition of the case on its merits. See e.g., *Coleman v. Pension Benefit Guar. Corp., 196 F.R.D. 193, 196 (D.D.C. 2000)*; *Mylan Lab., Inc. v. Akzo, Nev., 770 F. Supp. 1053, 1059 (D. Md. 1991)*; 2A James Wm. Moore et al., Moore's Federal Practice § 12.23 (3d ed. 1999); 5A Wright & Miller, Federal Practice and Procedure Civil 2d § 1392 at 762 (2d ed. 1990 & Supp. 2003) (finding

that the spirit of the law is to preserve the defense, not to delimit the mechanism for asserting it).

Here Defendants raised their earlier [*29] motions to dismiss the two groups of Plaintiffs, one for lack of standing and one for failure to reveal their names, in response to the Plaintiffs' efforts to obtain a preliminary injunction. The Defendants waited to raise the 12(b)(6) motion on the merits until after the Fourth Circuit completed its appellate review of the denial of the preliminary injunction. Given the circumstances of this case, there is no reason to go to the time and expense of filing an answer and moving for a judgment on the pleadings when the issues can be resolved now. Therefore, the Motion to Dismiss will be considered.

A.

Defendants first move to dismiss the equitable claims against UNC because they argue that the claims have become moot. Specifically, all of the orientation activities complained of in Amended Complaint were completed in 2002. Because there is no action to enjoin, the Defendants' Motion to Dismiss will be **GRANTED** as to the claims for injunctive relief.

The Constitution limits this Court's jurisdiction to the adjudication of actual cases and controversies. See U.S. Const. art. III, § 2. The requirement that a case have an actual, ongoing controversy extends throughout the [*30] pendency of the action. *Mellen v. Bunting, 327 F.3d 355, 363-64 (4th Cir. 2003)*. When the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome, the case becomes moot. Id.

When students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief generally become moot when they graduate and the policies no longer govern them. See e.g., *id. at 364; Bd. of Sch. Comm'rs of Indianapolis v. Jacobs, 420 U.S. 128, 129, 43 L. Ed. 2d 74, 95 S. Ct. 848 (1975)*. Plaintiffs do not contend that they will be subject to a freshman orientation program again, and hence they lack a legally cognizable interest in the outcome of this decision.

An exception to the mootness doctrine exists where the harm is "capable of repetition, yet evading review." *Mellen, 327 F.3d at 364*. This exception applies where two requirements are met: "(1) the challenged action is too short in duration to be fully litigated before the case will become moot; and (2) there is a reasonable expectation that the complaining party will be subjected to the same action again." Id. Students [*31] who bring suit challenging school policies but graduate during the pendency of the action do not ordinarily qualify for this exception because their graduation ensures that they will

never again be subject to the school's policies. Id. (listing several cases supporting this proposition).

As to the first requirement, the orientation program at issue in this case was brief in duration. The program was announced in May of 2002 and was completed in August of 2002. n13 However, this Court need not decide whether this time is too short in duration for full litigation because Plaintiffs fail the second requirement for the mootness exception. The Pseudonymous Plaintiffs in this case are no longer incoming freshmen at UNC, and therefore there is no chance that they will again be subject to any freshman orientation requirements. Although Plaintiffs cite Justice Scalia's dissenting opinion in *Honig v. Doe, 484 U.S. 305, 335-36, 98 L. Ed. 2d 686, 108 S. Ct. 592 (1988)*, for the proposition that a risk of harm to persons other than the complaining party may suffice under extraordinary circumstances, the current state of the law is otherwise. Defendants' Motion to Dismiss will be GRANTED as [*32] to the Plaintiffs' injunctive claims.

n13 Plaintiff's proposed Second Amended Complaint also objects to related on-and off-campus events, all of which were completed by mid-November of 2002.

B.

Defendants moved to dismiss the nominal damages claim against Chancellor Moeser in his individual capacity as to the *Establishment Clause* claims based on qualified immunity. Qualified immunity protects government officials performing discretionary functions from liability in an action under *42 U.S.C. § 1983* where the conduct of the official "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)*. Because this Court finds that Plaintiffs have not alleged the deprivation of a constitutional right, Defendants' Motion to Dismiss the nominal damages claim as to the *Establishment Clause* claim will be GRANTED.

Qualified immunity protects "all but the plainly [*33] incompetent or those who knowingly violate the law." *Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986); Williams v. Hansen, 326 F.3d 569, 579 (4th Cir. 2003)*. Essentially, qualified immunity gives a defendant "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985)*. A claim can be dismissed on qualified immunity grounds if the allegations of a complaint against a public official fail to state a violation of a clearly-established law. *Korb v. Lehman, 919 F.2d 243, 246-47*

*(4th Cir. 1990)*. Courts evaluate qualified immunity claims by first determining whether the plaintiff's allegations, if true, establish the deprivation of a constitutional right. *Mellen v. Bunting, 327 F.3d 355, 365 (4th Cir. 2003)*. Only if a deprivation has been alleged need the Court address whether that violated right was a clearly established right of which a reasonable person would have known. Id.

Plaintiffs contend that UNC's reading assignment and related discussion violate the *Establishment Clause*. n14 The *Establishment Clause* [*34] has long been the subject of intense litigation. Over time, the Supreme Court "has come to understand the *Establishment Clause* to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." *County of Allegheny v. A.C.L.U., 492 U.S. 573, 590-91, 106 L. Ed. 2d 472, 109 S. Ct. 3086 (1989)*. Furthermore, "it is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee v. Weisman, 505 U.S. 577, 587, 120 L. Ed. 2d 467, 112 S. Ct. 2649 (1992)*. On the other hand, government action does not automatically violate the *Establishment Clause* simply because it confers an incidental benefit upon religion. *Koenick v. Felton, 190 F.3d 259, 267 (4th Cir. 1999)*.

> n14 The *Fourteenth Amendment* extended *First Amendment* protections and prohibitions to the states. *Illinois ex rel. McCollum v. Bd. of Educ., 333 U.S. 203, 210, 92 L. Ed. 649, 68 S. Ct. 461 (1948)*.

[*35]

The likelihood of Plaintiffs succeeding on the merits of their *Establishment Clause* claim must be determined by analyzing the three prongs provided in *Lemon v. Kurtzman, 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971)*. n15 In Lemon, the Supreme Court stated that, to be constitutional, (1) the government activity must have a secular purpose, (2) the primary effect of the activity must neither advance nor inhibit religion, and (3) the activity must not cause the government to be excessively entangled in religion. *Id at 612-13*. Government activities or statutes are rendered unconstitutional if they violate any one of the Lemon prongs. *Stone v. Graham, 449 U.S. 39, 66 L. Ed. 2d 199, 101 S. Ct. 192 (1980)*.

> n15 Although the continued vitality of Lemon has been questioned, the Fourth Circuit continues to employ the Lemon test to evaluate alleged violations of the *Establishment Clause*. *Mellen, 327 F.3d at 370 (4th Cir. 2003)*.

1.

The first prong of the Lemon [*36] test requires courts to determine whether the government has a secular purpose in its actions. This prong "is a fairly low hurdle." *Mellen, 327 F.3d at 372 (4th Cir. 2003)*. A government activity lacks a secular purpose only if the activity was "'entirely motivated by a purpose to advance religion.'" Id. (citations omitted). In making this determination, the government's stated secular purpose is entitled to deference as long as it is sincere and not a sham. Id. The Supreme Court has looked to the history behind challenged policies as an aid in determining the sincerity of the stated secular purpose. See *Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 309, 147 L. Ed. 2d 295, 120 S. Ct. 2266 (2000)* (considering school's history of student-led prayers in determining the purpose of student-delivered messages at school football games).

UNC has stated a secular purpose for assigning Approaching the Qur'an. The assignment as posted on UNC's website explained that the book was selected in an effort to introduce incoming students to the academic life at UNC "by stimulating discussion and critical thinking around a current topic." The assignment explains that this [*37] book is particularly relevant in light of the terrorist events of September 11 and confusion about the Islamic faith. n16

> n16 Plaintiffs, on the other hand, contend that the only possible purposes of the reading assignment are to indoctrinate students with a favorable view of the Qur'an and to promote the Islamic faith.

Because UNC's stated secular purpose does not appear to be a sham, this Court will give deference to this stated secular purpose. The study of religious texts can be secular in purpose. If the religious text is presented as part of an objective secular program in which the school intends to explore the history, civilization, ethics, literary or historical aspects of the text, or if the text is used in the study of comparative religions, the use of the religious text is secular. See *Stone v. Graham, 449 U.S. 39, 42, 66 L. Ed. 2d 199, 101 S. Ct. 192; Epperson v. Ark., 393 U.S. 97, 106, 21 L. Ed. 2d 228, 89 S. Ct. 266 (1968); Sch. Dist. of Abington v. Schempp, 374 U.S. 203, 225, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963)*. [*38]

The author of Approaching the Qur'an states that the book's purpose "is neither to refute nor to promote the Qur'anic message. Rather the goal is to allow those who do not have access to the Qur'an in its recited, Arabic form to encounter one of the most influential texts in human history in a manner that is accessible." Sells, supra, at 5. Sells notes that the book "presumes to make no judgment on the ultimate truth of these texts, which are among the more influential in human history. It engages them with the respect for literary and theological depth that a translator gains through repeated efforts to recreate some sense of the original. In that spirit, this volume is meant for a varied audience ...." Id. at 26.

Because Defendants have advanced a secular purpose for the orientation assignment and discussions and because it cannot be said that the activity was motivated wholly by religious considerations, Defendants have satisfied the first prong of the *Lemon* test.

**2.**

The second prong of the Lemon test explores whether the primary effect of the challenged government activity is to advance or endorse religion. When analyzing the second prong, "the question [*39] is not the subjective intent of [the government], but whether the objective effect of its passage is to suggest government preference for a particular religious view or for religion in general." *Barghout v. Bureau of Kosher Meat & Food Control, 66 F.3d 1337, 1345 (4th Cir. 1995)*. See also *County of Allegheny v. A.C.L.U., 492 U.S. 573, 620, 106 L. Ed. 2d 472, 109 S. Ct. 3086* (explaining that constitutionality is judged according to the standard of a "reasonable observer").

It is well established that state sponsored school prayer has the impermissible effect of advancing religion. See e.g., *Mellen v. Bunting, 327 F.3d 355, 366-68 (4th Cir. 2003)* (discussing Supreme Court precedent of state-sponsored school prayers before deciding that university-sponsored prayers before meals violated the *Establishment Clause*). Furthermore, all endorsement of religion, whether framed in terms of promotion or favoritism, is impermissible. See *County of Allegheny, 492 U.S. at 592-94*. At a minimum, the *Establishment Clause* requires that government not seem to "take a position on questions of religious belief or 'make adherence to a religion relevant [*40] in any way to a person's standing in the political community.'" Id. (citations omitted). Instead, government must remain neutral. "When evaluating the effect of government conduct under the *Establishment Clause*, we must ascertain whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, of

their individual religious choices.'" *Id. at 597* (citations omitted).

The question in this case is whether the mandatory reading assignment and discussion meetings n17 reasonably appear to inculcate or compel a religious exercise. Plaintiffs complain that Defendants selected Approaching the Qur'an because it presents a biased, sanitized version of Islam. Because the Plaintiffs allege that the selected book is not objective, they contend that it cannot be part of a secular educational program and that UNC's purpose must be to promote Islam. (Compl. PP 45-46.) Defendants concede that an act of religious worship such as a school prayer would violate the *Establishment Clause* but maintain that the orientation program did not involve the promotion of [*41] any religious activity.

> n17 Defendants contend that the orientation is not mandatory and that students do not receive a grade for participation or even attendance.

The allegations of the Amended Complaint do not demonstrate that the assigned reading promotes or advances Islam. Instead, Approaching the Qur'an undertakes an analysis of the history, culture, and debate surrounding early Suras, as discussed above. The book simply explains certain religious tenets of Islam and discusses the ambiguities involved in some situations as well as the long-standing cultural issues involved in Islam. Although the book does not include any passages addressing an obligation to kill non-believers, a fact which Plaintiffs point to in finding the book to be pro-Islam, the aim of the book does not pretend to be an exhaustive review of Islam. The book instead acts as an anthropological, literary and historical review of one of the world's most widespread and controversial religions. Reading and discussing the book is not properly [*42] deemed a religious practice.

Approaching the Qur'an simply cannot be compared to religious practices which have been deemed violative of the *Establishment Clause*, such as posting the Ten Commandments, reading the Lord's Prayer or reciting prayers in school. The book does include Suras, which are similar to Christian Psalms. However, by his own words, the author endeavors only to explain Islam and not to endorse it. Furthermore, listening to Islamic prayers in an effort to understand the artistic nature of the readings and its connection to a historical religious text does not have the primary effect of advancing religion. The fact that few students are likely to have understood the Arabic readings lends support to the position that the purpose of the CD was to aid academic discussion and not to promote the religion of Islam. A reason-

able observer would not believe that the orientation program was an attempt to promote the Islamic faith.

Plaintiffs' coercion claims also must fail. Plaintiffs stress that the student-plaintiffs will be coerced by the orientation program and made to feel like outsiders if they do not participate, a situation rendered impermissible in *Doe v. Santa Fe Indep. Sch. Dist., 530 U.S. 290, 147 L. Ed. 2d 295, 120 S. Ct. 2266 (2000).* [*43] However, the facts presented do not support such an argument. The Supreme Court has recently noted that when a school is not advancing religion, the coercion or impressionability of students is not relevant to the *Establishment Clause* analysis. *Good News Club v. Milford Cent. Sch., 533 U.S. 98, 116, 150 L. Ed. 2d 151, 121 S. Ct. 2093 (2001)* (discussing the impropriety of excluding only religious groups from the use of school facilities after hours).

UNC's orientation program does not require participation in a religious activity. The assignment is not to participate in prayer or any other act of worship. Instead, the orientation program is an exercise in literary, artistic, and cultural understanding. The orientation program therefore satisfies the second prong of the*Lemon* test, regardless of whether attendance was mandatory.

3.

The third prong of the Lemon test prohibits excessive entanglement between government and religion. *Lemon, 403 U.S. at 613.* In analyzing this third prong, courts have examined "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between [*44] the government and religious authority." *Id. at 615.* The entanglement analysis is one of both "kind and degree." *Koenick v. Felton, 190 F.3d 259, 268 (4th Cir. 1999).* In the instant case, Plaintiffs contend that UNC is excessively entangled in religion because it assigned a religious book, required students to write an essay on religious themes, and asked students to think about and share their private feelings about religion. Defendants, however, insist that the only effect of the program is to improve the incoming students' analytical and writing skills.

Although Defendants clearly use a book exploring Islam as the basis for an analytical skill-building exercise, it is not clear that UNC is excessively entangled with Islam. The only institution benefitted by the orientation program was UNC. Although it is possible that exposure to Islam may have led some students to learn more about the religion and eventually practice it, this benefit is indirect at best. No improper relationship was created between UNC and members of the Islamic faith. The contested portion of the program occurred for only

two hours and did not involve the use of religious leaders. [*45]

Most importantly, the activities engaged in at the orientation session did not advance or promote religion and thus there can be no excessive entanglement with a religious activity. The Supreme Court has made a distinction between "the discourse of the scholar's study or the seminar room" or the "merely descriptive examination of religious doctrine" and "the evangelist's mission station." *Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 868, 132 L. Ed. 2d 700, 115 S. Ct. 2510 (1995)* (noting that an article discussing how Christ alone provides spiritual fulfilment fell in the latter category). UNC's orientation program involved the examination of both period writing, comparisons to earlier Arabic thought, and imagery as they relate to religious doctrine. It was scholarly discourse, not a proselytizing mission.

The Supreme Court has long recognized the need for academic freedom in universities. Perhaps the Supreme Court said it best nearly 50 years ago in the context of freedom of association:

> To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly [*46] comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire, 354 U.S. 234, 250, 1 L. Ed. 2d 1311, 77 S. Ct. 1203 (1957)* (addressing the situation where a professor was asked to disclose the content of his lectures in order to determine whether he had been engaged in subversive activities).

In short, UNC's orientation program passes the*Lemon* test. Because there has been no violation of the *Establishment Clause*, Defendant Moeser is entitled to qualified immunity as to the *Establishment Clause* claims.

V.

Plaintiffs have filed a Motion for Leave to File a Second Amended Complaint in order to add further fac-

tual allegations against UNC. The Plaintiffs' Motion will be GRANTED IN PART and DENIED IN PART.

*Federal Rule of Civil Procedure 15(a)* permits a party to [*47] amend its pleading once as a matter of course, and again by leave of court or written consent of the adverse party. The rule provides that "leave shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. The Fourth Circuit has explained that leave should be denied only when "the amendment would be prejudicial to the opposing party, [when] there has been bad faith on the part of the moving party, or [when] the amendment would be futile." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 311 (4th Cir. 2003)* (citations omitted). A proposed amendment would be futile if the claim would not survive a motion to dismiss. See *Burns v. AAF-McQuay, Inc., 166 F.3d 292, 294-95 (4th Cir. 1999)*.

1.

Plaintiffs wish to expand their factual allegations against UNC to include the "Related Events" listed on UNC's website n18 as supplemental activities for anyone interested in participating. The events were not limited to students, but are open to the public. The events include such things as art exhibits at the Ackland Art Museum, a music performance at Duke University, a film entitled "Islam in America" [*48] followed by a faculty-led discussion, and panel discussions on topics from the book by both student leaders and various campus ministers. In addition, the Muslim Students Association sponsored an event entitled "Islamic Awareness Week" during which students present various Islamic topics such as "Women in Islam" at a student gathering place on campus known as "The Pit."

> n18 The list of events could be reached by clicking on the link to "Related Resources" on the orientation assignment webpage, and then clicking on the link to "Related Events." These events were posted online and available to Plaintiffs at or before the time of the filing of Plaintiff's Amended Complaint, but were not mailed to students until after the Amended Complaint was filed.

For the reasons stated above, any claim for injunctive relief based on these new factual allegations would be moot. Further, any claim for nominal damages as to the *Establishment Clause* claim would not survive a 12(b)(6) motion to dismiss because offering students and [*49] the public the option to attend various campus and community events relating to the art and culture of Islam are not clear violations of the *Establishment Clause*. As such, the Chancellor would be entitled to qualified im-

munity on the *Establishment Clause* claims even under the proposed amendments.

The Plaintiffs also contend that UNC made the orientation mandatory, despite the Defendants' representations to this Court that participation in the orientation program was optional. However, as discussed earlier, the issue of whether the program was mandatory is not relevant to an *Establishment Clause* claim because there was no impermissible religious endorsement involved in UNC's orientation program.

Because the proposed Second Amended Complaint would not survive a 12(b)(6) motion to dismiss as to the *Establishment Clause* claims and the claims for injunctive relief, the Plaintiffs' Motion for Leave to File a Second Amended Complaint will be DENIED as to those claims.

2.

Although the Defendants' Motion to Dismiss purported to dismiss all of Plaintiffs' claims, the Defendants did not include any arguments in their Motion addressing Plaintiffs' Free Exercise claim. This omission is understandable [*50] considering that the Free Exercise claims have not been addressed by either party since Defendants' Response to Plaintiff's Motion for Preliminary Injunction. Accordingly, the Defendants reasonably believed that the Plaintiffs were no longer pursuing that claim. Nonetheless, the Free Exercise Claim remains.

The Plaintiffs' Motion for Leave to File a Second Amended Complaint will be GRANTED as it relates to the Pseudonymous Plaintiffs' Free Exercise claims. Should the Defendants wish to amend their 12(b)(6) Motion to include arguments relating to the Free Exercise claims in Plaintiffs' Second Amended Complaint, they will have twenty (20) days from the filing of this opinion to do so. If Defendants do so file, Plaintiffs will have an additional ten (10) days in which to respond.

VI.

Defendants have also filed a Motion to Stay Discovery. Discovery shall be stayed pending a resolution of the Free Exercise Claim.

VII.

Finally, Plaintiffs have filed a Motion to Strike portions of several affidavits provided to this Court by Defendants during the preliminary injunction hearing. Plaintiffs argue that the portions in question violate the Federal Rules of Evidence because they constitute [*51] hearsay, lay witness opinions, extraneous matters, and incorrect statements. Plaintiffs' Motion will be DENIED. To the extent that the affidavits contain any inadmissible evidence, those portions of the affidavits will not be considered.

2004 U.S. Dist. LEXIS 9152, *

VIII.

For the reasons set forth above, Defendants' Motion to Dismiss the Taxpayer Plaintiffs [Doc. # 10] will be GRANTED. Defendants' Motion to Dismiss the Pseudonymous Plaintiffs [Doc. # 8] will be DENIED. Plaintiffs' Motion to Proceed Anonymously [Doc. # 14] will be GRANTED. Defendants' Motion to Dismiss the Amended Complaint [Doc. # 36] will be GRANTED as to the *Establishment Clause* Claims and the claims for injunctive relief. Plaintiffs' Motion for Leave to File a Second Amended Complaint [Doc. # 42] will be GRANTED as to the Free Exercise claims and DENIED as to the *Establishment Clause* claims and claims for injunctive relief. Defendants' Motion to Stay Discovery [Doc. # 34] will be GRANTED. Plaintiffs' Motion to Strike [Doc. # 25] will be DENIED.

This the 20th day of May, 2004.

N. Carlton Tilley, Jr.

United States District Judge

**ORDER**

TILLEY, Chief Judge.

For the reasons set forth in a contemporaneously filed [*52] Memorandum Opinion, Defendants' Motion to Dismiss the Taxpayer Plaintiffs is GRANTED. Defendants' Motion to Dismiss the Pseudonymous Plaintiffs is DENIED. Plaintiffs' Motion to Proceed Anonymously is GRANTED. Defendants' Motion to Dismiss the Amended Complaint is GRANTED as to the *Establishment Clause* Claims and the claims for injunctive relief. Plaintiffs' Motion for Leave to File a Second Amended Complaint is GRANTED as to the Free Exercise claims and DENIED as to the *Establishment Clause* claims and claims for injunctive relief. Defendants' Motion to Stay Discovery is GRANTED. Plaintiffs' Motion to Strike is DENIED.

This the 20th day of May, 2004.

N. Carlton Tilley, Jr.

United States District Judge