## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1, *et al.* | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:06-cv-02131-EGS |
| ANDREW C. VON ESCHENBACH | ) |
| COMMISSIONER | ) |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

### DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules 12(b)(1) and 12(b)(6), Defendants hereby move the Court to dismiss Plaintiff's Complaint with prejudice. The bases for this Motion are set forth in the accompanying Memorandum.

February 26, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

  */s Jeffrey M. Smith*
JEFFREY M. SMITH (Bar No. 467936)
United States Department of Justice
20 Massachusetts Ave., N.W., Room 7144
Washington, D.C. 20001
Tel: (202) 514-5751
Fax: (202) 616-8202

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE #1, *et al.* | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:06-cv-02131-EGS |
| ANDREW C. VON ESCHENBACH | ) |
| COMMISSIONER | ) |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

JEFFREY M. SMITH (Bar No. 467936)
Trial Attorney
United States Department of Justice
20 Massachusetts Ave., N.W., Room 7144
Washington, D.C. 20001
Tel: (202) 514-5751
Fax: (202) 616-8202

*Counsel for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    *Statutory and Regulatory Framework* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        a.    *The PHSA and the FDCA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        b.    *21 C.F.R. § 601.25* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2.    *Anthrax Disease* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    3.    *AVA License Granted by NIH* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    4.    *FDA Panel Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    5.    *The Congressionally Directed Institute of Medicine Study* . . . . . . . . . . . . . . 14

    6.    *Prior Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    7.    *The Challenged FDA Final Order* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.    FDA'S DETERMINATION THAT AVA IS EFFECTIVE AGAINST ANTHRAX
    REGARDLESS OF THE ROUTE OF EXPOSURE IS NOT ARBITRARY,
    CAPRICIOUS, OR AN ABUSE OF DISCRETION . . . . . . . . . . . . . . . . . . . . . . . 24

    A.    FDA's Scientific Judgments Regarding Relevant Data and FDA's Scientific
        Determination that AVA Is Effective at Preventing Anthrax Regardless of the
        Route of Exposure Are Not Arbitrary, Capricious, or an Abuse of
        Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.    The Brachman Study Was a Well-Controlled Clinical Study which
            Demonstrated the Effectiveness of AVA . . . . . . . . . . . . . . . . . . . . . . 27

        2.    The Brachman Study Measured the Effectiveness of AVA Against
            Exposure to *B. Anthracis* (Anthrax) Regardless of the Route of that
            Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3.      FDA Properly Examined Additional Data that Corroborated the
Effectiveness Conclusion of the Brachman Study . . . . . . . . . . . . . . . . . 31

B.      FDA's Scientific Determination that the Current Version of AVA Is
Comparable to Earlier Versions of AVA Is Not Arbitrary, Capricious, or an Abuse
of Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

II.      PLAINTIFFS HAVE NOT ESTABLISHED STANDING TO CHALLENGE ANY
ALLEGEDLY INCONSISTENT VACCINATION SCHEDULE  . . . . . . . . . . . . . . . 35

III.     PLAINTIFFS' ATTEMPT TO SECURE RELIEF ON BEHALF OF CIVILIAN DoD
EMPLOYEES AND DoD CONTRACTORS IS BASELESS  . . . . . . . . . . . . . . . . . . 37

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ii

## PRELIMINARY STATEMENT

The Food and Drug Administration ("FDA") has properly used its substantial scientific and technical expertise to perform the role that Congress has entrusted it, namely to determine whether a drug is safe and effective for its intended purpose. In this case, FDA has concluded, on the basis of an exhaustive review of the scientific evidence, that Anthrax Vaccine Adsorbed ("AVA") is safe and effective for immunization against disease caused by *Bacillus anthracis* ("*B. anthracis*"), regardless of the route of exposure to that bacteria. *See* Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review; Anthrax Vaccine Adsorbed; Final Order ("FDA Order" or "Order"), 70 Fed. Reg. 75,180 (Dec. 19, 2005). Unlike a previous challenge to the use of AVA, in the instant case, Plaintiffs have not made (and cannot make) any contention that the FDA did not follow all of the required procedures in promulgating the Order at issue. Rather, Plaintiffs now challenge FDA's *scientific* judgments regarding the effectiveness of AVA. *See, e.g.*, Compl. ¶ 61 (alleging that FDA credited studies that are "not scientifically sound"); *id.* ¶ 70 (alleging FDA relied on "flawed" data); *id.* ¶¶ 78-79 (alleging FDA's scientific judgment that the vaccine is effective is incorrect); *id.* ¶¶ 88-89 (alleging FDA's scientific conclusion regarding changes to the vaccine is incorrect). This Administrative Procedure Act ("APA") review is a matter of law, and, as a legal matter, Plaintiffs' challenge must fail.

The administrative record demonstrates that FDA's scientific determination was reasonable, and legal precedent requires that the FDA's scientific determination be upheld. To rule otherwise would undermine the regulatory regime that Congress has set up to make complex scientific judgments regarding drugs, and could potentially upset the FDA's approval process of numerous drugs, by substituting courts for the FDA in the making of delicate scientific

determinations.

## **BACKGROUND**

1.     *Statutory and Regulatory Framework*

        a.     *The PHSA and the FDCA*

The Public Health Service Act ("PHSA"), 42 U.S.C. §§ 201, *et seq*., and the Federal

Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*, govern the regulation of

biological products in the United States.[1]  The PHSA governs licensing of biological products; it

grants FDA authority to issue licenses based on a demonstration that the biological product is

"safe, pure, and potent," 42 U.S.C. § 262(a)(2)(C)(i)(I), and that the facility in which the product

is manufactured "meets standards designed to assure that the biological product continues to be

safe, pure, and potent."  *Id.* § 262(a)(2)(C)(i)(II).  Biological products, such as vaccines, intended

for human use also are "drugs" for purposes of the FDCA, *see* 21 U.S.C. § 321(g)(1)(B), and,

under the FDCA, FDA is charged with approving drugs that are safe, effective, and not

misbranded.  *See id.* § 355(d);[2] *see also generally* Procedures for Review of Safety,

Effectiveness, and Labeling, 37 Fed. Reg. 16,679, 16,679-80 (Aug. 18, 1972) (explaining the

---

[1] The PHSA defines biological products as any "virus, therapeutic serum, toxin, antitoxin, vaccine . . . or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings."  42 U.S.C. § 262(i).

[2] Under the FDCA, as amended in 1962, a drug for human use must be shown to be effective prior to approval.  FDA, by regulation, has interpreted "potency" under the PHSA to mean "the specific ability or capacity of the product, as indicated by appropriate laboratory tests or by adequately controlled clinical data obtained through the administration of the product in the manner intended, to effect a given result."  21 C.F.R. § 600.3(s).  Therefore, both biologics under the PHSA and drugs under the FDCA must be demonstrated to be effective before approval.  In 1972, when FDA initiated a review of the safety and effectiveness of all previously licensed biologics, it stated that proof of effectiveness should consist of "controlled clinical investigations" except in certain limited circumstances.  *See* 21 C.F.R. § 601.25(d)(2).

interplay between PHSA and FDCA with respect to biologics).

Prior to 1972, the Division of Biologics Standards of the National Institutes of Health ("NIH") implemented PHSA's licensing provisions. *See* Redelegation of Authority to Administer Certain Provisions of the Federal Food, Drug, and Cosmetic Act, 37 Fed. Reg. 4,004, 4,005 (Feb. 25, 1972). In 1972, the Division of Biologics Standards (now the Center for Biologics Evaluation and Research) was transferred to FDA. *See* Statement of Organization, Functions, and Delegations of Authority, 37 Fed. Reg. 12,865 (June 29, 1972). That same year, FDA proposed, for notice and comment, regulations establishing procedures for reviewing the safety, effectiveness, and labeling of all biological products previously licensed by NIH. *See* Procedures for Review of Safety, Effectiveness and Labeling, 37 Fed. Reg. at 16,679. These comprehensive regulations, finalized in 1973, are codified at 21 C.F.R. § 601.25.

   b.  *21 C.F.R. § 601.25*

Section 601.25 establishes a two-stage process for reviewing biological products licensed prior to July 1, 1972. First, it directs FDA's Commissioner ("Commissioner") to appoint an advisory review panel for each category of biological products to (i) evaluate the safety and effectiveness of the licensed products, (ii) review the labeling of such products, and (iii) advise the Commissioner "on which of the biological products under review are safe, effective, and not misbranded." *See* 21 C.F.R. § 601.25(a).

In advising the Commissioner, each panel submits a report containing its conclusions and recommendations. *See* 21 C.F.R. § 601.25(e). The report is to contain a "statement . . . designat[ing] those biological products determined by the panel to be safe and effective and not misbranded," *id.* § 601.25(e)(1), and this statement "may include any condition relating to active

components, labeling, tests required prior to release of lots, product standards, or other conditions necessary or appropriate for their safety and effectiveness." *Id.* Products in this category are deemed "Category I" products. The report also contains a statement designating those products determined to be unsafe, ineffective or misbranded ("Category II" products); *see id.* § 601.25(e)(2); as well as those products for which the available data are insufficient to make the required determination such that further testing is required ("Category III" products). *See id.* § 601.25(e)(3). Product licenses remain in effect during the review process.

In the second step of the process, after reviewing the recommendations, the Commissioner must publish in the Federal Register the panel report and a proposed order.[3] *See* 21 C.F.R. § 601.25(f). The proposed order must contain a statement designating those biological products "determined by the Commissioner . . . to be safe and effective and not misbranded" (*i.e.*, those products in Category I), *id.* § 601.25(f)(1), as well as a statement designating those products determined to be in Category II and III. *See id.* § 601.25(f)(2)-(3); *see also id.* § 601.26 (reclassification procedures for certain Category III products). After reviewing comments on the proposed order, the Commissioner "shall publish . . . a final order on the matters covered" therein, *id.* § 601.25(g), which shall "constitute final agency action from which appeal lies to the courts." *Id.* § 601.25(i).

Section 601.25(d) establishes the standards for FDA (and the panels) to apply in evaluating safety, effectiveness, and labeling. *See* 21 C.F.R. § 601.25(d). In the Federal Register

---

[3] As FDA noted in the Federal Register promulgating Section 601.25, "the report of each panel is advisory to the Commissioner, who has the final authority either to accept or to reject the conclusions and recommendations of the panel." Procedures for Review of Safety, Effectiveness and Labeling, 38 Fed. Reg. 4,319, 4,321 (Feb. 13, 1973).

notice proposing Section 601.25, FDA noted the "unique problems involved in applying the requirement of 'substantial evidence of effectiveness' to biological products under the [FDCA]," 37 Fed. Reg. at 16,679, and stated that advisory panels, subject to FDA review, would develop "the standard and methodology for effectiveness for a particular class of biological products, taking into account all of the circumstances involved." *Id.*; *see also* 50 Fed. Reg. at 51,005 (Panel) ("the judgment concerning safety and efficacy of bacterial vaccines and toxoids presents some complex and knotty overall problems"). The standards for safety, effectiveness, and labeling in the regulation, by necessity, are not quantitative or measurable, but do set out definitions of those terms that guide FDA's expert, case-by-case determinations for particular products. *See Berlex Labs., Inc. v. FDA*, 942 F.Supp. 19, 25 (D.D.C. 1996) (discussing FDA regulations for determining safety, purity, and potency under the PHSA).

"Safety" is defined in the regulations as:

the relative freedom from harmful effect to persons affected, directly or indirectly, by a product when prudently administered, taking into consideration the character of the product in relation to the condition of the recipient at the time.

*See* 21 C.F.R. § 601.25(d)(1).[4] Application of this standard, as the Panel noted, must "be individualized for each kind of vaccine." 50 Fed. Reg. at 51,006 (Panel).

"Effectiveness" is defined in the regulations as:

a reasonable expectation that, in a significant proportion of the target population, the pharmacological or other effect of the biological product, when used under adequate directions, for use and warnings against unsafe use, will serve a clinically significant function in the diagnosis, cure, mitigation, treatment, or

---

[4] Proof of safety "shall consist of adequate tests by methods reasonably applicable to show the biological product is safe under the prescribed conditions of use, including results of significant human experience during use." 21 C.F.R. § 601.25(d)(1); *see also* 21 U.S.C. § 355(d)(1).

prevention of disease in man.

21 C.F.R. § 601.25(d)(2).[5]  Again, this standard "must be applied separately to each vaccine," according to "current expectations of . . . performance."  50 Fed. Reg. at 51,007 (Panel).

In determining safety and effectiveness, FDA (and the panels) must consider "[t]he benefit-to-risk ratio" of the product under review.  21 C.F.R. § 601.25(d)(3).  Risk/benefit analysis, "a fundamental [concept] in a consideration of vaccines," *see* 50 Fed. Reg. at 51,005 (Panel), requires FDA to determine whether the benefits of the product outweigh the risks of the product for the intended population.  *See id.* at 51,006 (Panel) (noting that "[g]reater risks of adverse effects might be tolerated for a vaccine that provided protection against a lethal disease than for a vaccine against a disease that is basically benign").  Each product "must be assessed individually for its special features that vary from the norm."  *See id.* (Panel).

Finally, with respect to the misbranding determination, FDA (and the panels) must determine whether the product labeling is "clear and truthful in all respects" and not "false or misleading in any particular," 21 C.F.R. § 601.25(d)(5), and whether the labeling complies with applicable statutory and regulatory requirements.  *See id.* (citing 42 U.S.C. § 262, 21 U.S.C. §§ 352 & 353, 21 C.F.R. §§ 610.60- 610.65, and 21 C.F.R. Part 201, Subpart D).

2.    *Anthrax Disease*

Anthrax is an acute bacterial disease caused by infection with spores of *Bacillus anthracis* ("*B. anthracis*").  *See* 50 Fed. Reg. at 51,058 (Panel).  Anthrax spores may enter the body in three

---

[5] Proof of effectiveness "shall consist of controlled clinical investigations" as defined in 21 C.F.R. § 314.126, unless this requirement is waived or alternate methods are adequate to substantiate effectiveness.  *See* 21 C.F.R. § 601.25(d)(2).  Investigations "may be corroborated by partially controlled or uncontrolled studies, documented clinical studies by qualified experts, and reports of significant human experience during marketing."  *Id.*

ways: by skin contact (cutaneous), by ingestion (gastrointestinal), and by breathing (inhalation). The case fatality rate for cutaneous anthrax is estimated to be 20% without antibiotic treatment. AR 638 (04AR, Vol. 3)[6] (Package Insert). The case fatality rate for gastrointestinal anthrax is unknown but estimated to be 25% to 60%. *Id.* The fatality rate for inhalation anthrax in the U.S. is estimated to be approximately 45% to 90%. *Id.* at 639 (Package Insert). From 1900 to October 2001, there were 18 identified cases of inhalation anthrax in the U.S., the latest of which was reported in 1976, with an 89% (16/18) mortality rate. *Id.* Most of these exposures occurred in industrial settings, *i.e.*, textile mills. From October 4, 2001 to December 5, 2001, a total of 11 cases of inhalation anthrax linked to intentional dissemination of Bacillus anthracis spores were identified in the U.S. *Id.* Five of these cases were fatal. *Id.*

Once inside the body, regardless of the route of exposure, the virulence components of *B. anthracis* includes an antiphagocytic capsule and three proteins known as protective antigen (PA), lethal factor (LF) and edema factor (EF). Individually, these proteins are not toxic but the combination of PA with LF or EF results in the formation of the cytotoxic lethal toxin and edema toxin, respectively. Although an immune correlate of protection is unknown, antibodies raised against PA may contribute to protection by neutralizing the activities of these toxins. Anthrax Vaccine Adsorbed (AVA) is the only vaccine licensed for active immunization against *B.*

---

[6] "AR ___" refers to the Administrative Record in this case. The Administrative Record consists of 4209 pages that were filed in 2004 in *Doe v. Rumsfeld*, 1:03-cv-00707-EGS (D.D.C.), and more than 20,000 additional pages that were considered by FDA in the making of its 2005 Order. Full citations to the Administrative Record contain a parenthetical secondary citation to assist the reader in locating the cited document within the voluminous Administrative Record. Citations to documents that were originally included in the 15 volume 2004 record (re-filed in this case on one CD) are secondarily cited as "(04AR, Vol. __)." Citations to the recently added pages (filed in this case on 3 CDs, each of which is denominated as a volume) are cited as "(07AR, Vol. __, Part __)."

*anthracis. See* AR 638-644 (04AR, Vol. 3) (Package Insert).

      3.    *AVA License Granted by NIH*

     "During 1965, it became apparent to many investigators at the National Communicable

Disease Center [CDC] and elsewhere tha[t] an anthrax vaccine was needed for human

immunization — no such vaccine was available from commercial sources." *See* AR 3764

(04AR, Vol. 13). That year, the Department of Defense ("DoD"), through the U.S. Army

Biological Laboratories, Fort Detrick, MD, contracted with the Michigan Department of Public

Health ("MDPH") to engage in the large-scale production of a PA-based anthrax vaccine.

*See* AR 3647-52 (04AR, Vol. 13). Prior to the MDPH contract, the Army had contracted with

Merck Sharpe & Dohme ("MS&D") to produce a PA-based vaccine ("MS&D vaccine"); *see* AR

3764, 3831, 3862 (04AR, Vol. 13); prior to that, the Army produced a PA-based vaccine itself

("original DoD vaccine"). *See* AR 3845-46 (04AR, Vol. 13), AR 645-50 (04AR, Vol. 3); *see*

*also* AR 3300 (04AR, Vol. 12) (describing the three vaccines).

     In 1966, CDC filed with NIH a "Notice of Claimed Investigational Exemption"

(file # DBS-IND-180) for "Anthrax Protective Antigen, Aluminum Hydroxide Adsorbed."

*See* AR 3829, AR 3665 (04AR, Vol. 13); *see also* AR 3607-3923 (04AR, Vol. 13) (portion of

record relating to DBS-IND-180). Under this "investigational new drug" application (or "IND"),

CDC began an open-label study designed to collect safety data on anthrax vaccine, the results of

which were provided to NIH in annual progress reports. In 1967, MDPH filed with NIH a

product license application ("PLA")[7] for "Anthrax Protective Antigen, Aluminum Hydroxide

--------

     [7] A "product license application" is now included within and referred to as a "biologics license application." *See* 21 C.F.R. § 601.2.

Adsorbed," *see* AR 3943-50 (04AR, Vol. 14), the vaccine it was producing under contract with the Army. *See* AR 3647 (04AR, Vol. 13); *see also* AR 3924-4030 (04AR, Vol. 14) (portion of record relating to PLA file). During the licensing process, the product name was changed to "Anthrax Vaccine, Adsorbed." *See* AR 3977 (04AR, Vol. 14).

NIH licensed AVA manufactured by MDPH in November 1970. *See* AR 1377 (04AR, Vol. 6); Licensed Biological Products, 36 Fed. Reg. 8,704, 8,705 (May 11, 1971). The NIH committee tasked with reviewing MDPH's application, *see* AR 3974 (04AR, Vol. 14), recommended that a license be granted based on, among other things, the CDC safety data,[8] laboratory tests showing AVA's ability to protect guinea pigs against challenge (potency data),[9] and the development and publication of additional standards relating to production and potency testing for AVA.[10] *See* AR 4021 (04AR, Vol. 14) (Nov. 2, 1970 memorandum from review committee chair); AR 3930-31 (04AR, Vol. 14) (June 21, 1968 review committee memorandum); *see also* AR 4022 (04AR, Vol. 14) (letter forwarding product license to

---

[8] These data, contained in the five annual progress reports CDC filed under DBS-IND-180, are in the record at AR 3668-75 (report #5), AR 3676-84 (report #4), AR 3685-97 (report #3), AR 3781-3820 (report #2), and AR 3761-80 (report #1) (all 04AR, Vol. 13). In the first year of its open-label study, CDC distributed the MS&D and MDPH vaccines. *See* AR 3764 (04AR, Vol. 13). After the first year, the progress reports reflect that CDC distributed only MDPH's product. *See* reports cited above; *see also* 70 Fed. Reg. at 75,183 (noting that approximately 15,000 doses of AVA were used). The CDC safety data is discussed in detail below.

[9] *See, e.g.*, AR 3947 (04AR, Vol. 14) (MDPH describing "time-to-death" animal potency tests based on challenge with injection of *b. anthracis* spores); AR 3684 (04AR, Vol. 13) (potency data); AR 3994-95 (04AR, Vol. 14) (potency data comparing AVA and MS&D vaccine).

[10] *See* AR 1138-39 (04AR, Vol. 5). These standards, originally codified at 21 C.F.R. § 620.24, were revoked along with numerous other biologics regulations in 1996. *See* Revocation of Certain Regulations; Biological Products, 61 Fed. Reg. 40,153, 40,154 (Aug. 1, 1996).

MDPH).[11]

   The NIH-approved labeling (or "package insert") recommended immunization with AVA for certain identified classes of persons with a risk of exposure to *B. anthracis* spores. *See, e.g.*, AR 3291 (04AR, Vol. 12) (recommending immunization for "individuals who may come in contact with imported animal hides, furs, bonemeal, wool, hair (especially goat hair), and bristles"); *see also* 50 Fed. Reg. at 51,058 (Panel) (AVA immunization "indicated only for certain occupational groups with risk of uncontrollable or unavoidable exposure to the organism"). It did not recommend that immunization be limited to any particular route of exposure. *See* AR 3291-92 (04AR, Vol. 12) (package insert) ("recommendations for use").

   4.   *FDA Panel Review*

   In 1973, FDA announced the Section 601.25 safety and effectiveness review for "bacterial vaccines and toxoids with standards of potency" — the category of products that includes AVA — and solicited relevant data and information. *See* Safety, Effectiveness and Labeling Review; Request for Data Information, 38 Fed. Reg. 5,358 (Feb. 28, 1973). The Panel considering these products (well over 100 products in all) submitted its report in 1980; *see* AR 0001-0600 (04AR, Vol. 1-2); in 1985, FDA published the report and a proposed order relating to the matters addressed therein. *See* 50 Fed. Reg. at 51,002.

--------

   [11] In various memoranda in the IND and PLA file, the NIH review committee commented that MDPH's vaccine had not itself been employed in a controlled field trial, and that the review committee therefore believed CDC's IND lacked controlled evidence of effectiveness. *See, e.g.*, AR 3629 (Sept. 30, 1969 memorandum); AR 3630 (Sept. 30, 1969 memorandum) (both 04AR, Vol. 13). As explained below, however, the original DoD vaccine was used in a well-controlled trial conducted by Brachman, *et al.*, and both the Panel and FDA concluded that, given the similarity between the PA-based vaccines, the Brachman study may be relied upon for proof of AVA's effectiveness.

With respect to AVA, the Panel recommended that it "be placed in Category I" — the category for products deemed safe, effective, and not misbranded — "and that the appropriate license(s) be continued because there is substantial evidence of safety and effectiveness for this product." 50 Fed. Reg. at 51,059 (Panel). FDA, in its proposed order, concurred in the Panel's recommendation, and proposed to adopt the Panel's conclusion. *See id.* at 51,104.

In determining AVA's safety, the Panel reviewed accumulated data from the CDC open-label study. During that study, approximately 7,000 at-risk persons were vaccinated with either the MS&D vaccine or the MDPH vaccine and monitored for adverse reactions. 70 Fed. Reg. at 75,183. Approximately 15,000 doses of MDPH-manufactured AVA were administered. *Id.* Noting that "[i]n general, safety of this product is not a major concern," 50 Fed. Reg. at 51,058 (Panel), the Panel found the CDC data "suggest[] that [AVA] is fairly well tolerated with the majority of reactions consisting of local erythema [*i.e.*, redness] and edema [*i.e.*, swelling]," *id.* at 51,059, and that "[s]evere local reactions and systemic reactions are relatively rare." *Id.*; *see also id.* at 51,058 (summarizing CDC data and finding that "[l]ocal reactions are typically mild;" "[s]ome individuals may have more severe local reactions with edema, erythema greater than 5x5 cm, induration, local warmth, tenderness and pruritus;" and "[o]nly a few systemic reactions with marked chills and fever have been recorded"). Based on these data, the Panel concluded: "there is substantial evidence of safety . . . for this product." *Id.* at 51,059.

In determining effectiveness, the Panel considered two sets of data: (i) the placebo-controlled human field trial conducted by Drs. Brachman, Gold, Plotkin, Fekety, Werrin, and Ingraham in the 1950s (in the record at AR 3732-3745 (04AR, Vol.13)); and (ii) surveillance data collected and summarized by CDC. *See* 50 Fed. Reg. 51,058.

-11-

The Brachman study involved 1,249 workers in four textile mills in the northeastern United States processing raw imported goat hair.[12]  *See* AR 3732-33 (04AR, Vol. 13).  A portion of the workers received anthrax vaccine ("vaccine group"), a portion received placebo ("placebo group"), and a portion received no treatment but were monitored for the occurrence of anthrax disease ("observational group").  *See id.* at 3734 (Table 2), 3736 (Table 4); 50 Fed. Reg. at 51,058 (Panel).  During the evaluation period, which included an "outbreak" of inhalation anthrax, *see* AR 3733 (04AR, Vol. 13), twenty-six cases of anthrax occurred.  Five of the twenty-six cases were inhalation cases.  *See id.* at 3736 (Table 4).  None of the inhalation cases was in the vaccine group, two were in the placebo group, and three were in the observational group.  *Id.* Four of the five inhalation cases were fatal.  *See id.* at 3734.  The remaining twenty-one anthrax cases were cutaneous.  *See id.*  Fifteen were in the placebo group (two in persons who did not receive the full sequence), three were in the observational group, and three were in the vaccine group (two in persons deemed not completely inoculated).  *See id.* at 3736 (Table 4).

Based on the occurrence of cutaneous and inhalation anthrax in members of the placebo group, *see id.* at 3736 & Table 4, Brachman, *et al.*, and the fact that "only one case was actually observed" in the completely inoculated vaccine group (a cutaneous case), Brachman, *et al.*, calculated the effectiveness of the vaccine against anthrax at 92.5 percent.  *See id.* at 3737.  The authors of the study based their calculation on a comparison of the vaccine group with the

---

[12] As the Brachman study noted, "[t]he necessary requirements of a well defined, exposed, susceptible population among whom cases of anthrax were reported with some regularity could only be met, in this country, in an industrial area" containing certain types of textile businesses.  *See* AR 3732 (04AR, Vol. 13).  Brachman, *et al.*, conducted their study in the 1950s.  *See id.* at 3737 (Figure 1).  By 1980, when the Panel submitted its report, this industrial setting was "vanishing, precluding any further clinical studies."  50 Fed. Reg. 51,058 (Panel).

placebo group, *see id.*, which, as noted above, included both cutaneous and inhalation cases.  The calculated effectiveness rate did not include data from the observational group.  *See id.*; AR 1381 at n.9 (04AR, Vol. 6).

While relying on the Brachman study for its recommendation of effectiveness, *see* 50 Fed. Reg. at 51,059, the Panel stated the study demonstrated "93 percent . . . protection" only against cutaneous anthrax, and that "[i]nhalation anthrax occurred too infrequently to assess the protective effect of vaccine against this form of the disease."  50 Fed. Reg. at 51,058.[13]  This observation, as FDA explained in its Final Order (70 Fed. Reg. at 75,183), was erroneous; that is, as noted above, Brachman, *et al.*, calculated the effectiveness of the vaccine to prevent *all* types of anthrax, not just cutaneous.  *See* AR 3736 (04AR, Vol. 13) (Table 4); *id.* at 3740-41 (Table 8).  Nevertheless, and notwithstanding this error, the Panel recommended no change with respect to the "recommendations for use" section of AVA's label (which, as stated above, recommended AVA for immunization against *B. anthracis*, without specifying a route of exposure).  *See* 21 C.F.R. § 601.25(e)(1) (Category I recommendation "may include any condition relating to . . . labeling" or "other conditions necessary or appropriate for . . . safety and effectiveness").

The Panel also considered surveillance data collected by CDC "on the occurrence of anthrax in at-risk industrial settings."  50 Fed. Reg. at 51,058 (Panel).  These data, the Panel observed:

---

[13] *See also id.* at 51,059 (Panel) (describing vaccine as "93 percent protective . . . against cutaneous anthrax" and noting that "[n]o meaningful assessment of its value against inhalation anthrax is possible due to its low incidence"); *id.* at 51,058 (Panel) (stating that "[a]nthrax vaccine poses no serious special problems other than the fact that its efficacy against inhalation anthrax is not well documented," and that "[t]his question is not amenable to study due to the low incidence and sporadic occurrence of the disease").

were summarized for the period 1962-1974.  Twenty-seven cases were identified.
Three cases were not mill employees, but worked in or near mills; none of these
cases were vaccinated.  Twenty-four cases were mill employees; three were
partially immunized (one with 1 dose, two with 2 doses); the remainder (89
percent) being unvaccinated.  Therefore, no cases have occurred in fully
vaccinated subjects while the risk of infection has continued.  These observations
lend further support to the effectiveness of this product.

50 Fed. Reg. at 51,058 (Panel); *see also id.* at 51,059 (Panel) (reviewing surveillance data).

Based on the summarized CDC surveillance data and the Brachman study, the Panel concluded

there was "substantial evidence of . . . effectiveness for this product."  *Id.* at 51,059 (Panel).

5.    *The Congressionally Directed Institute of Medicine Study*

In March 1998, the Department of Defense ("DoD") implemented the Anthrax Vaccine

Immunization Program ("AVIP") in order to protect certain at-risk service members and civilians

from anthrax.  Thereafter, Congress responded to "concerns about the anthrax vaccine and

AVIP" by requiring the independent study of AVA's safety and effectiveness.  AR 3324 (04AR,

Vol. 12) (IOM Report); *see* H.R. Conf. Rep. 106-371, 1999 WL 809497 (Oct. 8, 1999) ("The

Department [of Defense] is directed to enter into a contract with the National Research Council

to independently study the effectiveness and safety of the anthrax vaccine.").[14]  This independent

study was carried out by the Institute of Medicine's ("IOM") Committee to Assess the Safety and

Efficacy of the Anthrax Vaccine.  *See* AR  3303-583 (04AR, Vol. 12) (IOM Report).  The IOM

was established in 1970 by the National Academy of Sciences, a private, nonprofit, self-

---

[14] Congress also passed several provisions regulating AVIP.  *See, e.g.*, 10 U.S.C. § 1110
(requiring DoD to establish uniform procedures for exemptions from AVIP for administrative or
medical reasons); *id.* § 1178 (requiring an annual report on the number of military members
separated due to refusals to participate in AVIP); *id.* § 1580a (requiring notification of
emergency-essential civilian employees required to participate in AVIP).  Coupled with the
required study, these enactments clearly show that Congress understood that AVIP involved
mandatory vaccinations and allowed the mandatory vaccinations to continue.

-14-

perpetuating society of distinguished scholars dedicated to the furtherance of science and

technology and their use for the general welfare.  *Id.* at 3306.  The Committee to Assess the

Safety and Efficacy of the Anthrax Vaccine consisted of ten distinguished individuals from such

institutions as the University of Pennsylvania School of Medicine, Duke University Medical

Center, Massachusetts General Hospital, and Harvard Medical School.  *Id.* at 3307.  These

"Committee members were selected for their expertise in microbiology; vaccine research,

development, manufacture, and evaluation; post-marketing surveillance of adverse events;

regulatory and licensing procedures; epidemiology; biostatistics; immunology; and health

surveillance."  *Id.* at 3325.

The Committee spent approximately two years studying the safety and efficacy of AVA.

"All available data were sought and reviewed and were then weighed in the committee's

scientific assessment."  *Id.* at 3309.  The Committee's extensive review led to a favorable report

on AVA:  "As indicated by evidence from studies in both humans and animals, the committee

concluded that AVA, as licensed, is an effective vaccine to protect humans against anthrax,

including inhalational anthrax."  *Id.* at 3323.  "After examining data from numerous case reports

and especially epidemiologic studies, the committee also concluded that AVA is reasonably

safe."  *Id.*[15]

6.    *Prior Litigation*

In March 2003, six plaintiffs, denominated only as John Does 1-4 and Jane Does 1-2 and

---

[15] FDA's review of AVA was independent of the IOM review.  FDA has stated that it
"agrees with the [IOM] report's findings that certain studies in human and animal models support
the conclusion that AVA is effective against *B. anthracis* strains that are dependent upon the
anthrax toxin as a mechanism of virulence, regardless of the method of exposure."  70 Fed. Reg.
at 75, 183.

represented by the same counsel who represent Plaintiffs here, filed suit challenging AVIP.
*See* Case No. 1:03-cv-00707-EGS (D.D.C.) ("*Doe I*"). In their suit, the *Doe I* plaintiffs claimed
that AVA had not been approved by the FDA for protection against inhalation anthrax exposure,
and that mandatory inoculation violated 10 U.S.C. § 1107 and certain implementing regulations
and executive orders.

      Section 1107 addresses the use of an "investigational new drug" or a "drug unapproved
for its applied use" on members of the armed forces. 10 U.S.C. § 1107(a). It authorizes the
President to waive "the prior consent requirement imposed under section 505(i)(4)" of the FDCA
– the informed consent requirement that applies to investigational new drugs – upon a
determination that obtaining consent is not in the interests of national security. *See* 10 U.S.C.
§ 1107(f). The *Doe I* plaintiffs claimed that, because AVA assertedly had not been approved as
effective for use against inhalation anthrax, such use was subject to the prior consent requirement
imposed under section 505(i)(4) of the FDCA. The *Doe I* plaintiffs did not dispute that AVA has
been approved as safe and effective for use against cutaneous anthrax.

      On December 22, 2003, the Court issued a preliminary injunction, enjoining the
Department of Defense, "[i]n the absence of a presidential waiver [under Executive Order
13139], . . . from inoculating service members [with AVA] without their consent." *Doe v.
Rumsfeld*, 297 F.Supp.2d 119, 135 (D.D.C. 2003). The Court entered the injunction based upon
its conclusion that AVA is "an investigational drug" that was unapproved for use against
inhalation anthrax. *See id.* In framing the issue for resolution, the Court stated: "At bottom, this
inquiry turns on whether the FDA has made a final decision on the investigational status of
AVA[.]" *Id.* at 131. Observing that "FDA, the only agency that this Court could properly defer

to in determining AVA's status as an investigational drug, has failed to provide a formal opinion as to AVA's investigational status," *id.* at 133, the Court conducted its own inquiry into the "complex" issue regarding "AVA's investigational status." *Id.*; *see also id.* at 135 ("[B]ecause the record is devoid of an FDA decision . . . this Court must determine AVA's status for itself").

Shortly thereafter, FDA issued a Final Order, classifying AVA as safe and effective and approved for use against anthrax regardless of the route of exposure (*i.e.*, whether exposure is inhalation, ingestion, or cutaneous). *See* 69 Fed. Reg. 255 (Jan. 5, 2004). On January 7, 2004, the Court, noting that "the principal reason for the issuance of the injunction has been addressed" by FDA's Final Order "categorizing AVA as safe and effective for use against inhalation anthrax," stayed its preliminary injunction as to all but the six Doe plaintiffs. *Doe v. Rumsfeld*, 297 F. Supp. 2d 200, 201 (D.D.C. 2004).

The *Doe I* plaintiffs then amended their complaint to challenge the FDA's January 2004 Order. On cross motions for summary judgment, the Court addressed the procedure by which the FDA developed the December 30, 2003 Order. *See Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 7 (D.D.C. 2004). The Court noted that while the standard of review was "highly deferential" and that deference may be "heightened even further in cases involving scientific or technical decisions," the Court was nevertheless authorized "to ensure that the [FDA] adheres to its own *procedural* requirements." *Id.* at 8, 9 (emphasis supplied). The Court found that FDA had not properly followed its own notice and comment requirement, and thus vacated the December 30, 2003 Order. *See id.* at 16. The Court entered an injunction prohibiting mandatory inoculation "[u]nless and until FDA properly classifies AVA as a safe and effective drug for its intended use." *Id.* at 19.

-17-

While the appeal of that decision was pending, FDA withdrew the January 2004 Order (*see* 69 Fed. Reg. 78,280 (Dec. 29, 2004)), published a new proposed Order (*see* 69 Fed. Reg. 78,281 (Dec. 29, 2004)), received and reviewed approximately 350 comments totaling more than 13,000 pages (*see* AR 10899 - 23968 (07AR, Vol. 1, Part 34 - Vol. 2, Part 145)), and issued a new Final Order, classifying AVA as safe and effective and approved for use against anthrax regardless of the route of exposure, *see* 70 Fed. Reg. 75,180 (Dec. 19, 2005).  The D.C. Circuit found that the FDA's 2005 Order satisfied the District Court's "unless and until" clause, causing the injunction to dissolve "[b]y its own terms."  *Doe v. Rumsfeld*, 172 Fed. Appx. 327, 328 (D.C. Cir. 2006).  The D.C. Circuit thus found the appeal moot, and remanded to the District Court to consider whether to vacate the District Court opinion.  *Id.*  On remand, the defendants did not pursue vacatur, and that case remains pending only on attorney fee issues.

      7.    *The Challenged FDA Final Order*

The Final Order which led the D.C. Circuit to dismiss the appeal in *Doe I*, is the same Order that Plaintiffs now challenge in this action.  The purpose of the Order was to: "(1) Categorize AVA under [21 C.F.R.] § 601.25 according to the evidence of its safety and effectiveness, thereby determining if it may remain licensed and on the market, (2) issue a final response to recommendations made in the Panel's report, and (3) respond to comments on the proposed order [69 Fed. Reg. 78,281 (Dec. 29, 2004)]."  Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review; Anthrax Vaccine Adsorbed; Final Order, 70 Fed. Reg. 75,180, 75,181 (Dec. 19, 2005).

FDA noted that the Panel had based its determination that AVA is safe and effective for its intended use on two studies: (1) the Brachman study, which the FDA found to be "a well-

-18-

controlled field study," and (2) an open label safety study conducted by the National Center for Disease Control (which is now known as the Centers for Disease Control and Prevention).[16]  *Id.* at 75,181.  FDA noted that the Panel also considered surveillance data on the occurrence of anthrax disease in the United States in at-risk industrial settings as supportive of AVA's effectiveness.  *See id.*

FDA agreed with the Panel that the CDC open label safety study, which involved the monitoring of 7,000 persons who received the vaccine over a five year period, demonstrated the safety of AVA.  *See id.* at 75,183.  FDA further noted that data from a 1996 to 1999 study (which obviously post-dated the Panel's recommendation) "further supports the safety of AVA."  *Id.*

FDA also agreed with the Panel's finding that the Brachman study adequately demonstrated the effectiveness of AVA.  However, FDA noted:

> We do not agree with the Panel's statement that the protection [provided by AVA] was limited to cutaneous anthrax cases.  The Brachman study's comparison between anthrax cases in the placebo and vaccine groups included both inhalation and cutaneous anthrax cases.  Accordingly, the calculated effectiveness of the vaccine to prevent both types of anthrax disease combined was 92.5 percent (lower 95 percent confidence interval = 65 percent) as described in the Brachman, *et al.* report.

70 Fed. Reg. at 75,183.  FDA further noted that additional data corroborated the effectiveness finding of the Brachman report.  *See id.*

---

[16] The CDC open label safety study was relied on by the Panel and the FDA in determining that AVA is safe.  *See id.* at 75,183.  Neither this study's conclusions that AVA is "fairly well tolerated" and that "[s]evere local reactions and systemic reactions are relatively rare" (*id.*) nor the Panel's and FDA's reliance on this study for the conclusion that AVA is safe are challenged in Plaintiff's Complaint.  *See* Compl.  The CDC open label safety study, which established the safety of AVA, should not be confused with the CDC surveillance data which were not the result of a clinical study, but rather corroborated the effectiveness finding of the Brachman study.  *See* 70 Fed. Reg. at 75,183.

FDA received approximately 350 comments relating to this Order.  *See id.* at 75,184. Many of the comments were supportive of licensure.  For example, a former director of the Division of the Biological Standards ("DBS") of the NIH (and later with the FDA) stated that prior to NIH approval in 1970, there was a careful review of AVA by the DBS staff, and that there have been three "detailed, unbiased, and scientifically sound reviews . . . and all three reviews concluded that the vaccine is safe and effective."  *Id.* at 75,185.  Two of the scientists who served as clinical investigators in the Brachman study (including Dr. Brachman) submitted comments.  *See id.*  One stated that AVA "has demonstrated effectiveness" and the other (Dr. Brachman) stated that it was scientifically appropriate to analyze inhalation and cutaneous anthrax together.  *Id.*  "Another researcher discussed further and in more detail how the pathology of cutaneous and inhalation anthrax at the cellular level is fundamentally the same, *i.e.*, dependent on the actions of anthrax toxin, such that cytotoxic activities are blocked by antibodies produced in response to AVA in the same manner despite the route of exposure."  *Id.*  FDA also received comments opposing the licensure of AVA, and objections raised in these comments include the objections raised by Plaintiffs in this lawsuit.  FDA "carefully reviewed all comments" and responded in detail to these and other objections.  *See* 70 Fed. Reg. at 75,184-97. To the extent they are relevant to the issues in this case, FDA's responses to comments are discussed below.

After considering the scientific conclusions and the approximately 350 comments, FDA concluded: "After review of the comments and finding no additional scientific evidence to alter the proposed categorization, FDA accepts the Panel's recommendation . . . and determines AVA to be safe and effective and not misbranded."  *Id.* at 75,182.

-20-

* * *

In sum, as recently stated by the Court of Appeals for the Armed Forces, "[t]he licensing history [of AVA] reflects that the Vaccine has been licensed as approved for anthrax inoculation since 1970 without interruption, revocation, or suspension.  Moreover, the agency approval has been reaffirmed as recently as December 19, 2005."  *United States v. Kisala*, 64 M.J. 50, 54-55 (C.A.A.F. 2006).

## ARGUMENT

The D.C. Circuit has clearly set forth "the role the district court plays when it reviews agency action."  *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  "The district court sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the [agency's] study was factually flawed."  *Id.*  "The entire case on review is a question of law, and only a question of law."  *Id.*[17]  And, the judicial review is limited to the administrative record.  *See, e.g., Berlex Labs., Inc. v. FDA*, 942 F. Supp. 19, 23 (D.D.C. 1996) (refusing to consider extra-record affidavits submitted by plaintiff); *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 177 (D.D.C. 2000) (same).  Indeed, it is a fundamental principle of APA review that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing

---

[17] Because of the nature of APA review, the Court can address Defendants' arguments and look to the administrative record on a Motion to Dismiss.  *Id.* at 1226 (on a motion to dismiss in an APA case "the district court can consult the [administrative] record to answer the legal question before the court–in this case whether the agency adhered to the standards of decisionmaking required by the APA").  Whether such arguments are addressed in a Motion to Dismiss or a Motion for Summary Judgment, the legal standards are the same.  *Id.* at 1222-23 ("[W]hen a district court is reviewing agency action . . . the legal questions raised by a 12(b)(6) motion and a motion for summary judgment are the same.").

court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

In this appellate review, the Court reviews FDA's decision pursuant to the well-known standards of the Administrative Procedure Act ("APA"). As such, FDA's decision must be upheld unless that decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). The "arbitrary and capricious" standard is highly deferential to the agency and there is "a presumption in favor of the validity of administrative action." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 216 (D.D.C. 1996) (quotation omitted). A reviewing court considers only whether "the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *accord Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'") (internal citation omitted). An agency decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

A critical component of arbitrary/capricious review is that a court may not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43; *see also, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)

-22-

("[a]dministrative decisions should be set aside . . . only for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached") (internal citation omitted); *Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996) ("we might not have chosen the FDA's course had it been ours to chart . . . . [b]ut that is hardly the point").

This APA deference is heightened even further in cases involving scientific or technical decisions. For example, like other agencies operating in highly technical areas, *see, e.g., Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463 (1972), FDA is entitled to a "'high level of deference'" when its regulatory determination rests on its "'evaluation[] of scientific data within its area of expertise.'" *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (internal citation omitted).[18] The "determination whether a drug is generally recognized as safe and effective within the meaning of [the FDCA] necessarily implicates complex chemical and pharmacological considerations." *Weinberger v. Bentex Pharms., Inc.*,

---

[18] *Accord id.* at 1327 ("Neither we, nor the district judge, are scientists independently capable of assessing the validity of the agency's determination — beyond holding it to the standards of rationality required by the [APA]"); *Henley*, 77 F.3d at 621 ("FDA possesses the requisite know-how to conduct such analyses, by sifting through the scientific evidence to determine the most accurate and up-to-date information regarding a particular drug, and how those data affect human usage"); *Simpson v. Young*, 854 F.2d 1429, 1434 (D.C. Cir. 1988) ("[t]his court has 'neither the expertise nor the resources to evaluate complex scientific claims'"; "we cannot decide . . . whether technical evidence beyond our ken supports the proposition it is asserted to support") (internal citation omitted); *Alliance for Bio-Integrity*, 116 F.Supp.2d at 177 ("'[I]n an area characterized by scientific and technological uncertainty[,] . . . this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives'") (internal citation omitted) (alterations in original); *Bristol-Myers*, 923 F.Supp. at 220 ("[t]he parties' dispute is fundamentally a scientific one over which the court lacks expertise and over which the FDA is the expert"); *see also Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (EPA determination) ("[a]s we have said, we review scientific judgments of the agency 'not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality'") (internal citation omitted).

-23-

412 U.S. 645, 654 (1973).  FDA's "'judgments as to what is required to ascertain the safety and efficacy of drugs'" thus fall "'squarely within the ambit of FDA's expertise and merit deference from' the courts." *Bristol-Myers*, 923 F. Supp. at 220 (quoting *Schering Corp. v. FDA*, 51 F.3d 390, 399 (3d Cir. 1995)).

Similarly, "FDA's policies and its interpretation of its own regulations will be paid special deference because of the breadth of Congress' delegation of authority to FDA and because of FDA's scientific expertise."  *Berlex*, 942 F. Supp. at 25; *accord Bristol-Myers*, 923 F. Supp. at 216 ("because this action implicates, in part, an interpretation by the agency of its own regulations, the court must be especially deferential"); *cf. Public Citizen v. Foreman*, 631 F.2d 969, 975 (D.C. Cir. 1980) (USDA regulation) (traditional deference accorded agency interpretation of its own regulations "especially prudent in areas involving scientific and medical controversies").

I.    **FDA'S DETERMINATION THAT AVA IS EFFECTIVE AGAINST ANTHRAX REGARDLESS OF THE ROUTE OF EXPOSURE IS NOT ARBITRARY, CAPRICIOUS, OR AN ABUSE OF DISCRETION**

Counts One through Three of Plaintiffs' Complaint attack FDA's categorization of AVA as a Category I product under 21 C.F.R. § 601.25 based on FDA's conclusion that AVA is safe, effective, and not misbranded.  Specifically, Plaintiffs challenge FDA's scientific judgments regarding utilization of data demonstrating AVA's effectiveness, FDA's scientific conclusion

-24-

that AVA is effective,[19] and FDA's scientific determination that data regarding earlier versions of

---

[19] Plaintiffs' Complaint does not challenge FDA's determination that AVA is safe for human use.  Indeed, they could not, as there is substantial scientific evidence in the record to support FDA's determination that AVA meets the safety standard in Section 601.25(d).  Significantly, FDA's decision is supported by the accumulated data from CDC's five-year open-label study.  "[T]he CDC open label safety study, involving approximately 7,000 subjects who received DoD/MDPJ/AVA vaccine demonstrated the safety of AVA." 70 Fed. Reg. at 75,189 (Order) (footnote omitted); *accord* AR 3744 (04AR, Vol. 13) (Brachman) (noting that "[i]ndividual reactions to the vaccine was a relatively minor problem," "[e]dema-producing local reactions occurred following 2.8 percent of all inoculations," and "[s]ystemic reactions were rare with only 0.2 per cent of inoculations followed by noticeable symptoms"); *cf.* AR 645-49 (04AR, Vol. 3) (early study conducted with DoD vaccine).

Other data and information in the record corroborate the CDC study.  For example, a more recent DoD study of the safety and immunogenicity of AVA found that local reaction rates associated with AVA, although higher than those reported in the CDC data, are comparable to those associated with other licensed vaccines.  *See* AR 1414 (04AR, Vol. 5) (Pittman).  With respect to more serious adverse events, VAERS reports, reviewed and summarized by FDA from 1990 through September 30, 2001, *see* AR 3584-AR 3606 (04AR, Vol. 12), show "[n]o clear pattern of association between deaths or serious adverse events and anthrax vaccine."  *E.g.*, *id.* at 3587.

And the IOM committee, specifically charged by Congress to study AVA's safety and efficacy, concluded in its published report that AVA is safe.  AR 3323 (04AR, Vol. 12) (IOM) ("AVA is reasonably safe").  The committee reviewed case reports (primarily from VAERS), *see id.* at 3331-32, considered formal epidemiological studies, *id.* at 3332, and heard testimony "regarding adverse events following vaccination with AVA."  *Id.*  The IOM committee concluded:

> Within hours or days following vaccination, it is fairly common for recipients to experience some local events (*e.g.*, redness, itching, swelling, or tenderness at the injection site), while a smaller number of vaccine recipients experience some systemic events (*e.g.*, fever and malaise).  But these immediate reactions, and the rates at which they occur, *are comparable to those observed with other vaccines regularly administered to adults*.  The [IOM] committee found no evidence that vaccine recipients face an increased risk of experiencing life-threatening or permanently disabling adverse events immediately after receiving AVA, when compared with the general population.  Nor did it find any convincing evidence that vaccine recipients face elevated risk of developing adverse health effects over the long term, although data are limited in this regard (as they are for all vaccines).

AVA may be used to support the licensure of the current version of AVA.  FDA's scientific

determinations are reasonable, are not arbitrary or capricious, and are supported by the scientific

evidence.  For these reasons, Plaintiffs' claims lack merit.

> **A.     FDA's Scientific Judgments Regarding Relevant Data and FDA's Scientific Determination that AVA Is Effective at Preventing Anthrax Regardless of the Route of Exposure Are Not Arbitrary, Capricious, or an Abuse of Discretion**

Section 601.25(d) defines effectiveness as "a reasonable expectation that, in a significant

proportion of the target population, the pharmacological or other effect of the biological product,

when used under adequate directions, for use and warnings against unsafe use, will serve a

clinically significant function in the diagnosis, cure, mitigation, treatment, or prevention of

disease in man."  21 C.F.R. § 601.25(d)(2).  Proof of effectiveness "shall consist of controlled

clinical investigations" as defined in 21 C.F.R. § 314.126, unless this requirement is waived or

alternate methods are adequate to substantiate effectiveness.  *See id.*  Investigations "may be

corroborated by partially controlled or uncontrolled studies, documented clinical studies by

qualified experts, and reports of significant human experience during marketing."  *Id.*

Effectiveness must be determined in the context of each vaccine.  *See* 21 C.F.R.

§ 601.25(d)(2) (requiring a "reasonable expectation" that product will serve a "clinically

significant function").  The regulatory standard provides a definition to guide FDA's expert,

case-by-case determinations for particular drugs and products.  *See Berlex*, 942 F. Supp. at 25

---

*Id.* at 3323 (emphasis supplied); *see also id.* at 3332 (local and systemic reactions associated with AVA occur at rates comparable to those observed with diphtheria and tetanus toxoids and influenza vaccines); AR 1414 (Pittman) (local reaction rates for AVA comparable to rates for "other vaccines in common use today," including diphtheria and tetanus toxoids and pertussis vaccine adsorbed); AR 641-43 (04AR, Vol. 3) (labeling) (reporting pre- and post-licensure safety data).

(discussing FDA regulations for determining safety, purity, and potency under the PHSA).

Effectiveness determinations, at bottom, require judgments about the quantity and quality of scientific evidence. *See Ethicon, Inc. v. FDA*, 762 F. Supp. 382, 388 (D.D.C. 1991). These determinations can be quite complex. *See* 37 Fed. Reg. at 16,679 (FDA noting the "unique problems involved in applying the requirement of 'substantial evidence of effectiveness' to biological products under the [FDCA]," and that standards and methodologies for particular classes of products will "tak[e] into account all of the circumstances involved"); 50 Fed. Reg. at 51,005 (Panel) (noting that "the judgment concerning safety and efficacy of bacterial vaccines and toxoids presents some complex and knotty overall problems"). Judgments about a drug's effectiveness, like judgments about its safety, are at the very heart of FDA's expertise. *Bristol-Myers*, 923 F. Supp. at 220. As discussed below, FDA's determination that AVA is effective is amply supported by the record evidence.

### 1. The Brachman Study Was a Well-Controlled Clinical Study which Demonstrated the Effectiveness of AVA

Pursuant to its regulations, FDA approval of a biological product generally requires a controlled clinical investigation. *See* 21 C.F.R. 601.25(d)(2). "The purpose of conducting clinical investigations of a drug is to distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation." 21 C.F.R. § 314.126(a).

With regard to AVA, FDA relied on the well-controlled field study conducted by Brachman, *et al.*, in four textile mills processing raw imported goat hair. *See* 70 Fed. Reg. at 75,182 ("The Brachman study was an adequate and well-controlled clinical study conducted from

1954 to 1959 to evaluate the effectiveness of the anthrax vaccine."). The mills provided a natural

exposure setting:  raw materials (goat hair) were "*Bacillus anthracis*-contaminated," AR 3732

(04AR, Vol. 13) (Brachman), and workers were at risk of both cutaneous and inhalation

exposure.  Indeed, during the course of the study, there was an "outbreak" of inhalation anthrax

cases.  *See id.* at 3733.

The Brachman study involved 1,249 mill workers.  70 Fed. Reg. at 75,183.  Of these, 379

workers received anthrax vaccine, 414 received placebo, 116 received incomplete inoculations of

either anthrax or placebo, and 340 received no treatment.  *Id.*  During the trial, twenty-six cases

of anthrax were observed; twenty-one cutaneous and five inhalation.  *Id.*  "Of the five inhalation

cases (four of which were fatal), two received placebo, three were in the observational group, and

none received the anthrax vaccine."  *Id.*  Of the twenty-one cutaneous cases, fifteen received

placebo, three were in the observational group, and three received anthrax vaccine.  *Id.*[20]

Comparing anthrax cases between the completely inoculated placebo and vaccine groups,

Brachman, *et al.*, calculated the vaccine efficacy at 92.5 percent.  *Id.*

On review, FDA found that "the Brachman study, a multicenter study, was based on an

adequate sample size and appropriately combined the data from all mills in its analysis of vaccine

efficacy" and FDA "determine[d] that the original statistical analysis presented in the report from

---

[20] "Of the three cases in the vaccine group, one case occurred just prior to administration
of the third dose, one case occurred 13 months after the individual received the third of the six
doses (but no subsequent doses), and one case occurred prior to receiving the fourth dose of
vaccine."  *Id.*

Additionally, as CDC noted in the original submission of its 1966 IND application,
following the Brachman trial, all employees in the mills who received the placebo inoculations
subsequently received anthrax vaccine.  *See* AR 3840 (04AR, Vol. 13).  "No case of anthrax has
occurred among individuals who have remained immunized as recommended."  *Id.*

the Brachman study was correct in its estimation of vaccine effectiveness." *Id.* at 75,186. FDA

thus utilized a statistically significant, well-controlled clinical study in determining that AVA is

effective at preventing Anthrax.

> **2.    The Brachman Study Measured the Effectiveness of AVA Against Exposure to *B. Anthracis* (Anthrax) Regardless of the Route of that Exposure**

As FDA found, because the placebo group used in the Brachman analysis included two

inhalation cases,[21] the 92.5 percent effectiveness figure represented the calculated efficacy of the

vaccine to prevent all types of anthrax disease combined regardless of the route of exposure or

manifestation of disease. 70 Fed. Reg. at 75,187 (Order) ("In fact, the calculation of

effectiveness presented in the published report of the Brachman study pertains to both cutaneous

and inhalation anthrax.").[22] Indeed, Dr. Brachman himself informed FDA that: "In analyzing the

data we felt that since the pathophysiology of human anthrax is the same whether the organisms

gain entrance through the skin or through the lungs, and therefore, it was appropriate to combine

the data from the field trial." AR 11355 (07AR, Vol. I, Part. 38).

As Dr. Brachman's statement suggests, the Brachman study's analysis of the

effectiveness of anthrax vaccine against anthrax disease regardless of the route of exposure (and

FDA's acceptance of that analysis) is rational because the pathogenesis of *B. anthracis* is the

---

[21] *See* 70 Fed. Reg. at 75,187-88 (Order) ("The Brachman study included in the effectiveness calculation both the cutaneous and inhalation cases that occurred in vaccine and placebo recipients who received at least three doses and remained on schedule to receive the rest of the six-dose series.")

[22] The IOM committee independently came to the same conclusion as FDA on this point. *See* AR 3378 (04AR, Vol. 12) (IOM) ("[t]he overall effectiveness of the vaccine against anthrax infection generally was 92.5 percent").

same regardless of the route of exposure.  In other words, however *B. anthracis* enters the body, in order for it to produce active toxins, protective antigen binds to cellular receptors which then bind with either edema factor or lethal factor.  *See* AR 639 (04AR, Vol. 3) (labeling).  As AVA creates antibodies to protective antigen, FDA, applying its scientific expertise, concluded:

> The inclusion of both cutaneous and inhalation anthrax in the analysis of the Brachman study was appropriate because it was not possible to predict the route of exposure (cutaneous versus inhalation) that would occur within the environmental setting of the woolen mills.  With regard to the known pathophysiology of anthrax, the signs and symptoms of disease arise due to the production of toxins by anthrax bacteria growing within the infected individual. *The toxins produced by anthrax bacteria do not vary based on the route of exposure.*  The antibodies produced in response to vaccination contribute to the protection of the vaccinated individual by neutralizing the activities of those toxins.  Thus, *AVA elicits an antibody response to disrupt the cytoxic effects of toxins produced by anthrax bacteria, regardless of the route of infection.*

70 Fed. Reg., at 75,187 (Order) (emphases supplied); *accord id.* ("The Brachman study showed the anthrax vaccine to be effective in preventing anthrax disease regardless of route of exposure. This finding is consistent with our current knowledge of the critical role played by anthrax toxins in the pathophysiology of cutaneous and inhalation anthrax and how antibodies generated in response to vaccination with AVA disrupt cytoxic activities of those toxins.");  AR 11355-56 (07AR, Vol. I, Part. 38) (Brachman letter) ("The pathophysiology of anthrax is the result of a toxin produced by the organism causing local or systemic reactions regardless of the route by which the organisms entered the body.").

The Brachman study thus reasonably tested the effectiveness of AVA on Anthrax, regardless of the route of exposure, and FDA reasonably accepted the results of the study.  FDA's scientific judgment should be upheld.

3.      **FDA Properly Examined Additional Data that Corroborated the Effectiveness Conclusion of the Brachman Study**

FDA's regulation provides that a clinical investigation such as the Brachman study may be "corroborated by partially controlled or uncontrolled studies, documented clinical studies by qualified experts, and reports of significant human experience during marketing." 21 C.F.R. § 601.25(d)(2). Pursuant to this provision, FDA properly considered other data and information that corroborated the Brachman study's determination that AVA is effective. These corroborating data included the surveillance data collected by the Centers for Disease Control on the occurrence of anthrax disease in at-risk industrial settings between 1962 and 1974. *See* 70 Fed. Reg. at 75,183 (Order). Over thirteen years of observation (1962-1974), CDC identified twenty-seven anthrax cases; no cases (inhalation or cutaneous) were reported in "fully vaccinated" individuals. *See id.*; *see also* 50 Fed. Reg. at 51,058 (Panel summary of CDC data). These observations, FDA concluded, "lend further support to the effectiveness" of AVA. 70 Fed. Reg. at 75,183 (Order) (quoting 50 Fed. Reg. at 51,058 (Panel)). FDA also noted the 2002 Institute of Medicine report,[23] and stated that, while its review of AVA "is independent of the IOM's review," "FDA agrees with the [IOM] report's finding that certain studies in humans and animal models support the conclusion that AVA is effective against B anthracis strains that are

_____

[23] As discussed above, the IOM committee, charged by Congress to consider the "inhalation efficacy of the vaccine," H.R. Rep. No. 106-371, at 254 (1999), specifically concluded that "AVA, as licensed, is an effective vaccine to protect humans against anthrax, including inhalation anthrax." AR 3323 (04AR, Vol. 12). In addition to considering the Brachman study and human serological studies, *see id.* at 3377-80, the IOM committee reviewed studies in animal models. *See, e.g. id.* at 3385-88. After noting that "the pathology of anthrax in nonhuman primates such as macaques best mimics that seen in humans after inhalation exposure to *B. anthracis*," *id.* at 3385, the IOM committee concluded: "it appears that AVA is effective in protecting . . . macaques . . . from inhalation exposure to the strains of anthrax tested." *Id.* at 3387-88.

dependent upon the anthrax toxin as a mechanism of virulence, regardless of the route of exposure."  70 Fed. Reg. at 75,183; *see also* AR 626 (04AR, Vol. 3) (Fellows) (animal study) ("These results confirm previous reports showing that AVA is highly protective in this non-human primate animal model [rhesus macaques].");  AR 629 (04AR, Vol. 3) (Ivins, *Salisbury*) (animal study) ("[t]he data in this study demonstrates that the MDPH vaccine is highly efficacious against inhalation anthrax in rhesus monkeys").[24]

FDA's consideration of these data as corroborating the results of the Brachman study is consistent with 21 C.F.R. § 601.25(d)(2), and its scientific conclusion that they support a finding of efficacy is reasonable.

### B.    FDA's Scientific Determination that the Current Version of AVA Is Comparable to Earlier Versions of AVA Is Not Arbitrary, Capricious, or an Abuse of Discretion

As is the case with many drug products, the manufacturing process of AVA has evolved in order to optimize the product and the production process.  *See* 70 Fed. Reg. at 75,182 (Order) ("The versions of vaccine used in these studies reflect the optimization of anthrax vaccine during product and clinical development.").  The original version of AVA (known as DoD vaccine), which was used in the Brachman study, "was manufactured using an aerobic culture method." *Id.* at 75,184.  "Subsequent to the Brachman study, DoD modified the vaccine's manufacturing process to, among other things, optimize production of a stable and immunogenic formulation of

---

[24] In their complaint, Plaintiffs erroneously allege that the FDA "relie[d] on animal studies to prove efficacy."  Compl. ¶ 67.  In fact, FDA did not rely on animal studies to substantiate AVA's effectiveness for purposes of 21 C.F.R. § 601.25(d)(2).  FDA relied on Brachman, *et al.*'s controlled clinical investigation as "[p]roof of effectiveness" for purposes of Section 601.25(d)(2).  The animal studies, CDC surveillance data, and other supportive data and information were considered as corroborating evidence in accordance with the regulation.

vaccine antigen and increase the scale of manufacture." *Id.* In the early 1960's, DoD entered in

to a contract with Merck Sharp & Dohme ("MSD") in order "to standardize the manufacturing

process for large-scale production of the anthrax vaccine and to produce anthrax vaccine using an

anaerobic method." *Id.* This second version is known as DoD/MSD vaccine. Later in the

1960's, DoD entered into a contract with the Michigan Department of Public Health ("MDPH")

in order "to further standardize the manufacturing process and to scale up production for further

clinical testing and immunization of persons at risk of exposure to anthrax." *Id.* This third

version of vaccine, known as DoD/MDPH/AVA vaccine was used in the CDC open label safety

study and is the version that was licensed by NIH in 1970. *Id.*

   In determining whether the versions of anthrax vaccine were sufficiently comparable in

effect so that data from the first version of the vaccine (*e.g.*, the Brachman study) could be used

to evaluate the effectiveness of the more recent version, FDA applied its "long-standing approach

to comparability." *Id.* FDA "reviewed the historical development of AVA" and found that

"clinical data comparing the safety and immunogenicity of DoD/MDPH/AVA vaccine with DoD

vaccine . . . reveal[ed] that the serological responses to DoD/MDPH/AVA vaccine and DoD

vaccine were similar with respect to peak antibody response and seropositivity." *Id.* FDA thus

found that the two versions of the vaccine "are comparable in their ability to protect test animals .

. . and [their ability] to elicit similar immune responses in humans," allowing the data relating to

the original version to be used to approve the more advanced version. *Id.* ("[A]fter a

manufacturing change, a manufacturer may use data gathered with a previous version of its

product to support the effectiveness of a comparable version of the same product.").

   Plaintiffs' contention that FDA's comparability policy only applies to manufacturing

changes by a single manufacturer is baseless. *See* Compl. ¶ 90. Nothing in FDA's comparability policy states that it is limited to changes undertaken by a single manufacturer, and it is not, so long as the respective manufacturers have shared critical manufacturing process information. *See* AR 1399-1406 (04AR, Vol. 6) (FDA comparability policy). Moreover, FDA does not interpret its policy as being limited in the manner proposed by Plaintiffs. *Cf. Berlex*, 942 F. Supp. at 25 ("FDA's policies and its interpretation of its own regulations will be paid special deference because of the breadth of Congress' delegation of authority to FDA and because of FDA's scientific expertise."). Indeed, in *Berlex*, this Court upheld FDA's determination to "allow[ ] [the product manufacturer] to rely on the results of a clinical study of another company's . . . product." *Id.* at 22, 25. If entities, working together, share the critical manufacturing process information, as occurred in *Berlex* and as occurred here with DoD sharing the information with MSD and MDPH, such products may be deemed comparable under FDA's policy.

\* \* \*

At bottom, FDA weighed all of the scientific evidence and concluded, based on the data to which it applied its expertise, that AVA is effective for active immunization against *Bacillus anthracis*, regardless of the route of exposure. FDA is the expert agency charged by Congress with making effectiveness determinations; having rendered that determination, the Court "may not substitute its own judgment for that of the FDA." *Berlex*, 942 F. Supp. at 25.

FDA plainly has "examined the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Bristol-Meyers*, 923 F. Supp. at 219-20 (quoting *State Farm*, 463 U.S. at 43) (alteration in

-34-

original) (internal quotations omitted).  It considered the relevant factors, and made no "clear

error of judgment."  *State Farm*, 463 U.S. at 43.  Nothing more is required.  FDA's decision

should be upheld.[25]

## II.    PLAINTIFFS HAVE NOT ESTABLISHED STANDING TO CHALLENGE ANY ALLEGEDLY INCONSISTENT VACCINATION SCHEDULE

Count IV of Plaintiffs' Complaint alleges that "DoD has been following a vaccination

schedule inconsistent with the schedule required by the AVA license."  Compl. ¶ 98.  But

Plaintiffs allege no specific facts that could suggest that any of the Plaintiffs has been ordered to

undergo vaccination under any schedule inconsistent with the AVA license.  *See id.* ¶¶ 98-99.

Plaintiffs, therefore, have not established standing to challenge any "vaccination schedule."[26]

As the Court is aware, the party asserting jurisdiction has the burden "clearly to allege

facts demonstrating that he is a proper party to invoke judicial resolution of the dispute."

---

[25] Plaintiffs' assertion, upon "information and belief," that FDA's "Order was issued as a result of pressure by DoD and other sources" (Compl. ¶ 71) is baseless.  As the record clearly reflects, "FDA is responsible for reviewing the safety and effectiveness of vaccines [and in issuing its Order,] FDA is fulfilling this responsibility, and is not working to promote, or discourage, vaccination for members of the armed forces."  70 Fed. Reg. at 75,196-97 (Order).

Moreover, there is a well-established presumption of regularity accorded the acts of federal agencies.  *See, e.g., United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("a presumption of regularity attaches to the actions of Government agencies"); *Bristol-Myers*, 923 F. Supp. at 216 (noting the "presumption in favor of the validity of administrative action") (internal citation omitted).  The presumption of regularity requires that, "in the absence of clear evidence to the contrary, courts presume that [government officials] have properly discharged their official duties."  *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926); *see also, e.g., United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting this statement from *Chemical Foundation*).  There is *no* evidence — let alone "clear evidence" — that the challenged FDA Order is the product of bad faith or improper influence.

[26] Although not relevant to this Motion to Dismiss, DoD's policy regarding the administration of AVA, including the schedule of vaccination, does not violate 10 U.S.C. § 1107, a point that Defendants will make, if necessary, at the appropriate time.

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted).  Article III standing is an "indispensable part of the plaintiff's case," and to get by a motion to dismiss, a plaintiff must allege:  (i) an "actual or imminent" injury-in-fact; (ii) "fairly . . .  trace[able] to the challenged action of the defendant;" and (iii) "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)  (internal quotations and citations omitted) (alteration in original).

With regard to Count IV of their Complaint, Plaintiffs have not met their burden to "clearly allege facts" supporting standing.[27]  Count IV alleges that "[s]ince 2000, DoD has been following a vaccination schedule inconsistent with the schedule required by the AVA license." Compl. ¶ 98.  The reference to 2000 refers to the July 2000 vaccine shortage that forced DoD to "suspend[ ] AVA vaccinations for all but a limited number of personnel because of a shortage of the vaccine."  *Id.* ¶ 49.  Plaintiffs complain that "DoD announced that members [of the Armed Forces] who had received one or more vaccinations, but who had not completed the six shot sequence of vaccinations, would not be required to restart to inoculation sequence as long as they received a subsequent shot within two years of their last vaccination." *Id.* ¶ 50.  Plaintiffs allege (incorrectly) that this is unlawful, but nowhere do they allege that *they* are among the group that has started but not completed the six shot sequence.  Nor do they allege that *they* have been or

---

[27] The standing argument made here pursuant to Federal Rule 12(b)(1) is based on the allegations in Plaintiffs' Complaint.  Of course, to prevail on their claims, Plaintiffs will need to provide actual evidence of standing with regard to all of their claims.  *E.g.*, *Lujan*, 504 U.S. at 561.  At this time, Defendants cannot assess any evidentiary bases of Plaintiff's standing claims because Plaintiffs have refused to identify themselves to the Defendants.  Pursuant to an Order of this Court, Defendants have opposed Plaintiffs' filing as Does, and this issue remains before the Court.  Defendants will address the issue of proof (as opposed to allegations) sufficient for standing, if necessary, at the appropriate time.

likely will be ordered to receive the six shots in any sequence other than that recommended in the

product labeling.[28]  As such, Plaintiffs have not clearly alleged *facts* sufficient to demonstrate that

*they* have an actual or likely injury that is traceable to DoD's decision not to restart vaccinations

in individuals who have begun but not completed the sequence.  *See, e.g.*, *Ellipso, Inc. v. Mann*,

460 F. Supp. 2d 99, 103 (D.D.C. 2006) ("[T]he Court will not accept conclusory allegations or

draw inferences not supported by the facts alleged in the complaint." (citing *Kowal v. MCI

Comm's. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

III.    **PLAINTIFFS' ATTEMPT TO SECURE RELIEF ON BEHALF OF CIVILIAN
        DoD EMPLOYEES AND DoD CONTRACTORS IS BASELESS**

        Plaintiffs claim to be, and to represent, "active duty service members, Reservists,

National Guardsmen and civilian employees and/or DoD contractors."  Compl. ¶ 1.  However,

the only authority relied on by Plaintiffs for their alleged cause of action against the Secretary of

Defense and their alleged right to injunctive relief (10 U.S.C. § 1107) provides no rights

whatsoever to anyone other than members of the armed forces.  The two implementing measures

mentioned, Executive Order 13,139 and DoD Directive 6200.2 provide no privately enforceable

rights to anyone.

        10 U.S.C. § 1107 applies only when "the Secretary of Defense requests or requires a

*member of the armed forces* to receive an investigational new drug or a drug unapproved for its

applied use."  10 U.S.C. § 1107 (emphasis supplied).  Thus, civilians, whether DoD employees,

---

        [28] Alternatively, if the Plaintiffs' theory is that the 2002 vaccine shortage that caused
delayed doses will continue to cause delayed, allegedly illegal, doses, they have not alleged that
there continues to be a vaccine shortage that would create any expectation of a recurrence of
delayed doses.  They certainly have not alleged that any hypothetical future shortage poses an
"actual or imminent" injury as required by *Lujan*.

-37-

DoD contractors, or others, have no rights pursuant to Section 1107.

Executive Order 13,139, which implements Section 1107, also applies only to "members of the armed forces." Exec. Order 13,139, § 3, 64 Fed. Reg. 54,175, 54176 (Sept. 30, 1999). Moreover, the Executive Order does not provide for any privately enforceable rights. *Id.* at § 6(b), 64 Fed. Reg. at 54,178 ("Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers of employees, or any other person."); *see also State of Kansas ex rel. Todd v. United States*, 995 F.2d 1505, 1511 (10th Cir. 1993) (stating that "judicial review is not available for the [agency's] alleged violations of the various Executive Orders"); *State of Mich. v. Thomas*, 805 F.2d 176, 187 (6th Cir. 1986) ("Given [an Executive Order's] clear and unequivocal intent that agency compliance with [that Order] not be subject to judicial review, we hold that the Order provides no basis for rejecting the [agency's] final decision."). Plaintiffs' invocation of DoD Directive 6200.2 is similarly futile as it also creates no privately enforceable rights or cause of action. *See* DoD Directive 6200.2 (Aug. 1, 2000).[29]

---

[29] Nor is there any private right of action under the FDCA. *See* 21 U.S.C. § 337(a) (reserving to the United States enforcement actions for violation of the FDCA); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487 (1996).

-38-

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.

February 26, 2007                                   Respectfully submitted,

                                                    PETER D. KEISLER
                                                    Assistant Attorney General

                                                    JEFFREY A. TAYLOR
                                                    United States Attorney

                                                    VINCENT M. GARVEY
                                                    Deputy Branch Director


                                                    _/s Jeffrey M. Smith_____
                                                    JEFFREY M. SMITH (Bar No. 467936)
                                                    Trial Attorney
                                                    United States Department of Justice
                                                    20 Massachusetts Ave., N.W., Room 7144
                                                    Washington, D.C. 20001
                                                    Tel: (202) 514-5751
                                                    Fax: (202) 616-8202

                                                    *Counsel for Defendants*

-39-