UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE #1, et al.                    *
                                       *
              Plaintiffs,              *
                                       *        Case 1:06-cv-02131-EGS
         vs.                           *
                                       *
                                       *
ANDREW C. VON ESCHENBACH,              *
ACTING COMMISSIONER FDA,               *
 et al.                                *
              Defendants.              *
                                       *
*    *    *    *    *    *    *    *    *    *    *    *

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs John Doe #2, John Doe #3, John Doe #4, John Doe #5 and Jane Doe #1 (collectively "Plaintiffs"), hereby submit, through undersigned counsel, their Response to Defendants' Motion to Dismiss. For the reasons herein, Plaintiffs respectfully request that this Court enter an order denying Defendants' Motion to Dismiss and granting any other appropriate relief.

PRELIMINARY STATEMENT

Defendants' Memorandum states that Plaintiffs "challenge the FDA's scientific judgments regarding the effectiveness of AVA." (Defs. Mem. 1, emphasis in original). This attempt to invoke a higher standard of judicial deference, however, is unavailing and only detracts from the central issue.

The only issue before this Court for purposes of this motion is whether Plaintiffs' Complaint alleges sufficient facts to set forth a claim for injunctive relief under the Administrative Procedures Act ("APA"), 5 U.S.C. § 551, et seq., the All Writs Act 28 U.S.C. § 1651, and the Declaratory Judgments Act

28 U.S.C. § 2201, based on the FDA's arbitrary and capricious determination that the administrative record contained substantial evidence that Anthrax Vaccine Adsorbed ("AVA") is safe and effective against inhalation anthrax. This determination rests on sufficiency of evidence to support a particular conclusion, a determination well within the province of this Court.  Plaintiffs' allegations should survive a motion to dismiss because:

- The administrative record, including the only human trial of AVA, demonstrates that there is insufficient evidence of AVA's safety and efficacy for inhalation anthrax.

- AVA's 1996 Investigational New Drug ("IND") application belies any representation by Defendants that AVA in its current form was originally properly licensed for inhalation anthrax.

- The additional evidence that the FDA proffers attempts to do more than corroborate the Brachman Study; it attempts to reform the admitted deficiencies in the Brachman Study and fails at that.

- The FDA fails to follow its own procedures and longstanding practices with respect to drug comparability among the many versions of AVA that were manufactured during the better part of the last century.

- Plaintiffs have alleged sufficient facts to establish standing to challenge the inconsistent vaccination schedules as the Anthrax Vaccine Immunization Program ("AVIP") has been reinstated in all

segments of the Armed Forces and allow for service members to be

inoculated outside of the prescribed shot sequence.

- Plaintiffs have alleged sufficient facts entitling civilian Department of

Defense ("DoD") employees and contractors to relief since DoD

expressly covers them under AVIP.

For these reasons, as explained more fully below, Defendants' Motion

to Dismiss should be denied.

## BACKGROUND

Defendants set forth in their memorandum a lengthy yet patchy

background of the legal framework, the anthrax disease, AVA's licensing and

testing history, the prior litigation and the FDA's issuance of its Final Order.

Defendants' description is incorrect and deficient in several respects.

Statutory and Regulatory Framework

a.    The PHSA and the FDCA

Defendants quote from the Public Health Service Act ("PHSA"), 42

U.S.C. §§ 201, et seq., and the Federal Food, Drug, and Cosmetic Act

("FDCA"), 21 U.S.C.§§ 301, et seq., for each statute's respective provisions on

licensing, safety and effectiveness.  (Defs. Mem. 2-3).  However, Defendants

fail to delineate the differences between the standards under each statute

and fail to explain which standard is to apply here.  In fact, there is no

evidence that effectiveness was established for AVA at its initial licensure.

Licensing decisions made under the provisions of the PHSA were

issued using different criteria than those under the FDCA.  Not until 1972,

two years after the National Institute of Health ("NIH") licensed AVA, were

the safe, effective and not misbranded requirements of the FDCA applied to

biological drugs. See 21 C.F.R. § 601.25.  It is clear from several sources that

the main differences in standards between the statutes – potency and efficacy

– are not synonymous.  See, e.g., 45 Fed. Reg. 73922 (1980) (stating that for a

biological product to be licensed, it must be "tested to ensure that it is safe,

pure, potent, and effective") (emphasis added); 42 U.S.C. § 262(d)(1) (PHSA

requirement that licenses to be issued only on showing that product meetings

standards designed to ensure safety, purity and potency of licensed product);

cf. 21 U.S.C. § 355(d)(5) (stating that FDA can disapprove new drug

applications if lack of "substantial evidence" that drug is "effective").  An

advisory panel charged with reviewing data and information concerning the

safety, effectiveness and labeling of bacterial vaccines and bacterial antigens

with no U.S. standard of potency stated:

> [P]otency may be distinct from an ability to prevent, ameliorate
> or modify in a beneficial way, a disease state (effectiveness).  For
> example, a given antigen may induce specific antibodies after a
> specified interval of time … whether such antibodies prevent or
> alter the course of disease is a separate problem.  To illustrate,
> agglutinating antibody induced by the antigen may be found not
> to correlate with the prevention or modification of a given
> disease state … thus, evidence that a substance is potent as an
> immunogen would be insufficient to support effectiveness,
> unless a previously established correlation existed.

42 Fed. Reg. 58266, 58273 (1977).  See also, William R. Pendergast, Biologic

Drugs, in Food and Drug Law, 311 (F.D.L.I. 1991) (stating that FDCA's

efficacy provisions were more precise than PHSA's potency standard).

The administrative review process for all NIH-licensed products that began in 1972, see 21 C.F.R. § 601.25, was aimed precisely at remedying NIH's failure to apply FDCA effectiveness standards to biologics, especially vaccines. Thus, under its original 1970 license, AVA was never evaluated for efficacy.

    b.  21 C.F.R. § 601.25

Defendants, despite setting out the different standards for "safety" and "effectiveness," conflate the two with respect to AVA. Indeed, AVA has never been certified as effective – at least under any kind of NIH standard.

Not one scientific paper exists to substantiate FDA's present position on efficacy (i.e., that the current statistical manipulation of Brachman's study to demonstrate effectiveness of 92% was the result of combining cutaneous and inhalation cases). Even the Institute of Medicine ("IOM") Report reached the opposite conclusion when it found that: "The randomized field study carried out by Brachman and colleagues (1962) provides solid evidence indicating the efficacy of a vaccine similar to AVA against B. anthracis infection. The subsequent CDC data are supportive. However, the small number of inhalational cases in those studies provides insufficient information to allow a conclusion to be made about the vaccine's efficacy against inhalational infection." Administrative Record 003379 ("AR").

Buried in the reams of paper that comprise the convoluted administrative record in this case is a February 10, 1969 memorandum from

the Chairman of the Ad Hoc Committee formed to review the original

application for the AVA license stating (with emphasis added):

> Michigan has filed with the Division all required
> information and material for license except the
> results of an adequately controlled clinical
> investigation that establishes efficacy . . . therefore,
> it is recommended that licensed be granted and
> that NCDC (IND- 180) be requested to obtain data
> with a view to determine human efficacy of the
> product.

AR 003633.

In other words, the NIH license specifically relied on by the FDA and

claimed to demonstrate effectiveness against inhalation anthrax does no such

thing.  See AR 003629.  NIH approved AVA's licensing with a focus on the

PHSA's standard of potency, but with no clinical evidence of effectiveness.

The concerns that Congress apparently addressed by requiring FDCA

standards for involuntarily administered medicines were well-founded. AVA

was not subject to any meaningful standard of efficacy in the NIH license.

Instead, using PHSA standards, NIH moved forward to license the vaccine

based only on a potency review.

Defendants discuss the benefit to risk ratio required under the

regulations.  However, the original benefit to risk ratio was quite low because

the vaccine was not in widespread use give the limited nature of its target

audience.  That benefit to risk ratio calculation, present in the original

assessment of AVA is even less compelling for inhalation anthrax.

c.    Anthrax Disease

Defendants state – without citation to authority – that, once inside the body, the virulence components of anthrax include the same antiphagocytic capsule and the same three proteins regardless of the route of exposure. (Defs. Mem. 27).  They seem to imply by this statement that route of exposure is irrelevant once the anthrax bacteria is inside the system.  This unsupported implication is contradicted by Defendants' own citation to the drastically differing fatality rates depending on route of exposure, (Defs. Mem. 7, compare 20% for cutaneous with 45-90% for inhalation), signifying that even after entry into the body, the anthrax bacteria operates differently depending on route of exposure.  Moreover, the distinction between inhalation and cutaneous anthrax is not one that Plaintiffs devised but one that Brachman himself, the NIH and the OIM have consistently made.

d.    AVA License Granted by NIH

Defendants review NIH's license of AVA (Defs. Mem. 8) but ignore Brachman's distinction between inhalation and cutaneous anthrax.  They also fail to note that the NIH licensed the vaccine with insufficient evidence of effectiveness and efficacy in the record.

Furthermore, Defendants fail to point to a specific Panel comment stating that Brachman's study could be relied upon for proof of AVA effectiveness because no such comment existed at the time.  To the contrary, the NIH license was granted with the explicit caveat that efficacy data was lacking.  AR 003629, 003630.

e.    FDA Panel Review

Defendants admit that the FDA determined during the 1985 Panel Review that inhalation anthrax occurred too infrequently in the Brachman Study to assess the efficacy of AVA against inhalation anthrax. (Defs. Mem. 13). They attempt to deal with this problematic admission by citing to the unsupported statement in the FDA's 2005 Final Order that the 1985 determination was simply erroneous. (Defs. Mem. 13). This gloss of the record obscures the 1985 Panel's specific finding that there was no basis to determine the effectiveness of AVA against inhalation anthrax, AR 003629, 003630 (at least not until Brachman reversed himself in 2005 to support the FDA's Final Order classifying AVA as effective regardless of the route of exposure, 70 Fed Reg. at 75,185). For these reasons, the 1985 Panel was careful to couch its determination to license AVA in what it expected would be a limited use of the vaccine, stating that "whatever the problems with the vaccine, they were likely minimal and would get smaller because of the decreasing population slated to use it," 50 Fed. Reg. at 51,058, and that "there is sufficient evidence to conclude that anthrax vaccine is safe and effective under the limited circumstances for which this vaccine is employed," 50 Fed. Reg. at 51058-59 (emphasis added).

f.    The Congressionally Directed Institute of Medicine Study

Defendants state that Congress required the DoD to conduct additional studies of the safety and efficacy of AVA and that this study resulted in a favorable report. (Defs. Mem. 14-15). Defendants neglect to state, however,

that the Institute of Medicine study specifically concluded that it could not find a statistical basis for showing effectiveness against inhalation anthrax. AR 003379.  Moreover, the IOM report is no substitute for FDA effectiveness studies or proper scientific evidence.  Indeed, as recently as 1999, Congress was suspicious enough of AVA that it stated as follows:

> "The Department is directed to enter into a contract with the National Research Council to independently study the effectiveness and safety of the anthrax vaccine. The following issues shall be considered in the report: the types and severity of adverse reactions, including gender differences; long-term health implications; inhalational efficacy of the vaccine against all known anthrax strains; correlation of animal models to safety and effectiveness in humans; validation of the manufacturing process focusing on, but not limited to discrepancies identified by the Food and Drug Administration in February 1998; definition of vaccine components in terms of the protective antigen and other bacterial products and constituents; identification of gaps in existing research."

H.R. Rep. No. 106-371, at 254-55 (Oct. 8, 1999), available at 1999 WL 809497.

### g.     Prior Litigation

Defendants' review of the prior litigation is largely accurate.  However, it is noteworthy that the FDA's issuance of its new Final Order for AVA while the appeal in the prior litigation was pending is a suspect coincidence timed perfectly to reverse the effect of the District Court's permanent injunction in this case.  See 70 Fed. Reg. 75,180, 75,181.

### h.     The Challenged FDA Final Order

Defendants recite the FDA's bases for issuing its December 2005 Final Order classifying AVA as safe and effective as: "(1) the Brachman Study, which the FDA found to be 'a well-controlled field study,' and (2) an open

label safety study conducted by the National Center for Disease Control (which is now known as the Center for Disease Control and Prevention)." (Defs. Mem. 18-19).  However, the CDC Open Label Study Defendants reference (Defs. Mem. 19 n. 16) was specifically rejected as a basis for effectiveness by the NIH in its licensing discussions between 1969 and 1970. See, e.g., AR 003632.

Defendants also point to Brachman's statement that it was appropriate to analyze inhalation and cutaneous anthrax together.  (Defs. Mem. 20).  This statement directly contradicts Brachman's assessment at the time of his study that no determination could be made as to the effectiveness of AVA against inhalation anthrax.  Compare 70 Fed. Reg. at 75185 ("[Brachman] also stated that the pathophysiology of human anthrax, regardless of where the organism gains entrance to the body, is a result of the toxin released by the organism. Thus, it is appropriate to combine inhalation and cutaneous disease in the analysis.") with AR 003743 (Brachman: "When inhalation anthrax is considered, the limited experience with this form of the disease makes the data less significant in showing effectiveness of the vaccine."). Brachman's contradictory conclusions undermine his credibility and cannot be reconciled.  It is impossible to determine from the record as it stands whether Brachman's determination was flawed when he assessed the study's results in 1962 or when he abandoned that determination for the Comment Period in 2005.

Finally, in the background section, Defendants cite to United States v. Kisala, 64 M.J. 50, 54-55 (C.A.A.F. 2006), for the proposition that the FDA's approval of AVA for vaccination against inhalation anthrax was recently reaffirmed in the courts.  (Defs. Mem. 21).  Citation to this decision, issued by Article I judges overseeing a military criminal appeal, is misleading since Kisala was based solely on the so-called failure by the District Court to assess the lawfulness of an order issue.  Id. at 54-55.  There was no discussion about the district court's determination that the vaccine was improperly licensed.

    i.  Additional Omissions – 1996 IND Application

The memorandum categorically omits any discussion of the investigational new drug application filed by the manufacturer in 1996 and which remained current until 2004 (when it was unceremoniously pulled from the FDA by the defendants during the height of the initial litigation).  This study, coordinated and approved by the manufacturer, DoD and the FDA, and specifically designed to determine efficacy against inhalation anthrax, belies any representation by the FDA that it thought the vaccine was adequately licensed for inhalation anthrax.

<u>ARGUMENT</u>

I. FDA'S DETERMINATION THAT AVA IS EFFECTIVE AGAINST ANTHRAX REGARDLESS OF THE ROUTE OF EXPOSURE IS ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION.

Defendants argue that the question of whether the FDA's issuance of its Final Order was arbitrary and capricious is a pure question of law, appropriate for a motion to dismiss.  (Defs. Mem. 21).  They also argue that

judicial reviews of agency action are confined to the administrative record and may be determined either as a motion to dismiss or summary judgment with citations beyond the complaint and to the record.  (Defs. Mem. 21, n. 17).

Defendants cite to inapposite authority for these propositions.  Where the court is reviewing purely legal questions, such as whether an agency was required to grant a statutory exception, Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("Appellants' complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action."), the question may properly be determined as one of law.  But, where as here, the court is being asked to review the record to determine whether the facts present amount to a proper exercise of agency discretion, the question should not be determined as a matter of law.  See, e.g., Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 366-367 (1998) (analyzing an agency's fact-finding under the APA and stating: "We must decide whether that conclusion is supported by substantial evidence on the record as a whole. Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion.") (internal citations omitted).

It is indisputable that the reasonableness of agency action is reviewable by a district court so long as the case does not involve an agency's decision not to prosecute or enforce, Jerome Stevens Pharm., Inc. v. FDA, 319

F. Supp. 2d 45 (D.D.C. 2004), or is statutorily exempt from review, 5 U.S.C.

§ 701.  Neither exception applies here.  Thus, the FDA's action is entirely

reviewable.  See Allentown, 522 U.S. at 376-77 ("Reviewing courts are

entitled to take [agency's] standards to mean what they say, and to conduct

substantial-evidence review on that basis.")

Furthermore, the agency's action in this case is reviewable on the

merits – not as a matter of law.  Indeed, most of the cases cited by

Defendants involve motions for injunctive relief and the plenary review of the

record such motions entail.

> A.     FDA's Procedure for Determining that AVA is Effective at
>        Preventing Anthrax Regardless of the Route of Exposure
>        Is Arbitrary, Capricious, and an Abuse of Discretion.

Indeed, as Defendants point out in their memorandum (Defs. Mem.

27), because the action at issue involves an interpretation by the FDA of its

own statute and regulations, this Court must be especially deferential.

Ethicon, Inc. v. FDA, 762 F. Supp. 382, 386 (D.D.C. 1991) (citing United

States v. Rutherford, 442 U.S. 544, 553 (1979); Satellite 8301123 v. Hodel, 648

F. Supp. 410, 413 (D.D.C. 1986)).  The decision need not even be one that this

Court would independently reach, given the findings and the law; it need

only be reasonable.  Id. (citing Aluminum Co. of Am. v. Cent. Lincoln Peoples'

Utility Dist., 467 U.S. 380, 389 (1984); Chevron U.S.A., Inc. v. NRDC, Inc.,

467 U.S. 837 (1984)).  Nonetheless, this deference is not abdication. Id.  The

record must be scrutinized to determine "whether the decision was based on a

consideration of relevant factors and whether there has been a clear error of

judgment." Id. (citing Overton Park, 401 U.S. 402, 416 (1971)).  Furthermore, this Court must also find that the relevant factors on which the decision is based are supported by some evidence.  Id. (citing Ritter Transp., Inc. v. ICC, 684 F.2d 86, 88 (D.C. Cir. 1982), cert. denied, 460 U.S. 1022 (1983)).  A review of the record here shows that the FDA's decision to classify AVA as safe and effective against inhalation anthrax is not supported by the evidence. Indeed, the FDA's decision constitutes a clear error of judgment that this Court should rectify.

> 1.    The Brachman Study Was Not a Well-Controlled Clinical Study.

Defendants attempt to establish that the Brachman Study was a well-controlled field study by simple declaration.  (Defs. Mem. 27).  The evidence in the record, however, points to the contrary.

Prior to licensing, the National Institute of Health ("NIH"), the federal licensing authority for biological products such as AVA, made clear that no existing studies (including the Brachman Study) established AVA's efficacy:

- "The only evidence is that no case of Anthrax has-occurred in the textile mills where personnel have been vaccinated. Apparently there is no chance that controlled data will be forthcoming."  AR 003629.

- "It was emphasized that the epidemiological study [the Brachman Study] did not provide control data, whereby the effectiveness of the vaccine could be evaluated." AR 003630.

The NIH also noted that in the specific context of inhalation anthrax, there was no efficacy data.  AR 003636, 003780, 003846.

Also contrary to the FDA's averments, modern statistical analysis of Brachman data reveals that there is no statistical correlation between vaccination with AVA and inhalation anthrax protection.  See Walter R. Schumm & Robert L. Brenneman, How "adequate and well-controlled" was the "clinical trial" of a human anthrax vaccine, 1955-1959? and A Statistical Reanalysis of Brachman et al.'s 1962 study of a human anthrax vaccine, MEDICAL VERITAS 1 (2004) at 166-178 (attached as Exhibits 1 and 2, respectively).  Brachman himself admitted that "no assessment of effectiveness of the vaccine against inhalation anthrax could be made [from his study] because there were too few cases."  See Brachman & Friedlander, Anthrax, in VACCINES 629-637 (S.A. Plotkin & W.A. Orenstein, eds., 1999).

> 2. **The Brachman Study Explicitly Failed to Measure the Effectiveness of AVA Against Exposure to Inhalation Anthrax.**

Defendants conclude that because the placebo group used in the Brachman Study included two inhalation cases, the 92.5% effectiveness figure presented the calculated efficacy of the vaccine to prevent all types of anthrax regardless of route of exposure.  (Defs. Mem. 29).  This statement cannot be satisfactory of the APA's  and FDCA's requirements of "substantial evidence" to support agency action.

"Substantial evidence," as Chief Justice Hughes said, is "more than a mere scintilla.  Chrysler Corp. v. EPA, 631 F.2d 865, 890 (D.C. Cir. 1980).  It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

As stated above, other than the FDA's own revisionist conclusion in its 2005 Final Order declaring route of exposure irrelevant to its assessment (and Brachman's significant mirror reversal in his March 2005 letter to the FDA), the record consistently bemoans the paucity of evidence of AVA's efficacy against inhalation anthrax. No reasonable mind could accept these contradictory and ill-supported conclusions as adequate to substantiate a finding that a vaccination is safe and effective for mandatory administration to millions of humans.

>    3.    The Additional Data Proffered to Corroborate the
>           Brachman Study's Conclusions Are Ineffectual.

Defendants correctly state that the regulations provide that a well-controlled clinical study may be corroborated by partially controlled or uncontrolled studies by qualified experts, and reports of significant human experience during marketing." (Defs. Mem. 31, citing 21 C.F.R. § 601.25(d)(2)). However, they fail to apply the principle correctly and ignore that "[is]olated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered." 21 C.F.R. § 601.25(d)(2).

The additional evidence that is the basis of the FDA's Final Order does not corroborate an existing well-controlled study; it attempts to rehabilitate,

through unscientific revisionist tactics, the Brachman Study.  This attempted use of "corroborating evidence" is inconsistent with the Regulations' mandate that "[a]lternate methods, such as serological response evaluation in clinical studies and appropriate animal and other laboratory assay evaluations may be adequate to substantiate effectiveness where a previously accepted correlation between data generated in this way and clinical effectiveness already exists." 21 C.F.R. § 601.25(d)(2).  Defendants fail to point to any such previously accepted correlation that would allow for the use of animal studies or any of the other purported corroborating evidence.  See, e.g., AR 003385-88 (explaining numerous inconsistencies and difficulties in using animal models because of the way the animals react to the bacteria and the vaccine different substantially from humans and finding, ultimately, only "adequate" animal models for testing AVA efficacy).

> B.    FDA's Determination that the Current Version of AVA is Comparable to Earlier Versions of AVA is Arbitrary, Capricious, and an Abuse of Discretion.

Defendants reference the FDA's long standing approach to the establishment of comparability in connection with manufacturing changes for a biologic product such as AVA and conclude – without describing in detail the data on which the conclusion is based – that comparability was established.  (Def. Mem. 33).

In April, 1996, the Center for Biologics Evaluation and Research (CBER) and the Center for Drug Evaluation and Research (CDER) of the FDA jointly issued the "FDA Guidance Concerning Demonstration of

Comparability of Human Biological Products, Including Therapeutic Biotechnology-derived Products" (the "Guidance"), April 1996, available at http://www.fda.gov.cder/Guidance/compare.htm. The purpose of the Guidance was to provide more clarity and flexibility to manufacturers of biological products including vaccines, who want to establish comparability of biologic products despite changes in the manufacturing process (both pre-approval and post-approval). The Guidance provides that if a manufacturer can establish to the satisfaction of the FDA, that the post-manufacturing changes biologic product is comparable to the biologic product pre-manufacturing changes, then the manufacturer would not be required to provide the FDA with additional clinical safety and efficacy data. "Comparability" is generally defined by the FDA as the conclusion that the products are highly similar before and after manufacturing changes and there is no adverse effect on the safety, quality and efficacy of the product. See Guidance.

To establish comparability and obviate the need for additional clinical data in light of manufacturing changes:

1.    Manufacturers should carefully assess manufacturing changes and determine product comparability pre- and post changes based on chemical, physical and biological assays or tests, and if appropriate, other non-clinical data.

2.    Based on the extent of the manufacturing changes and the stage of manufacturing in which the changes occur, comparability testing may include the following tests, each of which are described in detail in the Guidance:

  a.  Analytical testing

  b.  Biological assays or testing (both in the lab and/or in animals or humans)

  c.  Assessment of pharmacokinetics and/or pharmacodynamics and toxicity in animals.

3.  Manufacturers should provide the FDA with extensive data from chemical, physical and bioactivity comparison with side-by side analyses of the pre-change and post-change products.

See Guidance at III.

What is notable from the Guidance is that the FDA requires extensive evidence of comparability based on the underlying knowledge that even a minor change in the manufacturing process can affect the safety and efficacy and potency of a biologic product. Neither the FDA's Final Order nor Defendants' Memorandum cite or describe the evidence that was produced to support the comparability of pre- and post- manufacturing changes, the review process undertaken by the FDA to analyze the data and reach the determination that the manufacturing changes did affect the comparability of the vaccine products, and the specific finding of the FDA as to comparability.

Subsequent to the completion of Brachman's study, the vaccine has undergone the following substantial alterations:

(1)  The strain of bacteria used to produce the vaccine was changed from R1-NP, a nonencapsulated, nonproteolytic mutant form of B. anthracis to V770-NP1-R.  70 Fed. Reg. 75180, 75192 (Dec. 19, 2005);

(2)  The active and component ingredients were altered. See Detailed Safety Review of Anthrax Vaccine Absorbed, December 23, 2005,

found at http://www.anthrax.osd.mil/documents/854AVASafetyRvw.pdf (the

production process was changed "to increase the concentration of the active

ingredient, known as 'protective antigen' (increasing the vaccine's potency),

and to decrease the amount of other bacterial components in the vaccine thus

increasing purity");

(3)     The AVA manufacturing method changed from using an aerobic

method to using an anaerobic method.  70 Fed. Reg. at 75192;

(4)     The AVA manufacturers changed from DoD personnel at Fort

Detrick, to Merck Sharp & Dohme from 1960 to 1961, and finally to the

Michigan Department of Public Health ("MDPH") in the mid-1960s.  Id.

(5)     Further changes were made to the manufacturing process in

order to scale up production.  For example, in the 1960s, after the completion

of the Brachman Study, the DoD changed the mutant B. anthracis strain

used to produce the vaccine and use of an anaerobic culture method.  Id.

U.S. Army medical research personnel from Fort Detrick, Maryland,

determined in October 1990 that changes in the AVA manufacturing process

(specifically to the fermenters and filters) resulted in a 100-fold increase in

AVA protective antigen levels from previous versions of the vaccine.  See

Testimony of Nancy Kingsbury, United States General Accounting Office,

before the Sub-Committee on National Security, Veterans' Affairs and

International Relations, Committee on Government Reform, House of

Representatives, October 23, 2001, at 5-6 (attached as Exhibit 3), available at http://www.gao.gov/new.items/d02181t.pdf.

None of these substantial changes have been adequately accounted for in the FDA's Final Order.  For this reason alone, FDA's classification of AVA as safe and effective is arbitrary, capricious and an abuse of discretion.

In sum, the FDA has attempted to replace what has always been a poor record of testing for safety and efficacy with a simple declaration filed in the midst of litigation that the Brachman Study was good enough after all, instead of satisfying the rigors of the FDCA and the FDA's own regulations for establishing safety and efficacy.  This is not and cannot be the degree of deference that Congress intended when it established the FDA.  FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125 (2000) (finding that Congress had not intended to authorize the FDA to regulate cigarettes no matter how serious the deleterious health effects that the FDA cited and stating: "Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'") (internal citations omitted).

II.    PLAINTIFFS HAVE ESTABLISHED STANDING TO CHALLENGE THE INCONSISTENT VACCINATIONS SCHEDULE

Defendants argue that Plaintiffs have no standing to challenge the inconsistent vaccination schedules that the DoD has authorized because Plaintiffs had not alleged specific facts that could suggest that Plaintiffs

would undergo such a vaccination schedule. (Defs. Mem. 35). Plaintiffs did allege, however, that DoD had approved a vaccination schedule inconsistent with product instructions (Pls. Compl. ¶¶ 93-103) and under "notice pleading," a court on a motion to dismiss must "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." Nat'l Wrestling Coaches Ass'n v. Dept. of Educ., 366 F.3d 930, 957 (D.C. Cir. 2004).

Furthermore, all the branches of the Armed Forces have now reinstated AVIP with specific instructions allowing service members to be vaccinated outside the vaccination schedule prescribed in the vaccine manufacturer's instructions. See Implementation Orders, available at http://www.vaccines.mil/default.aspx?cnt=resource/servicesAll&dID=21#21army (Army 2/13/07, Navy 3/12/07, Air Force 2/16/07, Marines 3/15/07). Thus, Plaintiffs have alleged sufficient facts to demonstrate at the very least a likely injury traceable to DoD's decision not to restart vaccinations in individuals who had previously begun and abandoned the sequence. Any additional facts necessary could be adduced through discovery and subsequent amendment.

III.    PLAINTIFFS ARE PROPERLY SEEKING RELIEF ON BEHALF OF CIVILIAN DoD EMPLOYEES AND DoD CONTRACTORS

Defendants argue that civilian DoD employees and DoD contractors have no right of redress under 10 U.S.C. § 1107 because the statute references only "members of the armed forces." (Defs. Mem. 37). However,

the December 6, 2006, letter from the DoD announcing the reinstatement of AVIP expressly applies to civilian employees and contractors in addition to uniformed service members on a mandatory basis. The DoD has no independent authority to require ordinary civilians outside of its authority to submit to mandatory inoculations. Thus, the civilians forced to submit to mandatory AVA vaccination under AVIP should have an even greater protection under 10 U.S.C. § 1107 to object to inoculation with an investigational new drug or a drug unapproved for its applied use.

CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order denying Defendants' Motion to dismiss and granting any other relief that is just and appropriate.

Date: April 11, 2007

Respectfully submitted,

/s/

_____

Mark S. Zaid, Esq.
D.C. Bar #440532
Mark S. Zaid, PC
1920 N Street, N.W.
Suite 300
Washington, D.C. 20036
(202) 454-2809

/s/
_____
John J. Michels, Jr., Esq.
D.C. Bar #457575
McGuireWoods LLP
77 W. Wacker, Suite 4400
Chicago, Illinois 60601
(312) 849-8150

Attorneys for the Plaintiffs

# Exhibit 1

*Doe v. Eschenbach,* Case No. 06-02131
Plaintiffs' Resp. to Defs. Mot. to Dismiss

166    *W.R. Schumm and R.L. Brenneman/Medical Veritas* 1 (2004) 166–170

# How "adequate and well-controlled"
# was the "clinical trial" of a human anthrax vaccine, 1955-1959?

**Walter R. Schumm, PhD and Robert L. Brenneman, MS**

School of Family Studies and Human Services
Justin Hall, Kansas State University
1700 Anderson Avenue
Manhattan, KS 66506-1403 USA
Phone: +1 785 539 3641 (home)    +1 785 532 1494 (office)
Fax: +1 785 532 5505
Email: Schumm@humec.ksu.edu (work)    WRSchumm@aol.com (home)

## Abstract

In late 2003, the Brachman et al. (1960, 1962) field study of an earlier anthrax vaccine became the basis for an FDA regulatory determination that the currently licensed vaccine is effective against B. anthracis strains, regardless of the route of exposure. Here, the Brachman et al. (1962) field study was reexamined in terms of the validity and completeness of its experimental design. Numerous limitations with respect to the trial's experimental design were either discovered or reaffirmed. Some of these limitations have never been explained satisfactorily for more than 40 years. In conclusion, our review indicates that Brachman et al.'s (1962) experimental design actually fell far short of being able to demonstrate, conclusively, the efficacy of the anthrax vaccine in humans, especially with respect to protection against inhalation anthrax. Any claim that the early trial of the vaccine was truly "adequate and well-controlled" must depend upon a consideration of only very limited information about the numerous weaknesses of that trial's experimental design.

©Copyright 2004, Pearblossom Private School, Inc.–Publishing Division. All rights reserved.

*Keywords:* Anthrax vaccine, Experimental Design, Limitations of Research

## 1. Background

The safety and the efficacy of the current anthrax vaccine used by the U.S. military has been challenged [1,2] despite arguments in its favor [3]. The U.S. Food and Drug Administration (FDA) has responsibility to license vaccines based on its scientific assessment of the efficacy and safety of such vaccines. On December 30, 2003 the FDA issued a regulatory opinion on anthrax vaccine, a Final Rule. FDA's Final Rule, and other assessments of the efficacy of the current anthrax vaccine in humans, are primarily tied to the reputed success of the field investigations done, with a similar vaccine, between 1955 and 1959 at four goat hair mills in the eastern United States.

The vaccine is widely quoted as having demonstrated "92.5" or "93%" effectiveness, a statistic extracted from Brachman et al., [4:634]. For example, Bales, Dannenberg, Brachman, Kaufmann, Klatsky, and Ashford [5:1165] recently stated that, "In a 1962 field investigation, an acellular anthrax vaccine was demonstrated to be 93% effective in reducing the risk for infection with B. anthracis in humans. The vaccine was subsequently recommended for persons who handle imported hair, wool, hides, or bone meal." Likewise, Friedlander, Pittman, and Parker [3:2105] stated that, with respect to the same field investigation, "Vaccination resulted in a statistically significant reduction in the incidence of anthrax in the vaccinated (1 cutaneous case) compared to the placebo group (13 cutaneous and 2 inhalational cases); 93% effective with a lower 95% confidence limit of 65%)."

The vaccine has been alleged to be effective against cutaneous anthrax, and only more recently, against inhalational an-

thrax, even though no new evidence from the original study has been produced to augment any claim for effectiveness against inhalational anthrax. Inglesby et al. [6:1740] recalled the field investigation and said, "A similar vaccine has been shown in 1 small placebo-controlled human trial to be efficacious against cutaneous anthrax." Brachman & Friedlander [7:635] admitted that "No assessment of the effectiveness of the vaccine against inhalational anthrax could be made because there were too few cases." Fulco, Liverman, & Sox [8:283] agreed with previous reports that "there were not enough cases of inhalation anthrax to determine if vaccination was effective against this, the most lethal form of anthrax." More recently, in stark contrast to previous conclusions, Brachman et al. [9] claimed efficacy for all routes of infection in the Institute of Medicine's Committee to Review the CDC Anthrax Vaccine Safety and Efficacy Research Program.

The validity of the design of the initial anthrax vaccine study is an important issue because it forms the foundation of claims for the current vaccine's efficacy. Demicheli, Rivetti, Deeks, Jefferson, & Pratt [10:884] concluded on the basis of both the Brachman field investigation and a Russian study that "killed anthrax vaccine is efficacious and well tolerated and should be administered to persons at high risk of the disease." Demicheli et al. [10:883] did, however, admit that Brachman et al.'s [4] reporting was not complete but still assessed the overall quality of the Brachman study as "relatively good." The Institute of Medicine's Committee to Review the CDC Anthrax Vaccine Safety and Efficacy Research Program, chaired by Dr. Brachman, observed, "A controlled trial to evaluate the safety and efficacy of this vaccine was conducted between 1955 and 1959 at goat hair-processing mills in the eastern United States

doi: 10.1588/medver.2004.01.00022

(Brachman et al., 1962). The study indicated that the vaccine was effective in this population. [9:25]" Their report assumed that the study's design was valid enough to permit dependable conclusions about the current vaccine's efficacy and safety.

The evidence for efficacy of the current anthrax vaccine is a central issue of a lawsuit brought by service members against the Department of Defense (DoD) and the Food and Drug Administration (FDA). If a vaccine is offered to an individual for a purpose for which it was not intended or known to be effective (not a licensed indication), then that individual should have the right to informed consent, even if in the military (10 U.S. Code, Section 1107). The defendants in John Doe #1 et al. v. Donald H. Rumsfeld, et al., (U. S. District Court for the District of Columbia, Civil Action No. 03-707) concede that the FDA's "effectiveness determination is based on the adequate and well-controlled study conducted by Drs. Brachman, Gold, Plotkin, Fekety, Werrin, and Ingraham." The defendants argue that the FDA's action in approving the anthrax vaccine for inhalational anthrax was "rational and supported by the evidence." Therefore, if the design of the Brachman et al. [4] field study in fact is not sufficiently strong to be able to support the efficacy of the current vaccine in humans for protection against inhalational anthrax, then much of the argument for efficacy of the vaccine against inhalational anthrax would be invalidated, as well as the validity of the FDA's Final Rule.

Objections to the current anthrax vaccination program may be raised on the basis of ethics and informed consent [11], or safety [2;8:13;12;13] but such issues are beyond the scope of this paper. However, numerous objections to the experimental design can be raised. We decided to review those issues briefly so readers would understand more clearly the historic and scientific background of the development of the human anthrax vaccine.

## 2. Summary of Brachman et al. (1962)

The U.S. Army began a field trial of what is now an older version of a human anthrax vaccine in 1955. Eventually, four textile mills that processed imported goat hair for suit interlinings were selected for participation in the study. The mills were probably selected on the basis of having had relatively high rates of anthrax infection previously; all four mills averaged 1.2 cases per 100 mill employees per year, a total of 130 cases between 1948 and the initiation of the study at each of the mills. In February 1955, the study began at Mill S with 273 workers and continued there until June 1958, with eleven workers contracting cutaneous anthrax during that time, one of them after being vaccinated and another after partial vaccination. The trial was extended to Mill M with 200 workers in May 1955 and continued there until late March 1959; only three workers developed cutaneous anthrax. The trial at Mill P with 144 workers did not begin until June 1956 and continued until late March 1959, with three workers developing cutaneous anthrax, the last in March 1959 after partial vaccination. The fourth Mill, Mill A, the Arms Mill in Manchester, New Hampshire became involved in the trial in May 1957 with 632 workers. However, after an epidemic of inhalational anthrax that began in late August, the trial was discontinued in November 1957, after which

all that mill's workers were vaccinated. That epidemic left four workers dead of inhalational anthrax and infected five others, one with inhalational anthrax and four with cutaneous anthrax. The identities of mills M, P, and S, as well as most of the workers who were infected with anthrax, including those who died, have remained a secret. Based on relative rates of person-months of exposure, Brachman et al. [4] calculated the effectiveness of the vaccine as 92.5%, usually rounded up to 93% in recent reports. The initial pool of workers was 1,330. It appears that the researchers would initially randomly select workers into treatment and placebo groups and then ask for volunteers, after removing those who appeared to have had previous anthrax infections (N = 81). It is not clear if previous infection was determined from company medical records or worker self-report or both. Those who refused did not participate. Some workers started receiving either genuine or placebo vaccinations but dropped out of the program, becoming "incompletes." Among the 793 workers who did not refuse to participate and who did not become incompletes, 379 (47.8%) were vaccinated with anthrax vaccine and 414 (52.2%) received placebo vaccine. Numerous other workers fell out of the study, either by choice or because they left the mills for employment elsewhere. At the end of the study, only 287 (23.0%) of the original 1,249 workers were still participating, as well as only 190 (24.0%) of the original 793 workers in the complete vaccine or placebo group.

Of the 379 vaccinated workers, only one developed cutaneous anthrax (0.3%); of the 414 placebo cases, 15 (3.6%) developed cutaneous or inhalational anthrax. Among the 456 refusals and incompletes, 10 (2.2%) developed cutaneous or inhalational anthrax. Overall, anthrax infection rates were low, even among those with presumably no protection in spite of, in some cases, years of exposure to anthrax spores in the work environment.

## 3. Problems with Brachman et al.'s Design

First, the field study provided complete anthrax vaccinations to only 379 (30.3%) of the 1,249 participants. Adding in the placebo vaccinations, the total increases to 793 (63.5%). Ideally, one would want to administer genuine vaccine to approximately half of the subjects in a study in order to have the most powerful statistical test of the effectiveness of the vaccine. The study fell short of the ideal in this regard, due to a high rate of refusals at some of the mills and numerous "incompletes."

Another ideal for experimental designs is for a study to be "double-blind," that neither the subjects nor the researchers in direct contact with the subjects know which groups are treatment and which are control. However, an earlier report by the Institute of Medicine [8:282] indicated that this ideal was probably not met: "The study subjects did not know whether they had received the active vaccine or placebo; the article does not state whether the investigators were also blinded to the allocation."

Secondly, an unknown number of workers received partial vaccinations; the lack of clarity is a result of Brachman et al. (1962) reporting partial vaccinations and partial placebo inoculations together, rather than separately. Specifically, 116 (9.3%)

doi: 10.1588/medver.2004.01.00022

*W.R. Schumm and R.L. Brenneman/Medical Veritas 1 (2004) 166–170*

of the 1,249 workers received partial vaccinations. That omission is important because it has prevented other researchers from ever analyzing the difference in effectiveness between partial vaccinations and partial placebo inoculations. The omission also weakens the ability of researchers to test the effectiveness of partial vaccinations because the "partial vaccination" group includes both those who received genuine vaccine and those who received partial placebo vaccine. One could statistically test the effects of partial vaccination but any legitimate effect of partial vaccination with the actual vaccine would be weakened by the presence of recipients of the placebo vaccine. This weakness of the study makes it impossible to determine exactly how many injections of the vaccine, below the recommended amount, are actually needed to provide an adequate level of immunity.

Thirdly, it is not clear how the design took into account certain unusual classifications of workers. For example, the departure of former workers and the arrival of new workers complicated the design in unknown ways. Brachman, Plotkin, Bumford, & Atchison [14:14] admit that two new workers who had not had a chance to receive either the vaccine or placebo (because they had started working at Mill A in mid-August 1957) had become infected. Thus, new workers who became ill were counted in the observational group, but it is not clear if new workers who did not become infected were added to the unvaccinated observational group. Likewise, Brachman et al. [4:642] admit that two workers at the Arms Mill were inadvertently given the first injection of the vaccine even though they had contracted cutaneous anthrax previously, implying that the study's attempts to remove workers with prior immunity to anthrax as a result of previous infections were not always successful. It is also possible that some workers had experienced subclinical cases of anthrax and had developed immunity without being aware of it. Yet the procedures used for screening those with previous clinical or subclinical infections were not specified, complicating interpretation of the study's experimental design.

Low retention rates were a fourth problem with the study's design. What we do know from Table 3 [4:635] is that of the 793 members of the experimental group (those who received either full vaccinations or full placebo inoculations) only 190 (24.0%) remained in the evaluation program after having had four booster inoculations. Thus, 76.0% of the experimental group did not complete the full study. Of those 116 who failed to complete their initial series of real or placebo vaccinations, there were 73 (62.9%) remaining at the end, admittedly a higher percentage than for the experimental group (24.0%) Such different retention rates remain troubling from a scientific perspective. Finally, with respect to retention rates, among the 340 workers who refused the vaccine, only 24 (a mere 7.1%) remained at the end of the study. The differences between these retention rates for the three groups (7.1%, 24.0%, and 62.9%) are very significant by chi-square (df = 2) = 153.7 (p < 0.001), though they yield an overall retention rate of 23% (287/1249). On the other hand, Brachman et al. [4: 635] provided no information in Table 3 about the differential retention rates between the placebo and the genuinely vaccinated groups (we know that together only 190/793 (24.0%) workers in the experimental

group remained in the study as of their fourth booster inoculation). Brachman et al. [4] also failed to report if there were significant differences in attrition rates across the four mills studied, a weakness that could further complicate the valid interpretation of their results. It is not clear what factors may have led workers to quit the project, but those unknown factors may have confounded differences between the vaccinated and unvaccinated groups and subsequent rates of anthrax infection. For example, twice as many placebo workers (15/414 or 3.6%) became infected with anthrax during the study as did workers who refused to participate in the program (6/340 or 1.8%). While the percentages were not different statistically (p < .17), such differences suggest there may be other ways in which the various groups differed but that were not controlled in the study's design.

However, from Table 8 [4: 640-641], we can estimate the retention rates at the end of the study, regardless of the previous number of inoculations for each mill. It appears that the retention rates for the four mills varied considerably. For example, from Table 2 [4: 634], Mill P started with 19 high risk workers who were vaccinated and with 22 high risk workers who were inoculated with placebo vaccine. Likewise, Mill P started with 22 low risk workers who were vaccinated and with another 22 low risk workers who received placebo. Altogether, Mill P began with 85 workers in the experimental group, which would translate into approximately 510 (85 x 6) person-months exposure over six months. However, Table 8 [4: 640-641] shows Mill P having only 453 person-months exposure in the first six-month evaluation period, a retention rate of 453/510 (88.8%). In its last available evaluation period, which was 12 months long, Mill P had only 156 person-months or 78 person-months over six months on average. Thus the final apparent retention rate for Mill P appears to have been 78/510 (15.3%). Similar figures for Mills A, M, and S were, respectively, 1740/1878 (92.3%), 477/984 (48.5%), and 399/1386 (28.8%). These estimates are conservative because workers who received incomplete vaccinations were not included in the initial totals, which would have enlarged the denominator in the previous statistics. Even if one were to use slightly different methods of calculating the retention rates, it would appear that substantial differences would still emerge among the mills with respect to their retention rates.

Whatever factors drove the differences in worker retention rates in the field trial, those factors were far more influential with respect to retention than the vaccine was at reducing anthrax rates. When external factors are not well-controlled but are far more powerful than the independent variable, the interpretation of the results of such a study are jeopardized. If Brachman et al. [4] had reported the breakdown of the partial inoculations, it might have been possible to control statistically for the study's retention problems, but that breakdown was not reported. Nevertheless, such limitations have not impacted the confidence often placed in the results of this trial.

Fourth, the vaccine was clearly administered only to volunteers [14:13-14] and it remains unclear how the group of volunteers was similar to or different from the group of nonvolunteers. From Table 2 [4: 634], it is apparent that refusal rates differed considerably among the mills -- 284/632 (44.9%)

doi: 10.1588/medver.2004.01.00022

for Mill A, 24/200 (12.0%) for Mill M, 31/144 (21.5%) for Mill P, and 1/273 (0.4%) for Mill S, with an overall refusal rate of 340/1249 (27.2%). Refusal rates also differed as a function of high risk versus low risk workers, with 89/589 (15.1%) of high risk workers refusing to participate, compared to 251/660 38.0%) of low risk workers. Differences in susceptibility to anthrax infection between the two groups (age, gender, preexisting health or genetic conditions, etc.) might well account for differences in outcome since the assignments to volunteer/non-volunteer groups were not randomized, as usually done in well-controlled experimental designs. Refusal rates did not parallel previous infection rates (1948 to start of study at each mill) among workers at the four mills, infection rates (Table 1 in [4: 633]) of 1% (Mill A), 1.4% (Mill M), 0.6% (Mill P), and 1.0% (Mill S) even though they appeared related to the relative risk status of each worker.

Fifth, it appears that the randomization procedures were done before the list of volunteers was obtained rather than afterwards [14:14], allowing for the possibility that factors associated with volunteering could confound the differences between the vaccinated and placebo groups.

Sixth, the length of time that each mill remained part of the study varied from a few months to over three years, creating substantial differences in possible exposure durations for each worker, both to anthrax spores and to the possibility of continuing vaccination.

Seventh, Brachman et al. [14] carefully reviewed the records of the Arms Mill and found not even one case of inhalational anthrax in the Mill from 1941 to July 1957, highlighting the unusual nature of the epidemic that occurred at the Arms Mill in the fall of 1957. Even though Brachman et al. [14:11] noted that anthrax bacilli were recovered from three of the Arms Mill victims and tested on laboratory animals (with $LD_{50}$ of 6,000 inhaled spores for monkeys and 50,000 for guinea pigs and with virulence equivalent to "the most virulent laboratory-selected strain," it is not clear that anyone publicly reported the causative strain of anthrax. It was referred to by Brachman, et al. [14:20] as the "Manchester strain," even though it arguably did not originate in that locality, since the goat hair used came from Iran, Iraq, and Pakistan [14:8]. One would have expected the particular strain of that disease to have been identified in order to know against what strain the vaccine might have been effective. It would be very helpful to know if the strain was the Ames strain manufactured by the United States Army or whether it was a different strain, perhaps one manufactured by the former Soviet Union, or a naturally occurring strain.

Finally, it should be added that nowhere did Brachman et al. [4] report statistical analyses of the vaccine's effectiveness that controlled for mill location, risk levels, age, race, gender of workers, or other factors that might have been of interest, as did Wiesen & Littell [15] in a recent analysis of anthrax vaccination and pregnancy outcomes (not to mention the retention issues discussed earlier). Our point is that quite an argument can be made to dispute the notion that the study was "well-controlled." At the very least, it was not well-controlled from the perspective of a multivariate statistical analysis controlling for numerous potential confounding factors.

The Brachman et al. [4] study was also limited not only in terms of what it did, but in terms of what it didn't do. In fact, FDA has recently noted [16:2] that "a window of opportunity for preventive therapy exists between the time of inhalation of aerosolized spores of B. anthracis and development of signs and symptoms of disease." The basis for FDA's statement is (1) Army research [3:1242] on non-human primates that "clearly showed that complete, long-term survival, after discontinuance of antibiotics, occurred when postexposure antibiotic treatment was combined with vaccination" and (2) the results in exposed postal workers none of whom developed anthrax after starting prophylactic antibiotics while asymptomatic. The recent success of post-exposure prophylaxis with vaccine and antibiotics after the 2001 anthrax letter attacks, along with Friedlander, et al.'s [3] results, appear to have convinced the CDC [17] that post-exposure prophylaxis with antibiotics and vaccine has as much statistical validity as pre-exposure immunization with a highly reactive [12] vaccine. Yet, the Brachman et al. [4] study did not include a post-exposure prophylaxis treatment group (for both vaccinated and placebo groups), making it impossible to determine the relative effectiveness of treating anthrax infections by vaccination alone, by vaccination and antibiotics, or by antibiotics alone. Regardless of the ethics of such an experiment, the lack of alternative treatments remains a weakness of the original Brachman et al. [4] study. Even among those who fell ill with inhalational anthrax in the study, there was no systematic attempt to administer adequate levels of antibiotics as early as possible, even after the first cases had occurred (and the local medical community presumably having been advised of the risk of mill workers contracting inhalational anthrax – at least that would have been the logical thing to have been done, if only in hindsight) [18].

## 4. Discussion

Readers might object, however, that the flaws in design might not be nearly substantial enough to influence the outcome of the study with respect to the efficacy of the vaccine. For example, if 99% of those vaccinated were protected from anthrax infection in contrast to only 50% of those not vaccinated, it could be argued that the 49% difference was so substantial as to override any errors associated with design flaws. It would be a valid argument, if the effect of the vaccine were so dramatic. However, vaccination raised protection rates against anthrax infection from 96.4% to 99.7% among the 793 workers in the experimental group in the study, a difference of only 3.3 percent, a difference small enough to perhaps compare with the errors associated with the study's flaws in design.

Uncertainty associated with retention rates and refusal rates clouds the clarity of the study's design. Without information on partial vaccinations, we cannot distinguish the effects of partial vaccination with placebo versus genuine vaccine. It is not clear how workers with previous anthrax infections were screened nor under what conditions and how incoming workers were admitted to the study. Numerous factors (risk level, gender, mill, age, etc.) were not controlled statistically in the estimation of the vaccine's effectiveness. The way in which the Brachman et al. [4] study was conducted leaves many questions unan-

170                    *W.R. Schumm and R.L. Brenneman/Medical Veritas* 1 (2004) 166–170

swered and falls far short of an ideal experimental design in numerous ways. In conclusion, our review indicates that Brachman et al.'s [4] experimental design actually falls far short of being able to demonstrate conclusively the efficacy of the current anthrax vaccine in humans. Given the uncertainty associated with the benefits of the vaccine, greater weight should be given to potential risks associated with the current vaccine when risk-benefit ratios with respect to the current anthrax vaccine are considered. Leaning on the Brachman et al. [4] study to justify the current anthrax vaccine's effectiveness is more akin to wishful thinking than to science in our opinion. Clearly, the debate about anthrax vaccine's safety and effectiveness [19, 20] and the role of vaccines in Gulf War illness [21] will continue, regardless of the measure of faith placed in the original human trials of the anthrax vaccine [4], but the evidence suggests that the Brachman et al. [4] study had numerous and considerable limitations in its design that tend to limit its usefulness for promoting human anthrax vaccine's effectiveness, especially with respect to protecting against inhalation anthrax.

## References

[1] Nicholson GL, Nass M, Nicolson NL. Anthrax vaccine: controversy over safety and efficacy. Antimicrobics and Infectious Disease Newsletter 2000;18(1):1–6.

[2] Nass M. The anthrax vaccine program: an analysis of the CDC's recommendations for vaccine use. American Journal of Public Health 2002;92:715–21.

[3] Friedlander, AM, Pittman, PR, Parker, GW. Anthrax vaccine: evidence for safety and efficacy against inhalational anthrax. JAMA 1999; 282:2104–6.

[4] Brachman PS, Gold H, Plotkin SA, Fekety FR, Werrin M, Ingraham NR. Field evaluation of a human anthrax vaccine. American Journal of Public Health 1962;52:632–45.

[5] Bales ME, Dannenberg AL, Brachman PS, Kaufmann AF, Klatsky PC, Ashford DA. Epidemiologic response to anthrax outbreaks: field investigations, 1950-2001. Emerging Infectious Diseases 2002;8:1163–4.

[6] Inglesby TV, Henderson DA, Bartlett JG, Ascher MS, Eitzen E, Friedlander AM et al. Anthrax as a biological weapon: medical and public health management. JAMA 1999; 281:1735–45.

[7] Brachman, PS, Friedlander, AM. Anthrax. In: SA Plotkin and WA Orenstein (Eds.), Vaccines. (3rd Ed.) Philadelphia: WB Saunders, 1999:629–37.

[8] Fulco CE, Liverman CT, Sox HC. Gulf War and health: depleted uranium, pyridostigmine bromide, sarin, vaccines. (Vol.. 1). Washington, DC: National Academy Press, 2000.

[9] Brachman PS, Adimora AA, Berry SH, Bush T, Eickhoff TC, Ferrieri P et al. An assessment of the CDC anthrax vaccine safety and efficacy research program. Washington, DC: National Academies Press, 2003.

[10] Demicheli V, Rivetti D, Deeks JJ, Jefferson T, Pratt M. The effectiveness and safety of vaccines against human anthrax: a systematic review. Vaccine 1998;16:880–4.

[11] Cummings ML. Informed consent and investigational new drug issues in the U.S. military. Accountability in Research 2002;9:93–103.

[12] Geier DA, Geier MR. Anthrax vaccination and joint related adverse reactions in light of biological warfare scenarios. Clinical and Experimental Rheumatology 2002;20:217–20.

[13] Schumm WR, Webb FJ, Jurich AP, Bollman SR. Comments on the Institute of Medicine's 2002 report on the safety of anthrax vaccine. Psychological Reports 2002;91:187–91.

[14] Brachman PS, Plotkin SA, Bumford FH, Atchison MM. An epidemic of inhalation anthrax. II. Epidemiologic investigation. American Journal of Hygiene 1960;72:6–23.

[15] Wiesen AR, Littell CT. Relationship between prepregnancy anthrax vaccination and pregnancy and birth outcomes among U.S. Army women. JAMA 2002;287:1556–60.

[16] Food and Drug Administration. Guidance for Industry: Inhalational Anthrax (Post-Exposure)–Developing Antimicrobial Drugs. Washington, DC: Center for Drug Evaluation and Research, 2002.

[17] Centers for Disease Control and Prevention. Use of anthrax vaccine in response to terrorism: supplemental recommendations of the Advisory Committee on Immunization Practices. MMWR 2002;51:1024–6.

[18] Plotkin SA, Brachman PS, Utell M, Bumford FH, Atchison MM. An epidemic of inhalation anthrax, the first in the twentieth century. American Journal of Medicine 1960;29:992–1001.

[19] Joellenbeck LM, Zwanziger LL, Durch JS, Strom BL (Eds.) The anthrax vaccine: is it safe? Does it work? Washington, DC: National Academy Press, 2002.

[20] Nass M. Anthrax vaccine: caveat emptor (Let the buyer beware). Current treatment options in infectious diseases 2003;5:361–4.

[21] Steele, L. Prevalence and patterns of Gulf War illness in Kansas veterans: association of symptoms with characteristics of person, place, and time of military service. American Journal of Epidemiology 2000;152:992–1002.

doi: 10.1588/medver.2004.01.00022



| ROLLINS SCHOOL OF PUBLIC HEALTH | Department of Global Health | EMORY |

March 2, 2005


Food & Drug Administration
Division of Dockets Management
5630 Fishers Lane
Room 1061
Rockville, Maryland  20852


To Whom It May Concern:

I am writing in reference to "Docket Number 1980N-0208, Final Rule & Final Order Involving Bacterial Vaccines and Toxoids" and specifically about the human anthrax vaccine.  In the study that I conduced in the late 1950s evaluating human anthrax vaccine developed by scientists at Fort Detrick, Frederick, Maryland, we selected as our volunteer group of subjects, employees at four textile mills in the northeastern part of the United States who volunteered for this double-blinded evaluation.  The four selected mills had a high risk of anthrax infections among its employees due to the processing of imported contaminated goat hair.  The volunteers were divided into two groups, one group receiving a placebo inoculation, and the other group the anthrax vaccine according to the published schedule.  I personally gave every dose of vaccine and placebo, and additionally, looked at the site of inoculations at 24 and 48 hours after giving each dose.  At the time of my evaluation of reactions, I was not aware as to whether the employee was in the vaccinated or placebo group.

When possible cases of cutaneous or inhalation anthrax infections were reported among the employees, I was immediately notified and I flew to the mill in order to confirm the diagnosis.  After several years, it was apparent that the anthrax vaccine was effective in preventing human anthrax infections.  Subsequently, the vaccine was made available to all employees in these four mills as well as in other mills who requested the vaccine.

In analyzing the data, we felt that since the pathophysiology of human anthrax is the same whether the organisms gains entrance through the skin or through the lungs, and therefore, it was appropriate to combine the data from the field trial.  The patho-physiology of anthrax is the result of a toxin produced by the organism causing local or

80N-0208                                                                                     C 11

Emory University
1518 Clifton Road NE
Atlanta, Georgia 30322

The Robert W. Woodruff Health Sciences Center
An equal opportunity, affirmative action university

Tel 404.727.8804
Fax 404.727.4590

systemic reactions regardless of the route by which the organisms entered the body.  In our statistical analyses, we did omit cases of anthrax that occurred in employees that did not volunteer to participate in the study.  However, if these cases are included in the analyses, the vaccine efficacy is not changed

Thus, I feel that the vaccine is appropriate for active immunization against Bacillus anthracis regardless of the route of exposure.  If I can be of any further assistance to you in considering this conclusion, do not hesitate in contacting me.

Sincerely,

Philip S. Brachman, M.D.
Professor

PSB/bf

W.R.. Schumm and M. Nass/Medical Veritas 3 (2006) 747–752    747

# The FDA's acceptance of Brachman's 1950's anthrax research: Good politics?  Maybe.  Good science?  No.

**Walter R. Schumm, PhD**
School of Family Studies and Human Services
Justin Hall, Kansas State University
1700 Anderson Avenue
Manhattan, KS  66506-1403 USA
Phone: +1 785 539 3641 (home)    +1 785 532 1494 (office)
Fax: +1 785 532 5505
Email: Schumm@ksu.edu  (work)    WRSchumm@aol.com (home)

**Meryl Nass, MD**
Mount Desert Island Hospital
10 Wayman Lane
Bar Harbor, ME  04609 USA

Phone: +1 207 288 5081 Ext 220 (office)

Email: mnass@gwi.net  (work)

## Abstract

In December 2005, the U.S. Food and Drug Administration (FDA) released its Final Order on anthrax vaccine, declaring it to be 92.5% effective for preventing both inhalation and cutaneous anthrax infections. While the FDA failed to discuss in its report many of the limitations found in the original research reports by Brachman *et al.* (1960, 1962), it did rebut an argument presented previously in *Medical Veritas* (2005) concerning the lack of statistical justification for combining data from the four textile mills involved in Brachman's studies. In contrast to the FDA's conclusions, research here demonstrates that the vaccine's efficacy was not consistent across the four mills, varying substantially from one mill to the next and was lower, across all the four mills, than the alleged 92.5% rate. It is observed that the Arms Mill, which had only nine cases of anthrax during its "epidemic," had over 200 cases of the flu during the same time period. Even the number of subjects in the treatment and control groups changed from one report (1960) to another (1962). Not only was Box's M test significant, indicating that data from the four mills should not be combined, Levene tests indicated similar problems with heterogeneity of variance across data from the four mills. A variety of statistical tests support the hypothesis that there were substantial differences among the four mills, especially in terms of refusal rates, which had a direct bearing on the validity of the way in which subjects were divided between treatment and control groups. FDA's regulatory decisions with respect to anthrax vaccine absorbed, while politically expedient, appear to lack the scientific basis mandated in federal statute and affirmed by U.S. Supreme Court precedents.
©Copyright 2006, Pearblossom Private School, Inc.–Publishing Division. All rights reserved.

*Keywords:* Anthrax vaccine, limitations of research, scientific ethics, vaccine efficacy, inhalation anthrax

## 1. Background

"Like the federal judiciary, the Department of Defense has to adhere to objective scientific standards in order to develop sound health policy and deal with controversial issues of medicine and science. [1]"
-- Deputy Assistant Secretary of Defense, John F. Mazzuchi, Ph.D., *et al.* (March 2000)

The efficacy of the U.S. anthrax vaccine has been an issue of considerable controversy [2-18], within the larger question of how best to respond to the threat of biological terrorism [19]. There have been several recent reviews of anthrax vaccine by individuals employed by the U.S. government [20, 21]. In December 2005, the United States Food and Drug Administration [22] responded to comments that it had received with respect to the U.S. human anthrax vaccine, Biothrax, formerly known as Anthrax Vaccine Adsorbed (AVA). One FDA response justified combining data from four study sites in the only human field trial of anthrax vaccine [23-26], even though Box's M test had indicated, in an article published in this journal, that the data were too dissimilar to permit such combination [14]. The FDA [22] stated that "when analyzing a multicenter clinical study, it is not reasonable to expect a statistically significant result at each site. Instead, *consistent effects* among individual study sites are the standard for multicenter studies" (emphasis added). Furthermore, the FDA said that, "The site-specific data for the Brachman study are quite consistent in that at all sites, the vaccine group had fewer cases of anthrax than the placebo group. The strength of the overall finding of vaccine efficacy is

such that, even with small numbers at each site, differences in outcome between the treatment and control groups are clearly statistically significant in one site and marginally significant in another. Thus, the site-specific data are fully supportive of the overall result, which showed a *large reduction* in risk of anthrax among those receiving vaccine." (emphasis added)

Our comments will focus on three issues -- first, whether the results were consistent from one site to another; second, how much reduction in risk or increase in protection was actually provided by the vaccine at the sites, and, third, a reexamination of the statistical issues concerning the similarity of conditions at the four sites, particularly as they may have undermined the value of any prior randomization of subject assignment to the treatment and control groups.

## 2. Methods

As explained previously [4, 6], we had reconstructed the Brachman study data to permit its reanalysis. In addition, dropout rates were calculated here from data provided in Table 8 in the 1962 Brachman study [23]. Chi-square tests were applied to the data to assess differences in percentages across the four mills, as shown in Table 1. The first four rows in Table 1 are based on 794 subjects, including the additional subject from Mill P who was fully vaccinated but not included in the experimental group (N = 793). However, Brachman's [23] data for drop-outs was based on 793 cases and was therefore used for the next three rows of results in Table 1. The remaining rows in Table 1 were based on 1,249 subjects. The categories

doi: 10.1588/Mediver.03.00093

748                          W.R.. Schumm and M. Nass/Medical Veritas 3 (2006) 747–752

of partial vaccinations (placebo and vaccine), full vaccinations, full placebo inoculations, and refusals for each mill add up to approximately 100% (within rounding error) in each column because those four categories account for all of the subjects at each mill. The next two rows of data show the initial refusal rates at each mill for low and high risk workers, not including later dropouts. The final two rows of data show the rates of cutaneous infections and of both cutaneous and inhalation infections among all workers at each mill, regardless of vaccination status.

### 3. Site consistency

The effectiveness of the vaccine at each site depends on the definitions of infection and of vaccination status. The prestigious Institute of Medicine [27: 58] noted that the definition used for "complete inoculation" appeared to be three anthrax shots since the experimental group of 793 subjects was defined as those who had received the first three shots of the series. However, one of the victims of cutaneous anthrax [case #26, 25 year old male, high risk department, Mill P, date of onset 27 March 1959], who was the last in the study to contract anthrax, was credited with an incomplete vaccine status despite having had three inoculations at the time [he had not received his fourth and fifth boosters]. As the Institute of Medicine said,

"Given the definition of "complete" vaccination in the published paper, one of the cases counted in the incomplete vaccination group should have been included in the complete vaccination group. Doing so would have reduced the efficacy somewhat [27: 58]."

In addition, Brachman et al. [23, 24] appear to have defined three inoculations as a complete series; as their 1960 report mentions no subsequent "planned" inoculations. It must be observed there was another "close call" for an incomplete vaccination worker who developed anthrax. Case #1 [probably female, a spinner, age 24, Mill S, employed for 4.5 years, date of onset 14 March 1955] was on schedule with the vaccine, having had two inoculations and due for the third in less than three days. According to the schedule, the second inoculation with vaccine would have occurred within the previous two weeks. It could be argued that since she was on schedule with the vaccine [some 1991 Gulf War veterans reported to the author that they only received two inoculations with anthrax vaccine before going into combat], she should have been counted as a complete case. If two inoculations were "good enough" for Gulf War veterans, why weren't they "good enough" for inclusion here as a vaccinated case? Or, if two vaccinations were not good enough for the Brachman study, why were they "good enough" for Gulf War veterans?

Using the original authors' inclusion criteria, one or both of these cases should have been counted as vaccinated since one case was "on schedule" and the other case had received the full initial complement of three inoculations. For the FDA to insist on a rigid interpretation of vaccination status now when it allowed the military to vary the schedule during the Gulf War, seems inconsistent, unless – as has been alleged – the Gulf War vaccine had been illegally modified with an unlicensed adjuvant [16, 28] to cause a heightened autoimmune response, thereby necessitating fewer doses. If two inoculations failed to

provide protection for the mill workers under low to moderate levels of spore exposure, why would it have been safe to have assumed that only two inoculations would have provided our service members full protection against potentially much higher levels of spores? On the other hand, if the Gulf War veterans were adequately protected with two inoculations, we would have expected the mill worker to have been protected with two inoculations. There are additional issues since five of the placebo cases alleged to have contracted anthrax infections were never confirmed [23].

However, separate analyses [6] of each mill indicated that the vaccine demonstrated significant ($p<0.05$) effectiveness at only one mill, Mill S, a mill that experienced no cases of inhalation anthrax during the field trial, over a period of nearly four years. Effectiveness at Mill S was either 87% [((7.84 – 1)/7.84) x 100] or 74% [((7.84 – 2)/7.84) x 100], depending on whether one accepts one or two cases of anthrax infection among the vaccinated. At the only mill, Mill A, to experience cases of inhalation anthrax, the vaccine was not significantly effective against either cutaneous or inhalation anthrax, separately or combined [6]. At Mill P, one case of cutaneous anthrax occurred among 41 vaccinated workers (2.4%) while one case also occurred among 43 placebo subjects (2.3%); thus, the vaccinated group experienced a slightly *higher* rate of anthrax infection than did the placebo group, yielding negative efficacy for the vaccine at that mill. Mill P's results demonstrate, contrary to FDA's claim, that the vaccine's effectiveness was not consistent from one site to the next.

Thus, we find that at Mill S, the efficacy, though significant statistically, was 74-87% against only cutaneous anthrax, while at Mill P the efficacy was negative, against only cutaneous anthrax. At the remaining two mills, the results were not statistically significant [6]. Yet the FDA claims such findings are "consistent." At the very least, the differences between mills should have alerted the original investigators that multivariate statistical controls (for age, gender, risk level, mill, race, and other factors) were needed to validate the bivariate results reported by Brachman [23]. Another clue to the limitations of the vaccine's efficacy, though overlooked by the FDA, was that that all of the subjects who had previously contracted an anthrax infection avoided further infections, even without "booster" illnesses, suggesting that a one-time natural infection might have provided a higher (100%) rate of long-term protection than even multiple inoculations with the vaccine over a number of years.

### 4. Protection provided (versus risk reduction)

The FDA [22] continues to promote the often cited figure of 92.5% effectiveness for the vaccine, especially as that figure supports their assertion that the overall result showed "a large reduction in risk of anthrax among those receiving vaccine" [22]. An ordinary soldier, or even a member of Congress, would probably interpret that figure to mean that hundreds of unvaccinated mill workers had become infected with anthrax in comparison to only a handful of vaccinated mill workers. Unfortunately for anthrax vaccine proponents, in the experimental group the best the vaccine did against *all types* of anthrax infection was to provide an increase in protection of 3.1% (99.5%

doi: 10.1588/Mediver.03.00093

*W.R.. Schumm and M. Nass/Medical Veritas* 3 (2006) 747–752                                                                749

for the vaccinated group versus 96.4% for the placebo group). The marginal protection provided by the vaccine is seldom admitted by those trying to promote its efficacy, including the FDA, which was well aware of our previous explanation [6] of this scientific fact. For example, even at Mill S, most of the workers avoided infection whether vaccinated (99.1%) or not (93.6%); if we were to add the "partial" vaccination case, that percentage comparison would be reduced to 98.3% versus 93.6%. At the other mills, the unvaccinated had even higher rates of avoiding infection (97.1% to 98.1%) in spite of possibly having greater exposure to anthrax spores.

Perhaps, the workers were of such healthy constitutions that few of them ever fell ill with anything, including anthrax. That might sound like a solid rebuttal to the low rates of anthrax infection, but Brachman [23-25] admitted that in contrast to nine cases of anthrax at Mill A from August 26 to November 4, 1957, there were (in the same time frame) approximately 220 complaints by workers to Mill A's company nurse concerning upper respiratory infections (ostensibly "Asian flu"), a rate nearly 25 times higher than for anthrax for the same workers. Even without any protection against anthrax, the vast majority of workers were far more likely to complain of flu-like symptoms than to contract an anthrax infection of any kind, even when in daily contact with anthrax spores, even in the middle of an anthrax epidemic. Another possibility is that some of the cases of "Asian flu" might have been overlooked autoimmune reactions to the anthrax vaccine.

However, the actual results do not support the "large reduction in risk of anthrax" cited by the FDA because the risk of contracting anthrax was very small, especially among low-risk workers, and the reduction in risk (as small as it was) depended critically upon questionable assumptions about the acceptance of unproven cases of anthrax among the placebo group and the rejection of proven cases of anthrax among the vaccinated group.

## 5. Failures in statistics used

Accuracy and proper use of statistics are essential for the acceptance of research results. However, in a Brachman [24] report published nearly three years after the trials had concluded at Mill A, this mill was reported as having had 150 vaccinated and 150 placebo subjects. A chi-square test was performed that suggested that the results were significant at Mill A. However, when the more precise Fisher's Exact Test was used, the results were found to have been nonsignificant (p>0.12) [4, 6]. The FDA [22] knew of the earlier report [24, reference #12] but did not deem the statistical error worthy of consideration. Nor did the FDA consider the contradiction in number of subjects in a later report [23] from 150/150 to 149/164 to be worthy of consideration either. Where did the vaccinated subject disappear (150 versus 149)? From whence did the 13-14 new placebo subjects come? Would not such discrepancies lead to a closer review of such research, in most other instances? Why has the Brachman research seemingly been exempted, especially by the FDA, from the scrutiny demanded by such evident problems, if science is to be the basis for regulatory decisions?

As noted previously [14], Box's M Test is clearly significant when comparing the four mills, which suggests that the mill data should not be combined. Yet the FDA rejected the use of Box's M test for this purpose, even though there is no statistical basis for suggesting our results were an anomaly. When Levene tests, with $F(15, 778)$, for homogeneity of variance were used in several analyses of variance predicting vaccination outcomes, in all models tested, the null hypothesis was rejected statistically (p<0.001, F values between 5.19 and 9.24), indicating that the assumption of homogeneity of variance was being violated, a result lending additional support to the implications of the results for Box's M Test: that data from the four mills were far too different to be combined.

Table 1 illustrates how many differences there were between the four mills, almost all being significant statistically, using data discussed previously [14]. Of course, there is always a risk that a finding can be significant statistically but have less substantial impact than other findings. Perhaps there were differences among the mills, but those differences were overshadowed by the relative magnitude of the impact of the vaccine. A common way to assess the magnitude of the combined linear and nonlinear impact of a factor is with the statistic *eta* (the statistic *r* is often used to assess only linear effects). The *eta* values were also often large, as high as 0.43, in comparison to the *eta*'s for the vaccine, which ranged between only 0.07 and 0.13. Hence, it is clear that the differences among the mills were not only significant statistically, but those differences far overshadowed the much smaller effects (which were often not even significant statistically) of the vaccine.

**Experimental Group Results.** From Table 1, it is observed, among the experimental group, that the number of workers in high risk (higher spore) environments varied from 38.0% of the workers at Mill A to 79.7% of the workers at Mill S (p<0.001). Because risk was found to be proportional to infection rates in the original study, that finding alone argues against combining data from the four mills. The rate of cutaneous infections also varied across the four mills, somewhat parallel to the proportion of workers at high risk at each mill (p<0.05). Excluding Mill A, which experienced the anthrax epidemic (after which all mill workers were vaccinated), Table 1 data show that drop-out rates for all subjects, vaccinated subjects, and placebo subjects varied considerably among the three remaining mills (p<0.001). The drop-out rates were somewhat different for the placebo and vaccinated groups, suggesting that differences in infection outcomes might have been related to other factors besides the subjects' group (treatment or placebo).

The FDA also maintained that the "vaccine and placebo groups were balanced with regard to the exposure risk factor [22: 75186]. Indeed, risk and vaccination status are not correlated significantly, but a one-sample chi-square analysis of the four groups (low risk vaccinated, high risk vaccinated, low risk placebo, and high risk placebo, N = 794) testing the null hypothesis that the four groups have equal membership yielded a rejection of that null hypothesis, with a value of 9.12 (df = 3, p<0.03). In other words, the groups were *not* balanced, from a statistical perspective.

**Total Group Results.** From Table 1, it is clear again that the proportion of high risk workers varied substantially from one mill to another (p<0.001). Refusal rates varied from 0.4%

at Mill S to 44.9% at Mill A (p<0.001). Variable refusal rates mean that any randomization applied prior to allowing subjects to refuse participation was probably effectively neutralized. Differences in infection rates might well have been associated with factors correlated with refusal rates, factors other than assignment to the treatment or control groups. Refusal rates also varied as a function of high and low-risk work environments, further complicating the interpretation of differences between treatment and control groups. Not only did refusals vary across the four mills, but the percentages of partially inoculated subjects (vaccine and placebo combined), fully vaccinated subjects, and full placebo vaccinees varied likewise (p<0.001). Whatever processes underlay such variations might have accounted for differences between the treatment and control groups in rates of infection. As noted for the experimental group, infection rates varied widely between the mills for cutaneous infections (p<0.01).

   Age Comparisons. Furthermore, although we do not now have data on ages of workers at the four mills, Brachman [23] did provide data on the ages of the victims of anthrax infection. Comparing Mill S and the other three mills by an independent samples t-test on age at time of infection, a significant result was obtained, with $t_{24}$ = 3.13 (p<0.006). Mill S victims had an average age of 36.8 years (SD = 8.8) while the other mills' victims had an average age of 50.8 years (SD = 12.7), a result that may suggest that Mill S workers were younger on average than the workers at the other mills. Such results tend to contradict the FDA's [24] assertion that the Brachman treatment and control groups were balanced with respect to employee age, as well as length of employment, department, and job. In addition, in Table 4 of Brachman [23], two of the 26 infected workers had "unknown" lengths of employment. How can workers be balanced with respect to any variable when a substantial number of subjects (2/26 = 7.7%; 7.7% of 1,249 = 96 workers) have unknown scores on that variable?

   One might be tempted to argue that the differences in Table 1 have no substance. However, in a well-controlled study, the division of subjects between treatment and control groups is randomized (otherwise, observed effects of treatment may actually be related to pre-existing differences between the two groups). Brachman, to the best of our own knowledge, has only claimed that the subjects in his study were randomized in one of his many citations [29]. His recent letter to the FDA [26] only claimed that the subjects were evenly divided between the treatment and placebo groups. Brachman admitted [23] that the subjects were allowed to refuse participation after their selection into either group, a procedure that opened a door wide for vitiation of the intended effects of randomization, even if randomization had been applied. Table 1 data shows us that refusal rates varied significantly and substantially across the four mills, undercutting any randomization procedures. Other significant differences may be due to failure to randomize, to changes introduced when subjects were allowed to refuse participation after the process of selecting vaccine and placebo subjects, or to variable drop-out rates between the placebo and vaccinated groups (see Table 1). Either way, any desirable benefits of random allocation between different groups were no doubt lost because of procedures subsequent to the allocation process.

   The FDA [22] still agrees with earlier conclusions by Brachman and his colleagues [23, 24] and with its own 1985 Proposed Rule [30] that there were too few cases of inhalation anthrax to permit finding a statistically significant effect of the vaccine against inhalation anthrax. In fact, the FDA [30] concluded in 1985 that "No meaningful assessment of its value against inhalation anthrax is possible..." Yet the FDA now argues that such non-significant results really do not matter. Sometimes such arguments can be valid. If one's goal was to "prove" the null hypothesis, then having too few cases is an issue because one can always fail to reject the null hypothesis if one merely uses very few cases. However, if one's goal is to reject the null hypothesis, then having too few cases is a poor excuse for non-significant results unless the effect sizes involved are very substantial. If the effect sizes of the vaccine had been substantial but the statistical results nonsignificant because of too few subjects, the FDA's argument might have made sense. However, our calculations show that the effect sizes of the vaccine were on the order of 0.10, which is a small effect size by any standard, regardless of sample size. Such an argument makes even less sense given the much larger effect sizes involved in the other differences between the four mills.

## 7. Conclusions

   Using a highly selective interpretation of the data, the FDA [22] concluded that the Brachman study [23-26] was adequate and well-controlled in spite of published evidence to the contrary, provided to the FDA by this author and many others. In order to conclude that the Brachman study was an adequate and well-controlled study, as standard scientific practice one would have to:

   (1) Accept unconfirmed cases of infection in the placebo group, even with negative results from bacteriological tests.
   (2) Reject confirmed cases of infection in the treatment group.
   (3) Accept reports of substantially different numbers of subjects for vaccinated and placebo groups in different published reports.
   (4) Maintain efficacy rates (92.5%) as valid even after being proven wrong.
   (5) Reject results of statistical tests (Box's M) even when supported by similar tests (Levene tests) and by substantive differences among comparison groups (Table 1).
   (6) Highlight one way of looking at outcomes (92.5% efficacy) and completely ignore equally valid ways of describing outcomes (3.1% difference between treatment and control groups).
   (7) Claim the benefit of random assignment to treatment and control groups when subsequent attrition varied from 0.4% to 44.9% among the different sites.
   (8) Claim effectiveness (against inhalation anthrax) when clearly not supported by statistical evidence.
   (9) Claim consistently favorable results among different sites when at least one site had unfavorable results and other sites had non-significant results.

   Assuming independence of each of the nine factors above, even if the odds were only 30% that each of those nine issues were valid, the odds that all of them would be invalid would only be 4% (1/25). More realistically, if the odds of validity were 50%, the odds for all being invalid are much lower, only 0.2% (1/500). Therefore, from a statistical perspective it is extremely improbable that the FDA followed accepted scientific proce-

doi: 10.1588/Mediver.03.00093

*W.R.. Schumm and M. Nass/Medical Veritas 3 (2006) 747–752*    751

dure in developing its conclusions about the efficacy of the current anthrax vaccine.

Experimental designs and statistics are designed to help us make scientifically-based rather than subjectively-based decisions. When policy or regulatory decisions contrary to the statistical results are made, the purposes of science are subverted. When regulatory science is applied so inconsistently as to be arbitrary, the law is subverted. In the case of anthrax vaccine adsorbed, FDA has now twice issued Final Orders only when the government was in legal extremis due to a lawsuit challenging the licensed status of the vaccine. The decades-late timing of FDA's rulings has been noted by a federal judge as "highly suspicious."

The same can be said for the science underlying the FDA's 2003 [31] and 2005 Final Orders [22], which rely almost exclusively on narrowly selected self-interested parties: Dr. Brachman, a career CDC employee, and military officers responsible for a mandatory vaccination program ruled "illegal" by a federal judge. In contrast, FDA explicitly excluded from consideration published, peer-reviewed articles cited by those critical of the vaccine, but not provided to the agency in their entirety; however, even peer-reviewed articles submitted in their entirety were essentially ignored, with several not even cited by the FDA [22]. Therefore, it is hard to imagine the FDA, which is a co-defendant in this lawsuit, ruling objectively on the vaccine's efficacy or safety when doing so would admit both government culpability in a massive illegal experiment and responsibility for the documented illnesses and deaths associated with the vaccine.

Based on our statistical findings, FDA's latest regulatory decision on anthrax vaccine adsorbed has clearly subverted both the Department of Defense (DoD) policy mandate for "objective scientific standards" that prefaced this article, as well as the statutory requirements of the Food, Drug, and Cosmetic Act. The issues presented here, however, are not inclusive of all of the issues associated with the Brachman [23-26] research, many of which we intend to address in other venues.

### Acknowledgements

The assistance of John A. Richardson (LtCol, USAFR, Retired) in the preparation of this report, for his policy and legal research as well as editing, is very gratefully appreciated.

### References

[1] Mazzuchi JF, Claypool RG, Hyams KC, Trump D, Riddle J, Patterson RE, Bailey S. Protecting the health of U.S. military forces: a national obligation. *Aviation, Space, and Environmental Medicine* 2000; 71:260-5.

[2] Jefferson T. Bioterrorism and compulsory vaccination: better vaccines are needed if vaccination is to be made compulsory. *BMJ* 2004; 329:524-5.

[3] Nass M. Anthrax vaccine: caveat emptor (let the buyer beware). *Current Treatment Options in Infect Dis* 2003; 5:361-4.

[4] Schumm WR, Brenneman RL. How adequate and well-controlled was the clinical trial of a human anthrax vaccine, 1955-1959? *Medical Veritas* 2004; 1:166-70.

[5] Schumm WR. Anthrax vaccine and Gulf War illness symptoms in Captain Jean Tanner's Dover Air Force Base survey. *Medical Veritas* 2004; 1:163-5.

[6] Schumm WR, Brenneman RL, Arieli B, Mayo-Theus S, Muhammad J. A statistical reanalysis of Brachman *et al.'s* (1962) study of a human anthrax vaccine. *Medical Veritas* 2004; 1:171-178.

[7] Schumm WR, Jurich AP, Webb FJ, Bollman SR, Reppert EJ, Castelo CS. Exposure to anthrax vaccination and pyridostigmine bromide tablets as associated with geographic location during the first Persian Gulf War. *Medical Veritas* 2005; 2:521-5.

[8] Schumm WR, Jurich AP, Bollman SR, Webb FJ, Castelo CS. The long term safety of anthrax vaccine, pyridostigmine bromide (PB) tablets, and other risk factors among Reserve Component veterans of the first Persian Gulf War. *Medical Veritas* 2005; 2:348-62.

[9] Schumm WR, Jurich AP, Webb FJ, Bollman SR, Reppert EJ, Castelo CS. Changes in the subjective health of Reserve Component veterans as a function of mobilization status during the first Persian Gulf War. *Medical Veritas* 2005; 2:336–41.

[10] Schumm WR. Were the rights of human subjects violated at the Arms Mill in Manchester, New Hampshire in 1957 during human anthrax vaccine trials? *Medical Veritas* 2005; 2:344–7.

[11] Schumm WR, Reppert EJ, Jurich AP, Bollman SR, Webb FJ, Castelo CS *et al.* Self-reported changes in subjective health and anthrax vaccination as reported by over 900 Persian Gulf War era veterans. *Psychological Reports* 2002; 90:639–53.

[12] Schumm WR, Webb FJ, Jurich AP, Bollman SR. Comments on the Institute of Medicine's 2002 report on the safety of anthrax vaccine. *Psychological Reports* 2002; 91:187–91.

[13] Schumm WR. Bioterrorism and compulsory vaccination: arguments for current vaccines are based on inadequate support for older vaccines. *BMJ* 2004; 329:977–8.

[14] Schumm WR. Was it statistically legitimate to combine data from the four textile mills in Brachman *et al.'s* (1962) study of the effectiveness of a human anthrax vaccine? *Medical Veritas* 2005; 2:342–3.

[15] Nass M. Anthrax vaccine: model of a response to the biologic warfare threat. *Infect Dis Clin N Am* 1999; 13:187–208.

[16] Asa PB, Wilson RB, Garry RF. Antibodies to squalene in recipients of anthrax vaccine. *Exp Mol Pathol* 2002; 73:19–27.

[17] Geier DA, Geier MR. Anthrax vaccination and joint related adverse reactions in light of biological warfare scenarios. *Clin Exp Rheumatol* 2002; 20:217–20.

[18] Geier MR, Geier DA. Gastrointestinal adverse reactions following anthrax vaccination: an analysis of the Vaccine Adverse Event Reporting System (VAERS) database. *Hepatogastroenterology* 2004; 51:762–7.

[19] Schumm WR, Webb FJ. Testing new predictive models involving biological warfare attacks on civilians. *Medical Veritas* 2005; 2:331–3.

[20] Grabenstein JD. Anthrax vaccine: a review. *Immunol Allergy Clin North Am* 2003; 23:713–30.

[21] Little SF. Anthrax vaccines: a development update. *Biodrugs* 2005; 19:233–45.

[22] U. S. Food and Drug Administration. Biological products; bacterial vaccines and toxoids; implementation of efficacy review; anthrax vaccine adsorbed; Final Order. *U.S. Federal Register* 2005 Dec. 19; 70(242):75180–98.

[23] Brachman PS, Gold H, Plotkin SA, Fekety FR, Werrin M, Ingraham NR. Field evaluation of a human anthrax vaccine. *Am J Public Health* 1962; 56:632–45.

[24] Brachman PS, Plotkin SA, Bumford FH, Atchison MM. An epidemic of inhalation anthrax: the first in the twentieth century. II. Epidemiology. *Am J Hygiene* 1960; 72:6–23.

[25] Plotkin SA, Brachman PS, Utell M, Bumford FH, Atchison MM. An epidemic of inhalation anthrax, the first in the twentieth century. American Journal of Medicine 1960; 29:992–1001.

[26] Brachman PS. Letter to Food and Drug Administration, Division of Dockets Management, 5630 Fishers Lane, Room 1061, Rockville, Maryland 20852. Department of Global Health, Rollins School of Public Health, Emory University, Atlanta, GA, March 2, 2005.

[27] Joellenbeck LM, Zwanziger LL, Durch JS, Strom BL (Eds.). *The anthrax vaccine: is it safe? Does it work?* Washington, DC: National Academy Press, 2002.

[28] Chan KC. *Gulf War illnesses: questions about the presence of squalene antibodies in veterans can be resolved.* (GAO/NSIAD-99-5). Washington, DC: U.S. General Accounting Office, 1999 (March 29).

[29] Brachman PS. Bioterrorism: an update with a focus on anthrax. *Am J Epidemiology* 2002; 155:981–7.

[30] U.S. Food and Drug Administration. Biological products; bacterial vaccines and toxoids; Proposed Rule. *U.S. Federal Register* 1985 Dec. 15; 50(240):51059.

[31] U.S. Food and Drug Administration. Biological products; bacterial vaccines and toxoids; implementation of efficacy review. *U.S. Federal Register 2004*; 69(2):255 (January 5, released by the FDA on December 30, 2003).

doi: 10.1588/Mediver.03.00093

**Table 1. Differences between the textile mills studied in Brachman et al. (1962)**

| Variable | Mill A % | Mill M % | Mill P % | Mill S % | $\chi^2$ | df | eta |
|---|---|---|---|---|---|---|---|
| N = 794 | | | | | | | |
| Number of Workers | 39.4 | 20.7 | 10.8 | 29.1 | 141.1[4] | 3 | --- |
| High Risk Workers | 38.0 | 55.5 | 48.8 | 79.7 | 94.5[4] | 3 | .35 |
| Placebo Inoculations | 47.6 | 44.5 | 48.8 | 50.2 | 1.3 | 3 | .04 |
| Cutaneous Infections | 0.3 | 1.8 | 2.3 | 3.9 | 9.3[2] | 3 | .11 |
| N = 793 | | | | | | | |
| Drop-Outs (All) | --- | 39.6 | 83.5 | 49.4 | 44.6[4] | 2 | .31 |
| Drop-Outs (vaccinated) | --- | 45.2 | 80.5 | 48.3 | 31.2[4] | 2 | .35 |
| Drop-Outs (Placebo) | --- | 35.2 | 86.4 | 50.4 | 15.3[4] | 2 | .26 |
| N = 1,249 | | | | | | | |
| Number of Workers | 50.6 | 16.0 | 11.5 | 21.9 | 463.4[4] | 3 | --- |
| High Risk Workers | 31.6 | 53.5 | 45.87 | 79.1 | 176.3[4] | 3 | .38 |
| Partial Vaccinations | 5/5 | 6.0 | 19.4 | 15.0 | 41.4[4] | 3 | .18 |
| Fully Vaccinated | 23.6 | 36.5 | 28.5 | 42.5 | 36.6[4] | 3 | .17 |
| Placebo Inoculations | 25.9 | 45.5 | 30.6 | 42.1 | 38.9[4] | 3 | .18 |
| Refusals, all Subjects | 44.9 | 12.0 | 21.5 | 0.4 | 225.2[4] | 3 | .43 |
| Refusals, Low Risk Workers | 49.5 | 17.2 | 26.9 | 0.0 | 80.5[4] | 3 | .35 |
| Refusals, High Risk Workers | 35.0 | 7.5 | 15.2 | 0.5 | 102.7[4] | 3 | .42 |
| Cutaneous Infections | 0.6 | 1.5 | 2.1 | 4.0 | 13.5[3] | 3 | .10 |
| All Infections | 1.4 | 1.5 | 2.1 | 4.0 | 6.8[1] | 3 | .07 |

[1] p<0.10
[2] p<0.05
[3] p<0.01
[4] p<0.001

doi: 10.1588/Mediver.03.00093

# Exhibit 2

*Doe v. Eschenbach,* Case No. 06-02131
Plaintiffs' Resp. to Defs. Mot. to Dismiss

*W.R. Schumm, R.L. Brenneman, B. Arieli, et al/Medical Veritas* 1 (2004) 171–178                                     171

# A statistical reanalysis of Brachman et al.'s 1962 study
# of a human anthrax vaccine

**Walter R. Schumm, PhD; Robert L. Brenneman, MS; Bari Arieli, MS;**
**Suzanne Mayo-Theus, MS; and Jahrael Muhammad, MS**

School of Family Studies and Human Services
Justin Hall, Kansas State University
1700 Anderson Avenue
Manhattan, KS 66506-1403 USA
Phone: +1 785 539 3641 (home)    +1 785 532 1494 (office)
Fax: +1 785 532 5505
Email: Schumm@humec.ksu.edu (work)    WRSchumm@aol.com (home)

## Abstract

In late 2003, the Brachman et al. (1960, 1962) field study of an earlier anthrax vaccine became the basis for an FDA regulatory determination that the currently licensed vaccine was effective against B. anthracis strains, regardless of the route of exposure. Here, the Brachman et al. (1962) field study is reexamined statistically, analyzing the vaccine's effectiveness as a function of risk levels, levels of vaccination status, types of anthrax infection, mill locations, and two study components (total versus experimental groups). Fisher's Exact Tests were used to compare the vaccine and non-vaccine groups because Fisher's Exact Tests are more accurate than the traditional chi-square tests, especially when cell sizes or probabilities are small. Numerous limitations of the trial were discovered or reaffirmed. Even taking both cutaneous and inhalational anthrax into account, we found that the vaccine's protective effects were not statistically significant ($p < 0.05$) in 75% of the mills studied. We found no evidence for the efficacy of incomplete vaccinations, although design or reporting flaws in the original study mitigated against finding such evidence. The reanalysis of Brachman et al. (1962) does indicate that the anthrax vaccine may help provide some marginal protection against cutaneous anthrax infection; however, cutaneous anthrax is seldom fatal and usually easily cured with antibiotics. The data do not provide statistically significant evidence of protection against inhalation anthrax. In conclusion, our reanalysis indicates that Brachman et al.'s (1962) data actually fell far short, as had actually been long acknowledged by leading anthrax experts until some time after 1999, of demonstrating the efficacy of the anthrax vaccine in humans, especially with respect to inhalational anthrax infection.

© Copyright 2004, Pearblossom Private School, Inc.–Publishing Division. All rights reserved.

*Keywords:* Anthrax vaccine, Inhalational Anthrax, Cutaneous Anthrax, Limitations of Research

## 1. Background

As observed previously [1], the safety and the efficacy of the current anthrax vaccine used by the U.S. military has been challenged [2,3,4] despite arguments in its favor [5,6]. The FDA recently issued a regulatory opinion on anthrax vaccine that was largely tied to the reputed success of the field investigations done, with a similar vaccine, in the 1950's at four textile mills. Indeed numerous recent sources have cited the 93% effectiveness rate reported by Brachman et al. [7] when discussing the efficacy of the current anthrax vaccine [5: 2105, 8:1165;9:1740;10:884). However, some researchers have admitted that the vaccine was not proven to work against inhalation anthrax; Brachman & Friedlander [11:635] as recently as 1999 admitted, "No assessment of the effectiveness of the vaccine against inhalational anthrax could be made because there were too few cases." However, more recently, Brachman et al. [12] claimed efficacy for *all* routes of infection, including *inhalational*, in the Institute of Medicine's Committee to Review the CDC Anthrax Vaccine Safety and Efficacy Research Program.

As noted previously [1], "the evidence for efficacy of the current anthrax vaccine is a central issue of a lawsuit brought by service members against the Department of Defense (DoD) and the Food and Drug Administration (FDA). If a vaccine is

offered to an individual for a purpose for which it was not intended or known to be effective (not a licensed indication), then that individual should have the right to informed consent, even if in the military (10 U.S. Code, Section 1107). The defendants in John Doe #1 et al. v. Donald H. Rumsfeld, et al., (U. S. District Court for the District of Columbia, Civil Action No. 03-707) concede that the FDA's "effectiveness determination is based on the adequate and well-controlled study conducted by Drs. Brachman, Gold, Plotkin, Fekety, Werrin, and Ingraham." The defendants argue that the FDA's action in approving the anthrax vaccine for inhalational anthrax was "rational and supported by the evidence." Likewise, if the Brachman et al. [7] field study in fact fails "to support the efficacy of the current vaccine in humans for protection against inhalational anthrax, then much of the argument for efficacy of the vaccine against inhalational anthrax would be invalidated, as well as the validity of the FDA's Final Rule. [1]."

Others have addressed issues of the safety of the current anthrax vaccine [3,4,13,14,15], issues of informed consent [16], and issues related to the design of the Brachman et al. [7] study [1]. However, such issues are beyond the scope of this paper. Here, our current goal was to assess whether Brachman's data had been "well-analyzed."

doi: 10.1588/medver.2004.01.00023

## 2. Goals

The objective of this report was to reevaluate the reputed effectiveness of the anthrax vaccine tested in Brachman et al.'s [7,17,18] study. Was the vaccine proven to be effective against cutaneous anthrax? Was it proven to be effective against inhalational anthrax? Did 93% effectiveness actually mean that 93% of those exposed to anthrax were protected in contrast to none of those not vaccinated, a result that seems implied to the layman by the repeated emphasis on the 92.5% or 93% effectiveness result. Did the vaccine work at all the mills in the study? Did the vaccine work across all times, as well as all places tested? What factors were controlled in the study, if any? These are all questions that deserve consideration in assessing the merits of the current anthrax vaccine since the Brachman et al. [7] study is the only field study conducted in the United States reported in open sources. Indeed, the Brachman field trial is accepted by scholars as the cornerstone of the arguments favoring efficacy of anthrax vaccine for preventing cutaneous or inhalational anthrax in humans.

Aside from the issue of whether the field study was well-controlled, if the claimed results from the Brachman, et al. [7] field trial fail to be supported by a detailed statistical analysis, then the whole foundation of the involuntary anthrax immunization program in the U.S. military would be undermined. Evidence of efficacy would then have to rest on animal trials, whose applicability to human situations remains uncertain at best [12].

## 3. Methods

The data for this reanalysis have been derived from three reports concerning an outbreak of anthrax at the Arms Mill in Manchester, New Hampshire and three other mills, identified only as M, P, and S: Brachman et al. [7,17] and Plotkin et al. [18]. Only the Arms Mill endured an "epidemic" of inhalational (and cutaneous) anthrax; the other three mills experienced occasional infections of cutaneous anthrax. In many respects, the experience at the Arms Mill deserves separate treatment, because it was substantially different from that of the other three mills and because the outcomes there are more relevant to projected military experience with inhalational anthrax as a biological weapon. Therefore, the analyses that follow will consider the Arms Mill experience separately from the other mills and will break down the outcomes on the basis of relative risk.

There were three levels of risk proposed by Brachman et al. [7,17,18]: highest risk (only associated with the carding/combing departments at the Arms Mill, 44 employees as of August 26, 1957), high risk (employees working in the picking, carding, combing, drawing, and spinning departments at each mill), and low risk (employees working in the weaving, finishing, maintenance, and office departments at each mill). Nowhere do Brachman et al. [7] specify which departments are high or low risk, but they state that only 3 of the 26 workers infected during the trial were from a low risk department. The only departments that could account for 3 workers are either weaving (3 workers) or picking, combing, and drawing (one

worker each). The picking and combing departments are among the first to be exposed to incoming bales of goat hair and tend to have a higher percentage of infected workers; the only remaining department that might be classified as low risk therefore is the weaving department. Therefore, the picking, combing, and drawing departments must be high risk, as well as the spinning and carding departments, which had ten infected workers each in Brachman et al. [7].

Furthermore, results for both cutaneous and inhalation anthrax will be considered separately because of the far greater military importance of inhalation anthrax. Cutaneous anthrax is rarely fatal and in most cases, easily treated, with the appropriate antibiotics. Notably, few fatalities from cutaneous anthrax have occurred in the United States since 1940. Furthermore, while cases of cutaneous anthrax were not uncommon at the mills and in agricultural settings, there had been few inhalational cases of anthrax until 1957; other than the five cases in 1957 at the Arms Mill, there were four other cases in the United States between 1950 and 1976, with no further cases until the fall of 2001 [8:1164]. In addition, three of the mills studied in Brachman et al. [7,17,18] experienced no inhalational anthrax cases at all, suggesting perhaps a different route, process, or level of exposure to the infecting agents.

Finally, data will be analyzed first for all employees, including those partially vaccinated or who refused vaccination (designated as the TOTAL group, data from Brachman et al. [7:634], Table 2), and second for only those employees (designated Experimental group) who were vaccinated completely, either with the anthrax vaccine or with a placebo (Brachman et al. [7:640-1], Table 8). Additional analyses will be performed on the 44 employees of the Arms Mill who were at greatest risk of anthrax infection, as reported elsewhere [17, 18].

Furthermore, in order to evaluate the data from additional perspectives, to avoid bias, we analyzed the data over time, observing how the results changed from the start of the four mills project to the end and we evaluated each mill separately for all types of anthrax. We also performed some analyses based on the attrition cited in Table 8 of Brachman et al. [7:640-1] because the 92.5% effectiveness statistic widely reported was derived from data in Table 8.

In summary, our analyses will differ from previous analyses because three risk levels, three levels of vaccination status (fully vaccinated, partially vaccinated, and unvaccinated), two types of anthrax, two general locations, and two study components (total versus experimental groups) will be considered rather than looking for a single summary measure of vaccine effectiveness across those many combinations of conditions.

Our analyses will start with the largest groupings of data and logically break them down into smaller subsets on the basis of risk and type of anthrax experience as shown in Table 1 below. Initially, multivariate binary logistic regression analyses were used to predict infection from vaccination status, mill, and risk level, but in no analyses were mill location or risk levels significant (beyond chance) for predicting infection. In addition, partial vaccination status was never a significant predictor of infection risk, suggesting that incomplete

doi: 10.1588/medver.2004.01.00023

*W.R. Schumm, R.L. Brenneman, B. Arieli, et al/Medical Veritas* 1 (2004) 171–178

173

vaccinations were relatively ineffective, even at preventing cutaneous anthrax infection, a situation mirrored in the three cases of anthrax found among partially vaccinated mill employees between 1962 and 1974 in an advisory panel report to the FDA [50 Federal Register 51058;5:2105]. Ultimately, for accuracy and ease of presentation, one-tailed (sided) Fisher's exact tests were used to test the association of vaccination with infection outcomes. Fisher's exact tests [19:39-40] are more accurate than the traditional chi-square tests used by Brachman et al. [7,17,18], especially when expected cell sizes or probabilities are small (as occurs often for the vaccinated but became infected cells, which should ideally be near zero, if the vaccine is working effectively). The Fisher's Exact Test gives a precisely accurate p-value or statistical significance level [20:132]. Chi-square tests depend upon assumptions about normal distributions that are good approximations in large samples, but often are less accurate for small samples or for samples including very low probabilities for some cells.

The chi-square tests for the experimental group will compare the percentage of workers becoming ill in the vaccinated group of workers compared to the placebo group of workers. The chi-square tests for the total group of workers will compare the percentage of workers becoming ill in the vaccinated group of workers compared to all other workers, including refusals, incompletes, and placebos.

### 4. Data Reconstruction

Table 2 illustrates the number of cases involved in each possible analysis for the mills as a total group while Tables 3 and 4 show the logical breakdowns for the mills other than the Arms Mill and for the Arms Mill itself.

Table 5 shows the reconstructed data from Brachman et al. [7,17,18] that specifies which of the 44 employees had certain jobs, previous experience with anthrax infection, antibodies to anthrax (suggesting a subclinical experience with anthrax infection), and had received either a genuine or placebo vaccination, as well as their disease outcome. Three of the titres measured after the epidemic occurred were assigned to placebo and non-placebo (but not to the vaccinated or previously had anthrax conditions) conditions because of lack of information on which specific workers within a department had been tested.

### 5. Results

Tables 6 through 8 present the overall findings for the Fisher's Exact Tests, assessing the relationship between vaccination status and anthrax infection outcomes. The overall results of the analyses reported in Tables 6-8 are summarized in Table 9, in which we consider the results from all of the tests previously discussed. Of the 8 significant findings for vaccine and cutaneous anthrax, none were associated with low risk conditions (workers in weaving, maintenance, finishing, or office departments). Table 9 clearly indicates that the vaccine was best described as sometimes effective against cutaneous anthrax infection and never significantly effective against inhalation anthrax. Table 10 indicates that very few workers ever became infected even when they had no previous

immunity, with 20% being the highest possible percentage that could be obtained looking at the highest possible risk group at the only mill that experienced any cases of inhalational anthrax (but from a total of 20 subjects of the 1,249 in the overall study).

The figure of 92.5% effectiveness was obtained from only the experimental group of 793 subjects, who had either had complete vaccinations or complete placebo inoculations. To look at the data in a different way than Brachman had previously and to guard against possible bias, we analyzed the same group of subjects for both types of anthrax combined using the Fisher's exact test, as before. Table 11 summarizes our findings.

Our results in Table 11 indicate that the vaccine failed to show statistically significant benefit in 75% of the mills tested, including even the one mill where inhalation anthrax occurred. It is of interest that the results in Table 11 were not statistically significant for the Arms Mill. Brachman et al. [17:14] reported that the results for the Arms Mill, identified only as a goat-hair processing mill in Manchester, New Hampshire in their report [17:6-7], were significant (p < 0.05, two-sided) but they used a standard chi-square test; had they used a precise Fisher's Exact Test they would have reported non-significant findings (p < 0.13, two-sided). Even so, Brachman et al. [17:21] admitted that "Anthrax vaccine containing alum-precipitated protective antigen appeared to afford protection to those who received it, but this impression could not be confirmed statistically," perhaps because [17:20] the "vaccinated group was not at as high a risk as the placebo or uninoculated control groups" for exposure to the most virulent forms of anthrax encountered at the Arms Mill during the epidemic in 1957 or because the weaknesses in the design of the study meant that [17:20] "The efficacy of the anthrax cell-free antigen as a vaccine was not fairly tested in this epidemic." Brachman et al. [17:20] did refer to an unpublished report that would later be published [7] as evidence for the efficacy of the vaccine when results from all the other mills were combined. However, it must be noted that Brachman et al. [17] used 300 cases as their total for the experimental group at the Arms Mill but used 313 cases for the same group in their later report [7].

As another challenge to our previous results, we turned to Table 8 in Brachman et al. [7:640-641], which had been used to obtain the 92.5% effectiveness figure. Table 8 lists the "person months" of exposure for high and low risk workers based on their vaccination/placebo inoculation status, for periods of six, six, twelve, twelve, and twelve months after the field test began at each mill. We divided the person months by the number of months, as appropriate, and reanalyzed the data for the most recent number of persons in the last reporting period for each mill. This approach was conservative because we assumed that all those who became infected remained in the final count of workers whereas all the workers who had dropped from the study had avoided infection. We found that the vaccine was not effective against the combined types of anthrax infection at mill A (Fisher's Exact Test, p = 0.147), mill M (p = 0.211), or mill P (p = 0.423), but was effective at mill S (p = 0.010), with most Mill S workers avoiding infection whether vaccinated (98.6%) or not (87.1%). Overall, combining all four mills, the Fisher's

doi: 10.1588/medver.2004.01.00023

174                    *W.R. Schumm, R.L. Brenneman, B. Arieli, et al/Medical Veritas* 1 (2004) 171–178

Exact Test was significant (p = 0.003), with most workers avoiding infection whether vaccinated (99.3%) or not (92.9%). Thus, even with our conservative procedures, designed to favor the hypothesis that the vaccine is effective, only one of the four mills (Mill S) yielded a significant result in favor of the vaccine.

The Assistant Secretary of Defense for Health Affairs has asserted a "grave harm to the armed forces in not vaccinating" against a "continuing significant threat" of anthrax [21]. Admittedly (according to DoD) if much larger exposures were encountered by service members, then a vaccine that might protect against the lower levels of exposure experienced by the mill workers might not work under more demanding conditions. Previously, the Secretary of the Army had acknowledged the fact that not all vaccinated soldiers would necessarily acquire immunity and that unforeseen adverse side effects were quite possible, when Mr. Caldera, authorizing indemnification of the anthrax vaccine manufacturer, stated, "...the obligation assumed by MBPI under this contract involves unusually hazardous risks associated with the potential for adverse reactions in some recipients and the possibility that the desired immunological effect will not be obtained by all recipients. The size of the proposed vaccination program may reveal unforewarned idiosyncratic adverse reactions. Moreover, there is no way to be certain that the pathogen used in tests measuring vaccine efficacy will be sufficiently similar to the pathogen that U.S. forces might encounter to confer immunity."[1]

We also looked at how the experimental group would have fared over time, from the start of the four mills project in February 1955. Table 12 documents those results.

What we see in Table 12 is that the program failed to yield any significant results for the first 20 months of its existence (February 1955 to late August 1956). Finally, by January 1957, a statistically significant result had been obtained for Mill S, which would remain the only mill to ever yield a statistically significant result for (cutaneous) anthrax. It was not until May 20, 1957, about the same time as the Arms Mill vaccination program began, that the overall significance for the first three mills combined finally reached below the p < 0.01 level, which – after nearly 30 months of field testing – probably assured the vaccine producers that their product was at least marginally effective and perhaps could stand up to a more rigorous challenge (i.e., against inhalational anthrax), should that occur by chance, of course, at any of the mills. Coincidentally, just such a more rigorous challenge occurred at the Arms Mill in Manchester New Hampshire near the end of August 1957, after the testing and vaccination program had begun at this mill in May 1957 [17:13], fortuitously allowing all employees in the experimental group just enough time to receive at least three inoculations before the epidemic began.

### 6. Conclusions

The reanalysis of Brachman et al. [7] reaffirms that the anthrax vaccine probably helps provide some marginal protection against cutaneous infection. However, it appears that the majority of mill workers avoided infection, even if they had not had previous clinical cases of anthrax nor any detectable subclinical cases, as assessed by detectable antibody titres. Moreover, the data simply do not provide statistically significant evidence of protection against inhalation anthrax. While that result may be attributed to too few cases or low statistical power, it would have taken an increase of 60% to 150% more cases of inhalational anthrax among unvaccinated workers (three more cases) in the various groups in order to achieve statistical significance for inhalational anthrax prevention. Coupled with the fact that some vaccines that protect against cutaneous infectious diseases are known to fail against inhalational versions of the same disease [22,23,24], the existing evidence is insufficient to determine how much, if any, protection against inhalation anthrax was afforded by this previous version of anthrax vaccine.

Even taking both types of anthrax into account, we found that the vaccine's protective effects were not significant in 75% of the mills tested, which paralleled our findings in Table 10, in which 75% of the specific statistical tests conducted were not significant.

A "best case scenario" to demonstrate vaccine protection was creating by forming a cohort of unvaccinated subjects with no prior immunity, who were working in the highest risk areas, at only the Arms Mill, and only during the epidemic there. Even so, the results were not significant (p < 0.05) by Fisher's Exact Test, which is most appropriate for such small samples.

To summarize, the reanalysis of Brachman et al. [7] does indicate that the anthrax vaccine may help provide some marginal protection against cutaneous infection. The data do not provide statistically significant evidence of protection against inhalation anthrax, which is the source of the military's interest in anthrax [25:471]. That outcome should not come as a shock – Colonel Friedlander himself said in 1997, as he did later in 1999 with Brachman [11:635], with reference to the Brachman et al. [7] study, "There were insufficient cases of inhalational anthrax to determine whether the vaccine was effective against this form of the disease [25:474]." In addition, numerous objections to the experimental design, aside from the statistics used, can be raised. In conclusion, our reanalysis indicates that Brachman et al.'s [7,17,18] data actually fall far short of demonstrating the efficacy of the anthrax vaccine in humans, especially with respect to inhalational anthrax infection. Given the uncertainty associated with the benefits of the vaccine, greater weight should be given to potential risks associated with the current vaccine when risk-benefit ratios with respect to the current anthrax vaccine are considered.

We acknowledge that, after 1999, later reports [12] seem to have, somehow, found new scientific evidence to provide statistically significant, and incontrovertible support for the efficacy of the anthrax vaccine against inhalational anthrax infection in humans. Certainly, we can understand the political pressure that might have been brought to bear to find such a

---

[1] Memorandum of Decision, dated 3 September 1998, Subject: Indemnification for Michigan Biologics Products Institute

doi: 10.1588/medver.2004.01.00023

W.R. Schumm, R.L. Brenneman, B. Arieli, et al/Medical Veritas 1 (2004) 171–178

175

"new" answer, but that should not overrule the traditional requirement for "revised" scientific answers to have specific empirical foundations in published peer-reviewed sources. Our research suggests that the Brachman et al. [7] study was not adequate for use as a principal source for revising our understanding of the protective effects of anthrax vaccine against inhalational anthrax. Given that understanding, one must wonder what was the source – and was it a *scientifically* valid source?    Lacking that, we can only conclude that the FDA's action in approving the current anthrax vaccine was not supported by the evidence from Brachman et al. [7, 17, 18], as demonstrated here, and therefore was not rational from a strictly scientific perspective. Therefore, the U.S. military's current approach of universal mandatory vaccination with an anthrax vaccine of clearly (as shown here) questionable efficacy and, as discussed elsewhere [2,3,4,14,15] uncertain safety, must be deemed inappropriate, if not illegal [16].

## References

[1] Schumm WR, Brenneman RL. How "adequate and well-controlled" was the "clinical trial" of a human anthrax vaccine, 1955-1959? Medical Veritas 2004; 1(2):166–70.

[2] Nicholson GL, Nass M, Nicolson NL. Anthrax vaccine: controversy over safety and efficacy. Antimicrobics and Infectious Disease Newsletter 2000;18(1):1–6.

[3] Nass M. The anthrax vaccine program: an analysis of the CDC's recommendations for vaccine use. Am J of Pub Health 2002; 92:715–21.

[4] Nass M. Anthrax vaccine: caveat emptor (Let the buyer beware). Current treatment options in infectious diseases 2003;5:361-4.

[5] Friedlander AM, Pittman PR, Parker GW. Anthrax vaccine: evidence for safety and efficacy against inhalational anthrax. JAMA 1999;282:2104–6.

[6] Joellenbeck LM, Zwanziger LL, Durch JS, Strom BL (Eds.) The anthrax vaccine: is it safe? Does it work? Washington, DC: National Academy Press, 2002.

[7] Brachman PS, Gold H, Plotkin SA, Fekety FR, Werrin M, Ingraham NR. Field evaluation of a human anthrax vaccine. American Journal of Public Health 1962;52:632-45.

[8] Bales ME, Dannenberg AL, Brachman PS, Kaufmann AF, Klatsky PC, Ashford DA. Epidemiologic response to anthrax outbreaks: field investigations, 1950-2001. Emerging Infectious Diseases 2002;8:1163-4.

[9] Inglesby TV, Henderson DA, Bartlett JG, Ascher MS, Etzen E, Friedlander AM et al. Anthrax as a biological weapon: medical and public health management. JAMA 1999;281:1735-45.

[10] Demicheli V, Rivetti D, Deeks JJ, Jefferson T, Pratt M. The effectiveness and safety of vaccines against human anthrax: a systematic review. Vaccine 1998;16:880–4.

[11] Brachman PS, Friedlander AM. Anthrax. In: SA Plotkin & WA Orenstein (Eds.), Vaccines. (3rd Ed.) Philadelphia: WB Saunders, 1999:629–37.

[12] Brachman PS, Adimora AA, Berry SH, Bush T, Eickhoff TC, Ferrieri P et al. An Assessment of the CDC Anthrax Vaccine Safety and Efficacy Research Program. Washington, DC: National Academies Press, 2003.

[13] Geier DA, Geier MR. Anthrax vaccination and joint related adverse reactions in light of biological warfare scenarios. Clinical and Experimental Rheumatology 2002;20:217–20.

[14] Schumm WR, Webb FJ, Jurich AP, Bollman SR. Comments on the Institute of Medicine's 2002 report on the safety of anthrax vaccine. Psychological Reports 2002;91:187–91.

[15] Schumm WR. Anthrax vaccine and Gulf War illness symptoms in Captain Jean Tanner's Dover Air Force Base survey. Medical Veritas 2004;1(2):163–5.

[16] Cummings ML. Informed consent and investigational new drug issues in the U.S. military. Accountability in Research 2002;9:93–103.

[17] Brachman PS, Plotkin SA, Bumford FH, Atchison MM. An epidemic of inhalation anthrax. II. Epidemiologic investigation. American Journal of Hygiene 1960;72:6–23.

[18] Plotkin SA, Brachman PS, Utell M, Bumford FH, Atchison MM. An epidemic of inhalation anthrax, the first in the twentieth century. American Journal of Medicine 1960;29:992–1001.

[19] Agresti A. An Introduction to Categorical Data Analysis. New York: Wiley, 1996.

[20] Dalgaard P. Introductory Statistics with R. New York: Springer, 2002.

[21] Winkenwerder W. Declaration to Washington, D.C. Federal District Court, December 30, as Assistant Secretary of Defense for Health Affairs.

[22] Davis KJ, Fritz DL, Pitt ML, Welkos SL, Worsham PL, Friedlander AM. Pathology of experimental pneumonic plague produced by fraction 1-positive and fraction 1-negative Yersinia pestis in African green monkeys (Cercopithecus aethiops). Archives of Pathological Laboratory Medicine 1996;120:156–63.

[23] Heath DG, Anderson GW, Mauro JM, Welkos SL, Andrews GP, Adamovicz J, Friedlander AM. Protection against experimental bubonic and pneumonic plague by a recombinant capsular F1-V antigen fusion protein vaccine. Vaccine 1998;16:11–2, 1131–7.

[24] Kenyon R. New vaccines, current research. Paper presented at The First Annual Department of Defense Conference for Biological Warfare Defense Immunizations. Fort Detrick, MD, May 25, 1999.

[25] Friedlander AM. Anthrax. Chapter 22. In: Sidell FR, Takafuji ET, Franz DR. Medical Aspects of Chemical and Biological Warfare. Washington, DC: Walter Reed Army Medical Center, 1997:467–8.

**Table 1. Reconstruction of Brachman data (1,249 cases)**

| \Mill | Risk Level | Vaccine Status | Total Number of Workers Studied | Number of Cutaneous Cases | Number of Inhalation Cases |
|---|---|---|---|---|---|
| A | High | Yes | 59 | 0 | 0 |
| M | High | Yes | 42 | 0 | 0 |
| P | High | Yes | 19 | 0 | 0 |
| S | High | Yes | 89 | 1 | 0 |
| A | High | Placebo | 60 | 0 | 1 |
| M | High | Placebo | 49 | 3 | 0 |
| P | High | Placebo | 22 | 0 | 0 |
| S | High | Placebo | 95 | 8 | 0 |
| A | High | Incomplete | 11 | 0 | 0 |
| M | High | Incomplete | 8 | 0 | 0 |
| P | High | Incomplete | 15 | 2 (Vaccine, Placebo) | 0 |
| S | High | Incomplete | 31 | 1 (Vaccine) | 0 |
| A | High | Refused | 70 | 2 | 3 |
| M | High | Refused | 8 | 0 | 0 |
| P | High | Refused | 10 | 0 | 0 |
| S | High | Refused | 1 | 1 | 0 |
| A | Low | Yes | 90 | 0 | 0 |
| M | Low | Yes | 31 | 0 | 0 |
| P | Low | Yes | 22 | 0 | 0 |
| S | Low | Yes | 27 | 0 | 0 |
| A | Low | Placebo | 104 | 1 | 1 |
| M | Low | Placebo | 42 | 0 | 0 |
| P | Low | Placebo | 22 | 0 | 0 |
| S | Low | Placebo | 20 | 0 | 0 |
| A | Low | Incomplete | 24 | 1 (Placebo) | 0 |
| M | Low | Incomplete | 4 | 0 | 0 |
| P | Low | Incomplete | 13 | 0 | 0 |
| S | Low | Incomplete | 10 | 0 | 0 |
| A | Low | Refused | 214 | 0 | 0 |
| M | Low | Refused | 16 | 0 | 0 |
| P | Low | Refused | 21 | 0 | 0 |
| S | Low | Refused | 0 | 0 | 0 |
| Total | | | 1,249 | 21 | 5 |

NOTE: Derived from Tables 2, 4, and 5 in Brachman et al. [7:634, 636-7]. The total group consists of all 1,249 workers; the "experimental" group consists of only those 793 workers in either the vaccinated (complete) group or the placebo (complete) group, omitting those who refused or did not complete their inoculations, whether vaccine or placebo.

doi: 10.1588/medver.2004.01.00023

176                                        W.R. Schumm, R.L. Brenneman, B. Arieli, et al/Medical Veritas 1 (2004) 171–178

**Table 2. Breakdown of analyses for all mills combined**

| Analysis | Mills | Groups | Risk Levels | Type Infection | Remarks (cases) |
|---|---|---|---|---|---|
| 1 | All | Total | Both | Cutaneous | 1,249 |
| 2 | | | Low | Cutaneous | 660 |
| 3 | | | High | Cutaneous | 589 |
| 4 | | | Both | Inhalation | 1,249 |
| 5 | | | Low | Inhalation | 660 |
| 6 | | | High | Inhalation | 589 |
| 7 | All | Experimental | Both | Cutaneous | 793 |
| 8 | | | Low | Cutaneous | 358 |
| 9 | | | High | Cutaneous | 435 |
| 10 | | | Both | Inhalation | 793 |
| 11 | | | Low | Inhalation | 358 |
| 12 | | | High | Inhalation | 435 |

**Table 3. Breakdown of analyses for all mills except the Arms Mill, Manchester, New Hampshire**

| Analysis | Mills | Groups | Risk Levels | Type Infection | Remarks (cases) |
|---|---|---|---|---|---|
| 1 | M,P,S | Total | Both | Cutaneous | 617 |
| 2 | | | Low | Cutaneous | 228 |
| 3 | | | High | Cutaneous | 389 |
| 4 | M,P,S | Experimental | Both | Cutaneous | 480 |
| 5 | | | Low | Cutaneous | 164 |
| 6 | | | High | Cutaneous | 316 |

NOTE: Since none of the three mills ever experienced a case of inhalation anthrax, analyses were not performed for that as an outcome. Analysis eventually revealed that no cases of anthrax infection occurred within the low risk group.

**Table 4. Breakdown of analyses for Arms Mill only**

| Analysis | Mills | Groups | Risk Levels | Type Infection | Remarks (cases) |
|---|---|---|---|---|---|
| 1 | Arms | Total | Both | Cutaneous | 632 |
| 2 | | | Low | Cutaneous | 432 |
| 3 | | | High | Cutaneous | 200 |
| 4 | | | Highest | Cutaneous | 44 |
| 5 | | | Both | Inhalation | 632 |
| 6 | | | Low | Inhalation | 432 |
| 7 | | | High | Inhalation | 200 |
| 8 | | | Highest | Inhalation | 44 |
| 9 | Arms | Experi. | Both | Cutaneous | 313 |
| 10 | | | Low | Cutaneous | 194 |
| 11 | | | High | Cutaneous | 194 |
| 12 | | | Both | Inhalation | 313 |
| 13 | | | Low | Inhalation | 194 |
| 14 | | | High | Inhalation | 119 |
| 15 | | | Highest | Inhalation | 21 |

NOTE: Because no cutaneous cases occurred for the highest risk cases in the experimental group, only inhalation anthrax is used as an outcome variable for the highest risk cases in the experimental group.

**Table 5. Reconstruction of data from Tables 4 and 5 (Brachman et al., [17:13-14])**

| Case No.[a] | Job | Had Anthrax Before | Previous Titres | Vaccine | Became Sick |
|---|---|---|---|---|---|
| 1 | Fixer | Yes | | | |
| 2 | Fixer | Yes | | | |
| 3 | Fixer | Yes | | | |
| 4 | Fixer | Yes | | | |
| 5 | Fixer | | | Placebo | |
| 6 | Fixer | | | Placebo | Inhalation |
| 7 | Fixer | | | | Inhalation |
| 8 | Fixer | | | Placebo | |
| 9 | Fixer | | | | Cutaneous |
| 10 | Fixer | | | | Cutaneous |
| 11 | Fixer | | | Placebo | |
| 12 | Oiler | Yes | | | |
| 13 | Oiler | | | Yes | |
| 14 | Oiler | | Yes | | |
| 15 | Oiler | | | | |
| 16 | Oiler | | | | |
| 17 | Gillbox | | | Yes | |
| 18 | Gillbox | | | Yes | |
| 19 | Gillbox | | | Yes | |
| 20 | Gillbox | | Yes | Placebo | |
| 21 | Gillbox | | | | |
| 22 | Gillbox | | Yes | | |
| 23 | Gillbox | | | | |
| 24 | Other | Yes | | | |
| 25 | Other | | | | |
| 26 | Other | | | | |
| 27 | Noil Remover | | | Yes | |
| 28 | Noil Remover | | | | Inhalation |
| 29 | Noil Remover | | | | Inhalation |
| 30 | Stripper | Yes | | | |
| 31 | Fixer | | | Yes | |
| 32 | Fixer | | | Yes | |
| 33 | Fixer | | | Yes | |
| 34 | Fixer | Yes | | Placebo | |
| 35 | Fixer | | | Placebo | |
| 36 | Fixer | | | Placebo | |
| 37 | Fixer | | | | |
| 38 | Fixer | | | | |
| 39 | Fixer | Yes | | | |
| 40 | Gillbox | | | Yes | |
| 41 | Gillbox | | | Yes | |
| 42 | Gillbox | | | Yes | |
| 43 | Gillbox | Yes | | Placebo | |
| 44 | Gillbox | | | Placebo | |
| Totals | 44 | 6 | 7 | 11 | 6 |

[a]Cases 1-26 were in the carding department; 27-44 in the combing department.

doi: 10.1588/medver.2004.01.00023

W.R. Schumm, R.L. Brenneman, B. Arieli, et al/Medical Veritas 1 (2004) 171–178

**Table 6. Breakdown of analyses for all mills combined**

| Analysis | Mills | Groups | Risk Levels | Type Infection | Results |
|---|---|---|---|---|---|
| 1 | All | Total | Both | Cutaneous | Yes (.005) |
| 2 | | | Low | Cutaneous | No |
| 3 | | | High | Cutaneous | Yes (.002) |
| 4 | | | Both | Inhalation | No |
| 5 | | | Low | Inhalation | No |
| 6 | | | High | Inhalation | No |
| 7 | All | Experimental | Both | Cutaneous | Yes (.001) |
| 8 | | | Low | Cutaneous | No |
| 9 | | | High | Cutaneous | Yes (.002) |
| 10 | | | Both | Inhalation | No |
| 11 | | | Low | Inhalation | No |
| 12 | | | High | Inhalation | No |

Under results, YES indicates that the Fisher's Exact Test yielded a statistically significant result, with that result shown in parentheses. NO indicates that the result was not statistically significant (p > 0.05).

**Table 7. Breakdown of analyses for all mills except the Arms Mill, Manchester, New Hampshire**

| Analysis | Mills | Groups | Risk Levels | Type Infection | Results |
|---|---|---|---|---|---|
| 1 | M,P,S | Total | Both | Cutaneous | Yes (.004) |
| 2 | | | Low | Cutaneous | No Disease |
| 3 | | | High | Cutaneous | Yes (.003) |
| 4 | M,P,S | Experimental | Both | Cutaneous | Yes (.002) |
| 5 | | | Low | Cutaneous | No Disease |
| 6 | | | High | Cutaneous | Yes (.003) |

NOTE: Since none of the three mills ever experienced a case of inhalation anthrax, analyses were not performed for that as an outcome. No significant results were obtained in logistic regression for Mill or Risk factors or for partial vaccination in any of the analyses within Table 7. Under results, "Yes" indicates that the Fisher's Exact Test yielded a statistically significant result, with that result shown in parentheses. "No" indicates that the result was not statistically significant (p > 0.05).

**Table 8. Breakdown of analyses for Arms Mill only**

| Analysis | Mills | Groups | Risk Levels | Type Infection | Results |
|---|---|---|---|---|---|
| 1 | Arms | Total | Both | Cutaneous | No |
| 2 | | | Low | Cutaneous | No |
| 3 | | | High | Cutaneous | No |
| 4 | | | Highest | Cutaneous | No |
| 5 | | | Both | Inhalation | No |
| 6 | | | Low | Inhalation | No |
| 7 | | | High | Inhalation | No |
| 8 | | | Highest | Inhalation | No |
| | | | Highest | Both Combined | No (*) |
| 9 | Arms | Experimental | Both | Cutaneous | No |
| 10 | | | Low | Cutaneous | No |
| 11 | | | High | Cutaneous | No Disease |
| 12 | | | Both | Inhalation | No |
| 13 | | | Low | Inhalation | No |
| 14 | | | High | Inhalation | No |
| 15 | | | Highest | Both Combined | No |

(*) Vaccine worked by chi-square test but not by Fisher's exact test; if those (13 of the 44 cases) with suspected natural immunity were removed from the analysis. Under results, "Yes" indicates that the Fisher's Exact Test yielded a statistically significant result, with that result shown in parentheses. "No" indicates that the result was not statistically significant (p > 0.05).

**Table 9. Summary of significant findings**

| Tests | Cutaneous Anthrax | Inhalational Anthrax |
|---|---|---|
| Number of Statistical Tests Conducted | 19 | 13 |
| Number of Statistical Tests With Disease Outcomes | 16 | 0 |
| Number of Significant Statistical Tests With Disease Outcomes | 8 | 0 |
| Percentage of Significant Tests | 50 | 0 |

doi: 10.1588/medver.2004.01.00023

178                 W.R. Schumm, R.L. Brenneman, B. Arieli, et al/Medical Veritas 1 (2004) 171–178

**Table 10. Detailed results for anthrax vaccination for high risk worker groups only**

| Groups | Type Infection | Percent Unvaccinated Protected (Not Infected) | Percent Vaccinated Protected (not infected) | Results |
|---|---|---|---|---|
| All Mills |  |  |  |  |
| All | Cutaneous | 95.3 | 99.5 | (p=.002) |
| Exper. | Cutaneous | 94.7 | 99.5 | (p=.002) |
| All | Iinhalation | 98.9 | 100.0 | n.s. |
| Exper. | Inhalation | 99.6 | 100.0 | n.s. |
| Three Mills |  |  |  |  |
| All | Cutaneous | 93.3 | 99.3 | (p=.003) |
| Exper. | Cutaneous | 92.8 | 99.3 | (p=.003) |
| Arms Mill |  |  |  |  |
| All | Cutaneous | 98.6 | 100.0 | n.s. |
| Exper. | Cutaneous | No cases | No cases |  |
| All | Inhalation | 97.2 | 100.0 | n.s. |
| Exper. | Inhalation | 98.3 | 100.0 | n.s. |
| Arms Mill Highest Risk - All | Cutaneous | 93.9 | 100.0 | n.s. |
|  | Cutaneous (among those with no previous immunity) | 90.0 | 0.0 | n.s. |
|  | Inhalation | 87.9 | 100.0 | n.s. |
|  | Inhalation (among those with no previous immunity) | 80.0 | 100.0 | n.s. |
| Highest Risk – Exper. | Inhalation | 90.0 | 100.0 | n.s. |
|  | Inhalation (among those with no previous immunity) | 85.7 | 100.0 | n.s. |

**Table 11. Effectiveness of Anthrax vaccine against both types of Anthrax combined for each of four mills in the experimental group**

| Mill | Healthy Vaccinated (%) | Healthy Placebo (%) | Fisher's Exact Test | Vaccine Effective |
|---|---|---|---|---|
| A | 100.0 | 98.1 | .087 | No |
| M | 100.0 | 97.6 | .254 | No |
| P | 100.0 | 97.1 | .363 | No |
| S | 99.1 | 93.6 | .019 | Yes |

**Table 12. Changes in significance over time for the four mills apparent effectiveness of anthrax vaccine**

| Date | Mills | Subjects | Ratio of Infections Placebo/ Vaccinated | Fisher's Exact Test | Percent Healthy Vaccinated versus Placebo |
|---|---|---|---|---|---|
| Feb-May 1956 | S Only | 231 | 5/1 | 0.104 | 99.1/95.7 |
| Feb-May 1956 | S and M | 395 | 5/1 | 0.129 | 99.5/97.6 |
| June 1956 | S/M/P | 480 | 5/1 | 0.129 | 99.6/98.0 |
| Sep 1 1956 | S/M/P | 480 | 7/1 | 0.044[a] | 99.6/97.2 |
| Jan 1957 | S/M/P | 480 | 8/1 | 0.025[b] | 99.6/96.8 |
| May 1957 | S/M/P | 480 | 9/1 | 0.014[c] | 99.6/96.4 |
| June 1957 | S/M/P/A[d] | 480[e] | 10/1 | 0.008[f] | 99.6/96.0 |

[a]Mills by each are not significant!
[b]Mill S is significant by itself (0.032)
[c]Mill S only is significant by itself (0.017)
[d]but A not ready yet
[e]soon to be 793 when adding Mill A
[f]Mill S only is significant by itself (0.017)

doi: 10.1588/medver.2004.01.00023

United States General Accounting Office

# GAO

## Testimony
### Before the Subcommittee on National Security, Veterans' Affairs, and International Relations, Committee on Government Reform, House of Representatives

For Release on Delivery
Expected at 10:00 a.m., EDT
Tuesday, October 23, 2001

# ANTHRAX VACCINE

# Changes to the Manufacturing Process

Statement of Nancy Kingsbury, Ph.D., Managing Director, Applied Research and Methods



GAO-02-181T

Mr. Chairman and Members of the Subcommittee:

We are pleased to be here today to contribute to your hearing on biological warfare defense vaccine programs. This topic is of considerable urgency today in light of the terrorist attacks of September 11 and the exposures to anthrax in recent weeks. Our testimony today is limited to the work we have done in response to your October 2000 request to review the changes to the manufacturing process for the anthrax vaccine that has been produced by the BioPort Corporation and its predecessor entities. As you know, BioPort is the sole facility in the U.S. currently capable of producing anthrax vaccine.

My testimony today will address the changes that occurred in the manufacturing process for anthrax vaccine since 1989, and the status of the approval of those changes by the Food and Drug Administration (FDA). It is, of course, FDA's responsibility to determine that the anthrax vaccine is safe and efficacious, and it is our understanding that FDA officials will be undertaking a review in the near future to determine if vaccine production can be resumed. We appreciate the opportunity to provide information that may be relevant to that determination.

A brief summary of our scope and methodology is provided in appendix I. A list of related GAO products is presented in appendix II.

## Background

The original anthrax vaccine was developed by George Wright and others in the 1950s and was first produced on a large scale by the pharmaceutical company Merck Sharp & Dohme (Merck).[1] A clinical study in 1962 evaluated the safety and effectiveness of the Merck vaccine in mill workers.[2] The results of this study formed the basis for subsequent licensure of the vaccine in 1970. The original license for the production of anthrax vaccine was issued to the Michigan Department of Public Health by the Division of Biologics of the National Institutes of Health.[3] In 1995, the facility changed its name to the Michigan Biologic Products Institute.

---

[1] Merck Sharp and Dohme is currently known as Merck and Co., Inc.

[2] The most common occurrence of anthrax infection has been in industrial settings like wool mills where workers may be exposed to infected animal products.

[3] Prior to the establishment of FDA as the licensing authority for vaccines, the National Institutes of Health was responsible for licensing.

In 1998, the facility was sold, and its name was changed to BioPort Corporation.

Today, FDA, through the Center for Biologics Evaluation and Research (CBER), licenses biological products (that is, biologics) and the facilities in which they are produced. The manufacturer is required to comply with current Good Manufacturing Practices (cGMP) regulations, which regulate personnel, buildings, equipment, production controls, records, and other aspects of the vaccine manufacturing process. [4]

When there is a major change in the manufacturing process—defined as a change determined by FDA to have a substantial potential to adversely affect the identity, strength, quality, purity, or potency of a product in relation to safety or effectiveness—the manufacturer must submit evidence to FDA demonstrating that the change does not have any such adverse effects. This requirement is particularly important for vaccines since the quality of biologics cannot be ensured solely from final tests on random samples. Instead, the quality of biologics can be determined only by a combination of strict control of the entire manufacturing process, in-process tests, and end-product tests. When significant process changes are made, the onus is on the manufacturer to ensure that the quality of the product is maintained after such changes are introduced. Depending on the changes made, this may require trial studies (with animals or humans) to evaluate the impact of the new process, followed by comparison of pre- and post-change lots before releasing the post-change lots for use. [5]

As our testimony today reports, in the case of the anthrax vaccine, the Michigan facility did not notify FDA of a number of changes made in the manufacturing process in the early 1990s and no specific studies were undertaken to confirm that vaccine quality was not affected. FDA inspectors did not inspect the Michigan facility's anthrax production room

---

[4] cGMP embodies a set of scientifically sound methods, practices, or principles that are implemented and documented during development and production to ensure consistent manufacture of safe, pure, and potent products. Such principles apply to the manufacturing process as well as to the facilities in which products are manufactured. (21 C.F.R., parts 600 through 680.)

[5] FDA guidance states that, if significant changes to the manufacturing or formulation of a vaccine are made after the original clinical trial, bridging studies may be used to demonstrate that immunogenicity and the occurrence of common adverse events have not been affected adversely by these changes. Anthony, B.F. and A. Sutton, "The Role of the Food and Drug Administration in Vaccine Testing and Licensure," *New Generation Vaccines*, New York, Marcel Dekker, Inc., Ch. 73, p. 1191.

until 1993. According to FDA, access was not granted because its inspectors had not been vaccinated against anthrax. FDA inspectors were able to perform some aspects of inspection—for example, reviewing records—but not equipment and production.[6]

The inspections that FDA ultimately was able to conduct over time found a number of deficiencies, many of which were not corrected in a timely manner. For example, the deficiencies that FDA identified it its February 1998 inspection fell broadly into two categories: (1) those that, although serious, might affect only one or a limited number of batches that were produced when the deficiency was extant and (2) those of a generic nature that could compromise the safety and efficacy of any batch or all batches. Vaccine production was suspended after these findings, and BioPort has been attempting since then to bring the facility and manufacturing process into compliance. We understand from recent testimony by the Secretary of Health and Human Services that BioPort has recently submitted an application for an FDA inspection to approve its facility and manufacturing process.

## Changes to the Fermenters and Filters in the 1990s and FDA's Approval of Those Changes

Beginning in 1990, the Michigan state-owned facility (the Michigan facility) that was later sold to BioPort changed both the fermenters and the filters it used in manufacturing the anthrax vaccine.[7] With regard to fermenters, it replaced the original glass fermenter with two 100-liter stainless steel fermenters in 1990, and installed two similar fermenters in 1993. With regard to filters, the facility changed from ceramic to nylon filters in 1990. After the 1990 change, the facility changed the types of filters two more times, in 1996 and 1997. According to Michigan facility officials, changing the filters reduced processing time for the production of a single lot of anthrax vaccine, while changing and adding additional fermenters increased its production volume. We were informed that both changes were made to increase production before the onset of the Gulf War.

---

[6] The purpose of FDA's inspection is to determine that the products are manufactured in compliance with cGMP as described in the license application. Manufacturers who fail to meet product standards or who make unreported or undocumented changes in manufacturing methods may have their license suspended or revoked.

[7] A fermenter is used to grow the bacteria. A filter is one of the processing stages after the fermentation. The filter removes whole bacteria and other biochemical components.

GAO-02-181T

Under FDA regulations, changes to a vaccine manufacturing process are to be reported to FDA and significant changes may require the manufacturer to submit a license application amendment.[8] In December 1990, FDA was notified of the replacement of the original glass fermenter with two 100-liter stainless steel fermenters. FDA approved that change in 1993. Although the Michigan facility installed two additional stainless steel fermenters in 1993, it did not notify the FDA about the additional fermenters at that time. Inspection records indicate that FDA was aware of the additional fermenters and encouraged the facility to submit a license amendment application for them in 1993[9] and again in 1995[10]. In January 1999, BioPort submitted a license amendment application with supporting documentation to FDA concerning the two additional fermenters. In May 2001, FDA approved these additional fermenters.

Because we could find no evidence in BioPort or FDA records that the filter changes had been reported to FDA, we contacted FDA officials in December 2000 to discuss the filter changes. They told us that they had not been notified and were not aware of changes to any filters used to produce anthrax vaccine. In February 2001, FDA wrote to BioPort, raising questions about the changes to the filters. In April 2001, BioPort submitted documentation, primarily in-process tests and lot release data, to FDA to demonstrate that the filter changes had not had a significant impact on vaccine quality. FDA reviewed and accepted the data and approved the filter changes in July 2001. Although the lot release data included lots produced immediately before and after the filter changes, the data submitted did not include the type of data that, according to FDA officials, would normally have been required if a license amendment application had been filed contemporaneously with the changes, that is, a direct

---

[8] Prior to 1997, FDA regulations required that "important" proposed changes in the vaccine manufacturing process be reported to FDA at least 30 days prior to implementation. Since 1997, FDA regulations have required that "major" changes be reported to FDA at least 30 days prior to implementation and that FDA approve such changes prior to distribution of vaccine made using them.

[9] The FDA inspection report (May 26, 1993) stated that "any changes to the manufacturing [process] that have the potential to affect the safety, purity, or potency of a biologic must be submitted and approved by CBER prior to implementation."

[10] In April 1995, Michigan facility officials told FDA that the additional fermenters installed in 1993 were similar, although not identical, to those installed in 1990 and approved in 1993. In response, FDA officials explained that "a different fermenter may cause change in the product, even if the fermenter is similar to the existing fermenter, and would most likely require agency approval." (FDA/CBER Conversation Record, Apr. 21, 1995.)

# Exhibit 3

*Doe v. Eschenbach*, Case No. 06-02131
Plaintiffs' Resp. to Defs. Mot. to Dismiss

biochemical analysis of vaccine samples from before and after the changes. FDA officials told us that such a direct comparison is not possible now, because appropriate pre-1990 vaccine samples no longer exist.

## Studies Suggest Possible Changes to the Anthrax Vaccine After the 1990 Manufacturing Changes

Because it is not now possible to definitively resolve the question of whether the anthrax vaccine produced after the filter changes is the same as that produced before the changes (a demonstration that is normally required in a license amendment application), we have reviewed other studies to see if evidence suggests that the question may need to be further examined. We have found two types of such evidence.

First, in an unpublished study performed in 1990, the Department of Defense (DOD) found up to a hundredfold increase in the protective antigen levels in lots produced after the filter change that year.[11] (Anthrax toxin is composed of protective antigen, lethal factor, and edema factor. The individual toxin components are not toxic. A protective antigen and lethal factor combination produces lethality, and a combination of protective antigen and edema factor cause swelling.)

In a subsequent article published in 1994, DOD researchers, referencing the earlier study, hypothesized that the filter change altered the composition of the vaccine by increasing the level of protective antigen in the finished product.[12] According to the authors of this article, when DOD questioned the Michigan facility about this increase in 1990, the responsible Michigan facility official attributed it to the change in the filter from ceramic to nylon.

[11] J.W. Ezell and T. Abshire, "In Vitro Analysis of Michigan Department of Public Health Human Anthrax Vaccine", U.S. Army Medical Research Institute of Infectious Diseases, Bacteriology Division, Fort Detrick, MD, Oct. 25, 1990. This unpublished study applied a then-new methodology to measure protective antigen that had not been separately validated at the time but is widely used today, and Dr. Ezell told us that the results should be interpreted cautiously as a result. We have had the study reviewed by two experts in anthrax vaccine issues who did not see any evident reasons to question the study methodology. We believe at best, however, it is an indicator that protective antigen levels may have changed after the filter changes. Since it cannot be replicated, it is the only evidence available on this point.

[12] B.E. Ivens and others, "Efficacy of a Standard Human Anthrax Vaccine Against *Bacillus anthracis* Spore Challenge in Guinea Pigs," *Vaccine*, vol. 12 (1994), pp. 872-874.

There are no studies to show what the effect of a significant increase in protective antigen may be on safety or efficacy of the vaccine. However, because the tests that could have demonstrated that the product was not changed in a material way in the context of a timely license amendment application were not done, and cannot now be done, there is potential merit in evaluating the findings of the 1990 DOD study further. We discussed the DOD study further with FDA officials on October 15, 2001, and they told us that they had not evaluated the study because they did not have it. At their request, we have provided the study to them.[13]

Second, we have reported several times in earlier work that, before 1990, anthrax vaccine was used by a small number of at-risk individuals (for example, wool mill workers), and FDA did not have any system to report adverse reactions associated with drugs and vaccines. Safety data, as reported in the product insert, were limited to the information from studies done in the 1960s, long before the fermenter and filter changes discussed here. Published and unpublished data on anthrax vaccine use during the Gulf War and since 1998 show a significantly greater incidence of both local and systemic adverse reactions compared with rates reported in the product insert. For example, the product insert says that the following should be expected: (1) 30 percent of recipients should experience a mild local reaction; (2) 4 percent should experience a moderate local reaction; and (3) 0.2 percent should experience systemic reactions characterized by malaise and lassitude with chills and fever reported in only a few cases. This indicates that some reaction should be experienced by a total of 34.2 percent of recipients. By comparison, in a survey we conducted in calendar year 2000, 85 percent of National Guard and reserve forces in our survey who were given the anthrax vaccine reported some reactions, with local reactions experienced by 76.2 percent of recipients and systemic reactions experienced by 23.8 percent. Chills and fever were reported by between 9 and 11 percent of our surveyed

---

[13] Because we had earlier discussed this study with both DOD and BioPort, we had assumed that one or both of them had referred the information to FDA. We had also asked FDA about the study in December 2000 but they did not request a copy from us at that time.

vaccine recipients.[14] These results are consistent with unpublished DOD studies and other published epidemiological work we are aware of.[15]

Because there are no data to evaluate the effect of the filter change on the characteristics of the vaccine product, it is difficult to determine whether these greater levels of adverse reactions could be related to changes in the vaccine associated with the filter changes. Ceramic filters (used before 1990) absorb proteins more than nylon ones, and the change to nylon filters in 1990 could theoretically have resulted not only in more protective antigen coming through but also other proteins. The end-product and in-process tests that BioPort submitted to FDA in 2001 in support of the filter changes may lack the capability to evaluate this possibility. Additional biochemical tests would have been required. For example, a filter change could have allowed more edema factor to pass through. The Michigan facility did not routinely test for edema factor in the product. We note that, since 1997, United Kingdom (U.K.) regulations have required the anthrax vaccine produced by the U.K. Center for Applied Microbiology and Researchto be tested for both protective antigen and edema factor. [16]

## Observations

General public health vaccines are produced according to cGMP and are in constant, routine use worldwide. This use permits real-time monitoring of whether the vaccines are performing properly. In contrast, bio-defense vaccines have no such ongoing reality check because of the absence of natural disease and relatively limited use. Thus, only in emergency situations are bio-defense vaccines subjected to the evaluations that public health vaccines undergo all the time. Accordingly, the stringent application of cGMP by FDA in its approval of the resumption of vaccine manufacture at BioPort, as well as subsequent monitoring of the manufacturing process, is vital to ensure that vaccines produced are safe, pure, and of high quality.

---

[14] The full results of our survey will be reported in the near future.

[15] We reported on the results of several DOD studies in *Anthrax Vaccine: Safety and Efficacy Issues* (GAO/T-NSIAD-00-48, Oct. 12, 1999.) See also Lea Steele, "Prevalence and Patterns of Gulf War Illness in Kansas Veterans: Association of Symptoms with Characteristics of Person, Place, and Time of Military Service." *American Journal of Epidemiology*, Vol. 152, No. 10, 2000, pp. 992-1002.

[16] The Center for Applied Microbiology and Research is the manufacturer of the U.K.'s only licensed anthrax vaccine.

In view of the increasing importance that will be given to the anthrax vaccine in the current environment and whether or not the anthrax vaccine is approved for production in the near future, it is important to ensure that studies continue to evaluate the vaccine's safety and efficacy, particularly with respect to the effect of higher levels of protective antigen and possibly other proteins. If FDA reinstates BioPort's license to manufacture and distribute vaccine, such studies would be strengthened by the implementation, by FDA or DOD, or both of an aggressive active surveillance program to ensure the early identification and analysis of adverse reactions.

Mr. Chairman, this concludes my statement. I will be happy to answer any questions you or Members of this Subcommittee may have.

## Contacts and Acknowledgments

For further questions regarding this testimony, please contact Nancy Kingsbury, Ph.D., at (202) 512-2700. Other individuals making key contributions to this testimony include Sushil K. Sharma, Ph.D., DrPH; Jack Melling, Ph.D.; George Bogart; and David Gootnick, M.D.

# Appendix I: Scope and Methodology

To conduct our work, we reviewed documents provided to us by FDA, DOD, and the Michigan facility/BioPort Corporation pertaining to the anthrax vaccine. In addition, we reviewed published and unpublished scientific reports on anthrax vaccine and on the safety and efficacy of the vaccine. In addition, we interviewed officials of FDA, DOD, the Michigan facility/BioPort, and experts in anthrax vaccine in U.S. and the U.K.

# Appendix II: Related GAO Products

*Gulf War Illnesses: Questions About the Presence of Squalene Antibodies in Veterans Can Be Resolved* (GAO/NSIAD-99-5, Mar. 29, 1999).

*Medical Readiness: Safety and Efficacy of the Anthrax Vaccine* (GAO/T-NSIAD-99-148, Apr. 29, 1999).

*Contract Management: Observations on DOD's Financial Relationship with the Anthrax Vaccine Manufacturer* (GAO/T-NSIAD-99-214, June 30, 1999).

*Medical Readiness: Issues Concerning the Anthrax Vaccine* (GAO/T-NSIAD-99-226, July 21, 1999).

*Anthrax Vaccine: Safety and Efficacy Issues* (GAO/T-NSIAD-00-48, Oct. 12, 1999).

*Medical Readiness: DOD Faces Challenges in Implementing Its Anthrax Vaccine Immunization Program* (GAO/-NSIAD-00-36, Oct. 1999).

*Medical Readiness: DOD continues to Face Challenges in Implementing Its Anthrax Vaccine Immunization Program* (GAO/T-NSIAD-00-157, Apr. 2000).

*Gulf War Illnesses: Questions About the Presence of Squalene Antibodies in Veterans Can Be Resolved* (GAO/NSIAD-99-5, March 29, 1999).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN DOE #1 <u>et al.</u>                                    *
                                                            *
                                                            *
                    Plaintiffs,                             *
                                                            *        Civil Action No. 06-2131 (EGS)
            vs.                                             *
                                                            *
ANDREW C. VON ESCHENBACH                                    *
COMMISSIONR                                                 *
FOOD AND DRUG ADMINISTRATION                                *
<u>et al.</u>                                               *
                    Defendants.                             *
*       *       *       *       *       *       *       *       *       *       *       *

**<u>ORDER</u>**

    Upon consideration of the defendants' Motion to Dismiss, and all related filings, it is

this _____ day of _____ 2007,

    ORDERED, that defendants' Motion is denied.

.

                                        _____
                                        UNITED STATED DISTRICT JUDGE