IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1, *et al.* | )<br>)<br>) |
| Plaintiffs | )<br>) |
| v. | )<br>) Case No. 1:06-cv-02131-EGS |
| ANDREW C. VON ESCHENBACH<br>COMMISSIONER<br>FOOD AND DRUG ADMINISTRATION, *et al.* | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

**DEFENDANTS' REPLY MEMORANDUM IN
SUPPORT OF THEIR MOTION TO DISMISS**

While much of Plaintiffs' Opposition Memorandum appears aimed at conjuring up irrelevant disputes such as whether the National Institutes for Health ("NIH") properly approved Anthrax Vaccine Adsorbed ("AVA") in 1970 (NIH did, but that issue is not before the Court here), Plaintiffs' Opposition offers no meaningful refutation of the key point currently before the Court – that the Food and Drug Administration's ("FDA") 2005 Order finding AVA to be safe and effective is a proper exercise of FDA's scientific expertise and is supported by the record.

As detailed in Defendants' Opening Memorandum, FDA is the agency that is charged by Congress with determining the safety and efficacy of drugs. Here, FDA has reviewed the scientific evidence. FDA has reviewed the Brachman study, a well-controlled study, and its conclusion that AVA is 92.5% effective against *Bacillus anthracis*, regardless of the route of exposure. FDA has properly reviewed other studies and reports of significant human experience and concluded that the data corroborate the findings of the Brachman study. FDA's review was appropriate and consistent with its regulations, and FDA's conclusion is fully explained and

supported by the record. As such, FDA's conclusion must be upheld.

## Argument

There is no dispute as to the proper standard of review in this case.[1] As Plaintiffs themselves state: "[B]ecause the action at issue involves an interpretation by the FDA of its own statute and regulations the Court must be especially deferential. The [FDA] decision need not even be one that this Court would independently reach, given the findings and the law; it need only be reasonable." Pls. Opp. at 13 (citing cases). Indeed, as Defendants discussed in their Opening Memorandum, the "arbitrary and capricious" standard that applies here is highly deferential to the agency, and there is "a presumption in favor of the validity of administrative action." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 216 (D.D.C. 1996) (quotation omitted). A reviewing court considers only whether "the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (an agency is entitled to a "high level of deference" when its regulatory determination rests on its "evaluation[] of scientific data

---

[1] Plaintiffs' discussion of whether this case presents a "matter of law" or a "merits" issue is both irrelevant and incorrect. *See* Pls. Opp. at 11-13. The issue before the Court – whether the FDA's 2005 Order is arbitrary or capricious – is both a question of law and a merits question. The D.C. Circuit has been crystal clear about the role that the District Court plays in reviewing agency action: "The district court sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the [agency's] study was factually flawed. The entire case on review is a question of law, and only a question of law." *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). This Court is thus reviewing the agency action based on the administrative record, in the same way that an appellate court would review a trial court decision based on the trial court record. That there are facts in the record – which is to be expected – does not mean that the review is not "a question of law." The issue is one of law because the reviewing court is not engaging in its own fact-finding, but is reviewing the agency's decision based on the pre-existing record.

within its area of expertise." (quotation omitted)).

Additionally, it is a fundamental principle of APA review that "the focal point for judicial review should be the administrative record already in existence." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Thus, the extra-record materials submitted by Plaintiffs (which, in any case, have little, if any, relevance to Plaintiffs' arguments) should be disregarded. *See, e.g., Berlex Labs., Inc. v. FDA*, 942 F. Supp. 19, 23 (D.D.C. 1996) (refusing to consider extra-record affidavits submitted by plaintiff); *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 177 (D.D.C. 2000) (same).

In this case, it is clear that FDA considered the relevant factors and properly utilized its substantial scientific expertise, and that there has been no clear error of judgment. FDA's Order should thus be upheld.

**I.    FDA'S DETERMINATION THAT AVA IS EFFECTIVE AGAINST ANTHRAX REGARDLESS OF THE ROUTE OF EXPOSURE IS NOT ARBITRARY, CAPRICIOUS, OR AN ABUSE OF DISCRETION**

**A.    FDA's Scientific Judgments and Scientific Determinations Regarding Relevant Data Are Not Arbitrary, Capricious, or an Abuse of Discretion**

A determination regarding a drug's effectiveness requires complex scientific judgments about the magnitude and quality of scientific evidence and the proper manner in which to evaluate this evidence,[2] and these complex judgments are at the heart of FDA's expertise. *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 220 (D.D.C. 1996); *see also Ethicon, Inc. v. FDA*, 762 F. Supp. 382, 388 (D.D.C. 1991) (FDA's scientific evaluation of the relevant data is

---

[2] *E.g.*, 37 Fed. Reg. 16,679 (Aug. 18, 1972) (FDA noting the "unique problems involved in applying the requirement of 'substantial evidence of effectiveness' to biological products under the [FDCA]," and that standards and methodologies for particular classes of products will "tak[e] into account all of the circumstances involved").

entitled to substantial deference).  As discussed in Defendants' Opening Memorandum, it is clear that FDA made those complex scientific judgments based on a considered review of the record.

FDA's determination that AVA is effective was based on a review of the Brachman study[3] and other, corroborating data.[4]  Plaintiffs level two attacks on the Brachman study.  Their first attack, contending that the Brachman study was not a well-controlled clinical study, is belied by the record.  Their second attack questions not the methodology of the Brachman study, but the statistical analysis of the study's results.  This latter attack attempts to obscure the issue that was before the FDA, and ultimately fails because the FDA has reasonably and properly applied its scientific judgment in determining the appropriate statistical analysis to use, and that statistical analysis demonstrates AVA's effectiveness against *Bacillus anthracis*.

Plaintiffs also criticize FDA for considering additional data that corroborates the Brachman study's conclusion that AVA is effective.  Plaintiffs' criticisms are baseless, as FDA's consideration of this data was proper.

### 1.     The Brachman Study was a Well-Controlled Study

As noted in Defendants' Opening Memorandum, FDA found the Brachman study to be "an adequate and well-controlled clinical study" that evaluated "the effectiveness of the anthrax vaccine." 70 Fed. Reg. at 75,182 (FDA Order).  This is not, as Plaintiffs suggest, "a simple

---

[3] The Brachman study is discussed at greater length at pages 12-13 and 27-29 of Defendants' Opening Memorandum.

[4] Plaintiffs' statement that the Centers for Disease Control ("CDC") open label study did not establish efficacy is a red herring.  *See* Pls. Opp. at 10.  FDA has never claimed that this CDC study established efficacy.  The CDC open label study was a *safety* study and it demonstrated that AVA is safe, *see* Defs. Opening Mem. at 19 n.16, a conclusion that Plaintiffs have never challenged.

declaration." Pls. Opp. at 14. Rather, this conclusion represents the scientific judgment, exercised in a formal administrative proceeding, of the agency that Congress has entrusted to make these scientific judgments. *See Doe v. Rumsfeld*, 297 F. Supp. 2d 119, 133 (D.D.C. 2003). ("FDA [is] the only agency that this Court could properly defer to in determining AVA's status"). And, it is a scientific judgment that is clearly reasonable and supported by the record.

The Brachman study involved 1,249 workers in four textile mills in the northeastern United States processing raw imported goat hair. *See* AR 3732-33 (04AR, Vol. 13). As the Brachman study noted, "[t]he necessary requirements of a well defined, exposed, susceptible population among whom cases of anthrax were reported with some regularity could only be met, in this country, in an industrial area" containing certain types of textile businesses. *See id.* at 3732. The Brachman study appropriately compared a vaccinated group against a control group which received placebo. *See id.* at 3734 (Table 2), 3736 (Table 4). During the trial, twenty-six cases of anthrax were observed. 70 Fed. Reg. at 75,183. Comparing anthrax cases between the completely inoculated placebo and vaccine groups, Brachman, *et al.*, calculated the vaccine efficacy at 92.5 percent. *Id.*

The fact that the Brachman study was a controlled study that compared results in a vaccine-inoculated group with results in a placebo control group has been noted in numerous reviews over the years and cannot seriously be disputed. *See* 70 Fed. Reg. at 75,182 (FDA Order); 50 Fed. Reg. at 51,058 (Panel) (Brachman study was "a placebo-controlled field trial"); AR 3326 (04AR, Vol. 12) (Congressionally directed Institute of Medicine study) (Brachman study was "a randomized controlled field study").

The only support Plaintiffs muster for their contention that the Brachman study was not a

5

well-controlled study are cites to 1969 NIH documents that have nothing to do with the Brachman study. Pls. Opp. at 14 (citing AR 3629, 3630 (04AR, Vol. 13)). These documents refer to entirely different, non-controlled, epidemiological data, such as the so-called "Talladega" data that is discussed elsewhere. *See, e.g.*, AR 3634 (04AR, Vol. 13) ("The lack of cases of anthrax in an uncontrolled population of approximately 600 persons in the Talladega mill can hardly be accepted as scientific evidence for the efficacy of the vaccine."). Indeed, the two documents cited by Plaintiffs nowhere mention the Brachman study, and the references to the lack of controlled data cannot refer to the Brachman study. Indeed, it is quite clear that the Brachman study was a controlled study, as it compared a fully vaccinated group with a placebo group (the latter being the "control" group). *Cf. Holland-Rantos Co. v. United States Dep't of Health, Educ. & Welfare*, 587 F.2d 1173, 1174 (D.C. Cir. 1978) ("The point of a control is to provide a basis of comparison from which the action of an experimental agency may be measured.").

The reason that these documents do not discuss the Brachman study has nothing to do with any perceived flaw in the Brachman study; it is because these documents deal solely with data generated using then-recently manufactured lots of the vaccine (such the uncontrolled Talladega data and other uncontrolled studies that are listed at AR 3607-16 (04AR, Vol. 13)). As another contemporary governmental document states:

> There have been no controlled evaluation studies with the Michigan anthrax product *as was done by Dr. Philip Brachman* using the Merck, Sharp and Dohme product. Indirect evidence of the protection afforded by the Michigan product can be inferred from our experience with immunized populations in several goat hair processing-plants. The textile mill in Talladega, Alabama employs approximately 600 people, and the goat hair is known to be contaminated by laboratory examinations. From past experience, Dr. Brachman stated that in an

>unimmunized population of 600, up to 10 cases of anthrax a year could be expected. There have been no reported cases of anthrax from the Talladega processing plant during the period in which the Michigan Anthrax Protective Antigen has been used.

AR 1375 (04AR, Vol. 6) (letter from CDC Laboratory Division Director to NIH Division of Biologics Standards Director) (emphasis supplied);[5] *see also* AR 3635 (04AR, Vol. 13) ("The earlier study by Dr. Brachman which shows good protective activity was performed using the Merck, Sharp & Dohme product.  This latter product [the one then under review] was prepared by a different method of manufacture . . . .").  Thus it is clear that the Brachman study was always considered to be a controlled study (conducted with an earlier version of the vaccine) that demonstrated "good protective activity" (AR 3635), and that the references to uncontrolled data are to later data (such as Talladega) where there was no control/placebo group.

The documents cited by Plaintiffs thus provide no support for their contention that the Brachman study was not a well-controlled clinical study.  FDA's scientific conclusion that the Brachman study was a well-controlled clinical study is reasonable, based on the record, and should be affirmed.

---

[5] As discussed at pages 32-33 of Defendants' Opening Memorandum, there have been three versions of AVA.  *See* 70 Fed. Reg. at 75,182 (Order)   The original version is known as DoD vaccine.  The second version is known as the Merck Sharp & Dohme vaccine, or DoD/MSD vaccine.  The third and current version, and the version that NIH was evaluating in the circa 1969 documents, is known as the Michigan Department of Public Health vaccine, or DoD/MDPH/AVA vaccine.

A number of governmental documents from the circa 1969 time period state that the Brachman study used the DoD/MSD vaccine when, in fact, the Brachman study used the DoD vaccine.  The relevant point, however, is that these documents are discussing data generated from the DoD/MDPH/AVA vaccine (referred to in this document as "the Michigan product") and they are thus not including the Brachman study which was conducted using an earlier version of the vaccine.  FDA's conclusion that these versions of the vaccine are comparable is discussed, *infra*, at Part II.B.

### 2. The Brachman Study Supports FDA's Finding that AVA is Effective

Plaintiffs' references to "contradictory" conclusions and "modern statistical analysis" are, at best, misleading, and they obfuscate the scientific issue that was before the FDA. There is no dispute over the mathematical accuracy of the statistical analyses that have been done, and there is no way in which "modern" statistical techniques alter these analyses. The dispute is over which of two different possible methods of statistical analysis is warranted by the scientific evidence. As discussed below, FDA used its scientific expertise to determine that the appropriate statistical analysis looked to whether AVA had been shown to be effective against anthrax, regardless of the method of exposure, and in doing so, made the type of judgment that FDA regularly makes in its evaluations of drugs, devices, and biological products.

As noted, the Brachman study was a well-controlled, clinical study in which a population of fully vaccinated individuals was compared with a control group of individuals who had been given placebo. *See* AR 3734 (Table 2), 3736 (Table 4) (AR04, Vol. 13). The researchers compared the incidence of anthrax disease in the inoculated group with the incidence of anthrax disease in the control group. *Id.* at 3736-37. This analysis resulted in a statistically significant finding that AVA is 92.5% effective against anthrax. *Id.* at 3737. It cannot be disputed that this is the correct statistical analysis if one concludes that contraction of anthrax disease is the result to be tested for.

A different statistical analysis is also possible. If one presumes that cutaneous and inhalation anthrax are different outcomes and should be tested for separately (as Plaintiffs do), one would conduct two separate statistical analyses, one for cutaneously contracted anthrax and one for anthrax contracted through inhalation. If one analyzes the Brachman study data in this

manner, one will conclude that, with regard to inhalation anthrax, although there were two instances of disease in the placebo control group and none in the AVA vaccinated group, there were not enough instances to make any analysis statistically significant.[6]

The question that FDA faced in analyzing the Brachman study data was which of these statistical analyses was warranted by the scientific understanding of anthrax. Put a different way, the FDA needed to determine whether the manner in which the vaccine counteracts *Bacillus anthracis* is the same regardless of the route of exposure – in which case the Brachman study demonstration of efficacy against anthrax should be accepted – or whether there is some difference in the manner in which the vaccine operates in relation to bacteria that has entered the body through the lungs versus bacteria that has entered the body through the skin – in which case separate and distinct studies would have to address each hypothesis independently. *Cf. Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 220 (D.D.C. 1996) ("The parties' dispute is fundamentally a scientific one over which the court lacks expertise and over which the FDA is the expert.").

FDA, applying its scientific expertise, concluded that the proper outcome to test for was anthrax, and not anthrax contracted through a particular route of exposure. This is because FDA determined that the bacteria produces the same toxins, regardless of the route of exposure, and

---

[6] The fact that a statistical analysis that tested for the outcome of anthrax contracted via inhalation would not be statistically significant is noted throughout the record. This is the supposed "inconsistency" that Plaintiffs reference. In fact, as stated above, there is no inconsistency. There are two possible statistical analyses, and it was FDA's task to determine which of the two is warranted by the science.

the vaccine acts against those toxins in the same manner, regardless of the route of exposure:

> With regard to the known pathophysiology of anthrax, the signs and symptoms of disease arise due to the production of toxins by anthrax bacteria growing within the infected individual. *The toxins produced by anthrax bacteria do not vary based on the route of exposure.* The antibodies produced in response to vaccination contribute to the protection of the vaccinated individual by neutralizing the activities of those toxins. Thus, *AVA elicits an antibody response to disrupt the cytotoxic effects of toxins produced by anthrax bacteria, regardless of the route of infection*.

70 Fed. Reg., at 75,187 (Order) (emphases supplied); *accord id.* ("The Brachman study showed the anthrax vaccine to be effective in preventing anthrax disease regardless of route of exposure. This finding is consistent with our current knowledge of the critical role played by anthrax toxins in the pathophysiology of cutaneous and inhalation anthrax and how antibodies generated in response to vaccination with AVA disrupt cytoxic activities of those toxins."). This scientific understanding is the same reason that Dr. Brachman designed his trial and conducted his analysis without regard to the route of exposure in the first place: "In analyzing the data we felt that since the pathophysiology of human anthrax is the same whether the organisms gain entrance through the skin or through the lungs, and therefore, it was appropriate to combine the data from the field trial." AR 11355 (07AR, Vol. I, Part. 38); *accord id.* at 11355-56 ("The pathophysiology of anthrax is the result of a toxin produced by the organism causing local or systemic reactions regardless of the route by which the organisms entered the body."). FDA's scientific conclusion is also consistent with the pre-existing AVA labeling, *see* AR 639 (04AR, Vol. 3) (describing that, regardless of how *B. anthracis* enters the body, in order for it to produce active toxins, protective antigen binds to cellular receptors which then bind with either edema factor or lethal factor), and with the separately-reached conclusions of the Congressionally-mandated

independent Institute of Medicine Study.[7]

Plaintiffs assert – without any support or rationale – that the differing fatality rates for cutaneous and inhalation contracted cases of anthrax signifies that "anthrax bacteria operates differently depending on route of exposure." Pls. Opp. at 7.  This statement is irrelevant to FDA's conclusion that the vaccine is effective regardless of the route of exposure.  The differing fatality rates have to do with the generally systemic (inhalation) or local (cutaneous) activity of the bacteria and the toxins they produce (*see, e.g.*, AR 3363-64 (04AR, Vol. 12) (IOM Report)), and not the manner in which the antibodies in a vaccinated individual will protect that individual from anthrax bacteria and toxins.  Plaintiffs can point to nothing to refute FDA's conclusion that "AVA elicits an antibody response to disrupt the cytotoxic effects of toxins produced by anthrax bacteria, regardless of the route of infection." 70 Fed. Reg. at 75, 187 (Order).  Therefore, FDA's scientific determination that the Brachman study supports a conclusion that AVA is effective against anthrax regardless of the route of exposure must be upheld. *See Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996) ("FDA possesses the requisite know-how to conduct such analyses, by sifting through the scientific evidence to determine the most accurate and up-to-date information regarding a particular drug, and how those data affect human usage.").

---

[7] According to the Institute of Medicine ("IOM") Committee, once inside the body, and regardless of the route of exposure, the virulence of *Bacillus anthracis* derives from three proteins — protective antigen (PA), edema factor (EF), and lethal factor (LF) — and an antiphagocytic capsule. *See* AR 3366-67 (IOM) (04AR, Vol. 12).  The proteins are not toxic by themselves; rather, to produce active toxins, PA must "bind to cellular receptors and then bind with either EF or LF." *Id.* at 3367.  The "resulting edema toxin or lethal toxin can then enter the cell," where "the toxins lead to damage." *Id.*  The IOM Committee concluded that "the available data indicate that immunity to anthrax is associated with the presence of antibodies to PA, such as those stimulated by the anthrax vaccine." *Id.* at 3396.

### 3.  FDA Properly Considered Additional Data Regarding the Effectiveness of AVA

As Plaintiffs concede (Pls. Opp. at 16), a clinical investigation such as the Brachman study may be "corroborated by partially controlled or uncontrolled studies, documented clinical studies by qualified experts, and reports of significant human experience during marketing." 21 C.F.R. § 601.25(d)(2). Pursuant to this regulation, FDA properly considered additional data regarding the effectiveness of AVA. An agency's application of its own regulations merits substantial deference from reviewing courts. *E.g.*, *DSE, Inc. v. United States*, 169 F.3d 21, 27 (D.C. Cir. 1999). Indeed, courts afford "great deference to an agency's interpretation of its own regulation: under well-recognized precedent, [a court] can reject the [agency's] interpretation only if it is plainly erroneous or inconsistent with the regulation." *Mistick PBT v. Chao*, 440 F.3d 503, 511 (D.C. Cir. 2006) (quotation omitted); *accord Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Data considered by FDA pursuant to 21 C.F.R. § 601.25(d)(2), included the CDC observational data which, in thirteen years of observation, identified 27 cases of anthrax, none of which were in fully vaccinated individuals. 70 Fed. Reg. at 75,183 (Order) (CDC observational data "lend further support to the effectiveness" of AVA (quoting 50 Fed. Reg. at 51,058 (Panel))); *see also* 50 Fed. Reg. at 51,058 (Panel summary of CDC data). These data were properly considered as "reports of significant human experience during marketing." 21 C.F.R. § 601.25(d)(2). This comprehensive 13 year observation by CDC is not, as Plaintiffs contend, "[i]solated case reports" or "random experience." *Id.* The CDC observational data were thus properly considered by FDA.

Additionally, while FDA's review was "independent of the IOM's review," FDA found that "certain studies in humans and animal models [cited in the IOM Report] support the conclusion that AVA is effective against *B. anthracis* strains that are dependent upon the anthrax toxin as a mechanism of virulence, regardless of the route of exposure." 70 Fed. Reg. at 75,183; *see also* AR 626 (04AR, Vol. 3) (Fellows) (animal study); AR 629 (04AR, Vol. 3) (Ivins, *Salisbury*) (animal study). These are scientific studies, and not "[i]solated case reports, random experience, [or] reports lacking the details which permit scientific evaluation," and thus FDA acted properly in considering them. 21 C.F.R. § 601.25(d)(2).

### B.   FDA's Scientific Determination that the Current Version of AVA Is Comparable to Earlier Versions of AVA Is Not Arbitrary, Capricious, or an Abuse of Discretion

It is undisputed that when FDA licences a biological product by approving a manufacturer's application, FDA may base its approval on studies done with an earlier version of the product, if FDA, in its scientific judgment, finds that the two versions are comparable in terms of clinical safety and effectiveness. *See* Pl. Opp. at 18-19 (discussing elements of FDA's comparability policy). It is also undisputed that FDA found comparability with regard to the versions of AVA at issue here. *See* 70 Fed. Reg. at 75,184 (Order).

Plaintiffs' Complaint made a single challenge to FDA's finding that the two versions of AVA were comparable – a contention that "the FDA's 'comparability policy' does not apply" because the versions of AVA were not made by a "single manufacturer." Compl. ¶ 90. This contention is legally baseless and was thoroughly refuted in Defendants' Opening Memorandum. *See* Defs. Opening Mem. at 33-34. In response, Plaintiffs completely drop this discredited argument, and present an entirely new, and equally unavailing, argument. *See* Pls. Opp. at 17-21.

13

Plaintiffs now contend that FDA's comparability determination is "a simple declaration filed in the midst of litigation." *Id.* at 21.  Plaintiffs' unsupported assertion is belied by the facts and the record.

FDA's comparability determination is a scientific judgment that is reflected in, and supported by, the administrative record.  As the Order states, FDA "reviewed the historical development of AVA" and found that "clinical data comparing the safety and immunogenicity of DoD/MDPH/AVA vaccine with DoD vaccine . . . reveal[ed] that the serological responses to DoD/MDPH/AVA vaccine and DoD vaccine were similar with respect to peak antibody response and seropositivity."  70 Fed. Reg. at 75,184 (Order).  The clinical data demonstrating similar peak antibody response and seropositivity in humans is in the record at pages 3698 through 3705 (AR04, Vol. 13).  *See also* AR 3994-95 (AR04, Vol. 14) (assays comparing different versions of the vaccine in guinea pigs).  FDA thus reviewed the clinical data and found that the two versions of the vaccine "are comparable in their ability to protect test animals . . . and [their ability] to elicit similar immune responses in humans," allowing the data relating to the original version to be used to approve the more advanced version.  70 Fed. Reg. at 75,184 (Order) ("[A]fter a manufacturing change, a manufacturer may use data gathered with a previous version of its product to support the effectiveness of a comparable version of the same product.").

FDA's conclusion in the Order is consistent with the agency's prior findings.  For example, in 2002, FDA explained:

> For the anthrax vaccine, the DOD or precursor vaccine [which was used in the Brachman study] is comparable in terms of formulation and manufacturing process to the BioPort vaccine [the current vaccine version, also known as the DoD/MDPH/AVA vaccine].  There are some differences in formulation and manufacturing process between the DOD vaccine and the BioPort vaccine, but the

> preclinical and clinical data described below provide assurance that the
> differences do not result in any meaningful difference in safety or effectiveness.
> . . . .
> The comparability of BioPort's anthrax vaccine to the DOD vaccine has been
> verified through potency data that demonstrate the ability of all three vaccines to
> protect guinea pigs and rabbits against challenge with virulent *Bacillus anthracis*
> spores. In addition, there are data comparing the safety and immunogenicity of
> BioPort's anthrax vaccine with the DOD vaccine. These data, while limited in the
> number of vaccinees and samples evaluated, reveal that the serological responses
> to the BioPort vaccine and the DOD vaccine were similar with respect to peak
> antibody response and serum conversion. . . . All of these data taken together
> demonstrate that BioPort's anthrax vaccine is safe and effective and is comparable
> to the vaccine used in the Brachman study.

AR 1383-84 (04AR, Vol. 5).

FDA's conclusion that the relevant versions of AVA are comparable is a scientific determination confirmed in the Order, based on a review of scientific data, consistent with the agency's earlier position, and supported by the record. As such, it should be upheld.

## II.     PLAINTIFFS HAVE NOT ESTABLISHED STANDING TO CHALLENGE ANY ALLEGEDLY INCONSISTENT VACCINATION SCHEDULE

Other than a section heading, Plaintiffs' Opposition does not even contest Defendants' argument that Plaintiffs have not alleged any facts sufficient to support standing to challenge any allegedly inconsistent vaccination schedule. Instead, Plaintiffs merely assert that they "did allege . . . that DoD had approved a vaccination schedule inconsistent with product instructions and under 'notice pleading,' a court on a motion to dismiss must presume[e] [sic] that general allegations embrace those specific facts that are necessary to support the claim." (Pls. Opp. at 22 (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 957 (D.C. Cir. 2004) (Williams, J., dissenting)) (citation omitted)). Plaintiffs' statement misses the point entirely.

15

The issue is not whether Plaintiffs have alleged facts that might support the existence of a *claim*. The issue is whether Plaintiffs have alleged facts that could demonstrate that *they* have *standing* to bring such a claim. To withstand a motion to dismiss for lack of standing, a plaintiff has the burden to "clearly" allege "facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Yet, Plaintiffs have alleged no facts that support even an inference that *they* are being subjected to the allegedly inconsistent vaccination schedule, *see* Defs. Opening Mem. Part II, a point that Plaintiffs' Opposition Memorandum cannot deny, *see* Pls. Opp. at 21-22. Thus, even if they otherwise have stated a claim, they certainly have not alleged facts to suggest that they are the proper people to bring that claim.

Finally, it is noteworthy that Plaintiffs have relied not on a majority opinion of the D.C. Circuit, but on a *dissent*. *See Nat'l Wrestling Coaches*, 366 F.3d at 957 (Williams, J., *dissenting*). The *majority* opinion in that case affirmed the granting of a motion to dismiss for failure to adequately allege facts that would support standing, finding that "mere 'unadorned speculation . . . will not suffice to invoke the federal judicial power.'" *Id.* at 938 (quoting *Simon v. E. Ky. Welfare Rights Org'*, 426 U.S. 26, 44 (1976)).

In this case, Plaintiffs have all of the facts at their disposal, yet they still are unable to even allege *any* facts that would demonstrate that *they* have standing to challenge the allegedly inconsistent vaccination schedule. Count IV should therefore be dismissed.

### III. PLAINTIFFS' ATTEMPT TO SECURE RELIEF ON BEHALF OF CIVILIAN DoD EMPLOYEES AND DoD CONTRACTORS IS BASELESS

As Plaintiffs do not dispute, Plaintiffs' request for relief in this case is based on 10 U.S.C. § 1107. And, Plaintiffs cannot and do not dispute that that statute provides rights only to "members of the armed forces." 10 U.S.C. § 1107; Pls. Opp. at 22. Faced with a clear deficiency in their case as it relates to civilian employees and contractors, Plaintiffs merely state, without support, that civilians "*should have* an even greater protection under 10 U.S.C. § 1107 to object to inoculation." Pls. Opp. at 23 (emphasis supplied). Whether or not civilians employees have similar rights under other statutes or "should have" such a right under Section 1107, the statutory text makes it clear that they do not have a Section 1107 claim, which is all Plaintiffs have asserted. *See United States v. Noland*, 517 U.S. 535, 541 n.3 (1996) (Respondent "may or may not have a valid policy argument, but it is up to Congress, not this Court, to revise the [statutory] determination if it so chooses."); *Commissioner v. Lundy*, 516 U.S. 235, 252 (1996) ("We are bound by the language of the statute as it is written, and even if the rule [respondent] advocates might accord with good policy, we are not at liberty to rewrite the statute because we might deem its effects susceptible of improvement." (quotation and alterations omitted).[8] This case brings claims only based on Section 1107, and thus it may be maintained (if at all) only on behalf of those persons covered by that Section, namely "members of the armed forces."

---

[8] In addition to the obvious textual deficiency to Plaintiffs' argument, their public policy rationale also fails. Members of the armed forces serve for particular terms and cannot terminate their service at will. They are therefore not similarly situated to civilian employees and contractors who continue their relationship with DoD either at will and/or in accordance with contracts that they voluntarily entered into. Because members of the armed forces have substantially less rights than civilians, there is a basis for Congress to have singled them out for protection in Section 1107.

## **CONCLUSION**

For the reasons stated above and the reasons stated in Defendants' Opening Memorandum, the Court should grant Defendants' Motion to Dismiss.

May 4, 2007                                                   Respectfully submitted,

                                                              PETER D. KEISLER
                                                              Assistant Attorney General

                                                              JEFFREY A. TAYLOR
                                                              United States Attorney

                                                              VINCENT M. GARVEY
                                                              Deputy Branch Director


                                                               _/s/ Jeffrey M. Smith_
                                                              JEFFREY M. SMITH (Bar No. 467936)
                                                              Trial Attorney
                                                              United States Department of Justice
                                                              20 Massachusetts Ave., N.W., Room 7144
                                                              Washington, D.C. 20001
                                                              Tel: (202) 514-5751
                                                              Fax: (202) 616-8202

                                                              *Counsel for Defendants*